IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOAN BERENSON and DAVID BERENSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FINANCIAL SERVICES LLC, FIDELITY BROKERAGE SERVICES LLC, and DOES 1-50, inclusive,<br><br>Defendants. | Civil Action No. 1:03 CV 02004 (RBW) |

**DEFENDANTS' MOTION TO DISMISS AND
FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 12(b)(6) and 56, defendants National Financial Services LLC and Fidelity Brokerage Services LLC (together, "Fidelity") move to dismiss the plaintiffs' Complaint in its entirety because Fidelity is entitled to judgment as a matter of law.

Pursuant to Local Rule 7(f), Fidelity requests an oral hearing on this motion.

       Respectfully submitted,

       NATIONAL FINANCIAL SERVICES LLC
       FIDELITY BROKERAGE SERVICES LLC
       By their attorneys,

       <u>/s/ Lawrence H. Martin</u>
       Lawrence H. Martin (D.C. Bar No. 476639)
       FOLEY HOAG LLP
       1747 Pennsylvania Ave., N.W.
       Washington, D.C. 20006-4604
       (202) 223-1200

       Nicholas C. Theodorou (Pro Hac Vice)
       John A. Shope (Pro Hac Vice)
       Kevin C. Conroy (Pro Hac Vice)
       William W. Fick (Pro Hac Vice)
       FOLEY HOAG LLP
       155 Seaport Boulevard
       Boston, MA 02210
       (617) 832-1000

Dated: November 7, 2003

17/507117.2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOAN BERENSON and DAVID
BERENSON, individually and on behalf of
all others similarly situated,

          Plaintiffs,

v.

NATIONAL FINANCIAL SERVICES LLC,
FIDELITY BROKERAGE SERVICES LLC,
and DOES 1-50, inclusive,

          Defendants.

Civil Action No. 1:03 CV 02004 (RBW)

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
PURSUANT TO LOCAL RULE 56**

Pursuant to LCvR 56, defendants National Financial Services LLC and Fidelity Brokerage Services LLC (together, "Fidelity") hereby submit the following Statement of Undisputed Facts in support of their Motion to Dismiss and for Summary Judgment.

**The Defendants**

1.     Defendants National Financial Services LLC ("NFS") and Fidelity Brokerage Services LLC ("FBS") are limited liability companies organized under the laws of the State of Delaware, each with principal place of business in Boston, Massachusetts.  Affidavit of Daniel Stickney ("Stickney Aff."), ¶ 3.

2.     NFS and FBS are subsidiaries of FMR Corp. and part of the Fidelity Investments family of companies.  Stickney Aff., ¶ 4.

3.     NFS and FBS are each a registered broker and dealer under the Securities Exchange Act and a member of the New York Stock Exchange, Inc. and various other national and regional stock exchanges.  Sitckney Aff., ¶ 5.

4. Neither NFS nor FBS is chartered by the Commonwealth of Massachusetts as a savings bank, cooperative bank, credit union or trust company; nor are they supervised by the Massachusetts Commissioner of Banks. Stickney Aff., ¶ 6.

5. Neither NFS nor FBS is chartered under federal law as a national bank, savings association, or credit union. Stickney Aff., ¶ 7.

**The Plaintiffs**

6. According to the website of a company with which he is affiliated, plaintiff David Berenson is the Chairman and co-founder of Comfidex Corp., a New York City based software company. He is the former CEO of TRV Imaging, a former national partner of Ernst & Young, a frequent commentator for national business publications, and a member of the Bar and a CPA in various jurisdictions. See http://www.comfidex.com/about.htm (visited November 6, 2003).

7. Plaintiffs Joan and David Berenson jointly opened a brokerage account with Fidelity in 1991. Stickney Aff., ¶ 8 & Ex. A (8/26/91 Application and Customer Agreement).

8. The Berensons maintain nine separate retail brokerage accounts with Fidelity including accounts in the name of two businesses, Berenson and Company International and Thunderbird Realty Ventures. The Berensons are classified as "premium" customers based on the asset level in their accounts. Stickney Aff., ¶ 9.

9. In completing and signing their application in 1991, the Berensons acknowledged that they had "read, understood, and agree to the terms set forth in the Customer Agreement." Stickney Aff., ¶ 8 & Ex. A (8/26/91 Application and Customer Agreement).

10. In accepting the Customer Agreement, the Berensons acknowledged that they had "received and read a copy of the Prospectus of the Transaction Fund selected by me, containing a more complete description of it and its operations" and that they "understand that all debit items,

such as checks, card charges, Securities Account purchases and electronic fund transfers, will be accumulated daily. . ." Id.

11. The Berensons have been joint subscribers to Fidelity's bill payment service since 1993. Stickney Aff., ¶ 10 & Ex. B (6/14/93 Bill Payment Application).

12. From 1991 to May 2001, the Berensons' Core Account, from which bill payment transactions were debited, was the Fidelity Daily Income Trust, a mutual fund. In May 2001, the Berensons began using the Fidelity Cash Reserves Money Market Fund, another mutual fund, as their Core Account. A Core Account is a money market mutual fund or cash account used by the customer, among other things, to purchase securities and to satisfy debits, such as bill payments. When the Berensons' money market mutual funds were debited to pay bills as they requested, mutual funds shares in their Core Account were redeemed to the extent necessary to satisfy the debit. Stickney Aff., ¶ 11.

**Fidelity's Bill Payment Service**

13. By 1986, Fidelity had established a bill payment service for its brokerage customers whereby a customer could order by telephone payments to creditors and other entities by debiting the customer's Core Account. The service is a convenience to investors that permits them to direct Fidelity to automatically make recurring payments (such as mortgage obligations or utility bills) or even one-time payments on their behalf. Affidavit of Camille Zaslau ("Zaslau Aff."), ¶ 3.

14. Fidelity's bill payment service works on a "good funds" business model. Specifically, in accordance with the Service Agreement, Fidelity debits payments from a customer's account on the date the customer specifies for the payment to be initiated in order to ensure that the customer has adequate funds in his or her account to make the payment.

Otherwise, Fidelity would assume the risk that a customer might withdraw funds in between requesting a payment and the payment reaching the payee. Zaslau Aff., ¶ 4.

15. Over time, Fidelity implemented additional methods to access the bill payment service, first via personal computer and modem and then via an Internet web site. Zaslau Aff., ¶ 5.

16. Currently, Fidelity customers who have registered for the BillPay service are able to arrange payments to creditors and other entities electronically using Fidelity's Internet website. Fidelity also permits customers to request assistance of telephone customer service representatives to modify BillPay information. Zaslau Aff., ¶ 6.

17. Fidelity and its vendor, CheckFree Corp., operate an automated process system that manages the BillPay service. Zaslau Aff., ¶ 7.

18. On either a recurring or non-recurring basis, the customer enters the necessary information on Fidelity's web site including the payee and the amount of the payment. Zaslau Aff., ¶ 8.

19. In accordance with Fidelity's written instructions, the customer also chooses a defined "Transaction Date." Zaslau Aff., ¶ 9.

20. On the Transaction Date selected by the customer, Fidelity's automated system (i) informs CheckFree that a payment is to be made; (ii) checks the customer's Core Account to ensure that the customer has adequate funds; and (iii) debits the customer's Core Account for the amount of the transaction. If the Core Account is a mutual fund, as it is for plaintiffs Joan and David Berenson, shares are redeemed in a sufficient amount to fund the debit. If the Core Account does not contain sufficient funds to support the bill payment, the customer's request is rejected. Zaslau Aff., ¶ 10.

21. At approximately 1:00 a.m. on the following morning, CheckFree determines whether the payee will accept payment electronically or by check. Zaslau Aff., ¶ 11. If payment is to be made electronically, CheckFree initiates the electronic payment that same day and settles with the payee thereafter. If payment is to be made by check, then Checkfree mails the payment the same day. Zaslau Aff., ¶ 12.

22. In the event that CheckFree cannot process the payment, Fidelity investigates the payment issue. If the issue cannot be resolved after 24 hours, there is no payment and Fidelity credits back the debit amount to the Customer's Core Account. Zaslau Aff., ¶ 13. The process described in the preceding five paragraphs is depicted in a graphic flow-chart attached to the Affidavit of Camille Zaslau as Exhibit A.

23. Because customers' Fidelity Core Accounts are debited as of the Transaction Date, because CheckFree must then determine whether the payee information it has received is correct, and because Fidelity must in turn supply CheckFree with the appropriate funds to make payments, it is not practicable to commence payment to the designated payees before the next day. Zaslau Aff., ¶ 15.

24. Fidelity guarantees its customers that the payee will be credited with payment within five business days; however, generally payees receive payments in a much shorter time. The five day cushion is needed to ensure that payments that are mailed reach their destination and the payee deposits the payment. Zaslau Aff., ¶ 16.

25. A customer who prefers to earn "interest" (or additional dividend income in the case of Core Accounts that are money market mutual funds) up until the time a payee actually receives payment may do so without using the BillPay service simply by writing checks on his or her Fidelity account. In that case, however, the customer must write and mail checks him- or

herself and assume the risk that the check will bounce if the account later contains insufficient funds. Zaslau Aff., ¶ 17.

**Fidelity's Disclosures**

26. Fidelity's relationship with BillPay customers is governed by the "global" Customer Agreement, the BillPay Service Agreement, and the Fidelity prospectus for the customer's "Core Account." A Core Account is a money market mutual fund or cash account in the customer's name that is used to receive and transfer funds and for other transactions. Affidavit of Anne Warren Fagan ("Fagan Aff."), ¶ 3 & Ex. A (current Customer Agreement); Ex. B (current BillPay Service Agreement); Ex. C (current prospectus for U.S. Government Reserves and Fidelity Cash Reserves Fund).

27. Fidelity provides customers with copies of the Customer Agreement and any pertinent prospectuses when they open their account. In addition, Fidelity provides customers with a copy of the BillPay Service Agreement when they enroll in the BillPay Service. All of these documents may be viewed on Fidelity's website. The BillPay Service Agreement in particular has been on Fidelity's website since at least 1998. When material changes are made to these documents, Fidelity notifies customers by mail or electronically. Fagan Aff., ¶ 4.

28. Fidelity agreements and prospectuses disclose that a BillPay customer's Core Account will be debited on the transaction date selected in advance by the customer, that the funds will be transferred to an account Fidelity maintains for this purpose, that it may take up to five days before the designated payee is credited with the funds paid from the separate Fidelity account, and that the customer will not earn dividend income on funds after they have been debited from his or her own account. Fagan Aff., ¶ 5.

29. In 1996, Fidelity developed a replacement for the Fidelity Bill Payment Service called Fidelity Interactive Bill Payment Service, which offered improved touch-tone telephone

access as well as an access option vial personal computer. In connection with this upgrade, customers were provided with Fidelity Interactive Bill Payment Service User's Guides and Disclosure Agreements. Fagan Aff., ¶ 6.

30. There were two versions of the Fidelity Interactive Bill Payment Service User's Guide distributed to customers, one for touch-tone telephone transactions and one for computer transactions. Both guides explained, in a section entitled "When and how payments are made":

> Shortly after 2:00 p.m. ET on the day you've schedule a payment transaction, we will deduct the payment amount you authorized from your Fidelity Ultra Service Account. We'll then send the funds to your payee by electronic funds transfer through the Automated Clearing House (ACH) or other funds transfer network. If your payee cannot accept electronic funds transfers, we will send a paper check.
>
> Because many payees do not yet accept electronic funds or they receive their electronic funds through a third party, it is important to allow the full five (5) business days for your payments to be received.

Fagan Aff., ¶ 7 & Ex. D (User's Guide for computer at 18) Ex. E (User's Guide for touch tone telephone at 4-5).

31. Likewise, there were two versions of the 1996 disclosure agreement, the Fidelity Interactive Bill Payment Service Software License and Disclosure Agreement for Personal Computer and the Fidelity Interactive Bill Payment Service Disclosure Agreement for Touch-Tone Telephone. Both Agreements provided, in a section entitled "Delivery of Your Payments":

> The date on which a payment is to be "initiated" is the date on which funds are to be deducted from your Account. The date is referred to in this Agreement as the "Transaction Date."
>
> After funds are withdrawn from your Account, we may remit your payments by mailing your Payee a check drawn on an account we maintain for this purpose, by electronic funds transfer, or by other means. Because of the time it takes to transmit your payment to your Payees, they generally will not receive payment on the Transaction Date. . .Therefore, in order to provide sufficient time

>for payments to be received by your Payees, the Transaction Date
>for each payment must be at least five (5) business days prior to
>the date your payment is due, excluding any applicable grace
>periods (the "Due Date").

Fagan Aff., ¶ 8 & Ex. F (Agreement for touch-tone telephone, Section 6); Ex. G (Agreement for computer, Section 7).

32. The "Fees" sections of the 1996 Agreements also provided: "The normal $5 monthly charge for Fidelity Interactive Bill Payment Service will be waived for the first six months after you enroll." Id., Ex. F (Agreement for touch tone telephon, Section 16); Ex. G (Agreement for computer, Section 17).

33. The 1996 version of the Fidelity Daily Income Trust Prospectus stated: "Shares will earn dividends through the date of redemption . . . " Fagan Aff., ¶ 9, Ex. H (1996 Prospectus at 23).

34. In November 1998, Fidelity prepared and sent three separate mailings for its bill payment customers: (i) a mailing for Premium customers such as the Berensons; (ii) a mailing for customers with more than $100,000 in their accounts; and (iii) a mailing for customers with less than $100,000 in their accounts. All three of the mailings announced that (i) the PC Software would be discontinued and that customers should now use the web and (ii) there would be a new payment structure. The letters directed the customer to "review the enclosed Fidelity BillPay Service Agreement for new terms and conditions." Fagan Aff., ¶ 10 & Ex. I (Premium mailing); Ex. J (over $100,000 mailing); Ex. K (under $100,000 mailing).

35. The November 1998 mailing to Premium Customers and customers with under $100,000 in their accounts stated: "Effective February 1999, the new Fidelity BillPay fee will be $9.95 per month. For customers with over $100,000 in assets with Fidelity, however, the monthly fee will be $4.95." Id., Ex. I; Ex. K.

36. The November 1998 mailing to customers with over $100,000 in their accounts stated: "Effective February 1999, the new Fidelity BillPay fee will be $4.95 per month. Based on your valued relationship with Fidelity as a customer with over $100,000 in assets, the BillPay fee will not be increasing. The new fee for all other bill payment customers will be increasing to $9.95." Id., Ex. J.

37. Section 8 of the Fidelity BillPay Service Agreement in the November 1998 mailings again disclosed the timing of debits from the customer's Core Account:

> The date on which a Non-Recurring Payment or a Recurring
> Payment is actually initiated (debited from your Fidelity Account)
> is the "Transaction Date."

Fagan Aff., ¶ 10 & Ex. L (Fidelity BillPay Service Agreement from November 1998 mailings).

38. Similarly, as disclosed previously, section 10 of the Fidelity Bill Pay Service Agreement in the November 1998 mailings stated:

> After we debit your Fidelity Account for the amount of a payment,
> we will remit your payment to the Payee by mailing the Payee a
> check drawn on an account we maintain for this purpose by
> electronic funds transfer, or by other means. Because of the time it
> takes to transmit a payment, a Payee generally will not receive
> payment on the Transaction Date regardless of whether the
> payment is a Same Day Payment, a Future Payment, or a
> Recurring Payment.

Id.

39. Section 12 of the Fidelity BillPay Service Agreement in the November 1998 mailings explained that in order to be eligible for Fidelity's on-time Payment Guarantee, in which Fidelity pledged to reimburse the customer's penalty if a payment is delivered late, the Transaction Date must be scheduled at least five business days prior to the actual due date. Id.

40. With regard to fees, section 17 of the Fidelity BillPay Service Agreement in the November 1998 mailings stated:

> You agree to pay a monthly fee for the service. The monthly fee is tiered and is based on the level of assets you hold at Fidelity. You will be charged $4.95 per month if you have over $100,000 in assets at Fidelity; otherwise, you will be charged $9.95 per month. We will determine your asset level at the end of each month. Your monthly fee for the following month may increase or decrease depending on your asset level at such time. For new users of the Service, the monthly fee will be waived for the first three (3) months following enrollment.

Id.

41. The 1998 version of the Fidelity Daily Income Trust stated: "Shares will earn dividends through the date of redemption . . ." Fagan Aff., ¶ 11 & Ex.M (1998 Prospectus at 24).

42. By November 1998 Fidelity had posted the Fidelity BillPay Service Agreement on the Fidelity Internet web site. A current version of the BillPay Service Agreement has been posted on the web site since that time. Today, every page on the Fidelity web site that deals with the BillPay service contains a link that the customer can click to access the BillPay Service Agreement. Fagan Aff., ¶ 12.

43. Fidelity records indicate that the Berensons are frequent users of the Fidelity website. Fagan Aff., ¶ 13.

44. In May 2000, Fidelity sent a letter to all BillPay customers, including the Berensons, noting that effective June 16, 2000, touch-tone phone service would be deactivated and that Fidelity web-based services would be enhanced in late June of that year. The letter included a buckslip that stated: "the Fidelity BillPay Service Agreement has been amended to reflect important changes outlined in this letter. Please visit fidelity.com/goto/billpayagree/ to read the new Service Agreement. Use of the Fidelity BillPay service on or after June 16, 2000 --

the effective date of these changes -- indicates your agreement with the modifications and amendments." Fagan Aff., ¶ 14 & Ex. N (May 2000 letter); Ex. O (May 2000 buckslip).

45. Before June 18, 2000, Fidelity implemented a notification of changes to the BillPay Service Agreement on Fidelity's Internet web site. Customers who used the BillPay web site had to click-through a pop-up window that stated: "Effective June 18, 2000 we have updated the Fidelity BillPay Service Agreement to reflect important changes. Use of the Service after June 18 indicates your agreement with the modifications and amendments." Fagan Aff., ¶ 15 & Ex. P.

46. Section 9 of the BillPay Service Agreement in effect as of June 18, 2000 stated:

> The date on which a Non-Recurring or a Recurring Payment is actually initiated (debited from your Fidelity Account) is the "Transaction Date."

Fagan Aff., ¶ 16 & Ex. Q (2000 BillPay Service Agreement).

47. Section 11 of the 2000 BillPay Service Agreement stated:

> After we debit your Fidelity Account for the amount of a payment, we will remit your payment to the Payee by mailing the Payee a check drawn on an account we maintain for this purpose, by electronic funds transfer, or by other means. Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of whether the payment is a Same Day payment, a Future Payment, or a Recurring Payment.

Id.

48. Section 12 of the 2000 Fidelity BillPay Service Agreement stated:

> THE SERVICE AND RELATED DOCUMENTATION ARE PROVIDED "AS IS," WITHOUT ANY WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

Id.

49. Section 13 of the 2000 Fidelity BillPay Service Agreement explains that in order to be eligible for Fidelity's on-time Payment Guarantee, where Fidelity pledges to reimburse the customer's penalty if a payment is delivered late, the Transaction Date must be scheduled at least five business days prior to the actual due date. Id.

50. Section 18 of the 2000 Fidelity BillPay Service Agreement states:

> You agree to pay a monthly fee for the Service. The monthly fee is based on the level of assets you hold at Fidelity. Fidelity Ultra Service Account customers who maintain $30,000 or more in assets in certain Fidelity accounts will not be charged a monthly BillPay fee. All other BillPay customers will get the first three months at no charge, thereafter, the monthly fee is $6.95.

Id.

51. Like its predecessors, section 9 of the current Fidelity BillPay Service Agreement provides:

> The date on which a Non-Recurring Payment or a Recurring Payment is actually initiated (debited from your Fidelity Account) is the "Transaction Date."

Fagan Aff., ¶ 3 & Ex. B (current Fidelity BillPay Service Agreement).

52. Again like its predecessors, section 11 of the current Fidelity BillPay Service Agreement provides:

> After we debit your Fidelity Account for the amount of a payment, we will remit your payment to the Payee by mailing the Payee a check drawn on an account we maintain for this purpose, by electronic funds transfer, or by other means. Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of whether the payment is a Same Day payment, a Future Payment, or a Recurring Payment.

Id.

53. Section 12 of the current Fidelity BillPay Service Agreement provides:

> THIS SERVICE AND RELATED DOCUMENTATION ARE PROVIDED "AS IS," WITHOUT ANY WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

Id.

54. Section 13 of the current Fidelity BillPay Service Agreement explains that in order to be eligible for Fidelity's on-time Payment Guarantee, where Fidelity pledges to reimburse the customer's penalty if a payment is delivered late, the Transaction Date must be scheduled at least five business days prior to the actual due date. Id.

55. Section 18 of the current Fidelity BillPay Service Agreement provides:

> You agree to pay a monthly fee for the Service. The monthly fee is based on either the level of assets or the trade activity in your Fidelity Relationship Household. Fidelity Accounts in Active Trader Households (36 or more trades in a rolling 12 month period) or in Households that maintain $100,000 or more will not be charged a monthly BillPay fee. All other BillPay customers will be charged a monthly fee of $6.95.

Id.

56. Section 27 of the current Fidelity BillPay Service Agreement provides: "This Agreement shall be governed by the laws of the Commonwealth of Massachusetts and the United States of America." Id.

57. Section 4 of the current Fidelity global Customer Agreement provides:

> I have received and read a copy of the prospectus of the transaction fund selected by me, containing a more complete description of the fund and its fees, charges and operations.

Fagan Aff., ¶ 3 & Ex. A (current Customer Agreement).

58. Section 7 of the current Customer Agreement also provides:

> [T]he Fidelity BillPay service is subject to the Fidelity BillPay Service Agreement . . . [A]ny use of the Fidelity BillPay service

>confirms my agreement to the Fidelity BillPay Service Agreement
>. . . . I understand the monthly fee is $6.95 and is waived for
>BillPay customers who trade 36+ times in a rolling 12-month
>period or maintain $100,000 or more in certain retail assets at
>Fidelity. All other customers will be charged a $6.95 monthly fee.
>See the Fidelity BillPay Service Agreement for complete details.

Id.

59. Section 14 of the current Customer Agreement also provides:

>Communications by mail, electronic means, messenger, telegraph,
>or otherwise, sent to me at the U.S. postal or electronic mail
>address listed on the application, or any other address I may give
>FBS, are presumed to be delivered to and received by me whether
>actually received or not.

Id.

60. Section 17 of the current Customer Agreement provides:

>This Agreement and its enforcement shall be governed by the laws
>of the Commonwealth of Massachusetts, except with respect to
>conflicts of law . . . [and] shall cover individually and collectively
>all accounts that I may open or reopen with Fidelity . . . .

Id.

61. Section 18 of the current Customer Agreement also provides:

>I agree that all controversies that may arise between us (including
>but not limited to controversies concerning this or any other
>account maintained with you), whether arising before, on or after
>the date this account is opened, shall be determined by arbitration .
>. . . No person shall bring a putative or certified class action to
>arbitration, nor seek to enforce any pre-dispute arbitration
>agreement against any person who has initiated in court a putative
>class action . . .until: (a) the class certification is denied; (b) the
>class is decertified; or (c) the customer is excluded from the class
>by the court. Such forbearance to enforce an agreement to arbitrate
>shall not constitute a waiver of any rights under this agreement
>except to the extent stated herein.

Id.

- 15 -

62. The current prospectus for Fidelity Cash Reserves provides: "Shares earn dividends until, but not including, the next business day following the day of redemption." Fagan Aff., ¶ 3 & Ex. C.

Respectfully submitted,

NATIONAL FINANCIAL SERVICES LLC
FIDELITY BROKERAGE SERVICES LLC
By their attorneys,


/s/ Lawrence H. Martin
Lawrence H. Martin (D.C. Bar No. 476639)
FOLEY HOAG LLP
1747 Pennsylvania Ave., N.W.
Washington, D.C. 20006-4604
(202) 223-1200

Nicholas C. Theodorou (Pro Hac Vice)
John A. Shope (Pro Hac Vice)
Kevin C. Conroy (Pro Hac Vice)
William W. Fick (Pro Hac Vice)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: November 7, 2003

17/506945.4