IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOAN BERENSON and DAVID BERENSON, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL FINANCIAL SERVICES LLC, FIDELITY BROKERAGE SERVICES LLC, and DOES 1-50, inclusive, <br><br> Defendants. | Civil Action No. 1:03 CV 02004 (RBW) |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Defendants National Financial Services LLC and Fidelity Brokerage Services LLC (together, "Fidelity") submit this memorandum in support of their motion to dismiss and for summary judgment on all counts of the Complaint.

### Introduction

Plaintiffs Joan and David Berenson allege in this proposed nationwide consumer class action that Fidelity failed to disclose that its bill payment service would not credit them with "interest" on their Fidelity money market mutual fund during the period of "float" between the time that amounts were debited from their account and the time that payees were ultimately credited with payments. The Berensons claim that this practice amounts to the "kiting" of interest and that Fidelity's failure to disclose its practice violates federal and state law.

As a matter of indisputable fact, however, Fidelity did nothing improper and made full disclosure of all material information. Specifically, Fidelity disclosed:

> that on the transaction date selected by the customer, Fidelity would debit the customer's account and transfer designated funds to a special bill paying account maintained by Fidelity from which payment would be made (thus guaranteeing payment in good funds to the customer's designated payee);

> that the customer would cease to receive income on debited funds as of the date that the customer's account was so debited;

> that payments would issue the <u>next day</u> to payees either by electronic transfer or paper check; and

> that it could take up to five days for the customer's payee to actually receive the funds (for example, due to postal delays).

Fidelity repeated these disclosures in numerous agreements and prospectuses that it sent to the Berensons for several years and that it made available on Fidelity's Internet website. Indeed, the allegation that Fidelity was somehow secretly "kiting" payments to secure hidden interest is scurrilous. Any user of Fidelity's bill payment service would necessarily see and know that his or her account is debited on the day he or she elects to initiate a transaction, and no reasonable consumer could actually believe that he or she would continue to earn interest on money after it had been debited from his or her own account at his or her own instruction.

In addition to these fundamental flaws, the Complaint suffers from numerous legal deficiencies that also compel dismissal.[1]

### Undisputed Facts

The following facts are undisputed for purposes of the defendants' motion to dismiss or for summary judgment.

---

[1] Fidelity's current Customer Agreement with the plaintiffs provides that disputes must be arbitrated but that Fidelity cannot compel arbitration of putative class actions before certification is denied. Statement of Undisputed Facts ("SOF") ¶ 61. Fidelity reserves the right to compel arbitration if this Court denies class certification, as it should if the case will proceed.

2

A.    **The Parties**

Defendants National Financial Services LLC ("NFS") and Fidelity Brokerage Services

LLC ("FBS") are limited liability companies organized under the laws of the State of Delaware,

each with a principal place of business in Boston, Massachusetts. SOF ¶ 1. They are

subsidiaries of FMR Corp. and part of the Fidelity Investments family of companies. SOF ¶ 2.

Plaintiff David Berenson[2] is Chairman and co-founder of Comfidex Corp., a New York

City-based software company. He is a former CEO of TRV Imaging, former national partner of

Ernst & Young, and is a member of the Bar and a CPA in various jurisdictions. SOF ¶ 6.

Joan and David Berenson opened a brokerage account with Fidelity in 1991. SOF ¶ 7.

In completing and signing their account application, the Berensons acknowledged that they had

"read, understood, and agree to the terms set forth in the Customer Agreement." SOF ¶ 9. The

Berensons thereby agreed that they had "received and read a copy of the prospectus of the

Transaction Funds selected by me, containing a more complete description of it and its

operations" and that they understood "that all debit items, such as checks, card charges,

securities account purchases and electronic fund transfers, will be accumulated daily." SOF ¶

10.

Currently, the Berensons maintain nine separate retail brokerage accounts with Fidelity

including accounts in the name of two businesses, Berenson and Company International and

Thunderbird Realty Ventures. SOF ¶ 8. They are classified as "premium" customers based on

the asset level in their accounts.  Id.

---

[2] The plaintiffs are apparently close relatives of a partner in the law firm that proposes to
represent the plaintiff class, Johanson Berenson LLP, a fact that makes their adequacy as class
representatives highly suspect. See, e.g., London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1254-
55 (11th Cir. 2003).

3

The Berensons have been joint subscribers to Fidelity's bill payment service since 1993. SOF ¶ 11. Until May 2001, the Berensons' Core Account, the transactional account they selected from which bill payment transactions were debited, was the Fidelity Daily Income Trust, a money market mutual fund. SOF ¶ 12. In May 2001, the Berensons began using the Fidelity Cash Reserves Money Market Fund, another mutual fund, as their Core Account. Id. When the Berensons' money market mutual funds were debited to pay bills as they requested, mutual fund shares in their Core Account were redeemed to the extent necessary to satisfy the debit. Id. Thus, it is not "interest" but rather dividend income on mutual fund shares after they have been redeemed that is at issue in this case.

**B.    Fidelity's Bill Payment Service**

As early as 1986, Fidelity had established a bill payment service for its brokerage customers whereby a customer could order by telephone payments to creditors and other entities by debiting the customer's Core Account. SOF ¶ 13. The bill payment service is a convenience to investors that permits them to direct Fidelity to automatically make recurring payments (such as mortgage obligations) or even one-time payments on their behalf. Id. As disclosed in the pertinent agreements, customers pay a modest monthly fee for the service unless Fidelity waives the fee due to the size of the account. SOF ¶¶ 55, 58.

Fidelity's bill payment service works on what is called a "good funds" business model. SOF ¶ 14. Specifically, in accordance with governing customer agreements, Fidelity debits payments from the customer's account on the date the customer specifies for the payment to be initiated in order to ensure that the customer has adequate funds in his or her Core Account to make the payment. Id. Otherwise, Fidelity would have to assume the risk that a customer might withdraw funds in between requesting a payment and the payment reaching the payee. Id.

4

Over time, Fidelity has implemented various methods to access the bill payment service, first via personal computer and modem and then via an Internet website. SOF ¶ 15. Currently, Fidelity customers who have enrolled in the BillPay service are able to arrange payments to creditors and other entities electronically using Fidelity's Internet website. SOF ¶ 16 Fidelity also permits customers to request assistance of telephone customer service representatives to modify BillPay information. Id.

Fidelity and its vendor, CheckFree Corp., operate an automated process system that manages the BillPay service. SOF ¶ 17. On either a recurring or non-recurring basis, the customer enters the necessary information on Fidelity's website such as the payee and the amount of the payment. SOF ¶ 18. The customer then chooses a "Transaction Date" as defined in relevant agreements. SOF ¶ 19.

On the Transaction Date selected by the customer, Fidelity's automated system (i) informs CheckFree that a payment is to be made; (ii) checks the customer's Core Account to ensure that the customer has adequate funds; and (iii) debits the customer's Core Account for the amount of the transaction. SOF ¶ 20. If the Core Account is a mutual fund, as it is for plaintiffs Joan and David Berenson, shares are redeemed in a sufficient amount to fund the debit. Id. If the Core Account does not contain sufficient funds to support the bill payment, the customer's request is rejected. Id.

At approximately 1:00 a.m. on the following morning, CheckFree determines whether the payee will accept payment electronically or by check. SOF ¶ 21. If payment is to be made electronically, CheckFree initiates the electronic payment that same day and settles with the payee thereafter. Id. If payment is to be made by check, then CheckFree mails the payment the same day. Id. If the payment instruction is invalid and cannot be corrected within 24 hours,

5

there is no payment and Fidelity credits the debit amount back to the customer's Core Account. SOF ¶ 22.

Because customers' Fidelity Core Accounts are debited as of the Transaction Date, because CheckFree must then determine whether the payee information it has received is correct, and because Fidelity must in turn supply CheckFree with the appropriate funds to make payments, it is not practicable to commence payment to the designated payees before the next day.  SOF ¶ 23.  Fidelity guarantees its customers that the payee will be credited with payment within five business days; however, generally payees receive payments in a much shorter time. SOF ¶ 24.  The five day cushion is needed to ensure that payments that are mailed reach their destination and the payee deposits the payment by the payment due date.  Id.

A customer who prefers to earn "interest" (or additional dividend income in the case of Core Accounts that are money market mutual funds) up until the time a payee actually receives payment may do so without using the BillPay service simply by writing checks on his or her Fidelity account.  SOF ¶ 25.  In that case, however, the customer must write and mail checks him- or herself and assume the risk that the check will bounce if the account later contains insufficient funds.  Id.

### C.    Fidelity's Repeated and Ongoing Disclosures

Fidelity has repeatedly disclosed the terms of its BillPay service, including the timing of bill payment debits and income on debited funds, to the Berensons and other customers.

### 1.    Fidelity's Disclosure Practices

Fidelity's relationship with BillPay customers is governed by the "global" Customer Agreement, the BillPay Service Agreement, and the Fidelity prospectus for the customer's "Core Account."  SOF ¶ 26.  Fidelity provides customers with copies of the Customer Agreement and any pertinent prospectuses when they open their account.  SOF ¶ 27.  In addition, Fidelity

6

provides customers with a copy of the BillPay Service Agreement when they enroll in the BillPay service. Id. All of these documents may be viewed on Fidelity's website. Id. The BillPay Service Agreement in particular has been on Fidelity's website since at least 1998. Id. When material changes are made to these documents, Fidelity notifies customers by mail or electronically. Id.

Fidelity's agreements and prospectuses disclose that a BillPay customer's Core Account will be debited on the transaction date selected in advance by the customer, that the funds will be transferred to an account Fidelity maintains for this purpose, that it may take up to five days before the designated payee is credited with the funds paid from the separate Fidelity account, and that the customer will not earn dividend income on funds after they have been debited from his or her own account. SOF ¶ 28.

2.    Specific History of Disclosure

Specifically with regard to the Berensons, it is indisputable that they received repeated, express notice of the terms and conditions governing BillPay transactions from well beyond any relevant period of statutory limitation through the present time.[3] For example, in 1996 Fidelity developed a replacement for the Fidelity Bill Payment service called Fidelity Interactive Bill Payment Service, which offered improved touch-tone telephone access as well as an access option via personal computer and modem. SOF ¶ 29. In connection with this upgrade, customers were provided with Fidelity Interactive Bill Payment Service User's Guides and

_____

[3] The Electronic Funds Transfer Act has a one year limitation period, 15 U.S.C. § 1693m(g), and the remaining tort, contract, and consumer protection claims have at most a three-year period. See D.C. Code § 12-301 (three-year statute for "simple contracts" and unspecified torts such as those in this case); District Cablevision L.P. v. Bassin, 828 A.2d 714, 729 (D.C. 2003) (applying three-year statute to unfair trade practices claims); Material Supply International, Inc. v. Sunmatch Indus. Co., 146 F.3d 983, 991-92 (D.C. Cir. 1998) (explaining that statute of limitations is procedural and forum rule therefore governs).

7

Disclosure Agreements (separate sets of documents were supplied for touch-tone telephone and computer access).  SOF ¶¶ 29-31.

The 1996 Users' Guides explained, in a section entitled "When and how payments are made":

> Shortly after 2:00 p.m. ET on the day you've schedule a payment transaction, we will deduct the payment amount you authorized from your Fidelity Ultra Service Account.  We'll then send the funds to your payee by electronic funds transfer through the Automated Clearing House (ACH) or other funds transfer network.  If your payee cannot accept electronic funds transfers, we will send a paper check.

> Because many payees do not yet accept electronic funds or they receive their electronic funds through a third party, it is important to allow the full five (5) business days for your payments to be received.

SOF ¶ 30.

The 1996 Disclosure Agreements stated, in a section entitled "Delivery of Your Payments":

> The date on which a payment is to be "initiated" is the date on which funds are to be deducted from your Account.  The date is referred to in this Agreement as the "Transaction Date."

> After funds are withdrawn from your Account, we may remit your payments by mailing your Payee a check drawn on an account we maintain for this purpose, by electronic funds transfer, or by other means.  Because of the time it takes to transmit your payment to your Payees, they generally will not receive payment on the Transaction Date. . .Therefore, in order to provide sufficient time for payments to be received by your Payees, the Transaction Date for each payment must be at least five (5) business days prior to the date your payment is due, excluding any applicable grace periods.

SOF ¶ 31.

Both of these documents, which were sent to all BillPay customers in 1996, made clear that the Core Account would be debited on the customer-selected transaction date several days

8

before any payee actually received the funds. In addition, the contemporaneous version of the Berensons' mutual fund prospectus expressly stated the (intuitively obvious) point that the customer would no longer receive income on funds that had been debited: "Shares will earn dividends through the date of redemption . . ." SOF ¶ 33. As mentioned, the redemption of shares is what generates cash to satisfy the bill payment debit.

Disclosures continued. In November 1998, after making amendments to the BillPay Service Agreement, Fidelity mailed all of its BillPay service customers a copy of the revised agreement. SOF ¶¶ 34, 37-40. By November 1998, Fidelity had also posted the Fidelity BillPay Service Agreement on the Fidelity Internet web site. SOF ¶ 42. Today, every web page that deals with the BillPay Service on Fidelity's website contains a link that the customer can click to access the BillPay Service Agreement. Id. The Berensons are frequent users of the Fidelity website. SOF ¶ 43.

Furthermore, in May 2000, Fidelity mailed its customers a notification stating that "The Fidelity BillPay Service Agreement has been amended to reflect important changes outlined in this letter. Please visit fidelity.com/goto/billpayagree/ to read the new Service Agreement." SOF ¶ 44. A month later, Fidelity implemented a notification of changes to the BillPay Service Agreement on Fidelity's website. Customers who used the BillPay website had to click through a pop-up window that stated: "Effective June 18, 2000 we have updated the Fidelity BillPay Service Agreement to reflect important changes. Use of the Service after June 18 indicates your agreement with the modifications and amendments." SOF ¶ 45.

Throughout this history of disclosure, the BillPay Service Agreements and pertinent prospectuses clearly stated that: (i) the payment amount is debited from the customer's account on the date that the customer chooses (the "Transaction Date"); (ii) once the payment amount is

9

debited, the customer no longer receives mutual fund dividend or other income (what the complaint calls "interest") on the payment amount; and (iii) there is a delay of as many as five days between the Transaction Date and the time that the payee receives payment. This is the natural result of the fact that Fidelity expressly assumes the obligation to pay the payee in good funds, that some payees must be paid by check, that the postal service may take a few days to deliver a check, and that the payee may delay in cashing it. Indeed, the content of relevant language in these agreements remains largely unchanged through the current agreement. Compare SOF ¶¶ 30-33 with 37-41 with 46-50 with 51-62.

Today, Fidelity continues to make clear that the date of debiting the customer's account precedes crediting of payment to the designated payee. Section 9 of the current BillPay Service Agreement explains that:

> The date on which a Non-Recurring Payment or a Recurring Payment is actually initiated (*debited from your Fidelity Account*) is the "Transaction Date."

SOF ¶ 51 (emphasis added). A number of provisions in the current BillPay Service Agreement further disclose that there will be delay between the Transaction Date when Fidelity debits the customer's account and time the payee receives payment. Section 13 explains that in order to be eligible for Fidelity's on-time Payment Guarantee, in which Fidelity pledges to pay the customer's penalty if a payment is delivered late, the Transaction Date must be scheduled at least five business days prior to the actual due date. SOF ¶ 54.

In addition, Section 11 of the current BillPay Service Agreement explains the process of payment delivery:

> After we debit your Fidelity Account for the amount of a payment, we will remit your payment to the Payee by mailing the Payee a check drawn on account we maintain for this purpose, by electronic funds transfer, or by other means. Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of whether the payment is a Same Day Payment, a Future Payment or a Recurring Payment.

10

16/371842.12

SOF ¶ 52.

With regard to income on the "float," which the plaintiffs mistakenly call "interest," the

prospectus dated January 29, 2003 for Fidelity Cash Reserves, the mutual fund currently used by

the Berensons as their Core Account, provides:

> Shares earn dividends, until, but not including, the next business day following
> the day of redemption.

SOF ¶ 62.[4]

Finally, with regard to the speed with which payees are paid, Section 12 of the BillPay

Service Agreement specifically provides:

> The service and related documentation are provided 'as is' without any warranty
> of any kind, either express or implied, including, but not limited to, the implied
> warranties or merchantability and fitness for a particular purpose.

SOF ¶ 53.  As explained previously, however, Fidelity does agree to pay penalties for any late

payment if the payment has been requested with sufficient advance notice.  SOF ¶ 54.  The

plaintiffs make no allegation that Fidelity has either made late payments or failed to honor that

promise.

## Argument

The Berensons contend the Fidelity violated the federal Electronic Funds Transfer Act

(Count I), the Massachusetts Truth-in-Savings Law (Count V), the Massachusetts Consumer and

Business Protection Act (Count VI), and the District of Columbia Consumer Protection

Procedures Act (Count VII).  In addition, the Berensons assert common law claims of intentional

(Count II) and negligent (Count III) misrepresentation, breach of fiduciary duty (Count IV) and

---

[4] Before May 2001, the Berensons' Core Account was the Fidelity Daily Income Trust, another
money market mutual fund.  The prospectuses for this fund contained very similar language to
that quoted above.  For example, the 1996 and 1998 versions of the prospectus provided: "Shares
earn dividends through the day of redemption."  SOF ¶¶ 33 and 41.

11

breach of Contract (Count V). Several of these claims are legally insufficient on their face, however, and all fail because, as a matter of indisputable fact, Fidelity fully disclosed all the facts that the plaintiffs incorrectly allege were omitted.

## I.    STANDARDS ON DISPOSITIVE MOTIONS.

For purposes of a motion to dismiss under Rule 12(b)(6), the Court must accept the plaintiffs' allegations as true and draw all inferences in their favor. Harris v. Ladner, 127 F.3d 1121, 1123 (D.C. Cir. 1997). Dismissal at the pleading stage is warranted where it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. See id. Here, even accepting the Berensons' allegations as accurate, the facts alleged in the Complaint fail to state valid claims for fraud, violation of the consumer protection laws, the Electronic Funds Transfer Act, and the Massachusetts Truth In Savings Law.

Summary judgment under Rule 56 is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Morgan v. Fed. Home Loan Mortg. Corp., 328 F.3d 647, 650 (D.C. Cir. 2003) (ellipsis in original and internal citation omitted). "A dispute is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party' and a moving party is 'entitled to a judgment as a matter of law' if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Id. (internal citations omitted). Because the written documents supplied to the plaintiffs indisputably made full disclosure, and completely negate the allegations of the entire complaint, summary judgment should be granted for the defendants.

12

II.    **THE PLAINTIFFS' CLAIMS UNDER THE ELECTRONIC FUNDS TRANSFER ACT FAIL AS A MATTER OF LAW.**

Count I of the Complaint asserts a cause of action under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.* Specifically, the Berensons contend that the failure to pay "interest" on the "float" between the time a BillPay transaction is debited from their Fidelity Core Account and the time the payee is actually credited with those funds "is tantamount to, and constitutes, undisclosed fees, charges, and/or penalties" for use of the BillPay Service. Cmplt. ¶ 26. They allege that Fidelity has failed to disclose this so-called "fee" as required by the EFTA. The Berensons further allege that Fidelity is liable for treble damages under the statute's "error resolution" provisions because it declined provisionally to re-credit their account and did not conduct a good faith investigation upon notice of a supposed "error" in determining the amount of interest that should have accrued to them.

The claim under the EFTA fails as a matter of law for three reasons. First, the EFTA does not require Fidelity to provide notice of the loss of potential "interest" income (actually, dividend income on mutual fund shares) because this kind of opportunity cost is not a "charge" or "fee" within the meaning of the EFTA and its implementing regulations. Second, even assuming that the EFTA is applicable (it is not), the undisputed facts demonstrate that Fidelity repeatedly provided the Berensons with ample disclosure. Third, the Berensons' allegations do not implicate the EFTA's error resolution provisions because Fidelity's compliance with its contract with the Berensons is not an "error" within the meaning of the statute.

A.    **Non-Payment of Interest on Funds That Are No Longer in a Customer's Account Is Not a "Fee" or "Charge" Subject to Disclosure Under the EFTA.**

The EFTA requires disclosure of, among other things, "any <u>charges</u> for electronic fund transfers or for the right to make such transfers." 15 U.S.C. § 1693c(a)(4) (emphasis added). The statute does not define "charge" and the Federal Reserve Board's implementing regulations

13

substitute the word "<u>fees</u>," also without definition. <u>See</u> 12 C.F.R. § 205.7(b)(5). As noted, the Berensons contend that the lost opportunity to earn interest on funds that are debited upon initiation of a BillPay transaction "is tantamount to, and constitutes" a fee or a charge. Cmplt. ¶ 26. Completely lacking in express authority, the plaintiffs' interpretation of the EFTA contravenes standard canons of statutory construction, contradicts controlling Federal Reserve regulations, and would be fundamentally unfair to Fidelity and other similarly situated mutual fund companies and securities brokers.

An inquiry into statutory meaning starts with "the fundamental canon that statutory interpretation begins with the language of the statute itself." <u>Seattle Opera v. NLRB</u>, 292 F.3d 757, 761 (D.C. Cir. 2002) (citing, <u>inter alia</u>, dictionary definitions). The court looks first "for the plain meaning of the text." <u>United States v. Barnes</u>, 295 F.3d 1354, 1359 (D.C. Cir. 2002). In ordinary usage, the plain meaning of a "fee" or "charge" is an actual debit for a fixed amount and not merely a foregone opportunity to earn an indeterminate amount of future income. <u>See</u> <u>Webster's New Collegiate Dictionary</u> 186 & 416 (1981) (defining "charge" as "expense, cost" or "the price demanded for something" or "a debit to an account" or "the record of a loan" and defining "fee" as "a fixed charge" or "a charge for a professional service."); <u>American Heritage</u> <u>Dictionary</u> 236 & 500 (3d ed. 1993) (defining "charge" as "a debt or an entry in an account recording a debt" and defining "fee" as a "fixed sum charged, as by an institution or by law, for a privilege.") The Berensons cannot credibly suggest that in ordinary financial services parlance the "opportunity cost" of interest foregone would ever be referred to as a "fee" or a "charge."

Indeed, the particular species of fees that are mentioned in the Federal Reserve Board's Official Staff Commentary to the EFTA's implementing regulations are all actual debits that are applied to an account, consistent with the plain meaning definitions above. <u>See</u> 12 C.F.R. § 205,

14

Supp. I, ¶ 7(b)(5)1 ( "An institution is required to disclose all fees for EFTs [Electronic Fund Transfers] or the right to make them.  Other fees (for example, minimum-balance fees, stop-payment fees, or account overdrafts) may, but need not, be disclosed.") (emphasis added); id., ¶ 7(b)(5)2 ("A per-item fee for EFTs must be disclosed even if the same fee is imposed on nonelectronic transfers."); id., ¶ (9)(b)(3)1 ("The fees disclosed may include fees for EFTs and for other nonelectronic services, and both fixed fees and per-item fees; they may be given as a total or may be itemized in part or in full.").

The Official Staff Commentary further states that finance (interest) charges debited from an account need not be disclosed.  See id., ¶ 9(b)(3)3 ("The requirement to disclose any fees assessed against the account does not include a finance charge imposed on the account during the statement period.") (emphasis added).  Since an actual interest charge need not be disclosed, the Berensons' contention that unearned potential interest is a "fee" subject to disclosure is implausible.  And while the retention of interest for a brief period by Fidelity and CheckFree may be construed as a benefit to them and an opportunity the plaintiffs lose, it also offsets the expense of the labor intensive bill payment service, thereby likely reducing the charge to the customer.

The expansive definition of "fee" that the Berensons propose, moreover, would entail absurdly burdensome reporting requirements and result in highly confusing periodic account statements.  The EFTA requires that periodic account statements provided to the consumer must include "the amount of any fee or charge assessed by the financial institution during the period for electronic fund transfers or for account maintenance."  15 U.S.C. § 1693d(c)(2).  If, as the Berensons argue, unearned potential interest were a "fee" within the meaning of the statute, each BillPay transaction reflected on a statement would of necessity be accompanied by a complex

15

variable "fee" calculation based on the amount of the transfer, the duration of the "float" (which could depend, in part, on the diligence of the postal service and action of payees, including how quickly they cashed the check), and the periodic interest (or dividend income) rate during the period of the "float." Allocation of such interest to BillPay customers would also entail burdensome record-keeping and tax reporting requirements. There is no evidence that Congress or the Federal Reserve intended to impose such an unwieldy regime. See, e.g., United States v. Wilson, 290 F. 3d 347, 361 (D.C. Cir. 2002) ("absurd results are strongly disfavored") (internal quotation omitted).

**B.      Even if a Lost Opportunity Were Deemed a "Fee," Fidelity Lies Within a Statutory Safe Harbor.**

Regardless of whether disclosure of "lost" interest was required, the EFTA provides a safe harbor exempting financial institutions from liability for "any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Board, notwithstanding that after such act, omission or failure has occurred, such rule, regulation, approval, or model clause is amended, rescinded, or determined by judicial or other authority to be invalid for any reason." 15 U.S.C. § 1693m(d)(2) (emphasis added). Because Fidelity has in fact followed a model clause, it cannot be subjected to liability here.

The model disclosure clauses that accompany the implementing Federal Reserve regulations envision just three categories of fees, none of which are consistent with the plaintiffs' proposed definition: a "per transfer charge" of a specified dollar amount, a "fixed charge" of a specified dollar amount for use of the service during a specified time period, or an "average or minimum balance charge" of a specified dollar amount. 12 C.F.R. § 205, App. A-2--Model Clauses for Initial Disclosures (§ 205.7(b))(e) (cited hereafter as "Model Clauses").

16

Consistent with the model clauses, Fidelity's BillPay agreement has always disclosed that there may be a fixed monthly charge depending on the level of assets a customer maintains with Fidelity. SOF ¶¶ 32 (1996 agreements), 40 (1998 agreement), 50 (2000 agreement), 58 (current agreement). The language of these disclosure tracks the content of the model clauses for "fixed charge" and "average or minimum balance charge." See Model Clauses ("We will charge you [insert dollar amount] each [insert time period] for our . . . [telephone bill-payment service] . . . ."; "We will only charge you for using our . . . [telephone bill-payment service] . . . if the [average] [minimum] balance in your . . . [accounts] falls below [insert dollar amount]. If it does, we will charge you [insert dollar amount] each . . . [insert time period].") (bracketed text in original). Fidelity does not impose any fee in a specified dollar amount on individual transfers that would implicate the model disclosure for a "per transfer charge." Fidelity has thus disclosed all of the pertinent fee-related information contemplated by the model clauses, and therefore as an independently sufficient ground for judgment may not be held liable for violation of the EFTA.

### C.    Fidelity Provided Notice of All Pertinent Terms and Conditions of the BillPay Service.

Even assuming that loss of potential future interest earnings is a "fee" that must be disclosed under the EFTA (it is not), and that Fidelity does not lie within a safe harbor (it does), Fidelity has repeatedly provided notice to the Berensons satisfying any obligations it might have under the EFTA.

The EFTA requires initial disclosure of pertinent terms and conditions, including any fees, "at the time the consumer contracts for an electronic fund transfer service." 15 U.S.C. § 1693c(a). Further disclosure is required "at least twenty-one days prior to the effective date of any change . . . if such change would result in greater cost or liability" to the consumer or

17

"decreased access to the consumer's account." 15 U.S.C. § 1693c(b) (emphasis added); see also

12 C.F.R. § 205.8. As an alternative to physical delivery of written notice in hard copy, EFTA

implementing regulations provide that "a financial institution may provide by electronic

communication any disclosure required by this part to be in writing" by "send[ing] the disclosure

to the consumer's electronic address" or by "mak[ing] the disclosure available at another

location such as an Internet web site" and "alert[ing] the consumer of the disclosure's

availability by sending a notice to the consumer's electronic address (or to a postal address, at

the financial institution's option)." 12 C.F.R. § 205.17(b)-(c).

　　　　Fidelity has always provided disclosures that go well beyond these standards. Fidelity

provides customers with copies of the global Customer Agreement and any pertinent

prospectuses when they open their accounts. SOF ¶ 27. In addition, Fidelity provides customers

with a copy of the BillPay Service Agreement when they enroll in the BillPay service. Id.

Copies of all of these documents are also available on Fidelity's website. Id. When material

changes are made to these documents, Fidelity notifies customers by mail or electronically. Id.

　　　　As recounted above, Fidelity repeatedly issued disclosures to BillPay customers making

clear that: (i) the payment amount is debited from the customer's account on the date the

customer sets to initiate the transaction (the "Transaction Date"); (ii) once the payment amount is

debited and mutual fund shares are redeemed for that purpose, the customer no longer receives

dividend income ("interest") on the payment amount; and (iii) there is a delay of as many as five

days between the Transaction Date and the time that the payee receives payment.　SOF ¶¶ 30-

33 (1996), 37-41 (1998), 46-50 (2000).

　　　　More specifically, the BillPay Service Agreement currently provides that Fidelity will

debit the Berensons' account on the Transaction Date. SOF ¶ 51 ("The date on which a Non-

18

Recurring Payment or a Recurring Payment is actually initiated (*debited from your Fidelity Account*) is the 'Transaction Date.'") (emphasis supplied). Furthermore, the prospectus for Fidelity's Cash Reserve Mutual Fund, which the Berensons currently use as their Core Account for BillPay debits, discloses that once shares are redeemed to satisfy a debit, a customer no longer receives dividend income on that money. SOF ¶ 62 ("Shares earn dividends, until, but not including, the next business day following the day of redemption.") Finally, the BillPay Service Agreement clearly notes that there will be a delay between the Transaction Date and the payment to the payee:

> Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of whether the payment is a Same Day Payment, a Future Payment or a Recurring Payment.

SOF ¶ 52.

In light of this plain language and long history of disclosure to the same effect, the Berensons cannot have had any reasonable expectation to earn interest on money they no longer possessed (more precisely, income on shares they no longer owned), after these shares were redeemed at their direction and the corresponding funds debited from their account. Furthermore, there can be no doubt that Fidelity adequately warned the Berensons that it might take as much as five days for the payee to receive and deposit their payment amounts. There was, in sum, full disclosure.

### D. The Error Resolution Provisions of the EFTA Are Inapplicable to the Plaintiffs' Claims.

The error resolution provisions of the EFTA require that a financial institution follow certain procedures when it receives notice of an "error" from a customer. See 15 U.S.C. § 1693f. The implementing regulations define "error" as:

> (i) An unauthorized electronic fund transfer;

19

(ii) An incorrect electronic fund transfer to or from a consumer's account;

(iii) The omission of an electronic fund transfer from a periodic statement;

(iv) A computational or bookkeeping error made by the financial institution relating to an electronic fund transfer;

(v) The consumer's receipt of an incorrect amount of money from an electronic terminal;

(v) An electronic transfer not identified in accordance with §§ 205.9 [concerning ATM transactions] or 205.10(a) [concerning pre-authorized transfers]; or

(vi) The consumer's request for documentation required by §§ 205.9 or 205.10(a) or for additional information or clarification concerning an electronic fund transfer, including a request the consumer makes to determine whether an error exists under paragraphs (a)(1)(i) through (vi) of this section.

. . .

The term error does not include:

(i) A routine inquiry about the consumer's account balance;

(ii) A request for information for tax or other recordkeeping purposes;

(iii) A request for duplicate copies of documentation.

12 C.F.R. § 205.11(a).

The legislative history explains the purpose and scope of these provisions and sheds further light on the nature of "errors" contemplated:

> [B]ecause most EFT systems rely totally on computers and electronics, errors are bound to occur, particularly at this relatively early stage of development. But more important, a consumer is likely to discover an EFT error only after it has occurred, meaning that outstanding checks on a checking account might be dishonored or, even worse, the consumer left without money to meet his essential expenses like rent, utility bills, and groceries.

S. Rep. No. 95-915, at 6-7 (1978), reprinted in 1978 U.S.C.C.A.N. 9403, 9408-09; see also id. at 14, reprinted in 1978 U.S.C.C.A.N. at 9416 (explaining that error provisions are "particularly important in the EFT context because a computer error could leave the consumer's bank account empty or with insufficient funds to cover outstanding checks or meet essential living expenses.").

20

16/371842.12

Receipt of an "error" notice from a consumer triggers investigation and provisional credit requirements when (i) it is received no later than 60 days after the institution sends the periodic statement on which the "error" is first reflected; (ii) it enables the institution to identify the consumer's name and account number and (iii) "[i]ndicates why the consumer believes an error exists and includes to the extent possible the type, date, and amount of the error, except for requests [for additional information or clarification] described in paragraph (a)(1)(vii)" Id. § 205.11(b).

These provisions are not applicable in this case because the loss of interest on the "float," at most a lost opportunity, does not fit any of the categories of "error" outlined in the statute and implementing regulations.   To the contrary, the Berensons themselves allege that it is not an error but rather the consistent and intentional policy of Fidelity not to pay interest on the "float" and undisputed facts demonstrate that this practice is properly grounded in the agreements that govern the BillPay service and the Berensons' Core Account money market mutual fund.  The Berensons have no claim under the EFTA and Count I must be dismissed.

## III.    THE PLAINTIFFS' MISREPRESENTATION CLAIMS FAIL AS A MATTER OF LAW.

In asserting intentional and negligent misrepresentation in Counts II and III of the Complaint, the Berensons argue that Fidelity's statements in (i) the agreements and prospectuses and (ii) advertisements related to the BillPay Service were fraudulent.  The fraud claims with respect to Fidelity's agreements with its customers fail because there is no misrepresentation -- in fact the agreements and prospectuses disclose that customers will not earn income on Core Account money market mutual funds after the Transaction Date, which will be before the date on which the customer's designated payee actually receives payment.  The allegation that Fidelity's BillPay Service advertisements fraudulently omit this fact also must be dismissed because the

21

plaintiffs fail to make these allegations with any particularity at all, much less the particularity

required by Fed. R. Civ. P. 9(b).

**A.      The Fidelity Agreements Disclose that Customers Will Not Earn Income on Mutual Funds after the Transaction Date.**

The Berensons allege that the Fidelity's agreements are fraudulent because they fail to

disclose that they will not earn "interest" after funds are debited from their account and before

they reach the payee.  Neither the intentional nor negligent misrepresentation claims related to

the customer agreements can be sustained, however, because the agreements clearly disclose the

information that the plaintiffs allege is omitted.  As stated above, the BillPay Service Agreement

provides that Fidelity will debit the customer's account the same day that the customer initiates a

BillPay transaction.  SOF ¶ 51.  In addition, the Berensons' money market mutual fund

prospectuses disclose that once an account is debited a customer no longer receives dividend

income on the amount of the redemption.  SOF ¶¶ 33, 41, 62.   Finally, the BillPay Service

Agreement clearly notes that there will be a delay between the Transaction Date and the payment

to the payee.  SOF ¶ 52.   The misrepresentation claims must be dismissed because as a matter of

indisputable fact no misrepresentation has been made.  See, e.g., Bamberg v. S.G. Cowen, 236

F.Supp.2d 79, 92 (D. Mass. 2002) (dismissing claim for fraud where there was no false

statement) (Massachusetts law).

**B.      The Plaintiffs' Claims Regarding Fidelity's Advertisements Do Not Allege Fraud with the Particularity Required by Rule 9(b).**

In paragraphs 41 through 43 of the Complaint, the plaintiffs allege, without any

supporting detail whatsoever, that Fidelity's advertisements regarding the BillPay Service are

"false and misleading."  These conclusory allegations do not satisfy the heightened pleading

22

requirements of Fed. R. Civ. P. 9(b).[5]  See In re Newbridge Networks Securities Litigation, 962

F. Supp. 166, 170 (D.D.C. 1997) ("the text of Rule 9(b) plainly states that '*all* averments of

fraud' must be pleaded with particularity, not just 'some' or 'many'") (emphasis in original).

"The purposes of 9(b) are threefold: to provide fair notice to defendants of the claims against

them, to prevent attacks on defendants' reputations when the claim for fraud is unsubstantiated,

and to prevent Plaintiffs from bringing strike suits purely for their settlement value." Shields v.

Washington Bancorporation, 1992 WL 88004 *4 (D.D.C. 1992).  Rule 9(b) requires the plaintiffs

to "state the time, place and content of the false misrepresentations, the fact misrepresented and

what was retained or given up as a consequence of the fraud." Kowal v. MCI Communications

Corp., 16 F.3d 1271, 1278 (D.C. Cir. 1994).  The Complaint does none of these things. See, e.g.,

Witherspoon v. Philip Morris, Inc., 964 F. Supp. 455, 460 (D.D.C. 1997); Massengale v. Ogu,

1992 WL 25894 *1 (D.D.C. 1992).

    Indeed, the Berensons' allegations are similar to those found insufficient in Witherspoon.

In that case, allegations regarding fraudulent advertising by a tobacco company failed the

requirements of Rule 9(b) where the plaintiffs did not identify the advertisements that they

alleged were fraudulent: "Plaintiffs must refer to some specific advertisements that he and his

---

[5]  The plaintiffs' intentional, *as well as its negligent*, misrepresentation claim related to the advertisements should be dismissed pursuant to Fed. Civ. R. P. 9(b).  In re: U.S. Office Products Co. Securities Litigation, 251 F.Supp.2d 58, 74 n. 9 (D.D.C. 2003), quoting Shields v. Washington Bancorporation, 1992 WL 88004 *9 (D.D.C. 1992) ("Similar to the requirements for pleading fraud claims, failure to meet the pleading requirements of Rule 9(b) may also be fatal to Plaintiffs' claims of negligent misrepresentation.").  In addition, to the extent that the Complaint asserts that Fidelity's BillPay advertisements violate the Massachusetts Consumer Protection Act or the District of Columbia Consumer Protection Procedures Act, these claims must also be dismissed pursuant to Fed. R. Civ. P. 9(b) because the plaintiffs are merely restating their misrepresentation claims.  Wayne Investment, Inc. v. Gulf Oil Corp., 739 F.2d 11, 12 (1st Cir. 1984) (affirming dismissal of Massachusetts Consumer Protection Act claim for failure to comply with Rule 9(b)); Wajda v. R.J. Reynolds Tobacco Co., 103 F.Supp. 2d. 29, 37 (D. Mass. 2000) (dismissing Massachusetts Consumer Protection Act claim that alleged conspiracy to defraud for failure to comply with Rule 9(b)).

16/371842.12

Decedent were likely to have seen when they began and continued to smoke." 964 F. Supp. at 460. Likewise, here the Berensons fail to state which Fidelity advertisements were or are false and misleading, when and how they reviewed these advertisements, and what content in these advertisements are misleading. Rather, they baldly state that "Defendants advertise their BillPay EBPS", Cmplt. ¶ 41, without providing any description as to which advertisements they are referring. Fidelity is left to guess as to whether the plaintiffs are referring to print, television or some other type of advertisement, what time period is involved, whether the plaintiffs actually reviewed and relied on these advertisements, and what content of the advertisements is supposedly fraudulent. Because Rule 9(b) obviates such guessing, the misrepresentation claims must be dismissed. See, e.g., Shields, 1992 WL 88004 *4.

## IV.    THE PLAINTIFFS' CLAIM FOR BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED.

In Count IV of the Complaint, the Berensons allege that Fidelity has breached a fiduciary duty to them. The Berensons argue that by failing to deliver the funds to the payee immediately after it debits their account, Fidelity has created a "constructive trust" for their benefit. According to the Berensons, Fidelity's failure to pay interest income on this constructive trust is a breach of its fiduciary duty. Cmplt. ¶ 75. This claim is meritless because the Fidelity agreements clearly state that the customer will not receive dividend income after his or her account is debited and that there will be a delay between the time the customer's account is debited and the time that the payment reaches the payee. It is that contract that controls. See Schmid v. National Bank of Greece, 622 F. Supp. 704, 710-11 (D. Mass. 1985), aff'd, 802 F.2d 439 (1st Cir. 1986); Merola v. Exergen Corp., 423 Mass. 461, 668 N.E.2d 351, 355 (1996).

In Schmid, the court dismissed a customer's claim for breach of fiduciary duty against a bank where the bank had acted in accordance with the customer agreement. 622 F. Supp. at 710-

24

11. Applying Massachusetts law (which the plaintiffs allege is controlling here, Cmplt. ¶¶ 33-34), the court noted that the customer agreement "controlled the obligations of the Bank" and that a claim for breach of fiduciary duty could not be sustained if the bank acted consistently with the agreement. Id.  Similarly, in Merola, the Massachusetts Supreme Judicial Court found that a majority shareholder did not breach his fiduciary duty to a minority shareholder by terminating the minority shareholder where the termination was allowed under the minority shareholder's employment contract, even though the relationship was unquestionably a fiduciary one. 668 N.E.2d at 355. Likewise, here the Fidelity agreements governed Fidelity's obligations and Fidelity acted in accordance with those agreements. Any claim for breach of a fiduciary duty based upon a theory of non-disclosure, moreover, must be dismissed in light of the fact that, as argued above, Fidelity fully and repeatedly disclosed all material facts.

The Berensons' claim that Fidelity further breached its fiduciary duty by failing to transfer the payment amount to the payee "as quickly as is commercially practicable," Cmplt. ¶ 76, must fail as well. Fidelity discloses in the BillPay Service Agreement that it may take as long as five business days for the payee to receive payment, SOF ¶ 54, and there is no allegation in the Complaint that payees did not receive payment within five days. Pursuant to Fidelity's automated system, moreover, CheckFree mails a check to the payee or initiates an electronic payment to the payee within 24 hours of the customer's initiation of the transaction, a period of time required to confirm payment information, confirm availability of customer funds and debit them, and transfer the appropriate funds from Fidelity to its vendor, CheckFree, which in turn pays the designated payees whose payment instructions are validated. SOF ¶ 22. There is simply no basis to allege that this practice is commercially unreasonable.

25

16/371842.12

## V.    THE PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT FAILS AS A MATTER OF LAW.

Count V of the Complaint alleges that Fidelity breached the contract that governs the BillPay Service by failing to transfer funds to designated payees as quickly as is commercially practicable and by failing to pay "interest" on the period of "float" between the time a BillPay transaction is debited from a customer's account and the time when the payee is actual credited with those funds. The claim fails as a matter of law because Fidelity's practices comply strictly with the relevant instruments governing the BillPay Service and accrual of dividends on the plaintiffs' mutual fund, which neither require payment of interest or dividends on the "float" nor require execution of payments in the fastest commercially practicable manner. In any event, through CheckFree Fidelity does pay as promptly as is commercially practicable.

As described above, three written instruments govern the contractual relations between Fidelity and the Berensons that are at issue in this case: the BillPay Service Agreement, the Supplemental Information and the prospectus for the Core Account, which in the instance of the Berensons is currently the Cash Reserves mutual fund and was formerly another money market mutual fund. As argued above, these documents clearly establish that (i) customers' accounts are debited on the day they set for initiation of a BillPay transaction; (ii) customers do not earn income on funds that are no longer in their account  and (iii) payees actually receive funds one or more days after a customer initiates a BillPay transaction.

Nothing in any of the subject agreements requires Fidelity to execute payments in the fastest commercially practicable manner.  To the contrary, Section 12 of the BillPay Service Agreement specifically provides that "The service and related documentation are provided 'as is' without any warranty of any kind, either express or implied, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose." As discussed above,

26

16/371842.12

however, Fidelity does, in fact, execute payments as quickly as commercially practicable, SOF ¶ 23 and contracts to pay any penalties for untimely payments if the customer has given proper advance notice. SOF ¶ 54. No allegation is made that Fidelity has made late payments or failed to reimburse the Berensons for any penalties for a late payment. As a matter of indisputable fact, Fidelity's practice is commercially reasonable.

## VI.    THE PLAINTIFFS' CLAIM UNDER THE MASSACHUSETTS TRUTH-IN-SAVINGS LAW FAILS AS A MATTER OF LAW.

Count V of the Complaint purports to assert a cause of action[6] under the Massachusetts Truth-in-Savings Law, Mass. Gen. Laws ch. 140E, §§ 1 *et seq.* Specifically, the Berensons allege that Fidelity failed to provide adequate written disclosures before they opened their accounts, as required by the statute. This claim fails as a matter of law for at least two reasons. First, the statute and its implementing regulations do not apply to Fidelity, which is not a covered "financial institution" within the scope of that particular statute. Second, even it were so included, Fidelity has properly disclosed any and all information that might have been required.

The Massachusetts Truth-in-Savings Law contains just one prescriptive sentence: "Before an account is opened, a financial institution shall disclose information on accounts to a consumer in a written statement which the consumer may retain." Mass. Gen. Laws ch. 140E, § 2(a). The remainder of the statute then directs the Massachusetts Commissioner of Banks to "promulgate rules and regulations prescribing the form, content and distribution of such information and the information to be disclosed which shall include but not be limited to the following: . . . the annual rate of simple interest; the effective annual yield; the formula used in calculating interest . . . . the method of determining the balance on which interest is paid . . fees, charges or penalties . . . ." Id.

---

[6] The statute in fact confers no private right of action.

The Truth-in-Savings Law defines "financial institution" as "a state or national bank, a state or federal savings and loan association, a state or federal savings bank, a cooperative bank, a state or federal credit union, or any person doing business similar to any business referred to" in section one of Mass. Gen. Laws. ch. 167, which regulates banks.    Mass. Gen. Laws ch. 140E, §1.    There can be no dispute that Fidelity is not a bank or a credit union, and the Complaint does not allege that it is.    Rather, Fidelity is a registered broker and dealer under the Securities and Exchange Act and a member of the New York Stock Exchange and other national and regional exchanges.    SOF ¶ 3.

Any attempt by the plaintiffs to suggest that the "similar to" language in the statute might sweep Fidelity within its purview, moreover, is foreclosed by the implementing regulations, which apply only to actual banks, defined as

> any association or corporation chartered by the Commonwealth as a Savings Bank, Cooperative Bank, Credit Union, or Trust Company or any individuals, association, partnership or corporation incorporated or doing a banking business in the Commonwealth, subject to the supervision of the commissioner [of banks] under M.G.L. c. 167, § 2.

Mass. Regs. Code tit. 209, § 4.01.    Fidelity fits none of these descriptions.    SOF ¶ 4; see also Mass. Gen. Laws. ch. 167, § 2 (outlining the Commissioner's responsibilities for "Examination of Banks") (emphasis added).

In any event, the only substantive regulation promulgated under the Massachusetts Truth-in-Savings Law, does nothing more than incorporate regulations under the federal Truth in Savings Act, which also are inapplicable to Fidelity:

> A bank which complies with the consumer deposit account disclosure provisions of 12 CFR Part 230 (Regulation DD) or the provisions of 12 CFR Part 707, the implementing regulations to the federal Truth in Savings Acts, shall be deemed to be in compliance with M.G.L. c. 140E and 209 CMR 4.00.

28

Mass. Regs. Code tit. 209, § 4.04. The federal regulations, incorporated by reference, apply only to "credit unions" or "depository institutions," terms that do not cover Fidelity or the customer accounts at issue in this case. See 12 C.F.R. § 707.1 (covering "credit unions"); 12 C.F.R. § 230.1 (covering "depository institutions"); 12 U.S.C. § 461(b)(1)(A) (lengthy definition of "depository institution" cross-referencing various classes of national bank, state bank, savings association, and credit union). As explained above Fidelity is not chartered as a state bank, nor is it chartered under federal law as a national bank, savings association, or credit union. SOF ¶ 4-5.

Since the Massachusetts Truth-in-Savings Law itself has no specific disclosure requirements, and since the Commissioner of Banks has not promulgated any regulation under the statute that is applicable to Fidelity, the claim under that statute necessarily fails as a matter of law.[7] As explained above, moreover, Fidelity has repeatedly and fully disclosed the terms and conditions of its mutual funds and BillPay service about which the plaintiffs complain.

## VII. THE PLAINTIFFS' CLAIMS UNDER THE MASSACHUSETTS CONSUMER PROTECTION ACT FAIL AS A MATTER OF LAW.

Count VI of the Complaint alleges that Fidelity's failure to pay interest on the BillPay "float" and supposed failures of disclosure together violate the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 1 et seq. ("ch. 93A"). This claim fails as a matter of law because, as previously argued above, the underlying common law and statutory causes of action upon which it is based also fail as a matter of law.

---

[7] In any event, the specified disclosures relating to payment of "interest" that the statute directs the Commissioner of Banks to regulate are inapposite in this case because, as explained above, the Berensons' Core Account money market mutual fund from which BillPay debits are made does not earn "interest" at all. Rather, it accrues dividends on shares in the fund.

16/371842.12

The Massachusetts Consumer Protection Act declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. Section 9 of the statute, in turn, confers a cause of action upon individual consumers who are "injured by another person's use or employment of any method, act or practice declared to be unlawful in section two." Id., § 9.

The statute itself does not precisely define the contours of "unfair or deceptive acts or practices." While actual violation of statutory or common law duties is not a prerequisite to liability under ch. 93A, courts have repeatedly emphasized that a defendant's conduct must "fall 'within at least the penumbra of some common-law, statutory or other established concept of unfairness' or [be] 'immoral, oppressive, or unscrupulous.'" St.-Gobain Indus. Ceramics, Inc. v. Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001), quoting PMP Assoc., Inc. v. Globe Newspaper Co., 366 Mass. 593, 321 N.E.2d 915, 917 (1975). Although "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a c. 93A violation is a question of law." Schwanbeck v. Federal-Mogul Corp., 31 Mass. App. Ct. 390, 414, 578 N.E.2d 789, 803-04 (1991) (internal citations omitted), rev'd on other grounds, 412 Mass. 703, 529 N.E.2d 1289 (1992).

In this case, as argued above, the undisputed facts leave no doubt that Fidelity fully disclosed the terms of its BillPay service and the accrual of dividends on the Berensons' money market mutual fund. Fidelity did not make any misrepresentations or commit any other acts or omissions that even come close to implicating a common law, statutory, or any other established sense of "unfairness." Count VI of the Complaint must therefore be dismissed. See AT&T v. IMR Capital Corp., 888 F.Supp. 221, 256 (D. Mass. 1995) (denying ch. 93A claim in the absence of actual misrepresentation; vague allegations about defendant's "duty" or negligence "does not

'reek of callousness' or 'meretriciousness' [and] is not the sort of 'truly inequitable marketplace behavior' which Chapter 93A was intended to punish."); <u>Barden v. Harpercollins Publishers, Inc.</u>, 863 F. Supp. 41, 46 (D. Mass. 1994) (granting summary judgment to defendants on both misrepresentation and ch. 93A claims).

## VIII.   THE PLAINTIFFS' CLAIM UNDER THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT FAILS AS A MATTER OF LAW.

Count VII of the Complaint alleges in the alternative (to the extent that the law of Massachusetts and its consumer protection statute do not apply) that Fidelity's failure to pay interest on the BillPay "float" and alleged omissions of disclosure violate the District of Columbia Consumer Protection Procedures Act ("DCCPPA"), D.C. Code §§ 28-3901 *et seq.* Because, as argued above, the underlying common law and statutory causes of action upon which this claim is based fail as a matter of law, it likewise fails.

Specifically, the Berensons allege that Fidelity has violated four subsections of the DCCPPA provision that defines "unfair trade practices":

> It shall be a violation of this chapter . . . for any person to:
>
> (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;
> . . .
> (d) represent that goods or services are of a particular standard, quality, grade, style, or model, if in fact they are of another;
>
> (e) misrepresent as to a material fact which has a tendency to mislead;
>
> (f) fail to state a material fact if such failure tends to mislead . . . .

D.C. Code § 28-3904.[8]  In essence, these provisions do nothing more than provide a statutory

basis of action for various species of misrepresentation.  See Alicke v. MCI Communs. Corp.,

111 F.3d 909 (D.C. Cir. 1997) (dismissing DCCPPA claim based on failure to satisfy elements

of common law fraud or misrepresentation).  While the list of unfair practice enumerated in § 28-

3904 is "not exclusive," the reach of the statute simply extends to practices that may "violate

other laws, including the common law."  District Cablevision L.P. v. Bassin, 828 A.2d 714, 723

(D.C. 2003); see also Osbourne v. Capital City Mortgage Corp., 727 A.2d 322, 325 (D.C. 1999)

("The CPPA protects consumers from those 'unlawful trade practices' enumerated in § 28-3904,

as well as practices prohibited by other statutes and common law.").

Here, the undisputed facts demonstrate that Fidelity did not make any misrepresentation

or otherwise act in violation of any statutory or common law duties.  Alicke is particularly

instructive in this regard.  There the plaintiff consumer alleged that MCI's practice of billing in

full-minute increments without disclosing its rounding-up policy on the bill misled consumers

about the cost of their long distance phone calls in violation of the DCCPPA.  Alicke, 111 F.3d

at 911.  The court rejected the plaintiff's argument and dismissed the case:

> Because no reasonable customer could actually believe that each
> and every phone call she made terminated at the end of a full
> minute, the customer must be aware that MCI charges in full-
> minute increments only.  Accordingly, MCI's billing practices
> could not mislead a reasonable customer.
>  . . . .
> [Plaintiff] has failed to state a claim . . . because there is nothing in
> the way MCI reports the length of long-distance phone calls that
> could mislead a reasonable consumer into thinking that she
> received more service than she really did receive and thereby cause
> her either to use more of MCI's service than she otherwise would

---

[8] In an apparent typographical error, the Complaint cites subsections (a), (d), (e), and (f) of § 28-3909.  Section 28-3909 concerns the powers of the Corporation Counsel, contains no subsection (d), (e) or (f), and has nothing to do with defining unfair trade practices.  Cmplt. ¶ 93.

32

> have or to refrain from switching to another carrier that bills for
> service in smaller increments.

Id. at 912.  Similarly, in this case no reasonable customer -- much less a highly sophisticated

businessman and attorney such as Mr. Berenson -- could actually believe that he would continue

to earn interest on money that had been debited from his account at his own instruction.  Fidelity

has repeatedly told its customers exactly how its BillPay process works.  The Berensons'

apparent failure to listen cannot justify the present action.

## Conclusion

For the reasons described above, Fidelity respectfully requests that the Court dismiss all

counts in the complaint.

> Respectfully submitted,
> NATIONAL FINANCIAL SERVICES LLC and
> FIDELITY BROKERAGE SERVICES LLC
>
> By their attorneys,
>
>
> /s/ Lawrence H. Martin
> Lawrence H. Martin (D.C. Bar No. 476639)
> FOLEY HOAG LLP
> 1747 Pennsylvania Ave., N.W.
> Washington, D.C. 20006-4604
> (202) 223-1200
>
> Nicholas C. Theodorou (Pro Hac Vice)
> John A. Shope (Pro Hac Vice)
> Kevin C. Conroy (Pro Hac Vice)
> William W. Fick (Pro Hac Vice)
> FOLEY HOAG LLP
> 155 Seaport Boulevard
> Boston, MA 02210
> (617) 832-1000

Dated:  November 7, 2003

16/371842.12

> THIS SERVICE AND RELATED DOCUMENTATION ARE
> PROVIDED "AS IS," WITHOUT ANY WARRANTY OF ANY
> KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT
> NOT LIMITED TO, THE IMPLIED WARRANTIES OF
> MERCHANTABILITY AND FITNESS FOR A PARTICULAR
> PURPOSE.

Id.

54.    Section 13 of the current Fidelity BillPay Service Agreement explains that in

order to be eligible for Fidelity's on-time Payment Guarantee, where Fidelity pledges to

reimburse the customer's penalty if a payment is delivered late, the Transaction Date must be

scheduled at least five business days prior to the actual due date.  Id.

55.    Section 18 of the current Fidelity BillPay Service Agreement provides:

> You agree to pay a monthly fee for the Service.  The monthly fee
> is based on either the level of assets or the trade activity in your
> Fidelity Relationship Household.  Fidelity Accounts in Active
> Trader Households (36 or more trades in a rolling 12 month
> period) or in Households that maintain $100,000 or more will not
> be charged a monthly BillPay fee.  All other BillPay customers
> will be charged a monthly fee of $6.95.

Id.

56.    Section 27 of the current Fidelity BillPay Service Agreement provides: "This

Agreement shall be governed by the laws of the Commonwealth of Massachusetts and the United

States of America."  Id.

57.    Section 4 of the current Fidelity global Customer Agreement provides:

> I have received and read a copy of the prospectus of the transaction
> fund selected by me, containing a more complete description of the
> fund and its fees, charges and operations.

Fagan Aff., ¶ 3 & Ex. A (current Customer Agreement).

58.    Section 7 of the current Customer Agreement also provides:

> [T]he Fidelity BillPay service is subject to the Fidelity BillPay
> Service Agreement . . . [A]ny use of the Fidelity BillPay service

- 13 -

> confirms my agreement to the Fidelity BillPay Service Agreement
> . . . . I understand the monthly fee is $6.95 and is waived for
> BillPay customers who trade 36+ times in a rolling 12-month
> period or maintain $100,000 or more in certain retail assets at
> Fidelity. All other customers will be charged a $6.95 monthly fee.
> See the Fidelity BillPay Service Agreement for complete details.

Id.

59.   Section 14 of the current Customer Agreement also provides:

> Communications by mail, electronic means, messenger, telegraph,
> or otherwise, sent to me at the U.S. postal or electronic mail
> address listed on the application, or any other address I may give
> FBS, are presumed to be delivered to and received by me whether
> actually received or not.

Id.

60.   Section 17 of the current Customer Agreement provides:

> This Agreement and its enforcement shall be governed by the laws
> of the Commonwealth of Massachusetts, except with respect to
> conflicts of law . . . [and] shall cover individually and collectively
> all accounts that I may open or reopen with Fidelity . . . .

Id.

61.   Section 18 of the current Customer Agreement also provides:

> I agree that all controversies that may arise between us (including
> but not limited to controversies concerning this or any other
> account maintained with you), whether arising before, on or after
> the date this account is opened, shall be determined by arbitration .
> . . . No person shall bring a putative or certified class action to
> arbitration, nor seek to enforce any pre-dispute arbitration
> agreement against any person who has initiated in court a putative
> class action . . .until: (a) the class certification is denied; (b) the
> class is decertified; or (c) the customer is excluded from the class
> by the court. Such forbearance to enforce an agreement to arbitrate
> shall not constitute a waiver of any rights under this agreement
> except to the extent stated herein.

Id.

62.    The current prospectus for Fidelity Cash Reserves provides: "Shares earn dividends until, but not including, the next business day following the day of redemption." Fagan Aff., ¶ 3 & Ex. C.

Respectfully submitted,

NATIONAL FINANCIAL SERVICES LLC
FIDELITY BROKERAGE SERVICES LLC
By their attorneys,


/s/ Lawrence H. Martin
Lawrence H. Martin (D.C. Bar No. 476639)
FOLEY HOAG LLP
1747 Pennsylvania Ave., N.W.
Washington, D.C. 20006-4604
(202) 223-1200

Nicholas C. Theodorou (Pro Hac Vice)
John A. Shope (Pro Hac Vice)
Kevin C. Conroy (Pro Hac Vice)
William W. Fick (Pro Hac Vice)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000


Dated: November 7, 2003


17/506945.4