IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOAN BERENSON AND DAVID BERENSON, | : | |
| Individually and on behalf of all others similarly situated, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | 1:03 CV 02004 RBW |
| | : | |
| NATIONAL FINANCIAL SERVICES, LLC, et al., | : | |
| | : | |
| Defendants | : | |
| | : | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

Plaintiffs, Joan Berenson and David Berenson, individually and on behalf of all others

similarly situated, oppose the motion of Defendants, National Financial Services, LLC ("NFS")

and Fidelity Brokerage Services, LLC ("FBS") (collectively, "Fidelity") to dismiss the

Complaint in its entirety or for summary judgment thereon, as follows:

**I.    Introduction**

Fidelity's motion papers are as disingenuous as the purported "notice" that Fidelity

allegedly gave to its BillPay customers regarding the true charges, fees and costs of the Fidelity

BillPay service.  In order to mislead this Court into believing that (i) Fidelity's BillPay customers

somehow knew, or at least were apprised, that Fidelity—and not the individual

customers—would obtain ownership rights to the customer's monies once a transaction was

designated under the BillPay service; and (ii) that Fidelity—and not the individual

customers—would earn interest on those monies, Fidelity cobbles together a series of purported

buckslips, form notices and  agreements.

In so doing, however, Fidelity ignores the plain language of those agreements and would have this Court draw all of the reasonable inferences from those agreements against the Berensons, the non-moving parties, which of course, is impermissible on a motion for summary judgment. Indeed, only now does Fidelity fully and faithfully advise the Court exactly what Fidelity failed and refused to inform its BillPay customers previously: that any customer who "prefers" to earn interest up until the time a designated payee actually receives payment may do so without using the BillPay service simply by writing checks on his or her Fidelity account, by writing and mailing the checks themselves. Motion at Statement of Material Facts, No. 25.[1] That is the very crux of this case! Fidelity completely failed and refused to inform its BillPay customers of this before.[2] Nowhere in the BillPay Agreements is this set forth. Nowhere in the thicket of buckslips or other purported notices allegedly provided to Fidelity's customers is this set forth. Nowhere on Fidelity's internet website is this set forth.[3]

Instead, to conceal the inadequacy of its notices, Fidelity bootstraps to its BillPay service the underlying agreement(s) for its customer's "core accounts" (what Fidelity calls its "Customer

---

[1]    Fidelity concedes that its customers (here, the Berensons) may write checks on their core accounts and that the shares in the underlying accounts are not redeemed until the designated transferee has received credit for the designated funds. From this, it seems apparent that, under the BillPay service, Fidelity and/or its vendor, CheckFree Corporation ("CheckFree") could easily write the checks for the customers and that the mutual fund shares in the underlying accounts would not be redeemed until the designated transferee has received credit for the designated funds. Indeed, as set forth, *infra*, such is the norm not only in traditional consumer financial transactions but apparently also in electronic bill payment services provided by financial institutions such as Fidelity. Thus, there is no legitimate business reason for precipitately debiting a customer's account and forcing a customer to prematurely redeem its mutual fund shares before the BillPay checks are issued via the BillPay service. Indeed, there is no ascertainable reason whatsoever except that Fidelity (and possibly, CheckFree) seek to profit from the BillPay service, at the customer's expense, without having provided due (or any) notice to the BillPay customers.

[2]    The Berensons do not mean to imply that by informing the Court of this, Fidelity has somehow informed its BillPay customers of this.

[3]    Without the benefit of discovery, one can only infer that Fidelity made a deliberate business decision not to fully and faithfully inform its customers of exactly how the BillPay Service works or what the true costs to the customer were because Fidelity didn't want its customers to know that the alleged "convenience" being provided to them actually benefited Fidelity (and its vendor, CheckFree), did so to the detriment of the customer and ran

Agreement") and from those multitude of agreements incorrectly argues that the BillPay customers had notice of exactly how the BillPay service worked.[4]  This is absurd.  Fidelity never told its BillPay customers that the Customer Agreements were to be part of the BillPay Service and that the terms of the Customer Agreements and any prospectuses would apply to the Fidelity "trust" account into which BillPay monies were transferred.  As that scenario would apply to the Berensons, Fidelity contends that because the Berensons' Customer Agreement purportedly informed the Berensons that when they redeemed shares from their account, they would not continue to earn interest ("dividends" according to Fidelity[5]) on those shares (Motion at Statement of Material Facts, No. 12[6]) and because the Berensons are purportedly "sophisticated" investors, they should have known that they would not earn any interest on monies designated in the BillPay service and placed into the Fidelity trust account.  This is the primary "factual" basis on which Fidelity's motion rests.  It is misplaced.

---

contrary to established banking practices regarding check payment, namely, that the customer retains ownership of his funds and continues to earn interest until the payee receives and takes possession of the customer's funds.

[4]    This, of course, unilaterally imposes upon each Fidelity customer, regardless of sophistication, a never-ending burden (and, as Fidelity would have it, a legal obligation) to review the terms and conditions of each Agreement individually and together with each and every other Agreement pertaining to every Fidelity account or service.  One can imagine Fidelity's millions of customers spreading out their agreements, notices and buckslips like a patch work quilt on their kitchen tables and spending hours comparing the details of each term and condition from one notice or agreement with each term and condition of the numerous other notices or agreements.

[5]    Fidelity argues the use of the term "interest" by the Plaintiffs is incorrect, and that the accurate description is "dividend income" earned, or rather not earned, on mutual fund shares.  Fidelity apparently ignores the fact that the Fidelity Cash Reserves Money Market Fund serving as the "Core Account" for the Berensons is based solely upon interest bearing obligations.  Dividends as defined in the corporate world require a declaration by a Board of Directors, and are neither accrued nor payable on a day-to-day basis as a money market fund yield is, and as the Cash Reserves Money Market Fund is.  Indeed, the Cash Reserves yield is specifically promoted by Fidelity on a daily yield basis.  Fidelity may currently label the yield as a "dividend", but in actuality the yield is simply the daily fluctuating market yield of the underlying interest paying obligations.  Such yields are not deemed to be dividends under 2003 tax law due to their true interest bearing status.  Accordingly, the Plaintiff's will continue to use the term "interest".

[6]    Fidelity fails to clarify for the Court that the Berensons' "switch" from the Fidelity Daily Income Trust as their "Core Account" in May, 2001 to the Fidelity Cash Reserves Money Market Fund was forced upon them by Fidelity's discontinuation of the Daily Income Trust, just as Fidelity, Plaintiffs are apprised, has now in turn discontinued the Cash Reserves Fund.

Simply put, the Berensons did not know, and they could not have known, that they would not earn any interest on the monies that Fidelity held for the Berensons and put into a "special" Fidelity account for purposes of BillPay.  Attached as Exhibit 1 is the Affidavit of Joan Berenson.  Attached as Exhibit 2 is the Affidavit of David Berenson.

The Customer Agreements provide that when a customer redeems shares in their core account, the customer obtains the monies.  However, under the BillPay agreements, on any given "transaction date," when Fidelity prematurely redeems shares for the Berensons, it then places those monies in trust in a "special" Fidelity account for the express purpose of paying the Berensons' designated payee.  The Berensons' Customer Agreement is completely silent on this trust account.  The BillPay Agreements and Fidelity's many purported notices and buckslips to its customers (including the Berensons) are all silent on this trust account.  And, despite all of Fidelity's deliberations to ensure its website and customer relations are on the cutting-edge, with regard to this issue, Fidelity fell off the edge:  there is nothing on Fidelity's internet website that addresses these particular circumstances.[7]

We do not know from Fidelity's motion papers what the proverbial "reasonable" customer is to understand because the motion papers stop short of explaining the legal implications of why Fidelity failed to inform its customers that no interest would be paid on customer monies placed into this "special" Fidelity account, interest as would ordinarily be earned otherwise in the case of a check traditionally drawn on the customer's account or why the

---

[7]      One should not have to remind Fidelity that Fidelity was not the designated payee under the BillPay service.  The purpose of BillPay was not to pay Fidelity so that Fidelity could pay a customer's bills.  Indeed, Fidelity's "guarantee" of payment goes only so far as to repay any service fees or late fees incurred by the customer in the vent of a late payment.  Surely, Fidelity does not contend that it stands in the shoes of its BillPay customers vis-à-vis the gas company or the phone company.

plain language of the Customer Agreement, when read together with the BillPay Agreements, is not vague and ambiguous (it is clearly susceptible to more than one interpretation, given Fidelity's apparent interpretation vis-à-vis the Berensons' interpretation and understanding).

Indeed, the only terms and conditions that can be reasonably inferred from the parties' relationship is that BillPay was supposed to operate like a normal checking account, through normal automated clearinghouse channels, in which interest is earned until the designated payee receives credit for the designated funds, except that the BillPay customers paid Fidelity to transfer the monies or, in certain circumstances, to write the check and mail it. Why would anyone believe otherwise? Again, those were the actual expectations and understandings of the Berensons. Ex. 1 and 2. If the Berensons, as the "sophisticated" investors Fidelity alleges them to be, understood this to be the case, then, they submit, Fidelity failed to give proper notice to the contrary. Why would an unsophisticated investor understand otherwise?[8]

## II.    Factual Background: Federal Rule 56(f)

Fidelity's motion papers purport to set forth all of the material facts that are (allegedly) not in genuine dispute in this case, and in so doing go well beyond what the actual content of  its referenced documents. However, the facts are not yet at issue, Rule 26 initial disclosures have not been made, and discovery not even begun. [9]

---

[8]      Indeed, just as it took a "highly sophisticated" Attorney General to discover the long-standing practice in numerous mutual funds to engage in after hours trading at an undisclosed cost to consumers, so it appears to have taken the Plaintiffs in this case to bring Fidelity's long-standing self-dealing practice to light.

[9]      In conversations between counsel before this Motion was filed, Defendants' counsel was asked to expedite discovery, but refused Plaintiffs' counsel's request. Defendants, having felled a small forest, have now filed motion papers comprising over 150 pages, including numerous documents and affidavits.

At this point in time, almost all of the material facts of this case are in the sole possession of Fidelity and/or its vendor, CheckFree.[10] Moreover, although affidavits are attached to the motion papers, the veracity of the affiants' statements are genuinely in question where they exceed a simple recitation of the language of the agreements or a summary of certain Fidelity documents. In some instances, the affiants purport to be expert witnesses offering opinion evidence as to the legal and financial rationale behind why Fidelity purports to operate BillPay as it does (*i.e.*, offering opinions as to the so-called "good funds" model of banking and the legal effect of certain documents).[11] The affiants have not been cross-examined. As such, the

---

[10]     Fidelity has filed a motion to transfer venue to the District of Massachusetts, raising a *forum non conveniens* argument. The Berensons do not concede here that because it appears that almost all of the facts are in Fidelity's possession that the motion has any merit and that the requested transfer is justified. Indeed, CheckFree is headquartered in Georgia and various other third-party depositions will occur outside of the Commonwealth of Massachusetts. In other words, the so-called "inconvenience" of this case being tried in this forum is not an inconvenience to the class members or even Fidelity, but simply a thinly veiled attempt to usurp Plaintiffs' choice of forum. Under Fidelity's simplistic theory, no consumer could ever bring a claim against Fidelity in any jurisdiction other than Massachusetts. This is absurd.

[11]     Fidelity places great emphasis on the so-called "good funds" model, using it as a theoretical basis for assuming complete ownership of a BillPay customer's funds before they are properly transferred to a designated payee. *See* Zaslau Affidavit at ¶ 10. Fidelity contends that "[o]therwise, Fidelity would assume the risk that a customer might withdraw funds in between requesting a payment and the payment reaching the payee." *Id.* This is disingenuous at best, nonsensical at worst. As Fidelity contends throughout its motion papers, under BillPay, there are essentially two ways to transfer monies: by wire transfer or check. Under either of BillPay's methods of payment, if there are insufficient funds in the core account on the "transaction date," then Fidelity does not process the transaction. Ordinarily, outside the BillPay service, if a wire transfer is to be made as of a certain date and there are insufficient funds in the subject account, then Fidelity simply does not process the requested wire transfer. In short, there is no legitimate business reason to prematurely redeem shares in the core account in order to make a wire transfer. Wire transfers account for approximately seventy-five percent (75%) of the transactions processed by CheckFree according to the CheckFree internet website. Simply put, sufficient funds are either present or they are not. There is no need to withdraw them from an account before the wire transfer is to be made. Similarly, if a check is to be drawn under BillPay, then it is no different than an ordinary check and the risk of insufficient funds at time of check cashing by the merchant falls not on Fidelity but on the customer, as it ordinarily would under established banking and legal principals. Fidelity concedes that checks may otherwise be drawn (without the use of BillPay) on the core accounts and interest earned until the designated transferee receives credit for the funds. Indeed, the Affidavits generally raise more questions than they answer in addressing the actual operations between Fidelity and CheckFree and the propriety of the BillPay operations.

        Moreover, the name "good funds" business model is completely misleading. Fidelity would lead us to believe that no other banking is conducted on a "good funds" business model. Specifically, Fidelity would lead us to believe that checks drawn and paid under ordinary clearinghouse channels are not based upon a "good funds" model and that Fidelity permits its customers to write checks without having "good funds" to back them up. Here, Fidelity contends that by segregating the designated monies under the BillPay service, it ensures that payment will

Berensons cannot properly oppose the motion with affidavits that contain facts essential to justify the party's opposition. Attached as Exhibit 3 is the Affidavit of Douglas A. Rubel, Esquire, counsel for Plaintiffs.

Moreover, as to the affiants' assertions, the asserted "good funds" model is dubious at best, and does not comport with at least one other electronic bill pay service in the industry. Because discovery has not yet been had, we will use our personal experience to inform the Court of at least one instance where a financial institution, also using CheckFree as its vendor, does not exercise control over its customer's funds pending the payment to a third party payee.[12] For example, Navy Federal Credit Union operates an electronic bill pay service where funds, as expected, are debited from a customer's account AFTER the third party payee cashes the check or funds are transferred electronically. *See* Affidavit of Kenneth L. McWilliams, attached hereto as Exhibit 4. At a minimum, Fidelity's "good funds" model needs to be scrutinized and tested vis-à-vis standard industry practices and adequate disclosure requirements against the legal standards set forth in the Complaint and the concomitant factual disputes contained in Defendants' instant Motion to Dismiss or for Summary Judgment and Plaintiffs' opposition thereto.

Accordingly, the Berensons respectfully request this Court to refuse Fidelity's application for judgment as material facts are clearly in dispute as set forth herein and in the attached affidavits, or, pursuant to Federal Rule 56(f), to order a continuance of the consideration of this

---

be made. In reality, it simply ensures that Fidelity receives the benefit and use of the customer's monies rather than the customer (without notifying the customer, of course).

[12]    When discovery is commenced, Plaintiff's will depose third-party financial institutions as well as use expert testimony to refute Fidelity's asserted 'good funds" model.

motion to permit affidavits to be obtained, depositions to be taken and full discovery to be had.

Fed.R.Civ.P. 56(f).

### III.    The Material Facts In Genuine Dispute

Fidelity's "material facts" are in genuine dispute or at least open to question at this time.

For example, Fidelity indicates that it outsources its BillPay service to CheckFree.  Motion at

Statement of Material Facts, No. 17.  Fidelity sets forth considerable alleged factual detail on

how Fidelity operates BillPay through CheckFree.  *Id* at ¶¶ 17-24.  However, there are no factual

statements regarding the relationship between Fidelity and CheckFree (including any notice

having been given to the BillPay customers that Fidelity was outsourcing to CheckFree).

Moreover, CheckFree regularly contracts directly and indirectly with individuals across the

United States to provide the same type of electronic banking payment service offered by Fidelity.

Under those circumstances, Plaintiffs are advised that CheckFree does not require that monies be

transferred to a CheckFree account, but that the monies come directly from the customer's

account and, therefore, the monies continue to belong to the customer and to earn interest or

otherwise benefit the customer until the designated payee is paid.  Ex. 3 (Rubel Affidavit).

Discovery of CheckFree is obviously needed before this case can be decided.

Similarly, in Statement of Fact No. 28, Fidelity affirmatively sets forth that Fidelity's

agreements and prospectuses disclose that "the customer will not earn dividend income on funds

after they have been debited from his or her account.  Fagan Aff. ¶ 5."  This is misleading and

the inferences to be drawn from that factual statement are not as Fidelity would have this Court

believe.  While a Fidelity customer no longer earns interest on redeemed shares, Fidelity's

Agreements and prospectuses fail to disclose that the customer will not earn interest or dividend

income on monies that Fidelity is holding in trust in a Fidelity account for the benefit of its

customer.  Again, that is the crux of this case and the notice that was not given to the BillPay customers.

## IV.    Legal Discussion

### A.    Standard of Review

Fidelity has partially recited the appropriate standard of review in its motion papers.  It bears noting that summary judgment is an extreme remedy that should be granted only when it is "quite clear what the truth is."  *Sator v. Arkansas National Gas Corp.*, 321 U.S. 620, 627 (1944); *Pollar v. CBS*, 82 S.Ct. 486 (1962).  The evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Tao v. French*, 27 F.3d 635, 638 (D.C. Cir. 1994).  If material facts are at issue, or though undisputed are susceptible to divergent inferences, summary judgment is not available.  *Id*.  To be successful on a motion for summary judgment, the moving party must demonstrate the absence of any material factual issue.  Any doubt, however slight, as to whether an issue of fact has been raised, is sufficient to preclude a grant of summary judgment.  *Washington Post Co. v. Keogh*, 265 F.2d 965, 967 (1966).  Under this standard, the Defendants are not entitled to either the dismissal of the Complaint or the entry of summary judgment thereon.  Plaintiffs' claims are legally viable and there exist genuine disputes of material facts as to each of them.

### B.    The Berensons' Claims Under the Electronic Funds Transfer Act (Count I) are Viable and Should Be Tried

Defendants contend that Count I of the Complaint for Violation of the Electronic Funds Transfer Act ("EFTA") should be dismissed as a matter of law for three reasons: first, that potential interest income is not a charge, cost or fee under the EFTA; second, that Fidelity

provided adequate notice of the charge, cost or fee incurred; and, third, that EFTA's error
resolution provisions do not apply in this case.  Motion at pp. 13-21.  Each is misplaced.

First, Fidelity recites chapter and verse on the cannons of statutory construction and
provides the Court with dictionary definitions of "fee" and "charge," but then simply ignores
those definitions.  A "charge" is said to be an "expense, cost" or "the price demanded for
something."  Motion at p. 14 (*citing Webster's New Collegiate Dictionary* 186 & 146 (1981)).
Fidelity then defines the Berensons' allegations to mean an "opportunity cost" ("a foregone
opportunity to earn an indeterminate amount of future income") and makes the quantum leap that
the "opportunity cost" is not a "fee" or "cost" as contemplated under the statute.[13]

There is no need for a convoluted semantic debate worthy of biblical scholars on this
issue. The simple answer is that a "charge" is a "charge" and a "cost" is a "cost," and that the
EFTA itself, and the implementing regulations, do not make the fine distinctions that Fidelity
suggests.  Moreover, the Berensons complain that the "cost," charge" and "expense" to them of
the BillPay service is that Fidelity took the Berensons monies out of their core account and
placed it into a Fidelity account in which Fidelity held the monies for the benefit of the
Berensons (for an easily ascertainable period of time for each transaction) and did not pay the
Berensons any interest on those monies while they resided in the "special" Fidelity account.
That is, in any parlance, the "cost of doing business" with Fidelity under the BillPay service, of
which "cost" Fidelity failed to notify the Berensons.  Indeed, "but for" the BillPay service—and
each electronic fund transfer in question—the Berensons would not have incurred the "cost" of
losing ownership rights in their funds and interest/dividends thereon so that Fidelity could

---

[13]    For Fidelity to argue that an ". . opportunity to earn an indeterminate amount of future income . ."  is not a
fee or charge is to argue that any floating rate debt instrument similarly does not have a "charge" for interest.  If no
fee or charge was intended, Fidelity should have no compunction with returning the "mere opportunity cost" derived
from its BillPay customers to the Plaintiff Class.

unilaterally invoke its so-called "good funds" business model and purport to ensure that it did not assume any risk in the underlying transaction (as though any financial institution assumes any risk otherwise). <u>Even Fidelity acknowledges and agrees that it benefits from this scenario</u>: "[a]nd while the retention of interest for a brief period of time by Fidelity and CheckFree may be construed as a benefit to them and an opportunity the plaintiffs lose, it also offsets the expense of the labor intensive bill payment service, thereby reducing the charge to the customer." Motion at p. 15.[14]

For Fidelity to argue that the lost benefit of interest earned on mutual fund shares prematurely redeemed by Fidelity is not a "charge" is to deny economic reality. A transfer of funds derived from the use of money is either revenue, loan, capital or a donation. To argue that the amounts gained from Fidelity's self-dealing "float" of the Berensons' money is not a charge is to argue that the receipt of the benefit of these monies was not income to Fidelity (either directly as revenue or indirectly as an expense reduction). Neither generally accepted accounting principles ("GAAP") nor the United States Internal Revenue Code would recognize such an inventive "exclusion" of income. Discovery of Fidelity is obviously needed before this case can be decided.

To the extent that Fidelity seeks to invoke Official Staff Commentary ¶ 9(b)(3)3 ("the requirement to disclose any fees assessed against the account does not include a finance charge

---

[14]    For a financial institution such as Fidelity, valued in the billions of dollars, and with billions of dollars under management, to imply that it does not take the use of money into account during BillPay transactions is specious. The very essence of the Fidelity enterprise is based upon the concept of the use of money. Moreover, the notion that there is a substantial cost to Fidelity, which outsources the BillPay service to CheckFree, is humorous. Fidelity contends that it provides the BillPay service to its customers as a "convenience" and, to the extent that its customers do not have considerable assets in Fidelity accounts, charges a considerable $9.95 monthly fee to certain customers and a $4.95 monthly fee to others. More disingenuous still is the notion that the service is somehow "labor intensive." Isn't the entire basis of the electronic funds transfer system that it is an automated and automatic system that reduces labor (the customer's and the financial institution's)?

imposed upon the account during the statement period"), that provision and the related

provisions are clearly inapplicable, as they relate to charges and fees associated with the

underlying account itself, not with charges or fees that are imposed from without strictly because

of a customer's use of the BillPay service.  If someone is benefiting (Fidelity), then someone else

is paying a cost (the Berensons).  In banking, it is a zero sum game.

Fidelity's contention that the Berensons' definition of "fee" would impose undue

reporting requirements upon Fidelity is also misplaced.  The alleged burden of the reporting

requirements is of Fidelity's own making.  Had it provided proper notice, it is arguable that none

of this would be in issue.  Fidelity cannot now be allowed to contend that because it violated the

EFTA or various consumer protection statutes that it has an undue reporting requirement.

Moreover, the reporting is not necessarily of the foregone interest/dividends from the core

account, which is easily calculable in a stable money market account—such requirements are

imposed routinely under the Employee Retirement Income Security Act ("ERISA").  The

reporting is likely to be of interest earned while a customer's monies are in the Fidelity account,

being held in trust by Fidelity for the putative benefit of the customer.

Fidelity's statutory safe harbor argument also must fail.  First, simply because there is no

model form to provide a safe harbor for failing to properly notify a customer of a charge does not

mean the charge does not require notice.  It means that the legislature did not contemplate

providing a safe harbor for the failure to provide such notice.  Second, the model disclosures

only provide a safe harbor for the form of certain of the contemplated disclosures, not a safe

harbor for all content that is required, under differing circumstances, to be disclosed.  The

Regulations provide:

> Form of disclosures. Disclosures required under this part shall be
> clear and readily understandable, in writing, and in a form the

12

> consumer may keep. A financial institution may use commonly
> accepted or readily understandable abbreviations in complying
> with the disclosure requirements of this part.

12 CFR § 205.4. As applicable here, the model forms that comprise Appendix A contemplate

that if a "per transfer" charge is being incurred that a specific dollar amount be inserted into the

form. However, it does not preclude that the financial institution provide notice of an

ascertainable per transfer charge of interest lost.

As to the content of the notice itself, as set forth above, Fidelity did not provide any

notice to the Berensons that the monies transferred to the Fidelity account would not accrue

interest. To repeat, Fidelity <u>never</u> told its BillPay customers that the Customer Agreements were

to be part of the BillPay Service and that the terms of the Customer Agreements and any

prospectuses would govern the Fidelity trust account into which BillPay monies were

transferred. As that scenario would apply to the Berensons, Fidelity contends that because the

Berensons' Customer Agreement purportedly informed the Berensons that when they redeemed

shares from their account, they would not continue to earn interest or dividends on those shares

(Motion at Statement of Material Facts, No. 12) and because the Berensons are purportedly

"sophisticated" investors, they should have known that they would not earn any Fidelity account.

This is the primary "factual" basis on which Fidelity's motion rests. It is misplaced.

Simply put, the Berensons did not know, and they could not have known, that they would

not earn any interest/dividends on the monies that Fidelity held for the Berensons and put into a

Fidelity account for purposes of BillPay. Ex. 1 and 2.

The Customer Agreements provide that when a customer redeems shares in their core

account, the customer obtains the monies. However, under the BillPay agreements, on any given

"transaction date," when Fidelity prematurely redeems shares for the Berensons, it then places

those monies in trust in a "special" Fidelity account for the express purpose of paying the

Berensons' designated payee.  The Berensons' Customer Agreement is completely silent on this

trust account.  The BillPay Agreements, and Fidelity's many purported notices and buckslips to

its customers (including the Berensons), and Fidelity's internet website are all silent on this trust

account.

For the foregoing reasons, Fidelity's Motion to Dismiss Count I or for Summary

Judgment thereon, should be denied.

C.    **Plaintiffs' Claims for Intentional Misrepresentation (Count II) and Negligent Misrepresentation (Count III) Are Viable And Should Be Tried**

For reasons similar to those set forth above, Fidelity's motion as to Plaintiffs' claims for

intentional and negligent misrepresentation should be denied.  Plaintiffs' claims for intentional

misrepresentation and for negligent misrepresentation are similar.  Under Massachusetts law, a

defendant can be held responsible not only for outright untrue statements, but also for giving

misleading partial information or for telling half-truths.  *Golber v. BayBank Valley Trust Co.*, 46

Mass.App.Ct. 256, 258, 704 N.E.2d 1191, 1193 (1999) (*citing Kannavos v. Annino*, 56 Mass. 42,

48, 247 N.E.2d 708, 711-12 (1969)).  Where a defendant had some special obligation to a

plaintiff based upon a fiduciary relationship between them, an affirmative obligation is imposed

upon the defendant to fully and faithfully inform the plaintiff of all pertinent and material facts.

Similarly, where a defendant actually speaks to an issue, he must do so truthfully.  *Kannavos,*

*supra,* 356 Mass. 42, 47, 247 N.E.2d 708, 711.  *See also Nota Constr. Corp. v. Keyes Assoc.,*

*Inc.*, 45 Mass.App.Ct. 15, 19, 694 N.E.2d 401, 405 (1998) (*citing* Restatement (Second) of Torts

551 (1997)).  This fundamental premise is set forth in the Restatement (Second) of Torts:

> [a] representation stating the truth as far as it goes but which the
> maker knows or believes to be materially misleading because of

his failure to state additional or qualifying matters is a fraudulent misrepresentation.

Restatement of Law, Second, Torts 2d § 529 (1976).  In this regard, a statement that contains only favorable matters and omits all references to unfavorable matters is as much a false representation as if all the facts and circumstances stated were untrue.  *Id*.; *Zimpel v. Trawick*, 679 F.Supp. 1502 (W.D. Ark. 1988).

Under ordinary check clearinghouse channels, a customer continues to receive interest on the subject funds until the designated payee is paid.  Fidelity advertises on its BillPay internet website that bills are "paid from your account."  Attached to the accompanying Rubel Affidavit is a copy of the relevant Fidelity internet website.  Ex. 3.  Yet, as Fidelity now readily admits, a customer's bill is not paid from his or her account, but instead it is either paid from a "special" Fidelity account or from a CheckFree account.  This is misleading.  Under these circumstances, where Fidelity undertakes to inform its customers of the terms of the BillPay service in the various agreements, and advertises those services, Fidelity must be faithful and complete in its disclosures.  The clear message, directly and by implication, of the advertisement that a customer's bills are being paid directly from his or her account is that the customer will continue to earn interest or dividends on the funds in his or her account until the bills are paid.  This is in conformance with generally accepted clearinghouse practices.  Subsequently informing a customer that the monies are being transferred instead to a Fidelity account and that Fidelity will pay the bills from that account or from a CheckFree account, does not clear the confusion and does not disclose that the monies being placed in the "special" Fidelity account are not going to continue to accrue interest for the customer, as the customers believed to be the case.  *Kannavos, supra,* 356 Mass. 42, 48, 247 N.E.2d 708, 711 ("Fragmentary information may be as misleading . . . as active misrepresentation, and half truths may be as actionable as whole lies. . . .").

15

Moreover, contrary to Fidelity's contentions, the Berensons have pleaded fraud with the requisite particularity under Rule 9(b). Indeed, Rule 9(b) does not place a heavy burden on a plaintiff,[15] as it is to be read in conjunction with the relatively liberal pleading requirements of Rule 8. *Shields v. Washington Bancorporation*, 1992 WL 88004 *4 (D.D.C. 1992 (*citing Shahmirzadi v. Smith, Barney, Harris Upham & Co.*, 636 F.Supp. 49, 53 (D.D.C. 1985). Generally, a plaintiff is required to specify the fraudulent conduct which is the subject of the suit and (i) to provide fair notice to a defendant of the claims against them, (ii) to prevent attacks on the defendant's reputation when the claim for fraud is unsubstantiated, and (iii) to prevent a plaintiff from bringing strike suits purely for their settlement value. *Id*. (*citing Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1003 (2nd Cir. 1988), *cert. denied,* 488 U.S. 852).

To achieve these purposes, a plaintiff must generally allege the time, place, manner, contents, and speaker of the allegedly fraudulent statements, in addition to a description of how the plaintiff was misled. To satisfy the particularity requirement, a plaintiff must also give information "as to the respect in which plaintiff contends the statements were fraudulent." *Cosmas v. Hassett*, 866 F.2d 8 (2nd Cir. 1989); *Goldman v. Belden*, 754 F.2d 1059, 1069-1070 (2nd Cir. 1985). Because, however, a plaintiff often cannot know information that is peculiarly in the possession of the defendant, the plaintiff need only provide a statement of facts upon which the plaintiff's allegations are based. *In re Craftmatic Sec. lit.*, 890 F.2d 628, 645 (3rd Cir. 1989); *Stern*, *supra* at 1004. If a plaintiff is alleging fraudulent omissions of material facts, plaintiff must, to some extent, identify the information which should have been disclosed. *Billet v. Storage Technology Corp.*, 72 F.R.D. 583, 586 (S.D.N.Y. 1976).

---

[15]    The purpose behind the rule is clear: absent discovery, Plaintiffs won't have the particularity that will eventually emerge when, as here, facts relevant to the misrepresentation counts are in Defendants' custody and control.

This is precisely what the Berensons did.  Fidelity is fully apprised of the details of the alleged intentional misrepresentation and of the details of the alleged negligent misrepresentation: Fidelity's complete failure to advise its BillPay customers that they would not earn interest on the monies in the Fidelity trust account or that Fidelity would claim complete control and ownership over those funds as a result.  The Complaint could not be any clearer, given that Defendants possess all of the pertinent information.  As such, Fidelity's Motion to Dismiss Counts II and III, or for Summary Judgment thereon, should be denied.  *Id.*

D.    **Plaintiffs' Claim for Breach of Fiduciary Duty (Count IV) Is Viable And Should Be Tried**

For reasons similar to those set forth above, Fidelity's motion as to Plaintiffs' claims for breach of fiduciary duty should be denied.  Here, Fidelity again argues that (allegedly) because the parties' agreements provide that dividend interest will not continue to accrue on shares once they are redeemed, that Fidelity somehow complied with the parties' agreements and, therefore, cannot be held accountable for breach of fiduciary duty.  In support, Fidelity cites as authority *Schmid v. National Bank of Greece*, 622 F.Supp. 704, 710-11 (D.Mass. 1985), *aff'd,* 802 F.2d 439 (1st Cir. 1986)(table).  However, the *Schmid* case is easily distinguishable.  *Schmid* relates to a situation involving an escrow agreement, which is the type of agreement and information that is specifically lacking between the Berensons and Fidelity.  *Schmid* supra at 710 ("the escrow agreement or instructions constitute the full measure of obligation assumed by the escrow holder and owing to the parties).  Here, Fidelity purports to take control of and hold for the benefit of the Berensons, in trust, the monies that are subject of the BillPay service as designated in a given transaction.  However, Fidelity does not reach an agreement with the Berensons as to the terms of the Fidelity trust account.  Instead, it unilaterally imposes certain terms—which Fidelity still has not disclosed, other than its apparent unilateral right to usurp ownership of the funds. This is

improper and impermissible.  Under such circumstances, there exists a duty from Fidelity to the Berensons, which duty Fidelity breached by not informing the Berensons of the true and complete terms of the Fidelity account and the BillPay service.  *See, e.g., Schultz v. Rhode Island Nat. Bank.* 94 F.3d 721, 729 (1st Cir. 1996) (*citing In re Discipline of Two Attorneys*, 421 Mass. 619, 626-27, 660 N.E.2d 1093 (*citing Maganas v. Northrup*, 135 Ariz. 573, 663 P.2d 565 (1983) (duty to disclose *known* fraud)); *Collins v. Heitman*, 225 Ark. 666, 286 S.W.2d 628 (1955)(duty not to engage in self-dealing); *Kitchen Krafters, Inc. v. Eastside Bank of Mont.*, 242 Mont. 155, 789 P.2d 567 (1990) (duty to disclose material facts relevant to escrow), *overruled on other grounds by Busta v. Columbus Hosp. Corp.*, 916 P.2d 122 (Mont. 1996)); *American State Bank v. Adkins*, 458 N.W.2d 807 (S.D. 1990)(duty to avoid self-dealing and conflicts of interest)). These legal theories equally apply to the Berensons' claim for failure to transfer the payment amount to the payee as quickly as commercially practicable.  If the facts in discovery reveal that Fidelity and CheckFree were not paying the designated payees as quickly as possible, and they earned any monies as a result of the delay, Fidelity is liable for self-dealing.  *Id*.[16]

As such, Fidelity's Motion to Dismiss Count IV or for Summary Judgment thereon, should be denied.

**E.    Plaintiffs' Claim for Breach of Contract (Count V) Should Not Be Dismissed**

Fidelity apparently misunderstands the allegations of the Complaint.  The Berensons allege that there exists a contract between the parties pursuant to which Defendants were obligated to pay interest to Plaintiffs on monies that were on deposit or otherwise being maintained at Fidelity until such time as the monies were actually credited to the Berensons'

---

[16]    By way of analogy, Fidelity's argument is akin to a lender advising a borrower that it is charging him or her interest at the annual rate of 400% and then arguing that the interest rate was not usurious because the customer was so advised.  This is improper and impermissible. *Johnson v. Tele-Cash, Inc.*, 82 F.Supp.2d 264 (D.Del. 1999).

designated payee  and were required to transfer any and all of the Berensons' funds to the designated transferees as quickly as commercially practicable.  Complaint at ¶ 80.  The Berensons further allege that Fidelity breached the parties' agreement by failing to so transfer the funds and to pay interest while the monies were in the Fidelity account, and that the Berensons suffered actual damages as a result.  *Id*. at ¶¶ 81-82.

Thus, the crux of the allegations is not that Fidelity failed to pay dividends before the monies in the Core Account were redeemed, but that they failed to advise the Berensons of the terms of the Fidelity trust account, failed to pay the interest or dividends on the Berensons' monies therein, and failed to transfer the monies in as commercially reasonable a manner as possible.  Nothing in Fidelity's motion papers refutes this.  As such, Fidelity's Motion to Dismiss Count V or for Summary Judgment thereon, should be denied.

**F.    Questions of Fact Exist as to Plaintiffs' Claim of Violation of the Massachusetts Truth-in-Savings Act (Count VI) for Which Discovery Should Be Permitted.**

As noted above, Defendants possess the material facts in this case and the Berensons have requested an opportunity to conduct discovery, which would reveal the propriety of Fidelity's claim that it is not covered under the Massachusetts Truth-in-Savings Act.  To the extent that Fidelity contends that it provided full and faithful notice, for the sake of convenience, the Berensons incorporate their previous arguments.  The Berensons contend that the terms of the Fidelity trust account should have been fully disclosed.  Fidelity can not have it both ways:  It can not act as a bank (earning interest on depositor's money) but claim that because it is not a bank in the technical sense, it is not subject to well-settled banking rules and regulations.  Indeed, when discovery is had, if warranted, Plaintiff's may seek to amend the Complaint to

include securities violations.[17]  What is clear, however, is that Defendant cannot obviate either established banking rules or corollary securities rules and regulations in the handling of its customer's funds.

> **G.    Plaintiff's Claims for Violation of the Massachusetts Consumer Protection Act (Count VII) and for Violation of the District of Columbia Consumer Protection Procedures Act (Count VIII) are Viable and Should be Tried**

The Berensons' claims for violation of the Massachusetts Consumer Protection Act and the District of Columbia Consumer Protection Procedures Act[18] are pleaded in the alternative and are essentially identical claims.  Fidelity's BillPay agreements provide that Massachusetts law governs the agreements.[19]  Thus, the Massachusetts statute is invoked.  With regard to either statute, Fidelity falls far short of satisfying its burden of demonstrating the absence of any material factual issue and fails to offer any relevant legal basis entitling them to judgment as a matter of law.

Among other things, UDAP generally prohibits trade practices which have a tendency to mislead consumers.  In determining whether a practice violates UDAP, the totality of the transaction must be examined including the manner and context in which representations or omissions are made.  *Besta v. Beneficial Loan Co. of Iowa*, 855 F.2d 532, 534 (8th Cir. 1988).  The capacity to deceive is measured by the effect upon the least sophisticated.  *Aurigemma v.*

---

[17]    Defendants imply that Fidelity is solely subject to the laws and regulations under the "Securities Exchange Act, the New York Stock Exchange and various other national and regional stock exchanges."  Stickney Aff., ¶ 5.

[18]    D.C. Code §§ 28-3901 *et seq*.  The D.C. Consumer Protection Procedures Act is generically a law regulating unfair, deceptive, acts and practices and is referred commonly to as "UDAP" as are the consumer protection laws of almost all states, Massachusetts included.

[19]    For this reason standing alone, the Berensons submit, class certification is appropriate and permissible:  the same BillPay agreements apply to all class members, the same law (Massachusetts) applies and the class members have suffered the same damages (Fidelity's unilateral assumption of ownership of each customer's monies and non-payment of interest on those monies from the time of the designated "transaction" date until the actual transfer of the designated monies to the designated transferee).

*Arco Petroleum Products Co.*, 734 F.Supp. 1025 (D.Conn. 1990); *Madsen v. Western American Mortg. Co.*, 694 P.2d 1228 (Ariz.Ct.App. 1985).

As to both UDAP claims, Fidelity simply contends that because it believes all of Plaintiffs' other statutory and common law causes of action should be dismissed, that Count VII for violation of the Massachusetts consumer protection act should also be dismissed.   In support of its contentions, however, Fidelity acknowledges that the Act itself does not precisely define the contours of "unfair or deceptive acts or practices."  Indeed, "it is impossible to frame definitions which enable all unfair practices [because] there is no limit to human inventiveness in this field."  H.R. Conf. Rep. No. 1142, 63rd Cong., 2d Session (1914).  Nonetheless, Fidelity contends that while a particular set of facts is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a violation is a question of law.  Motion at p. 30 (*citing Schwanback v. Federal-Mogul Corporation*, 31 Mass. App. Ct. 390, 414, 578 N.E.2d 789, 803-04 (1991) (internal citations omitted), *rev'd on other grounds,* 412 Mass. 703, 529 N.E.2d 1289 (1992)).  Fidelity then contends that it has not crossed the boundaries of what may qualify for consideration as a violation of the UDAP statutes.

Yet, for all of the reasons set forth above, this question of law should be decided in favor of the Berensons.  Fidelity failed and refused to fully and faithfully notify the Berensons of the terms of the Fidelity trust account, namely, that contrary to what the Berensons had expected and understood, Fidelity was not paying interest on the Berensons' monies in the Fidelity account and was, instead, unilaterally exercising ownership rights to the Berensons' monies.  Under what legal theory does this not fall within the UDAP statutes?  Given the banking industry's use of generally accepted clearinghouse channels for checks, under which the Berensons earned interest

until their monies were actually transferred to the designated payee, and given no notice from

Fidelity to the contrary, the Berensons had every right to believe that they would earn interest on

their monies and submit that their claims fall within the "penumbra of common law, statutory

and other established concepts of unfairness," and are easily recognizable as "immoral,

unethical, oppressive or unscrupulous" conduct which would "even raised the eyebrow of

someone inured to the rough and tumble world of commerce." *Levings v. Forbes and Wallace,

Inc.*, 8 Mass. App. Ct. 498, 396 N.E.2d 149 (1979).  As such, there exists a question of fact, to be

determined at trial.  For this reason standing alone, Fidelity's Motion to Dismiss Count VII or for

Summary Judgment thereon should be rejected. [20]

Fidelity cites *Alicke v. MCI Communications Corp.*, 111 F.3d 909 (D.C. Cir. 1997), in

which the court determined that "no reasonable consumer could actually believe" that a

misleading billing occurred which:

> could lead a reasonable consumer into thinking that she received
> more service than she really did receive and thereby cause her to
> use more of MCI's service than she otherwise would have or to
> refrain from switching to another carrier that bills for service in
> smaller increments.

*Id*. at 911.  *Alicke* is distinguishable on its face.  Here, as Fidelity concedes, the Berensons could

earn interest on their monies up until the monies are actually transferred to a designated payee.

This is precisely how checks run their course through the automated clearinghouse channels and

precisely what Fidelity suggests the Berensons should do if they wanted to earn such interest.

Statement of Material Facts, No. 25.  Moreover, given that the automated clearinghouse is the

standard manner in which checks have cleared banking channels for well over a century, there is

---

[20]     Fidelity cannot counter, as a matter of fact, that its "good funds" business model, as it applies to BillPay, is
the industry standard.  There is evidence to the contrary, as set forth in the accompanying McWilliams Affidavit.
Moreover, it is well established that a misleading and unfair practice violates UDAP even though it may be
customary throughout an industry.  *Moog Industries, Inc. v. FTC*, 355 U.S. 411 (1958).

no reason to expect that the Berensons (or any other Fidelity BillPay customers) would expect to be treated otherwise.  Indeed, there is every reason to suppose that the Berensons reasonably believed that they were earning interest on their monies and, thereby receiving more service than they actually received, causing them to use Fidelity's BillPay service more than they otherwise would have or to refrain from switching to another electronic bill payment service (such as CheckFree directly or through another financial institution or service provider using CheckFree's system, and not incurring the hidden costs of doing business with Fidelity).  Reference the discussion in Section II, *supra,* wherein it is shown that other financial institutions do not usurp ownership rights of their customer's money pending payment to a third party payee.  Exhibit 4.  As such, Fidelity's Motion to Dismiss Count VIII or for Summary Judgment thereon should be denied.  *Alicke, supra*.

## IV.    Conclusion

WHEREFORE, Plaintiffs, Joan Berenson and David Berenson, individually and on behalf of all others similarly situated, respectfully request this Court to deny Defendants' Motion to Dismiss or for Summary Judgment.  Pursuant to Local Rule 7(b), Plaintiff's request an oral hearing on the issues set forth herein.

Dated: November 28, 2003                    Respectfully submitted,


//s//Kenneth L. McWilliams                  //s//Douglas A. Rubel
Kenneth L. McWilliams #462723               Douglas A. Rubel    #416676
Johanson Berenson LLP                       Johanson Berenson LLP
1146 Walker Road, Suite C                   201 Shannon Oaks Circle, Suite 200
Great Falls, Virginia  22066                Cary, North Carolina 27511
(703) 759-1055                              (919) 654-4544

Attorneys for Plaintiffs                    Attorneys for Plaintiffs