IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOAN BERENSON and DAVID BERENSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FINANCIAL SERVICES LLC, FIDELITY BROKERAGE SERVICES LLC, and DOES 1-50, inclusive,<br><br>Defendants. | Civil Action No. 1:03 CV 02004 (RBW) |

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
### THEIR MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Defendants National Financial Services LLC and Fidelity Brokerage Services LLC (together, "Fidelity") submit this memorandum in reply to the opposition of plaintiffs Joan and David Berenson to Fidelity's motion to dismiss and for summary judgment.

### Introduction

Stripped of its rhetoric, the Berensons' opposition to Fidelity's motion to dismiss and for summary judgment does little more than attempt to tear down caricatures of Fidelity's legal arguments and distort what are now concededly undisputed facts. Much of the opposition is based on the Berensons' complete disregard of the controlling documents, including the Fidelity BillPay Service Agreement, and upon mischaracterization of a statement on the Fidelity website that states simply "Pay an unlimited number of bills online from your brokerage account." The Berensons assert that the BillPay Service Agreement and the Fidelity website imply that once the funds are debited from the Berensons' account for bill payment, these funds are held in an alleged "trust account" for their benefit. But such an interpretation finds no support in the plain

wording of the documents.  The Berensons also assert that they need discovery pursuant to Rule 56(f), but fail to specify the requisite facts that they believe they would establish with such discovery and cite no authority to oppose Fidelity's concurrent motion to dismiss various counts of the complaint on their face.

At the end, the fundamental flaw of the opposition is that it fails to refute the simple truth of the matter, which is that Fidelity's agreements and prospectuses disclose that, on the transaction date selected by the customer, Fidelity debits the customer's account and after that time the customer ceases to receive income on the debited funds.  Because the Berensons cannot escape that fact, their Complaint should be dismissed as a matter of law.[1]

---

[1] On page two of their opposition, the Berensons allege that Fidelity failed to inform its customers that a customer who prefers to earn interest up to the time the payee receives payment may do so by writing a check.  Although they claim this point is the "crux of the case," the Berensons fail to cite it to support any of their eight counts.  This may be because Fidelity in its agreements in fact does explain the advantages and disadvantages of using checks as opposed to BillPay.  For example, because in a BillPay transaction Fidelity debits the money from a customer's account on the transaction date, and pays the payee from Fidelity's own account, that payment will not "bounce."  In contrast, the Fidelity Customer Agreement advises the customer that checks the customer himself writes on a Fidelity account "will be dishonored if the collected balance is insufficient to honor a check in full, and Fidelity and the bank are not liable . . . for any consequences of such dishonor."  Affidavit of Anne Warren Fagan ("Fagan Aff."), Ex. A at 4.  (It has come to the defendants' attention that in the process of scanning Exhibit A of the Fagan Affidavit, one page of the original exhibit (two pamphlet pages) inadvertently was lost.  A complete and more legible replacement copy of this exhibit is appended to this memorandum with pagination added.)  There is a fundamental contradiction, moreover, between the Berensons' position that, on the one hand, Fidelity should have better explained how ordinary personal checks work and, on the other hand, their position that, notwithstanding the clear language of Fidelity's disclosures, they expected BillPay to work in the same way as the supposedly familiar check "clearinghouse" system.

<u>**Argument**</u>

I.    **THE PLAINTIFFS HAVE SHOWN NO BASIS UNDER FED. R. CIV. P. 56(f) TO DENY SUMMARY JUDGMENT OR TO ORDER A CONTINUANCE FOR DISCOVERY.**

The Berensons do not squarely challenge any of defendants' Statement of Undisputed Facts ("SOF"), nor have they filed the separate statement disputing the facts upon which Fidelity relies that is required by Local Rule 56.1.  Under that rule, the facts are thus deemed admitted. <u>See</u> LCvR 56.1.  Nevertheless, the Berensons urge this Court to deny summary judgment or to order a continuance for discovery pursuant to Fed. R. Civ. P. 56(f), which provides for such relief where it appears "from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition."  In support of this argument, the Berensons' counsel states :

> Most of the facts necessary to properly oppose Defendants' motion are in the possession of the Defendants and their vendors (including CheckFree Corporation, Defendants' vendor for its BillPay service) and cannot be fully and faithfully set forth in opposition to the motion without benefit of discovery in this case.

> Similarly, Defendants set forth certain purported expert testimony in their motion papers, namely, certain testimony about a so-called "good funds" business model. The facts necessary to oppose these expert opinions are in the possession of third-parties and cannot be properly set forth without benefit of discovery.  Other facts upon which the Plaintiffs' expert witnesses will base their testimony are in the possession of other third-parties and cannot be set forth in opposition to the motion without benefit of discovery.

Affidavit of Douglas A. Rubel, ¶¶ 3-4.  These conclusory and speculative averments are inadequate to invoke Rule 56(f).

Under Rule 56(f), a court "<u>may</u> deny a motion for summary judgment or order a continuance to permit discovery if the party opposing the motion adequately explains why . . . it cannot present by affidavit facts needed to defeat the motion."  <u>Strang v. United States Arms</u>

Control and Disarmament Agency, 864 F.2d 859, 861 (D.C. Cir. 1989) (emphasis in original).[2]

The party opposing summary judgment has the burden to specifically "show what facts he

intended to discover," Byrd v. EPA, 174 F.3d 239, 248 n.8 (D.C. Cir. 1999), and to explain why

such facts "would create a triable issue." Carpenter v. Federal Nat'l Mortgage Ass'n, 174 F.3d

231, 237 (D.C. Cir. 1999). In addition, it "is well settled that [c]onclusory allegations

unsupported by factual data will not create a triable issue of fact." Byrd, 174 F.3d at 248 n.8.

(citation omitted). "Without some reason to question the veracity of [the moving party's]

affiants," the plaintiffs' "desire to 'test and elaborate' affiants' testimony falls short . . . and is

too vague to require the district court to defer or deny dispositive action." Strang, 864 F.2d at

861; see also Bancoult v. McNamara, 217 F.R.D. 280, 283 (D.D.C. 2003) (dismissing class

action prior to discovery and noting that "Rule 56(f) may not defeat summary judgment 'where

the result of a continuance to obtain further information would be wholly speculative.'") (citation

omitted).

       Here, the affidavit of the plaintiffs' counsel does not come close to the specificity

required under Rule 56(f). It neither identifies particular facts that require discovery nor

explains why such facts would affect the outcome of the case. In any event, the critical

undisputed facts relating to Fidelity's disclosures are based on customer documents that speak

for themselves and the Berensons have not denied receiving them.

       Nor do any of the handful of supposed factual issues that the Berensons raise in their

opposition memorandum warrant discovery because they are not "material" facts pertinent to

disposition of Fidelity's motion for summary judgment under Rule 56. For example, the

_____

[2] Whether the circumstances warrant a continuance to permit discovery is a decision that falls
within the discretion of the district court. See Carpenter v. Federal Nat'l Mortgage Ass'n, 174
F.3d 231, 237 (D.C. Cir. 1999) (reviewing Rule 56(f) decision for abuse of discretion).

Berensons focus on the fact that Fidelity operates its BillPay system through an outside vendor, CheckFree, Statement of Undisputed Facts ("SOF") ¶ 17, and complain that Fidelity has neither explained the relationship between Fidelity and CheckFree nor provided notice of that relationship to customers.  Plaintiffs' Opposition ("Opp.") at 8.  The Berensons also suggest that CheckFree may operate other bill payment services for other financial institutions that do not use the "good funds" business model and contend that they would need discovery of standard industry practices.  Opp. at 7-8.

But none of these issues is material to resolving Fidelity's motion.  Fidelity's Statement of Undisputed Facts contains background information about CheckFree and the "good funds" business model in order to provide a coherent narrative.  Whether Fidelity operates the BillPay service itself or through a vendor is immaterial.   This is because the BillPay Service Agreement specifically authorizes Fidelity in its sole discretion to use a vendor for the BillPay Service. Fagan Aff., Ex. B ("'we,' 'us' or 'our' refers to Fidelity Brokerage Services LLC, and any affiliate, subsidiary, agent, independent contractor, designee, or assignee we may, in our sole discretion, involve in the provision of the Service").

The relative prevalence of the "good funds" business model across various financial institutions' bill payment services is likewise irrelevant.  Fidelity has never suggested that "good funds" is the only business model or even the best business model for a bill payment service. Indeed, Fidelity has no legal obligation to ensure that its BillPay system is ideal or comports with some supposed "industry standard."[3]  Rather, the critical undisputed facts are that Fidelity has fully and repeatedly disclosed how its BillPay system works and the timing of debits to its customers' accounts, thus negating all of the Berensons' allegations of deception.

Also under the rubric of purported "material facts in genuine dispute," the Berensons contend that Fidelity's uncontested disclosure that "the customer will not earn dividend income on funds after they have been debited from his or her account," SOF ¶ 28, is somehow misleading because Fidelity failed to disclose that "the customer will not earn interest or dividend income on monies that Fidelity is holding in trust in a Fidelity account for the benefit of its customer." Opp. at 8-9. This is an argument about the legal sufficiency of Fidelity's disclosure, Fidelity's Memorandum ("Mem.") at 17-19, and has no bearing on the Berensons' purported need for fact discovery.[4] Such discovery is unnecessary.

## II.    A PLAIN READING OF THE FIDELITY AGREEMENTS DOES NOT SUPPORT THE BERENSONS' POSITION THAT IT CREATES A "SPECIAL ACCOUNT" THAT OPERATES LIKE A CHECKING ACCOUNT.

Central to the Berensons' opposition is the argument that the BillPay Service Agreement gives rise to a supposed "trust account" once funds are debited from the customer's account by the BillPay Service. Opp. at 4. According to the Berensons, this alleged "trust account" should operate in the same manner as a "normal checking account," in which customers earn interest on their funds until the designated payee receives credit for their funds. In asserting this position, the Berensons take two giant leaps that are contradicted by the plain language of the agreements. First, they argue that the Customer Agreement and the money market fund prospectus cannot

---

[3] Moreover, the Fidelity BillPay Service Agreement expressly disclaims all warranties (except for the specific on-time Payment Guarantee). See SOF ¶¶ 53-54.

[4] On its merits, the Berensons' disclosure argument also misses the mark. Fidelity need not "disclose" that "the customer will not earn interest or dividend income on monies that Fidelity is holding in trust in a Fidelity account for the benefit of its customer" because, as explained in Section II infra, that is not what Fidelity is doing. Fidelity debits a customer's account to initiate a bill payment requested by the customer to a third party and discloses that it does so. The customer has no basis, in common sense or contract, to expect to derive any income from funds that have been so debited. Mem. at 26-27.

have any application to the BillPay Service. Opp. at 2. Instead, the Berensons contend that the only permissible vehicle for any disclosure relevant to the BillPay service is the BillPay Service Agreement itself. Second, the Berensons argue that the BillPay Service Agreement creates an alleged "trust account" for the benefit of the customer and that the customer should earn interest on this account. Neither of these propositions has any merit as a manner of law.

**A.    The Customer Agreement and the Money Market Fund Prospectus Also Apply to the BillPay Service.**

The Berensons' attempt to discard the overall Fidelity Customer Agreement and Fidelity's money market fund prospectus as having no relevance to the BillPay Service must fail as a matter of law. In the first place, the Berensons' position in the opposition is directly contrary to their position in the Complaint, where they admit that the Customer Agreement, which is included in the Supplemental Information, governs the BillPay Service. Complaint ¶ 26. The Customer Agreement explains how the different services offered by Fidelity (check writing, credit card, electronic funds transfers, BillPay, investments, and others) are integrated and specifically identifies the BillPay Service Agreement and the money market prospectus. All of the agreements are thus relevant. See, e.g., Chicopee Concrete Serv., Inc. v. Hart Eng'g Co., 498 N.E.2d 121, 122 (Mass. 1986) ("Unless incorporation by general reference is explicitly rejected by some statute or regulation, incorporation by a clearly stated general reference will suffice."); Lowney v. Genrad, Inc., 925 F. Supp. 40, 47 (D. Mass. 1995) (a document is incorporated into a contract where it is "referred to and described in the contract so that the referenced document may be identified beyond doubt").

The Customer Agreement provides that a money market fund selected by the customer becomes the "Core Account" and that shares of the Core Account "will be redeemed at their net asset value, and [the customer] agree[s] that such shares shall be automatically redeemed to

satisfy debt balances in the securities account, card or check usage, <u>electronic funds transfers</u>, overdrafts and other authorized debit items." Fagan Aff., Ex. A at 3 (emphasis added). In addition, the Customer Agreement specifically references the prospectus for the "Core Account," and, by agreeing to the Customer Agreement, the customer expressly agrees that he has read the prospectus. <u>Id</u>. Finally, the Customer Agreement also references the BillPay Service Agreement by noting that the BillPay Service is subject to the BillPay Service Agreement. <u>Id</u>. at 5. It is undisputed that current versions of the BillPay Service Agreement, the Customer Agreement and the relevant money market prospectus are available on Fidelity's website.[5] SOF ¶27. The argument that these agreements have no application to the BillPay Service is belied by their plain language.

### B.    There is No Interest-Bearing "Trust Account."

The Berensons further argue that, through the following sentence in the BillPay Service Agreement, Fidelity has created a "special trust account" that operates for their benefit in the same manner as a "normal checking account":

> After we debit your Fidelity Account for the amount of a payment, we will remit your payment to the Payee *by mailing the Payee a check drawn on an account we maintain for this purpose*, by electronic transfer, or by other means.

(emphasis supplied). In support of their position, the plaintiffs include the affidavits of David and Joan Berenson, who apparently read this sentence of the BillPay Service Agreement and,

---

[5] The Berensons' position that customers need to "spend[ ] hours" at their "kitchen tables" reviewing "agreements, notices and buckslips" in order to understand all of the terms of the BillPay Service is silly. Opp. at 3 n. 4. A Fidelity customer who wants to fully understand the BillPay Service can access the Fidelity website and read the materials that apply to it on-line or download them. Indeed, the structure of Fidelity's customer agreements is designed to keep things simple. Rather than publishing a single enormous document that governs general terms and conditions, every Fidelity mutual fund, and every ancillary service such as BillPay, the Customer Agreement is a manageable size and makes clear that the customer in addition need only read particular fund prospectuses and ancillary service agreements that apply to him or her.

without elaborating, "expected and understood that Fidelity was to pay interest" on this special account.  (They do not explain why they never noticed the absence of any interest recorded on such a "special account" in years of Fidelity account statements.)  This completely unreasonable expectation cannot foreclose summary judgment.

"The interpretation of a contract is generally a question of law" and "in interpreting a contract, the court must construe all words that are plain and free from ambiguity according to their usual and ordinary sense." <u>Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co., Inc.</u>, 716 N.E.2d 130, 133 (Mass. App. Ct. 1999).  Contracts that are free from ambiguity must be interpreted according to their plain terms and "an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other's." <u>Jefferson Ins. Co. v. Holyoke</u>,  503 N.E. 2d 474, 476 (Mass. App. Ct. 1987); <u>see</u> also <u>Freelander v. G.K. Realty Corp.</u>,  258 N.E. 2d 786, 788 (Mass. 1970).

The Berensons' position that the BillPay Service Agreement implies that a "trust account" is created that will function in the same manner as a "checking account" is contradicted by the clear terms of the Fidelity agreements, which note that a BillPay customer's account is debited on the defined Transaction Date and the customer will not earn income on these funds thereafter.  As noted in Fidelity's opening brief, the BillPay Service Agreement provides that Fidelity debits the BillPay customer's account on the Transaction Date.  SOF ¶ 51 ("The date on which a Non-Recurring Payment or a Recurring Payment is actually initiated (*debited from your Fidelity Account*) is the 'Transaction Date.'") (emphasis supplied).  The prospectus for Fidelity's Cash Reserve Mutual Fund, which the Berensons currently use as their Core Account for BillPay debits, in turn discloses that once shares are redeemed to satisfy a debit, a customer no longer retains control of those funds or receives dividend income on that money.  SOF ¶ 62 ("Shares

earn dividends, until, but not including, the next business day following the day of redemption.").[6]

Even the one sentence upon which the Berensons rely, quoted above, does not support their position. Rather, this sentence indicates that the alleged "trust account" is maintained by Fidelity for the purpose of making the payment to the payee, not for the benefit of the customer. To the extent that any ambiguity is created by this one sentence (which Fidelity disputes), the Fidelity BillPay Application, which the Berensons signed, explains that money is debited from the customer's account and is paid to Fidelity, so Fidelity can make payment on the customer's behalf. The Berensons' signed Application provides: "I (we) hereby authorize and request Fidelity Brokerage Services, Inc. to debit my (our) account for amounts *to be paid to it for its use* in making payments or initiating credit entities to accounts I (we) have authorized you to pay in my (our) behalf." Affidavit of Daniel Stickney Ex. B (emphasis supplied). There is simply no way to read the Fidelity agreements as implying the existence of a "trust account" that will operate in the same manner as a checking account held in the name of the customer.

Even if an ambiguity exists in the Fidelity agreements (which there is not), the Berensons' notion that a customer would therefore assume that BillPay is managed like a "normal checking account" on which customers earn interest is nonsensical. The assertion that a customer would assume that "normal checking accounts" earn interest is baseless. Federally insured banks were legally prohibited from providing interest on checking accounts prior to

---

[6] Thus, the Berensons have it precisely backward when they state: "The Customer Agreements provide that when a customer redeems shares in their core account, the customer obtains the monies." Opp. at 13. Rather, in the circumstances relevant to this case, shares are redeemed to initiate bill payments to third parties.

- 10 -

1980.  Compare 87 Stat. 342 (prohibiting interest on checking accounts) with 12 U.S.C. § 1832

(permitting interest on checking accounts).  It is common knowledge, moreover, that many banks

offer checking accounts that do not pay interest at all, or that do not pay interest on accounts that

fail to maintain a minimum balance.  Because the BillPay Service works through an automated

system, involving electronic transfers as well as checks, it is not clear, moreover, that a customer

would assume that the same assumed "rules" that apply to written checks would apply to

BillPay.


III.    **THE PLAINTIFFS' CLAIMS UNDER THE ELECTRONIC FUNDS TRANSFER
        ACT FAIL ON THEIR FACE.**

Whatever the sufficiency of Fidelity's disclosures on the facts, the Berensons' attempt to

salvage their claim under the Electronic Funds Transfer Act ("EFTA") does not succeed as a

matter of law.  This is so because any lost interest is not a "fee" subject to the EFTA, and in any

event, Fidelity rests within a statutory safe harbor.

The Berensons argue in rebuttal that the "opportunity cost" of foregone interest is, in fact,

a "real" cost of doing business and therefore must also be a "charge" or "fee" within the meaning

of the EFTA.  Opp. at 9-11.  But the Berensons thereby omit the other key elements of common

usage based on dictionary definitions, which contemplate an actual debit for a fixed amount,

neither of which applies to variable amounts of future interest foregone in the bill payment

process.  Mem. at 14.  Not surprisingly, the Berensons also have failed to point to any use of

"fee" or "charge" in the financial services industry or government regulations that would support

their position.

The Berensons next object that the species of "fees" described in the Federal Reserve

Board's Official Staff Commentary to the EFTA's implementing regulations, which does not

support their notion of a fee-by-analogy, are supposedly inapplicable because "they relate to charges and fees associated with the underlying account itself, not with charges or fees that are imposed from without strictly because of a customer's use of the BillPay service."  Opp. at 12. This is a distinction without a difference.  The Staff Commentary describes various types of "fees" that must be disclosed under the EFTA "for EFTs [Electronic Fund Transfers] or the right to make them."   12 C.F.R. § 205, Supp. I, ¶ 7(b)(5)1.  The statute, implementing regulations, and Commentary do not distinguish between "fees associated with the underlying account itself" and "fees that are imposed from without."   The Staff Commentary's examples of "fees" that must be disclosed under the EFTA, whatever their origin, provide no support for the Berensons' position that foregone interest is "tantamount to" a fee and therefore subject to the Act.

The Berensons' further contention that burdensome reporting requirements do not absolve Fidelity of responsibility for violating the EFTA misstates Fidelity's argument.  Opp. at 12.  The point is that the absurdly burdensome reporting requirements that would flow from the Berensons' definition of a "fee" under the EFTA provide a compelling reason to reject their definition in the first place, not that they would justify any statutory violations.  The Berensons' reading would require each BillPay transaction reflected on a periodic statement to be accompanied by a complex variable "fee" calculation based on the amount of the transfer, the duration of the "float," and the periodic interest (or dividend income) rate during the period of the "float."

It would be impossible, moreover, to disclose the amount of such a variable "fee" in advance, as the EFTA requires.  See  12 C.F.R. § 205.7 (disclosure of free amount to be made at time of contract or in advance of any transfer).  This is because it is impossible to know in advance what the opportunity cost of future lost interest will be.  This latter point conclusively

confirms the view that the statutory definition of a "fee" should not encompass prospective lost

opportunities such as interest on the "float," the amounts of which would be unknown in

advance.  Statutes are not to be read to require an impossibility.

The Berensons' final contention that Fidelity is not protected by the EFTA's "safe

harbor" also misses the boat.  Opp. at 12-13.  The Berensons acknowledge that the Federal

Reserve Board's model forms "contemplate that if a 'per transfer' charge is being incurred that a

specific dollar amount be inserted into the form."  Opp. at 13.  "However," the Berensons

continue, the form "does not preclude that the financial institution provide notice of an

ascertainable per transfer charge of interest lost."  Id.  This argument defies the very nature of a

"safe harbor."  While a financial institution always has the option to disclose more information

than statutes and regulations require, the purpose of the EFTA's "safe harbor" provisions is to

insulate regulated entities from liability as long as their disclosures comport with the minimum

standards of the model clauses.  Since Fidelity has disclosed all of the pertinent "fee"-related

information contemplated by the model clauses, it cannot be held liable for failure to disclose

additional information that might later be deemed to be required by "judicial or other authority."

15 U.S.C. § 1693m(d)(2).  The claim under the EFTA must be dismissed on its face.


## IV.    THE PLAINTIFFS' MISREPRESENTATION CLAIMS MUST FAIL AS A MATTER OF LAW.

Although the Berensons allege in the Complaint that Fidelity's statements in the (i)

agreements and (ii) advertisements related to the BillPay Service were "fraudulent," in the face

of Fidelity's motion under Fed. R. Civ. P. 9(b), they now identify only one statement contained

on Fidelity's web-site as fraudulent.  Opp. at 15.  But this statement is not misleading and, even

if it were, the Berensons have admitted that they did not rely on it.  Accordingly, their misrepresentation claims must fail.

A.    **The Plaintiffs' Reliance on a Statement on Fidelity's Website for its Misrepresentation Claim is Misplaced.**

According to the opposition, the misrepresentation claim is solely based on a statement contained on Fidelity's Bill Payment website:  "Pay an unlimited number of bills online from your brokerage account."  The Berensons allege that "the clear message, directly and by implication, of the advertisement that a customer's bills are being paid directly from his or her account is that the customer will continue to earn interest or dividends on the funds in his account until the bills are paid."  Opp. at 15.  But the Berensons do not explain why the statement on the website would lead a customer to believe that he or she would earn interest on the customer's account until the payment reaches the payee, other than a vague reference to a customer's supposed assumptions about "generally accepted clearinghouse practices."

The statement on the Fidelity website is not fraudulent, nor is the alleged "fraud" set forth with the particularity required by Rule 9(b).  Through the BillPay Service, Fidelity does debit a customer's account in order to make the payment.  SOF ¶20.  The fact that the funds are transferred through a separate account maintained by Fidelity does not make the statement false.  Second, the statement is not misleading.  It simply does not address when the customer will cease receiving interest and the BillPay web page referenced by the Berensons' (the second of two screen captures attached to the Affidavit of Douglas A. Rubel) provides a link to BillPay Service Agreement (as do all pages of Fidelity's website relating to BillPay, SOF ¶ 42) where the

customer can learn when funds are debited from his account.[7]  The web page referenced by the Berensons directs the customer to review the Agreement for "complete details."

In addition, the Berensons fail to explain the meaning of "generally accepted clearinghouse practices" or why a customer would assume that "generally accepted clearinghouse practices" apply after reading the web page.  As noted above, moreover, the Berensons' assertion that a customer would assume a checking account would necessarily provide for interest is incorrect — many don't.

Even if the Berensons could somehow prove that that the statement on the BillPay website was misleading, they cannot show that they relied on the statement, which is a necessary component of any claim for misrepresentation.  See Collins v. Huculak, 783 N.E.2d 834, 838 (Mass.App.Ct. 2003) ("A plaintiff alleging fraud must, however, prove that 'the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that *the plaintiff relied upon the representation as true and acted upon it to his damage*.'") (emphasis supplied) (quoting Danca v. Taunton Sav. Bank, 429 N.E.2d 1129 (Mass. 1982)).  In her affidavit submitted with the opposition, plaintiff Joan Berenson notes the she has not "accessed the Fidelity internet website."  Affidavit of Joan Berenson, ¶ 5. Plaintiff David Berenson, in his affidavit, indicates that he has accessed the Fidelity website, but that his purpose "has been solely to check on the performance of certain stocks or other

---

[7] The Affidavit of Douglas A. Rubel, ¶ 5, and the Affidavit of David Berenson, ¶ 5, also seem to imply that BillPay information on the Fidelity website is somehow hidden or difficult to find. This is not the case.  It is true that the public Fidelity home page does not contain a direct link to BillPay (because only Fidelity account holders, not every member of the public who visits the website, can access the service).  However, the "Portfolio Summary" page that appears when a customer logs in to his account (for example, to check investments) does contain a link to BillPay, both in the top "margin" of the screen and in a "pull-down" menu.  Supplemental Affidavit of Anne Warren Fagan, ¶ 3 & Ex. A.  Once inside the BillPay system, of course, there is a link to the BillPay Service Agreement.  Id., ¶ 4 & Ex. B.

investments" in which he owns an interest and that he "he did not use, and [has] not used, BillPay via the internet."  Affidavit of David Berenson, ¶ 5-6.  Because the Berensons have not accessed the BillPay portion of the Fidelity website, it is clear that they did not rely on any alleged misrepresentation that is contained therein.  Counts II and III therefore must be dismissed.

## V.    THE PLAINTIFFS' ATTEMPT TO DISTINGUISH THE CONTROLLING CASE LAW ON THE BREACH OF FIDUCIARY DUTY FAILS.

Because Fidelity's obligations were clearly set forth in the operative agreements with which Fidelity complied, the Berensons' claim for breach of fiduciary duty cannot succeed.  See Schmid v. National Bank of Greece, 622 F.Supp. 704, 710-11 (D.Mass. 1985).  The Berensons' effort to distinguish Schmid is in vain.  The relevant holding of Schmid is that since the bank there acted in accordance with the agreement with its customer, the bank could not have breached its fiduciary duty.  Id.  Likewise, here the Fidelity agreements governed Fidelity's obligations and Fidelity acted in accordance with those agreements.  Any claim for breach of a fiduciary duty based upon a theory of non-disclosure must be dismissed in light of the fact that, as argued above, Fidelity fully and repeatedly disclosed all material facts.

The Berensons' further claim that Fidelity breached its fiduciary duty by failing to transfer the payment amount to the payee "as quickly as commercially practicable" must fail as well.  The Berensons have failed to allege or cite one payment that Fidelity did not make in a timely way.  Contrary to their statements in their opposition, the Berensons cannot use discovery to find untimely payments without at least alleging one untimely payment.  Indeed, the Berensons' inability to identify a single such instance raises the question of whether the allegations in the Complaint satisfied Fed. R. Civ. P. 11.  Fidelity's evidence of prompt payment

remains uncontroverted -- a wire transfer is executed or a paper check is mailed within 24 hours,

SOF ¶¶ 20-21 -- and summary judgment therefore should be granted.

## VI.     THE PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT FAILS.

Contrary to the Berensons' opposition, Fidelity understands the nature of their breach of

contract claim and its opening memorandum describes why it fails.[8]  The  documents governing

the BillPay Service clearly establish that (i) customers' accounts are debited on the day they set

for initiation of a BillPay transaction; (ii) customers do not earn income on funds that are no

longer in their account  and (iii) payees actually receive funds one or more days after a customer

initiates a BillPay transaction.  The breach of contract claim fails because Fidelity has strictly

complied with these governing documents and the Berensons have failed to make a single

allegation otherwise.

## VII.    THE PLAINTIFFS' CLAIM UNDER THE MASSACHUSETTS TRUTH IN SAVINGS LAW FAILS AS A MATTER OF LAW.

The Berensons contend that discovery is required to reveal whether or not the

Massachusetts Truth-in-Savings Law applies to Fidelity.  Opp. at 19-20.  This assertion is

baseless.  First, the Berensons continue to ignore the fundamental point that this statute confers

---

[8] The Berensons groundlessly assert that Fidelity misinterprets the breach of contract claim as
relating to the payment of "dividends *before* the monies in the Core Account were redeemed" or
debited.  Opp. at 19 (emphasis supplied).  Fidelity's motion, however, is directed to the issue of
the payment of dividends on funds *after* the shares are redeemed and funds are debited, which is
the breach of contract issue described in the Complaint.  Mem. at 26 ("Count V of the Complaint
alleges that Fidelity breached the contract that governs the BillPay Service by failing to transfer
funds to designated payees as quickly as is commercially practicable and by failing to pay
"interest" on the period of "float" *between the time a BillPay transaction is debited from a
customer's account and the time when the payee is actually credited with those funds*.")
(emphasis supplied).

no private right of action.  Second, by failing to address Fidelity's statement of undisputed facts, under LCvR 56.1 the plaintiffs have conceded that Fidelity is not chartered as a bank or other institution that is covered under the statute.  Rather, as Fidelity explained at length in its opening brief, it is a registered broker and dealer under the Securities and Exchange Act and is a member of various stock exchanges.   Mem. at 27-29.  If the Berensons actually harbored legitimate doubts about the fact of Fidelity's corporate legal status (which seems highly unlikely), they could challenge those characterizations based on publicly available corporate and regulatory documents.  They have not done so, and no discovery pursuant to Rule 56(f) is warranted.

The Berensons' further suggestion that every brokerage company that offers a money market mutual fund based on interest obligations must somehow necessarily be covered by "banking" laws not only lacks authority but is contrary to the statutory scheme.  If, on the other hand, the Berensons truly believed that they had a claim under the securities laws (as they speculate that they may), they should have included such a claim in the Complaint, or should have asserted it now.  The prospect of a hypothetical securities law claim provides no basis to maintain the Berensons' claim under an inapplicable Massachusetts banking statute.

## VIII.   THE PLAINTIFFS' CONSUMER PROTECTION CLAIMS FAIL AS A MATTER OF LAW.

The Berensons' citation of generic consumer protection cases from other jurisdictions cannot rescue their claims under the Massachusetts Consumer and Business Protection Act and the District of Columbia Consumer Protection Procedures Act.  Opp. at 20-23.   The Berensons essentially acknowledge, as they must, the authority Fidelity cites for the proposition that an actionable unfair or deceptive practice must run afoul of a statute, a regulation, common law, or another established concept of unfairness.   Fidelity's adherence to its fully disclosed agreements

implicates no such standard.  Mem. at 29-33.   In the absence of any viable underlying cause of

action, and given the undisputed fact of full disclosure by Fidelity, there is no basis to allow

plaintiffs' consumer protection claims to proceed.[9]

---

[9] The Berensons' attempt to distinguish <u>Alicke v. MCI Communications Corp.</u>, 111 F.3d 909
(D.C. Cir. 1997), is unavailing.  Opp. at 22.  Their assertion that they "reasonably believed that
they were earning interest on their monies" after their accounts were debited to initiate a BillPay
transaction is untenable.   No reasonable consumer could believe that he or she would continue
to earn income on funds no longer in his or her account.  This is simply common sense,
confirmed by a fund prospectus that expressly states that shares cease to earn income after they
are redeemed.  As explained above, the Berensons' notion of a "trust account" is a red herring
and, in any event, there was never any indication on the Berensons' periodic account statements
over several years that they were earning income on some BillPay transactional "trust account"
other than their brokerage account.

## **Conclusion**

For the reasons descried above and in the defendants' opening memorandum in support

of their motion to dismiss and for summary judgment, Fidelity respectfully requests that the

Court dismiss all counts in the complaint.

Respectfully submitted,

NATIONAL FINANCIAL SERVICES LLC
FIDELITY BROKERAGE SERVICES LLC

By their attorneys,


/s/ Lawrence H. Martin
Lawrence H. Martin (D.C. Bar No. 476639)
FOLEY HOAG LLP
1875 K Street, N.W., Suite 800
Washington, D.C. 20006-1238
(202) 223-1200

Nicholas C. Theodorou (Pro Hac Vice)
John A. Shope (Pro Hac Vice)
Kevin C. Conroy (Pro Hac Vice)
William W. Fick (Pro Hac Vice)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000


Dated:  December 12, 2003

Fagan Aff., Ex. A, P. 1
(replacement copy)

## ACCOUNT INFORMATION

# Customer Agreement

## General Information

This agreement between me and Fidelity Brokerage Services LLC, ("FBS") and National Financial Services LLC ("NFS") (collectively "Fidelity" or "you") sets forth the terms and conditions governing the Brokerage non-retirement account (known as, among other things, the Fidelity Account℠) (the "Account"), and includes this General Information section, The Margin Account Agreement, Electronic Services Customer Agreement, the Terms of Use of Third Party Content, and Fidelity Dividend Reinvestment Agreement.

The Fidelity Account offers integrated financial services including an FBS securities account (the "securities account") linked with an income earning account or an eligible money market fund ("transaction fund") at my option, and as selected by me: (1) checking services provided by one or more banks as you may select from time to time; (2) a Fidelity American Express® Gold Card or Fidelity American Express® *Platinum Card,*® issued by American Express Centurion Bank; (3) a Visa® Gold Check Card, issued by PNC Bank, Delaware; (4) electronic funds transfer services, including bill payment services and electronic fund share purchases and redemptions.

Fidelity does not promote day-trading strategies. I understand that trading in volatile markets can present increased challenges and risks, which may include:

First, the risk of market orders being executed at unexpectedly high prices. If I have limited assets to pay for a transaction, such as in a retirement account with contribution restrictions, I will consider placing a limit order. If I cannot pay for a transaction, Fidelity may be required to liquidate account assets at my risk.

Second, delays in quotes, order execution and reporting. In volatile markets, transmission of quotes, orders, and execution reports may be delayed, even for information which appears to be real time. Security prices can change dramatically during such delays.

Third, it may not be possible to cancel an order previously submitted, even if I have received a confirmation that you have received my cancellation order. As a result, I understand that I will be sure my prior order is actually cancelled before entering a replacement order.

Fourth, certain securities, such as IPOs trading in the secondary market and Internet and other technology-related stocks, are subject to particular volatility. I will consider managing market risk with limit orders.

Fifth, access to Fidelity or my account can be delayed by factors such as high telephone volume or systems capacity limitations. I understand I may have alternative ways of reaching Fidelity, such as the Web and telephone representatives, in addition to the automated telephone system.

For more complete information regarding this topic, I will contact Fidelity.

## 1. Nature of Services Provided

Upon acceptance of my application, I understand you will maintain an account for me and, as my broker, buy or sell securities according to my instructions. All decisions relating to my investment or trading activity shall be made by me or my duly authorized representative and I accept full responsibility for such decisions. I agree to notify you in writing of any material changes in my financial circumstances or investment objectives.

To help the government fight the funding of terrorism and money laundering activities, to verify my identity, Federal law requires that Fidelity obtain my name, date of birth, address, and a government-issued identification number before opening my account. In certain circumstances, Fidelity may obtain and verify this information with respect to any person(s) authorized to effect transactions in an account. For certain entities, such as trusts, estates, corporations, partnerships, or other organizations, identifying documentation is also required. My account may be restricted and/or closed if Fidelity cannot verify this information. Fidelity will not be responsible for any losses or damages (including but not limited to lost opportunity) resulting from any failure to provide this information, or from any restriction placed upon, or closing of, my account.

Any information I provide to Fidelity may be shard with third parties for the purpose of validating my identity and may be shared for other purposes in accordance with Fidelity's Privacy Policy. Any information I give to Fidelity may be subject to verification, and I authorize Fidelity to obtain a credit report about me at any time. Upon written request, I will be provided the name and address of the credit reporting agency used. You also may monitor or tape record conversations with me in order to verify data about any transactions I request, and I consent to such monitoring or recording. I also understand that my account is carried by NFS, an affiliate of FBS. I understand that Fidelity will not be responsible for the accuracy, completeness, timeliness or use of any information received by me from third-party data services and that Fidelity does not make any warranty concerning such information.

FBS routes most orders to its affiliated broker/dealer, NFS. NFS transmits customer orders for execution to various

*Please note: Orders placed through Fidelity's telephone, electronic, wireless or online trading systems cannot specify a particular market center for execution.

exchanges or market centers based on a number of factors. These include: size of order, trading characteristics of the security, favorable execution prices (including the opportunity for price improvement), access to reliable market data, availability of efficient automated transaction processing, and reduced execution costs through price concessions from the market centers. Certain of the market centers may execute orders at prices superior to the publicly quoted market in accordance with their rules or practices. While a customer may specify that an order be directed to a particular market center for execution,* NFS's order-routing policies, taking into consideration all of the factors listed above, are designed to result in favorable transaction processing for customers.

FBS and/or NFS receives remuneration, compensation or other consideration for directing customer orders for equity securities to particular broker/dealers or market centers for execution. Such consideration, if any, may take the form of financial credits, monetary payments or reciprocal business.

## 2. Applicable Rules and Regulations

All transactions through Fidelity are subject to the constitution, rules, regulations, customs, and usages of the exchange, market, or clearing house where executed, as well as to any applicable federal or state laws, rules, and regulations.

I am aware that various federal and state laws or regulations may be applicable to transactions in my account regarding the resale, transfer, delivery or negotiation of securities, including the Securities Act of 1933 ("Securities Act") and Rules 144, 144A, 145 and 701 thereunder. I agree that it is my responsibility to notify you of the status of such securities and to ensure that any transaction I effect with you will be in conformity with such laws and regulations. I will notify you if I am or become an "affiliate" or "control person" within the meaning of the Securities Act with respect to any security held in my account. I will comply with such policies, procedures and documentation requirements with respect to "restricted" and "control" securities (as such terms are contemplated under the Securities Act) as you may require. In order to induce you to accept orders with respect to securities in my account, I represent and agree that, unless I notify you otherwise, such securities or transactions therein are not subject to the laws and regulations regarding "restricted" and "control" securities. I understand that if I engage in transactions which are subject to any special conditions under applicable law, there may be a delay in the processing of the transaction pending fulfillment of such conditions. I acknowledge that if I am an employee or "affiliate" of the issuer of a security, any transaction in such security may be governed by the issuer's insider trading policy and I agree to comply with such policy.

Pursuant to industry regulations, I will also notify you if I am or become affiliated or employed by a stock exchange, or member firm of an exchange or the NASD, a municipal securities dealer, or by Fidelity.

## 3. Special Account Registration.
**Joint Accounts** If this is a joint account, "I" refers to all account holders, and each of the account holders agrees that any account holder has authority on behalf of the joint account to: (a) buy, sell (including short sales), and otherwise deal in stocks, bonds, options, and other securities on margin or otherwise; (b) receive demands, notices, confirmations, reports, statements of account, and communications of every kind on behalf of the joint account; (c) receive money, securities, and property of every kind and dispose of the same on behalf of the joint account; (d) make agreements relating to any of the foregoing matters and to terminate, modify, or waive any of the provisions of the agreement on behalf of the joint account; (e) deal with FBS as fully and completely as if he/she alone were interested in this account and without notice to the other account participants, and (f) elect and terminate account-related products and services. All obligations and liabilities arising under this account are joint and several and may be enforced by FBS against any or all account holders.

FBS is authorized to follow the instructions of any joint account holder in every respect and to deliver any or all monies, securities, or other property to any joint account holder upon the instructions of any joint account holder, or to any other person upon such instructions, even if such delivery or payment is to that joint account holder personally and not to the other(s). FBS will be under no obligation to inquire into the purpose or propriety of such delivery or payment and is not bound to inquire into the disposition or application of such delivery or payment. This authority remains in force until written notice to the contrary, is addressed to FBS and delivered to its main office in Boston. FBS, in its sole discretion and for its sole protection, may require the written consent of all account holders prior to acting upon the instruction of any account holder.

Laws governing joint ownership of property vary from state to state. I understand that I am responsible for verifying that the joint registration I select is valid in my state. Generally, however, for **joint tenants with rights of survivorship**, in the event of the death of either tenant, the entire interest in the joint account shall be vested in the surviving joint tenant(s) on the same terms and conditions. For **tenants in common**, the interest in each tenancy shall be equal unless specified and in the event of death of either tenant the interest in their share of the tenancy shall vest in the decedent's legal representative. State laws regulating **community property** vary. Consult your own legal advisor.

## Custodial Accounts (Uniform Gifts to Minors Act or Uniform Transfers to Minors Act). If this is a custodial account, I understand FBS will maintain an account established under Uniform Gifts to Minors Act or Uniform Transfers to Minors Act and for which I act as custodian. I understand

that I represent and warrant the assets in the account belong to the minor and all such assets, whether or not transferred out of the Fidelity UGMA/UTMA accounts, will only be used by me for the benefit of the minor. As used herein, "I" or "my" shall refer to the custodian or to the minor as the context may require.

# Cash Account/Money Market Fund

**4. Transaction Fund** Amounts contributed and received in my Fidelity Account will be invested in an income earning account or in one of the following money market funds of my choice: Fidelity Municipal Money Market Fund, Fidelity Massachusetts Municipal Money Market Fund, Fidelity California Municipal Money Market Fund, Fidelity New York Municipal Money Market Fund, Fidelity New Jersey Municipal Money Market Fund, Fidelity Connecticut Municipal Money Market Fund, Fidelity Ohio Municipal Money Market Fund, Fidelity Michigan Municipal Money Market Fund, or any other fund Fidelity Account makes available and is selected by me (the "transaction fund, core account"), subject to prior payment by me and on my behalf of any outstanding margin loan balances, card overdrafts or other debit items arising from, including and without limitation, card usage, checkwriting, or Fidelity BillPay,℠ or authorized payments of securities account settlements. My account statement will detail all activity in the core transaction fund. This is provided in lieu of a confirmation that might otherwise be provided to me with respect to those transactions. Any free credit balances in the securities account (i.e., any cash that may be transferred out of the securities account without giving rise to interest charges) will be automatically invested on a daily basis in my transaction fund. Interest and dividends accrued daily are paid monthly on those free credit balances. A variable rate of interest or dividends may be paid on cash balances awaiting reinvestment (excluding any short credit balances) providing that accrued interest or dividends for any particular month equals or exceeds $.005. The variable rate of interest paid will be determined by the daily balance in the account. Fidelity reserves the right to increase or decrease the rate of interest at any time without notice. Initial investment in any transaction fund must meet the minimum described in the fund's prospectus. Any fund I am later able to choose as my transaction fund will also be subject to these provisions. Fidelity Management & Research Company will receive a fee for serving as an investment adviser to the transaction fund.

Investments by check will be promptly credited to my transaction fund and will earn dividends or interest on the transaction fund as described in that fund's prospectus, prior to final collection of such checks. I understand that access to the redemption proceeds of transaction fund shares purchased with monies so advanced may be with-held for up to four business days (20 days for foreign checks) to ensure that such checks have been collected.

Such withholding may result in dishonor of checks or rejection of card transactions or other debit items if monies are not otherwise available to me within my account.

Shares of the transaction fund will be redeemed at their net asset value, and I agree that such shares shall be automatically redeemed to satisfy debit balances in the securities account, card or check usage, electronic funds transfers, overdrafts, and other authorized debit items. If I so elect, and upon my instructions, monies representing the redemption of transaction fund shares may be transferred to a bank account designated by me. Such monies shall be submitted, at your election, via the Federal Reserve wire system or an automated clearinghouse system.

An investment in a money market fund is neither insured nor guaranteed by the Federal Deposit Insurance Corporation or any other U.S. government agency. Although a money market fund seeks to preserve the value of your investment at $1 per share, it is possible to lose money by investing in a money market fund.

I ratify any instructions given on this account and any account of another Fidelity fund into or from which I exchange or any bank accounts predesignated by me, and agree that neither you nor the fund's transfer agent will be liable for any loss, cost, or expense for acting upon such instructions believed by you or the transfer agent to be genuine and in accordance with the procedures described in the fund prospectus. I understand that it is my responsibility to read the prospectus of any other Fidelity fund or non-Fidelity fund into which I purchase or exchange.

I understand certain fees may be applicable for services including but not limited to Fidelity BillPay,℠ Research@Fidelity.com and the charge card. I understand that you may change the amount of these fees and that the transaction fund will assume various charges in connection with my account. I further understand that for any special services that are not part of your regular Fidelity Account and that are requested by me and performed by you, I will pay your customary service charges.

**I have received and read a copy of the prospectus of the transaction fund selected by me, containing a more complete description of the fund and its fees, charges and operations.**

# Transactions

**5. Choice of Marketplace** When securities may be traded in more than one marketplace, in the absence of specific instructions from me, Fidelity may use its discretion in selecting the market in which to place my order.

**6. Purchase of Precious Metals** If I direct Fidelity to purchase precious metals for me, I understand: (a) the Securities Investor Protection Corporation does not provide protection for precious metals, but if stored through Fidelity, they are insured by the depository at market value; (b) precious metals are

not marginable; (c) precious metal investments can involve substantial risk due to rapid and abrupt price changes and, therefore, Fidelity cannot guarantee an advantageous purchase or liquidation price; and (d) if I take delivery of my metals, I am subject to delivery charges and applicable sales and use taxes.

## 7. Checkwriting, Charge Card, Check Card, or Bill Payment Service:

**CHECKWRITING** Optional free checkwriting is provided by such bank as you may select from time to time (the "bank"). I understand that by choosing the checkwriting feature, I may write checks on the checking service, which is governed by the rules of the bank, the applicable provisions Uniform Commercial Code and applicable state and federal law, and that you will charge me a nominal fee for check reorders and any special expenses incurred on this checking service, including a charge for checks returned for insufficient funds, stop payment requests, dishonored checks, and copies of checks. Canceled checks will not be returned. Accounts engaged in excessive checkwriting may have the checkwriting feature revoked or the account may be closed immediately at Fidelity's discretion. I understand that checks will be dishonored if the collected balance in my account is insufficient to honor a check in full, and Fidelity and the bank are not liable to me for any consequences of such dishonor.

**CHARGE CARD** The optional Fidelity American Express Gold Card and Fidelity American Express *Platinum Card* ("Cards") are issued by American Express Centurion Bank and are subject to approval by it. For the Fidelity American Express Gold Card the $75 Basic Card fee and the $35 Additional Gold Card fee will be paid by Fidelity as long as I maintain my Fidelity Account. For the Fidelity American Express *Platinum Card* $75 of the $395 standard *Platinum Card* fee and the $45 Additional Gold Card fee will be paid by Fidelity as long as I maintain my Fidelity Account. An Additional Fidelity American Express *Platinum Card* fee is $175. The Cards are available to non-retirement brokerage accounts with individual or joint account registrations only and cannot be issued to corporate, trust, UGMA or UTMA registrations.

By signing the accompanying application and by checking the Fidelity American Express Gold Card box contained therein, I ask that a Card be issued in my name and Card(s) issued as I request, and that American Express Centurion Bank ("the issuer") renew and replace them until I cancel. I agree to be bound by the agreement governing my Card. I understand that all purchase transactions made using this Card will be automatically paid out of funds in my Fidelity Account at the end of each billing period while all cash transactions will be paid out on a daily basis. I agree to be liable for all charges to my Card, including charges incurred with any Additional Card(s) issued now or in the future. Should sufficient funds not be available in the account

when payment is due, late fees will be charged as described in the Fidelity American Express Cardmember Agreement.

I understand that I must provide all the information requested in the application and I certify that such information is accurate. I authorize the Card issuer to verify the information on the application and to receive and exchange information about me, including requesting reports from consumer reporting agencies. If I ask whether or not a consumer report was requested, the Card issuer will tell me and if the Card issuer received a report, the issuer will give me the name and address of the agency that furnished it. If my application is approved, I authorize the issuer and its affiliates and subsidiaries to contact these sources for information at any time, to use information about me, including information from this application and from consumer reports, for marketing and administrative purposes and to share such information with each other. I may direct the Card issuer not to share with its affiliates and subsidiaries certain credit information (other than transaction or experience information) about me or any Additional Card applicant(s) by writing to the issuer at: American Express, P.O. Box 7852, Ft. Lauderdale, FL 33329. I will include my Social Security number and indicate if my request applies to any Additional Card applicant(s) as well.

Additional Cards: I have advised Additional Card applicant(s) that the Card issuer may obtain, verify, exchange and use information about them in the same manner described above, that they may be responsible for payment of their own charges if I fail to pay them, and that their own credit records may be affected by non-payment.

I acknowledge that any benefit or service offered with the Card may be modified or terminated at any time.

**Fidelity American Express Gold Card**

| Annual Fees: $0* | All purchase transactions made using this Card are automatically paid out of funds in my Fidelity Account at the end of each billing period. |
|---|---|
| Late Fees: Initially up to $25, thereafter up to the greater of $30 or 2.9% of delinquent balance. | |

*The $75 Basic Card fee and the $35 Additional Card fee will be paid by Fidelity as long as I maintain my Fidelity Account.

**Fidelity American Express *Platinum Card***

| Annual Fees:<br>Basic Card: $395**<br>Additional Card: $175<br>Additional Gold Card: $0*** | All purchase transactions made using this Card are automatically paid out of funds in my Fidelity Account at the end of each billing period. |
|---|---|
| Late Fees: The greater of $30 or 2.9% of delinquent balance. | |

**$75 of the $395 standard *Platinum Card* fee will be paid by Fidelity as long as I maintain my Fidelity Account.

***The $45 fee for each Additional Gold Card is paid by Fidelity as long as I maintain my Fidelity Account.

AN APPLICANT, IF MARRIED, MAY APPLY FOR A SEPARATE CARD.

Notice to Married Wisconsin Residents: No provision of any marital property agreement, unilateral agreement, or court decree under Wisconsin's Marital Property Act will adversely affect a creditor's interest unless prior to the time credit is granted, the creditor is furnished a copy of that agreement or decree, or is given complete information about the agreement or decree.

Fidelity Accounts which maintain more than $500,000 in assets or coded as Premium or Private Access or held by customers with householded annual trading activity of 240 or more stock, bond, or options trades will not be charged a $1.50 ATM fee ("the fee"). Fidelity Accounts which maintain between $100,000 and $500,000 in assets will receive up to three (3) free ATM transactions per calendar month, and will be charged the fee for each ATM use thereafter. All others will be charged a $1.50 fee for each ATM transaction. Assets are calculated each business day and free ATM use is extended to the account the following day. Accounts which do not maintain the stated balances may be charged the fee without notice. ATM withdrawals may be subject to other fees and limits.

Other institutions may assess ATM fees for use of ATMs in their network. Fidelity accounts that maintain more than $500,000 in assets or coded as Premium or Private Access or held by customers with householded annual trading activity of 240 or more stock, bond, or options trades will be reimbursed for ATM fees charged by other institutions while using cards linked to the Fidelity Account (maximum reimbursement of $2.50 per ATM transaction, up to $75 per year). Refer to your Fidelity American Express® Cardmember Agreement for complete details.

**CHECK CARD** An optional free Fidelity VISA® Gold Check Card is provided by PNC Bank, Delaware ("PNC") and is subject to approval by it. I authorize PNC to check my credit and employment history and to ask me questions about my payment experience. The card is available to non-retirement brokerage accounts with individual, joint, and certain trust registrations; however, it cannot be issued to accounts without Social Security or taxpayer ID number. If approved, PNC will issue a card to me and I am responsible for all card usage. I authorize Fidelity to debit my account to satisfy card transaction upon notice from PNC. As used in this agreement, the total value of the core account and margin loan shall be the "collected balance." I understand that in the case of the accounts with the Fidelity AccessLine® feature, total check card transactions (including merchant transactions, authorizations, and ATM withdrawals) may not exceed my collected balance. I understand in the case of accounts without the AccessLine feature, such total check card transactions generally may not exceed $10,000 per day and may be lower in some cases. In any event, I understand that I am responsible for all authorized transactions. I understand that authorization requests will reduce my collected balance by the amount of the authorization even if the authorization does not result in a transaction. I further understand that my usage of the debit card will be governed by PNC's Check Card Agreement and Disclosure Statement for this service and applicable state and federal law. I also understand that Fidelity accounts coded Premium or Private Access or held by customers with householded annual trading activity of 240 or more stock, bond, or options trades will have all ATM fees waived. These accounts will also be reimbursed for ATM fees charged by other institutions while using ATM cards linked to the Fidelity Account (maximum reimbursement of $2.50 per ATM transaction, up to $75 per year). All other Fidelity accounts will receive up to five (5) free ATM transactions per calendar month, and will be charged a $1.00 fee for each ATM use thereafter.

**BILL PAYMENT** I hereby understand that FBS is the provider of the Fidelity BillPay℠ service. I hereby understand that and/or agree to:

(1) authorize FBS to post bill payment transactions originating from the Fidelity BillPay service to my Fidelity Account; (2) my request to add Fidelity BillPay to my Fidelity Account is subject to review and acceptance by the provider of the service; (3) the Fidelity BillPay service is subject to the Fidelity BillPay Service Agreement; (4) any use of the Fidelity BillPay service confirms my agreement to the Fidelity BillPay Service Agreement; (5) I may terminate the Fidelity BillPay service at any time by calling or writing the customer service phone number or address provided in the Fidelity BillPay Service Agreement; and (6) I hereby authorize the provider of the service to honor any instructions entered through the Internet using my Social Security number and personal identification number.

I understand the monthly fee is $6.95 and is waived for Billpay customers who trade 36+ times in a rolling 12-month period or maintain $100,000 or more in certain retail assets at Fidelity. All other customers will be charged a $6.95 monthly fee. See the Fidelity BillPay Service Agreement for complete details.

**8. Electronic Funds Transfer** I may elect any or all of the following electronic funds transfer services: (a) telephone purchase and redemption (wire redemption authorization will also include payment via electronic funds transfer) of fund shares to be settled through my designated bank account; (b) authorization of bill payments to preestablished merchants or other accounts to be settled through the Fidelity Account; and (c) direct transmission to my brokerage account of payments to be made to me by others on a preestablished, periodic basis.

Bank Wire and Fidelity Money Line® ("electronic funds transfer" or "EFT") are two services that enable me to electronically transfer money between my bank account and my Fidelity Account.

Bank Wires are processed through the Federal Reserve wire system, and are normally completed on the business day following my request.

Electronic funds transfers are processed through the Automated Clearing House ("ACH"). My bank must be an ACH member for me to use this service, and one common name must appear on both my bank and Fidelity Accounts. The minimum EFT transaction is $10 and the maximum is $99,999. EFTs are normally completed within three business days, and credits to my account are subject to a four-day collection process.

I hereby constitute and appoint FSC and FBS, my true and lawful attorney, to surrender for redemption any and all shares held in my accounts with full power of substitution in the premises. FSC and FBS are hereby authorized and directed to accept and act upon any directions for redemptions of shares held in my account from any person who requests payment to be made to the bank account above. I understand and agree that FSC and FBS will not be liable for any loss, expense, or costs arising out of any telephone request for redemption so long as FSC and FBS transmit the redemption proceeds to the bank account identified. FSC and FBS reserve the right to cease to act as agents to the above appointment upon 30 days' written notice to the address of record listed on my application. I further certify and agree that the above certifications, authorizations, and appointments in this document will continue until FSC and FBS receive actual written notice of any change thereof.

# Settlement

**9. Payment of Items** I understand that all debit items, including checks, debit or check or charge card charges, bill payments, securities account purchases, and electronic funds transfers, will be accumulated daily (or monthly in the case of card charges), and that you will promptly pay each on my behalf to the extent sufficient funds are available. I will maintain sufficient assets in my account to satisfy all obligations as they become due. I understand that payment of any debit items in my account will be made first from amounts contributed by me or on my behalf and available that day, or from the proceeds of redemption of transaction fund shares and second, should this source prove insufficient, and I have selected the margin option, from margin loans made by Fidelity within the available margin loan value of my securities account; and third, should these sources prove insufficient or not applicable and at Fidelity's discretion, from other Fidelity money market mutual funds in my account, which you are hereby authorized to redeem to pay such items. As used in this agreement, the total of cash and margin loan value shall be the "collected balance." Any such amount will be a loan by Fidelity to me and will be secured by the securities in my account. If Fidelity extends credit to me, interest will be charged from the date credit is extended, and is subject to the terms of the Margin Account Agreement.

Fidelity shall not be responsible for the dishonor of any transaction due to insufficient collected balance. Other transactions that I initiate or to which I have consented may also reduce my collected balance.

I understand that if the collected balance in my account is insufficient to pay any item, subject to the issuing bank electing to advance funds on my behalf as described above in connection with card charges, such items will not be honored. I will promptly return to you any assets that you distribute to me but to which I am not entitled.

**10. Settlement of Transactions** In the absence of a specific demand, all transactions in any of my accounts are to be paid for, securities delivered, or required margin deposited, no later than 2 p.m. Eastern time on the settlement date. Fidelity reserves the right to cancel or liquidate, at my risk, any transaction not timely settled. Margin calls are due on or before the date indicated regardless of the settlement date of the transactions.

**11. Security Interest** Any credit balances, securities, assets, or related contracts, and all other property in which I may have an interest, held by you or carried for my accounts shall be subject to a general lien for the discharge of my obligations to you, and you may sell, transfer, or assign any such assets or property to satisfy a margin deficiency or other obligation whether or not you have made advances with respect to such property. Shares of any investment company in which I have an interest, and for which Fidelity Management & Research Company serves as investment adviser and which are custodied, recordkept, or otherwise administered by an affiliate of FBS or NSF, also are subject to a general lien for the discharge of my obligation to FBS and NFS, and FBS and NFS may redeem any such shares to satisfy my obligation without further notice or demand. No provision of this agreement concerning liens or security interests shall apply to any account to the extent such application would be in conflict with any provision of the Employee Retirement Income Account of 1974, as amended, "ERISA" or the Internal Revenue Code of 1986, as amended, relating to retirement accounts.

**12. Liability for Costs of Collection** I am liable for payment upon demand of any debit balance or other obligation owed in any of my accounts or any deficiencies following a whole or partial liquidation, and I agree to satisfy any such demand or obligation. I agree to reimburse FBS and NFS for all reasonable costs and expenses incurred in the collection of any debit balance or unpaid deficiency in any of my accounts, including, but not limited to, attorneys' fees.

# Reporting

**13. Periodic Reports** I will receive a statement of all transactions quarterly, and monthly in the months in

which there is activity in my account. If I elect to establish cash management features or qualify for Active Trader Services, I will receive a transaction statement monthly. The brokerage statement will detail: securities bought or sold in my securities account, whether on margin or on a fully paid basis; all purchases of merchandise, services, and cash advances made with the check or charge card; redemption checks; margin loans and repayments and interest charges, if any; the number of fund shares that were purchased or redeemed for me; and electronic funds transfers and monthly fees assessed.

### 14. Receipt of Communications

Communications by mail, electronic means, messenger, telegraph, or otherwise, sent to me at the U.S. postal or electronic mail address of record listed on the application, or any other address I may give FBS, are presumed to be delivered to and received by me whether actually received or not. I understand that I should promptly and carefully review the transaction confirmations and statements and notify you of any errors. Information contained on transaction confirmations and account statements is conclusive unless I object in writing within five and ten days, respectively, after transmitted to me.

## Other

### 15. Extraordinary Events Fidelity shall not
be liable for any losses caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, strikes, or other conditions beyond its control, including, but not limited to, extreme market volatility or trading volumes.

### 16. Termination of Account My account
may be terminated by me or Fidelity at any time. This agreement will remain in effect until its termination is acknowledged in writing by an authorized representative of FBS. I will remain responsible for all charges, debit items, or other transactions initiated or authorized by me, whether arising before or after termination.

If my Fidelity Account is terminated either by me or you, I will promptly return all unused checks and cards to you. I understand that failure to return such checks and cards may result in a delay in complying with my instructions as to the disposition of assets in my account. FBS reserves the right to charge a service fee or close any account that fails to maintain minimum activity or balance requirements, and further reserves the right to close an account or remit credit balances because of insufficient investment-related activity. FBS may periodically review my account activity, and reserves the right to charge reasonable inactivity fees or to close or change the optional account features, fees, and services or to cease paying interest on account credit balances for any reason including, but not limited to, insufficient investment activity in accordance

with the regulations of the New York Stock Exchange and Securities Investor Protection Corporation. FBS will notify me if any changes or charges are imposed. Termination will result in the cancellation of my account and other features or privileges.

### 17. Modification and Miscellaneous

No provision of this agreement can be amended or waived except in writing by an authorized representative of FBS. If any provision of this agreement becomes inconsistent with any present or future law or regulation of any entity having regulatory jurisdiction over it, that provision will be superseded or amended to conform with such law or regulation, but the remainder of this agreement remains in force and effect.

The failure of Fidelity at any time to require performance by me of any provision of these terms and conditions will not limit the right to require such performance at any time thereafter. Fidelity reserves the right, at its sole discretion and without prior notice, to restrict or limit any transaction or series of transactions in any investment company advised or managed by Fidelity or its affiliates that Fidelity determines may adversely affect the investment company or its shareholders. Any failure to provide accurate trading or allocation instruction, including options transactions, may result in losses in my account. I may not assign this or any related agreement without the prior written consent of Fidelity.

**I acknowledge that this Agreement constitutes the entire agreement between Fidelity and me with respect to its subject matter. This Agreement and its enforcement shall be governed by the laws of the Commonwealth of Massachusetts, except with respect to conflict of law; shall cover individually and collectively all accounts that I may open or reopen with Fidelity; and shall inure to the benefit of Fidelity's successors and assigns, whether by merger, consolidation, or otherwise. If a court of competent jurisdiction shall deem any provision unenforceable, that provision will be enforced to the maximum extent permissible, and the remaining provisions will remain in full force and effect.**

## Arbitration

### 18. Pre-Dispute Arbitration Clause I
**agree that all controversies that may arise between us (including but not limited to controversies concerning this or any other account maintained with you), whether arising before, on or after the date this account is opened, shall be determined by arbitration in accordance with the rules then prevailing of either the New York Stock Exchange, Inc., or National Association of Securities Dealers, Inc. as I may designate. If I do not notify you in writing of my designation within five (5) days after I**

Fagan Aff., Ex. A, P. 8
(replacement copy)

receive from you a written demand for arbitration, then I authorize you to make such designation on my behalf. I understand that judgment upon any arbitration award may be entered in any court of competent jurisdiction.

I am aware of the following:

a. Arbitration is final and binding on the parties.

b. The parties are waiving their right to seek remedies in court, including the right to jury trial.

c. Pre-arbitration discovery is generally more limited than and different from court proceedings.

d. The arbitrators' award is not required to include factual findings or legal reasoning, and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

e. The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (a) the class certification is denied; (b) the class is decertified; or (c) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

# Margin Account Agreement

## To: Fidelity Brokerage Services LLC ("FBS"), and National Financial Services LLC ("NFS") (collectively "Fidelity" or "you").

My margin account will be established with the Automatic Repayment option. The settlement of securities purchased and other debit items (including without limitation Fidelity American Express Card(s), the Fidelity Visa® Gold Check Card, checks and balances transfer transactions) in the Fidelity Account comes first from the available core balance and second from any margin availability. Any cash or money market fund balance in my core account will be automatically applied to my margin debit balance.

I may select the optional repayment option if I enhance my margin feature with Fidelity AccessLine.® The margin availability is accessed for trade settlement in margin accounts prior to the core account. This method allows the purchase of securities to settle using margin availability while keeping a balance in the core account at the

same time. I understand that the difference between interest earned on cash balances or the dividend rate earned on core money market fund balances and interest charged on AccessLine balances may result in higher net costs to me. Debit items such as Fidelity Visa® Gold Check Card transactions, checks and balance transfer transactions come first from available core balances or money market account(s) and second from any margin availability. Regardless of which payment method I select, cash dividends paid on margin-eligible securities posted to my account automatically pay down my outstanding margin balance.

Further, I have carefully examined my financial resources, investment objectives, and tolerance for risk, along with the terms of the Margin Account Agreement, and have determined that margin financing is appropriate for me. I understand that investing on margin involves the extension of credit to me and that my financial exposure could exceed the value of my securities.

If my account is approved for margin, all marginable assets will be held in a margin account, unless I instruct you to the contrary.

**1.** In consideration of your accepting one or more accounts, I acknowledge that I have read, understand and agree to the terms set forth in this customer agreement. I agree to notify you of any material changes in my financial circumstances or investment objectives. Any information I give you on this account agreement will be subject to verification, and I authorize you to obtain a credit report about me at any time. Upon written request, you will provide the name and address of the credit reporting agency used. You may also tape record conversations with me in order to verify data about any transactions I request, and I consent to such recording. I also understand that my account is carried by NFS, an affiliate of FBS.

## 2. Security Interest: Loan of Margin Securities Any and all credit balances, securities, or
contracts relating thereto, and all other property of whatsoever kind belonging to me or in which I may have an interest held by you or carried for my accounts, shall be subject to a general lien for the discharge of my obligations to you (including unmatured and contingent obligations), however arising and without regard to whether or not you have made advances with respect to such property and without notice to me, may be carried in your general loans, and all securities may be pledged, re-pledged, hypothecated or re-hypothecated, separately or in common with other securities or any other property, for the sum due to you thereon or for a greater sum and without retaining in your possession and control for delivery a like amount of similar securities or other property. At any time and from time to time you may, at your discretion, without notice to me, apply and/or transfer any securities, contracts relating thereto, cash or any other property therein, interchangeably between any

of my accounts, whether individual or joint, from any of my accounts to any account guaranteed by me. You are specifically authorized to transfer to my cash account, on the settlement day following a purchase made in that account, excess funds available in any of my other accounts, including, but not limited to, any free balances in any margin account, sufficient to make full payment of this cash account. I agree that any debit occurring in any of my accounts may be transferred by you at your option to my margin account.

Shares of any investment company in which I have an interest and for which Fidelity Management & Research Company serves as investment advisor and which are custodied, record kept or otherwise administered by an affiliate of FBS or NFS, also are subject to a general lien for the discharge of my obligations to FBS and NFS, and FBS and NFS may redeem any such shares to satisfy my obligation without further notice or demand. However, no provision of this agreement concerning liens or security interests shall apply to any account to the extent such application would be in conflict with any provisions of ERISA or the Internal Revenue Code relating to retirement accounts.

In return for your extension or maintenance of credit in connection with my account, I acknowledge that the securities in my margin account, together with all attendant rights of ownership, may be lent to you or lent out to others. In connection with such loans and in connection with securities loans made to me to facilitate short sales, you may receive and retain certain benefits to which I will not be entitled. In certain circumstances, such loans may limit, in whole or in part, my ability to exercise voting rights of the securities lent.

**3. Payment Upon Demand** I will maintain such margins as you may in your discretion require from time to time and will pay on demand any debit balance owing with respect to any of my accounts. I will be liable to you for any deficiencies in such account in the event of the liquidation of such accounts, in whole or in part, by you or me. Whenever in your sole discretion you deem it desirable for your protection (and without the necessity of a margin call or any other form of notice), you may, without prior demand, tender, and without any notice of the time or place of sale, all of which are expressly waived, sell any or all securities or contracts relating thereto that may be in your possession, or that you may be carrying for me, or buy any securities, or contracts relating thereto of which my account or accounts may be short, in order to close out in whole or in part any commitment on my behalf, or you may place stop orders with respect to such securities and any of the foregoing sales or purchases may be made at your discretion on any stock exchange, before or after hours market, or other market where such business is then transacted, or at public auction or private sale, with or without advertising, no demands, calls, representations, assurances, tenders or notices that you may

make or give nor any prior course of conduct or dealings between us shall invalidate or modify your rights as set out above to take such actions as you deem desirable for your protection. You shall have the right to purchase for your own account any or all of the aforesaid property at such sale, discharged of any right of redemption which is hereby waived. I understand that my financial exposure could exceed the value of securities in my account. I am liable for payment upon demand of any debit balance or other obligation owed in any of my accounts or any deficiencies following a whole or partial liquidation, and I agree to satisfy any such demand or obligation. Interest will accrue on any such deficiency at prevailing margin rates until paid. I agree to reimburse FBS and NFS for all reasonable costs and expenses incurred in the collection of any debit balance or unpaid deficiency in any of my accounts, including, but not limited to, attorneys' fees. I understand that no provision of this agreement can be amended or waived except in writing signed by an authorized representative of Fidelity and that this agreement shall continue in force until its termination by me is acknowledged in writing by an authorized representative of Fidelity, or until written notice or termination by you shall have been mailed to me at my address last given.

**4. Settlement of Transactions** In the absence of a specific demand, all transactions in any of my accounts are to be paid for, securities delivered or required margin deposited no later than 2 p.m. Eastern time on the settlement date. Fidelity reserves the right to cancel or liquidate, at my risk, any transaction not timely settled. Margin calls are due on or before the date indicated regardless of the settlement date of the transaction.

**5. Receipt of Communications** Communications by mail, electronic means, messenger, telegraph or otherwise, sent to me at the U.S. postal or electronic mail address of record listed on the application, or any other address I may give FBS, are presumed to be delivered to and received by me whether actually received or not. I understand that I should promptly and carefully review the transaction confirmations and statements and notify you of any errors. Information contained on transaction confirmations and account statements is conclusive unless I object in writing within five and ten days respectively, after transmitted to me.

**6. Rate of Interest** I agree to be charged interest on any credit extended to or maintained for me by you for the purpose of purchasing, carrying, or trading in any security. The annual rate of interest that will be charged on average debit balances will be calculated by means of a formula based on Fidelity's base rate. The base rate is set at your discretion, with reference to commercially recognized interest rates, industry conditions regarding the extension of margin credit, and general credit conditions. The annual rate of interest is subject to change without

Fagan Aff., Ex. A, P. 10
(replacement copy)

prior notice in accordance with changes in the base rate. With the exception of credit balances in the short account and income account, all other balances in all of my accounts are combined to determine the daily balance and interest is charged to the margin account based on the average of any resulting daily debit balance. Interest is computed monthly on the average debit balances during the month. If, during the month, there is a change in interest rates, separate charges will be shown for each interest period under the different rate. The combining of balances, as well as the actual interest calculations, are done by computer, but interest is arrived at by multiplying the average debit balance by the effective rate of interest divided by 360, times the number of days a daily debit balance was maintained during the interest period.

### 7. Maintenance of Margin Requirements
In the event there is a decline in the market value of the securities in the margin account, you may have to request additional collateral. You retain the right to require additional margin at any time, without notice, you deem it necessary or advisable in your sole discretion. Any such call for additional collateral may be met by delivery of additional marginable securities or cash. Any securities in any of my accounts are collateral for any debit balances in the account with you. A lien is created by these debits to secure the amount of money owed you. This means that, in accordance with the terms of this agreement, securities in the accounts can be sold by you to redeem or to liquidate any debit balances in these accounts. You reserve the right to increase maintenance requirements and to require additional collateral at any time at your sole discretion and without notice. I understand that you may borrow securities in the amount and class for which I may be carrying a short position and that you may be forced to liquidate all or part of my short position if the lender recalls the borrowed securities, which liquidation may result in a loss to me. The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from a public assistance program, or because the applicant has, in good faith, exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is: Securities and Exchange Commission, 450 Fifth Street NW, Washington, DC 20549.

### 8. Modification or Termination of Account
I understand that no provision of this agreement can be amended or waived except in writing signed by an authorized representative of Fidelity and that this agreement shall continue in force until its termination by me is acknowledged in writing by an authorized representative of Fidelity, or until written notice of termination by you shall have been mailed to me at my last address given. I will remain responsible for all charges, debit items, or other transactions initiated or authorized by me, whether arising before or after termination.

### 9. Applicable Rules and Regulations
If any provision hereof is or at any time should become inconsistent with any present or future law, rule, or regulation of any securities exchange, or of any sovereign government or a regulatory body thereof and if any of these bodies has jurisdiction over the subject matter of this agreement, said provision shall be deemed to be superseded or modified to conform to such law, rule or regulation, but in all other respects this agreement shall continue and remain in full force and effect.

### 10. Extraordinary Events
Fidelity shall not be liable for loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, strikes or other conditions beyond its control, including, but not limited to, extreme market volatility or trading volumes.

### 11. Choice of Marketplace
When securities may be traded in more than one marketplace, in the absence of specific instructions from me, Fidelity may use its discretion in selecting the market in which to place my order.

### 12. Governing Law
THIS AGREEMENT AND ITS ENFORCEMENT SHALL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS; SHALL COVER INDIVIDUALLY AND COLLECTIVELY ALL FIDELITY ACCOUNTS WHERE APPROPRIATE THAT I MAY OPEN OR REOPEN WITH FIDELITY; SHALL INURE TO THE BENEFIT OF FIDELITY'S SUCCESSORS AND ASSIGNS, WHETHER BY MERGER, CONSOLIDATION OR OTHERWISE, AND FIDELITY MAY TRANSFER MY ACCOUNT TO YOUR SUCCESSORS AND ASSIGNS, AND THIS AGREEMENT SHALL BE BINDING UPON MY HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, AND THE ASSIGNS.

### 13. Pre-Dispute Arbitration Agreement
I AGREE THAT ALL CONTROVERSIES THAT MAY ARISE BETWEEN US (INCLUDING BUT NOT LIMITED TO ALL CONTROVERSIES CONCERNING THIS OR ANY OTHER ACCOUNT MAINTAINED WITH YOU), WHETHER ARISING BEFORE, ON OR AFTER THE DATE THIS ACCOUNT IS OPENED, SHALL BE DETERMINED BY ARBITRATION IN ACCORDANCE WITH THE RULES THEN PREVAILING OF EITHER THE NEW YORK STOCK EXCHANGE, INC., OR NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., AS I MAY DESIGNATE. IF I DO NOT NOTIFY YOU IN WRITING OF MY DESIGNATION WITHIN FIVE (5) DAYS AFTER I RECEIVE FROM YOU A WRITTEN DEMAND FOR ARBITRATION, THEN I AUTHORIZE YOU TO MAKE SUCH DESIGNATION ON MY BEHALF. I UNDERSTAND THAT JUDGMENT UPON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT OF COMPETENT JURISDICTION.

(a) ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

(b) THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

(c) PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PRO-CEEDINGS.

(d) THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

(e) THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

NO PERSON SHALL BRING PUTATIVE OR CERTIFIED CLASS ACTION OR ARBITRATION, NOR SEEK TO ENFORCE ANY PREDISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL: (A) THE CLASS CERTIFICATION IS DENIED; OR (B) THE CLASS IS DECERTIFIED; OR (C) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

**14. Check Card** An optional free Fidelity VISA® Gold Check Card is provided by PNC Bank, Delaware ("PNC") and is subject to approval by it. I authorize PNC to check my credit and employment history and to ask me questions about my payment experience. The card is available to non-retirement brokerage accounts with individual, joint, and certain trust registrations; however, it cannot be issued to accounts without Social Security or taxpayer ID number. If approved, PNC will issue a card to me and I am responsible for all card usage. I authorize Fidelity to debit my account to satisfy card transactions upon notice from PNC. As used in this agreement, the total value of the core account and margin loan shall be the "collected balance." I understand that in the case of the accounts with the Fidelity AccessLine® feature, total check card transactions (including merchant transactions, authorizations, and ATM withdrawals) may not exceed my collected balance. I understand in the case of accounts without the AccessLine feature, such total check card transactions generally may not exceed $10,000 per day and may be lower in some cases. In any event, I understand that I am responsible for all authorized transactions. I understand that authorization requests will reduce my collected balance by the amount of the authorization even if the authorization does not result in a transaction. I further understand that my usage of the debit card will be governed by PNC's Check Card Agreement and Disclosure Statement for this service and applicable state and federal law. I also understand that Fidelity accounts coded Premium or Private Access or held by customers with householded annual trading activity of 240 or more stock, bond, or options trades will have all ATM fees waived. These accounts will also be reimbursed for ATM fees charged by other institutions while using AMT cards linked to the Fidelity Account (maximum reimbursement of $2.50 per ATM transaction, up to $75 per year). All other Fidelity accounts will receive up to five (5) free ATM transactions per calendar month, and will be charged a $1.00 fee for each ATM use thereafter.