```
                                                              1


 1                          VOLUME  I
 2                          PAGES    1 - 134
 3              UNITED STATES DISTRICT COURT
 4                DISTRICT OF MASSACHUSETTS
 5   --------------------------------x
 6   JOAN BERENSON AND DAVID
 7   BERENSON, INDIVIDUALLY AND ON
 8   BEHALF OF ALL OTHERS SIMILARLY
 9   SITUATED,
10         Plaintiffs              Civil Action
11      v.                         No. 04 CV 11311
12   NATIONAL FINANCIAL SERVICES,     (WGY)
13   LLC, FIDELITY BROKERAGE
14   SERVICES, LLC, AND DOES 1-50,
15   INCLUSIVE,
16         Defendants
17   --------------------------------x
18           DEPOSITION OF CAMILLE ZASLAU
19             Wednesday, January 19, 2005
20                    10:05 a.m.
21               Perkins, Smith & Cohen
22                 One Beacon Street
23                Boston, Massachusetts
24      REPORTER:  Virginia L. Barry, RPR/CSR
```

                                                                    2

1   APPEARANCES:

2   JOHANSON BERENSON, LLP

3   By Douglas A. Rubel, Esquire

4   201 Shannon Oaks Circle, Suite 200

5   Cary, North Carolina 27511

6   (919) 654-4544

7   dar@JohansonBerenson.com

8   and

9   JOHANSON BERENSON, LLP

10  By Kenneth L. McWilliams, Esquire

11  1146 Walker Road, Suite C

12  Great Falls, Virginia 22066

13  (708) 759-1055

14  On behalf of the Plaintiffs.

15

16  FOLEY HOAG, LLP

17  By John A. Shope, Esquire

18  155 Seaport Boulevard

19  Boston, Massachusetts 02210

20  (617) 832-1000

21  jshope@foleyhoag.com

22  On behalf of the Defendants.

23  ALSO PRESENT:  Colleen Hankins

24

```
 1                    I N D E X
 2   WITNESS:      DIRECT   CROSS   REDIRECT   RECROSS
 3   Camille Zaslau
 4   (By Mr. Rubel)    4              120,130
 5   (By Mr. Shope)           116                126,132
 6   (By Mr. McWilliams)              128
 7
 8
 9
10
11                    E X H I B I T S
12   NO.                             FOR IDENTIFICATION
13   4   Affidavit of Camille Zaslau        107
14
15
16
17
18
19
20
21
22
23
24   **Original exhibits retained by Attorney Rubel
```

```
 1                    PROCEEDINGS
 2              CAMILLE ZASLAU, having been
 3    satisfactorily identified and duly sworn by the
 4    Notary Public was examined and testified in answer
 5    to direct interrogatories by MR. RUBEL:
 6         Q.   State your name for the record.
 7         A.   Camille Zaslau.
 8         Q.   And by whom are you employed?
 9         A.   National Financial Services, LLC.
10         Q.   Is that what it says on your check?
11         A.   Yes.
12         Q.   The reason I ask is we had some questions
13    yesterday about I don't think two people knew who
14    they were paid by.  It's easy to say Fidelity;
15    right?  Have you ever been deposed before?
16         A.   No.
17         Q.   What I'll do is ask you a question, you'll
18    answer the question to the best of your abilities.
19    If you don't understand what I'm asking you, please
20    let me know, otherwise, I'm going to assume that you
21    understood the question.  Your lawyer may want to
22    interpose an objection, I'm sure he's told you that,
23    so, you know, wait a second, give him a chance to
24    breathe and speak, if he needs to, speak, that is.
```

58

1    is a check issued from a CheckFree corporate
2    account; a draft would be a draft initiated off a
3    customer account.
4        Q.   A draft would be initiated off a customer
5    account, the customer being Joe Sample?
6        A.   Correct.
7        Q.   Does CheckFree utilize all three of those
8    methods with regard to Fidelity?
9        A.   No.
10       Q.   Why not?
11       A.   Fidelity is on a Good Funds Model.
12       Q.   What does that mean?  I don't want to
13   interrupt you, go ahead.
14       A.   Fidelity reviews customer accounts,
15   ensures that the money is available, takes the money
16   from the customer's account, and then releases that
17   file to CheckFree.
18       Q.   Right.  What makes it a Good Fund -- what
19   makes the Good Funds Model a Good Funds Model; what
20   does that mean?
21       A.   From an industry standard, the Good Funds
22   Model is the corporate client, being Fidelity,
23   withdrawing those funds from the customer's account
24   to ensure that that payment will not bounce, and

77

1    Q.   Has it changed significantly?
2    A.   The number of accounts enrolled has
3    increased over the years.
4    Q.   What was it a year ago?
5    A.   I don't know.
6    Q.   Roughly, can you ballpark it, can you
7    guess?
8    A.   I couldn't even guess.
9    Q.   Would you have any idea of the rate of
10   increase?
11   A.   No.
12   Q.   And the operations you're describing apply
13   equally to all the accounts; correct?
14   A.   Correct.
15   Q.   So the funding group wires monies to
16   CheckFree?
17   A.   To a bank account in CheckFree's name.
18   Q.   Do you know where that account is?
19   A.   No.
20   Q.   Where does -- where are the monies wired
21   out of?
22   A.   They are wired out of a Fidelity account.
23   Q.   And that account is just called the
24   general ledger account?

1    are transferred?
2        A.    I know when that is presented to the
3    clearinghouse.
4        Q.    And then you don't --
5        A.    From that part, ACH is typically a next
6    day settlement, so it's passed to that vendor's bank
7    account typically next day.
8        Q.    Next day would be the 22nd?
9        A.    Correct.
10       Q.    So in the best of all worlds, it should
11   take two business days if everything can be done
12   electronically?
13       A.    We average three business days for an
14   electronic transfer.
15       Q.    Why three?
16       A.    The 20th we initiate the file to
17   CheckFree, the 21st CheckFree initiates the file to
18   the clearinghouse, and that file then on the, the
19   20th, 21st, the 20th, the 21st; the 22nd it's
20   initiated to the clearinghouse, and the payee
21   typically will have access to those funds on the
22   23rd.
23       Q.    Okay.  Assuming that all of those days are
24   business days?

1       A.      Correct.
2       Q.      What if CheckFree has to issue a check to
3    HSBC?
4       A.      If a check is issued on the second day,
5    which would be the 21st, CheckFree will issue that
6    check and put it in the mail.
7       Q.      Do they actually generate a paper check on
8    the 21st?
9       A.      Yes.
10      Q.      And somebody sticks it in an envelope,
11   puts a stamp on it, puts it in the United States
12   mail?
13      A.      Whatever CheckFree's mail process is once
14   their checks are issued.
15      Q.      What's your understanding as to their mail
16   process?
17      A.      They have a bulk mail process where they
18   will issue checks and put it in the mail.
19      Q.      First Class mail or bulk mailings; you
20   don't know?
21      A.      I don't know.
22      Q.      Now, if they issue a check to HSBC, do you
23   have any information similar to what you just said
24   with regard to the electronic transfers as taking on

```
 1   average three days, do you have any information as
 2   to how long on average is takes if they have to
 3   issue a check?
 4        A.   On average, between three and five
 5   business days.
 6        Q.   What happens if the check doesn't get to
 7   HSBC until the 3rd or 4th of the month, and HSBC
 8   charges, which is probably unlikely in our mortgage
 9   scenario, but let's just say hypothetically that
10   HSBC charges the customer a late fee because it
11   hasn't received the check by the 1st?
12        A.   In our current process if a customer makes
13   us aware that they have a late fee associated with a
14   payment that was initiated through the bill payment
15   service, we will review with the customer to make
16   sure that they, both the customer and the payee, was
17   the customer -- if the customer provides us with
18   information that they received a late fee, they also
19   provide some information, typically they will
20   provide, sometimes they don't, some details
21   associated with that payment.  If they don't, we
22   will contact the payee to get the additional
23   details; when the payment was due, what date it was
24   credited to the customer's account, was the
```

116

```
 1      A.   Bill payment service agreement.
 2      Q.   Anything else?  I'm sorry, were you
 3  finished?
 4      A.   Um-hmm, yes.
 5      Q.   17?
 6      A.   Personal knowledge.
 7      Q.   You estimated the number of accounts at
 8  40,000; if I were to tell you that Warren Fagan
 9  yesterday said it was, her estimate was 44,000,
10  would you have any reason to disagree with her
11  number?
12      A.   The number of enrolled accounts at,
13  approximately, 44,000, I ballparked 40,000.
14      Q.   Same ballpark, so 44,000?
15      A.   Yes.
16           MR. RUBEL:  I have no more questions.
17           MR. McWILLIAMS:  John, will you need
18  that exhibit while you examine?
19           MR. SHOPE:  I think I may.  We'll make
20  a copy before we leave.
21                CROSS EXAMINATION
22      Q.   (By Mr. Shope) Just a few questions.  At
23  the beginning of the deposition Mr. Rubel was asking
24  you about a scenario where a Fidelity customer named
```

```
 1   to be made?
 2        A.    Correct.
 3        Q.    So if in July, the next July they don't
 4   want any transactions, they're still charged the
 5   monthly fee?
 6        A.    Correct.
 7        Q.    Okay.  How many of the accounts are not
 8   charged the fee?
 9              MR. SHOPE:  You're asking of the
10   44,000, approximately?
11        Q.    Yes, you said of the 44,000 there's a
12   certain number that have enrolled but have never
13   used it, so they're not charged the fee; right?
14        A.    Correct.
15        Q.    That was counsel's question; right?
16        A.    Correct.
17        Q.    How many?
18        A.    There's, approximately, 28,000 accounts
19   that are currently considered active BillPay users.
20        Q.    So there are 16, approximately, 16,000
21   accounts that have been opened and enrolled, but
22   never used?
23        A.    If that's the math, yes.
24        Q.    So it's 28,000 accounts are active?
```

132

```
1      A.   Are considered active, yes.
2           MR. RUBEL:  Okay.  That's fine, too.
3  Anything further?
4           MR. McWILLIAMS:  No.
5           MR. RUBEL:  Okay.
6           MR. SHOPE:  I just have one question.
7                  RECROSS EXAMINATION
8      Q.   (By Mr. Shope) The customer -- does the
9  customer have the right to cancel the BillPay
10 service and thereafter cease receiving a charge for
11 the monthly service charge?
12     A.   Yes.
13          MR. SHOPE:  Okay, I have nothing
14 further.
15          MR. RUBEL:  Thank you for coming.  I
16 assume you're doing with this witness what you did
17 with the others.
18          MR. SHOPE:  I'm doing with this
19 witness what I did with the others?
20          MR. RUBEL:  She's reading, she's not
21 waiving.
22          MR. SHOPE:  We had said the same
23 stipulations, yes.
24 (Whereupon the deposition adjourned at 1:17 p.m.)
```