1

```
 1                      VOLUME   I
 2                      PAGES    1 - 131
 3           UNITED STATES DISTRICT COURT
 4             DISTRICT OF MASSACHUSETTS
 5      ---------------------------------x
 6   JOAN BERENSON AND DAVID
 7   BERENSON, INDIVIDUALLY AND ON
 8   BEHALF OF ALL OTHERS SIMILARLY
 9   SITUATED,
10        Plaintiffs            Civil Action
11      v.                      No. 04 CV 11311
12   NATIONAL FINANCIAL SERVICES,    (WGY)
13   LLC, FIDELITY BROKERAGE
14   SERVICES, LLC, AND DOES 1-50,
15   INCLUSIVE,
16        Defendants
17      ---------------------------------x
18           DEPOSITION OF ANNE WARREN FAGAN
19             Tuesday, January 18, 2005
20                   11:07 a.m.
21             Perkins, Smith & Cohen
22                One Beacon Street
23              Boston, Massachusetts
24      REPORTER:  Virginia L. Barry, RPR/CSR
```

```
 1   APPEARANCES:
 2   JOHANSON BERENSON, LLP
 3   By Douglas A. Rubel, Esquire
 4   201 Shannon Oaks Circle, Suite 200
 5   Cary, North Carolina 27511
 6   (919) 654-4544
 7   dar@JohansonBerenson.com
 8   and
 9   JOHANSON BERENSON, LLP
10   By Kenneth L. McWilliams, Esquire
11   1146 Walker Road, Suite C
12   Great Falls, Virginia 22066
13   (708) 759-1055
14   On behalf of the Plaintiffs.
15
16   FOLEY HOAG, LLP
17   By John A. Shope, Esquire
18   155 Seaport Boulevard
19   Boston, Massachusetts 02210
20   (617) 832-1000
21   jshope@foleyhoag.com
22   On behalf of the Defendants.
23
24   ALSO PRESENT:  Colleen Hankins
```

```
 1                    I N D E X
 2   WITNESS:         DIRECT   CROSS   REDIRECT   RECROSS
 3   Anne Warren Fagan
 4   (By Mr. Rubel)     4               120
 5   (By Mr. Shope)             115
 6
 7
 8
 9
10
11                    E X H I B I T S
12   NO.                             FOR IDENTIFICATION
13   2   Affidavit of Colleen Hankins        22
14   3   Affidavit of Anne Warren Fagan      79
15
16
17
18
19
20
21
22
23
24   **Original exhibits retained by Attorney Rubel
```

```
1                    PROCEEDINGS
2            MR. SHOPE:  We wanted to put on the
3   record a couple of housekeeping matters that we were
4   discussing at the break.  No. 1, Mr. Rubel has
5   indicated that subject to correction of the non
6   substantive typographical error, he will be
7   executing a proposed confidentiality stipulation
8   that I faxed to him last week.  Is that correct,
9   Mr. Rubel?
10           MR. RUBEL:  That is correct.
11           MR. SHOPE:  And the second item is
12  that we will have the same stipulations as to the
13  deposition that we had in the just completed
14  deposition of Daniel Stickney.  And the third item
15  is that we will be numbering the exhibits
16  sequentially from the earlier depositions in the
17  case.  And if you could continue to mark the time.
18           ANNE WARREN FAGAN, having been
19  satisfactorily identified and duly sworn by the
20  Notary Public was examined and testified in answer
21  to direct interrogatories by MR. RUBEL:
22      Q.   Please state your name for the record.
23      A.   Anne Warren Fagan.
24      Q.   And by whom are you employed?
```

```
 1        A.    Fidelity Investments.
 2        Q.    Do you know any more specifically than
 3   that?  You heard my questions previously to
 4   Mr. Stickney.  Do you know if you're employed by
 5   National Financial Services, LLC, or Fidelity
 6   Brokerage Services, LLC, or by whom?
 7        A.    I believe my paychecks say FMR Corp.
 8        Q.    Have you ever been deposed before?
 9        A.    No.
10        Q.    You did just sit in on Mr. Stickney's
11   deposition, so, as you know, I will ask you a series
12   of questions.  Just answer the questions to the best
13   of your ability.  If you have any questions about
14   what I've asked you, please let me know so that I
15   can clarify it.  If you don't advise me as to some
16   ambiguity or misunderstanding of what I've asked,
17   I'm just going to assume that you understood what I
18   said.
19              Give your lawyer a moment to interpose
20   an objection.  You noticed before that with regard
21   to Mr. Stickney there were a couple of times when he
22   objected on the basis of the form of the question.
23   However, I'll try not to speak when you're speaking,
24   so that the court reporter can take down all of your
```

1   answer as you give it, and I'd ask the same courtesy
2   from you.
3           If you need to take a break for any
4   reason, except to discuss an answer with your
5   counsel, we'll do that. Just let me know, raise
6   your hand, bang on the table, do whatever you need
7   to do. If you have any other questions, ask your
8   lawyer.
9           MR. SHOPE: And the only thing I would
10  add as an amendment, generally speaking, when
11  there's a pending question, we should not consult,
12  but if you have a concern about whether or not the
13  question relates to conversations that you've had
14  with me or Miss Hankins or any of the other legal
15  staff, and you're not sure whether it's something
16  that you should be disclosing to Mr. Rubel or not,
17  you can ask that question of me.
18      Q.  By all means. And that being said, what
19  is it you do for Fidelity?
20      A.  I'm a director of product management.
21      Q.  What does that mean?
22      A.  I work in the retail organization managing
23  our, some of our cash management products.
24      Q.  As a director, does that mean that you

```
1    oversee various other employees?
2       A.   No.
3       Q.   What is your relationship with the BillPay
4    service product that Fidelity has?
5       A.   It is one of the products that I'm
6    responsible for.
7       Q.   What other products are you responsible
8    for?
9       A.   Our debit card product.
10      Q.   I'm sorry, debit card?
11      A.   Debit card product, credit card products,
12   and some money movement products.
13      Q.   What are your job duties?
14      A.   I'm responsible for the day-to-day
15   management of these products.
16      Q.   Okay.  Can you be more specific?
17      A.   I would review marketing materials about
18   these products.  I would review content on
19   fidelity.com regarding these products.  I would
20   review materials that might go to our sales reps
21   about these products.  I would be responsible for
22   new product development or any changes to our
23   product.
24      Q.   Including BillPay?
```

1     A.   Yes.
2     Q.   What do you mean you're "responsible for"?
3     A.   I'm not sure I understand the question.
4     Q.   Well, does the ultimate decision as to
5  changes to the BillPay service rest with you, or
6  what do you mean you're "responsible for"?
7     A.   The ultimate decision would not be mine
8  alone.
9     Q.   Would you have input into the ultimate
10 decision?
11    A.   Yes, I would.
12    Q.   With whom?
13    A.   It depends on what change, but it could be
14 a combination of my management, our operations
15 group, our legal organization, our sales force.
16    Q.   Can you name specific names of people you
17 might consult with?
18         MR. SHOPE:   Objection, and I don't
19 want to speak, but are you asking about BillPay in
20 particular or are you just asking about the range of
21 products that she just discussed?
22         MR. RUBEL:   No, I'm limiting it to
23 BillPay only.
24    A.   My manager, Ann Johnson, in operations I

13

1     Q.   You didn't work for Fidelity while you
2  were at Cornell?
3     A.   No.
4     Q.   When did you rejoin Fidelity?
5     A.   June of 2000.
6     Q.   And in what capacity?
7     A.   I was a marketing manager in the mutual
8  fund product group.
9     Q.   Did that include anything having to do
10 with BillPay?
11    A.   No.
12    Q.   And when did your position next change?
13    A.   June of 2002.
14    Q.   To what?
15    A.   The director of product management, my
16 current role, cash management products.
17    Q.   Do you have any knowledge, have you
18 reviewed any documents relating to the number of
19 subscribers in Fidelity's BillPay service?
20    A.   I'm aware of the number, the general
21 number of subscribers to Fidelity's BillPay.
22    Q.   What's that general number?
23    A.   44,000.
24    Q.   Is that 44,000 individuals or 44,000

```
 1   accounts?
 2        A.   44,000 accounts.
 3        Q.   That's a whole lot.  And what's the basis
 4   of that knowledge; how do you know this?
 5        A.   We track enrollment statistics.
 6        Q.   So what documents have you seen that would
 7   show the enrollment, what do we call them?
 8        A.   They're just sort of ad hoc reports from
 9   our operations group.
10        Q.   And how often are those reports generated?
11        A.   As requested, I mean, generated to me as
12   requested.
13        Q.   Well, are there reports that are generated
14   on a monthly basis that show the status of the
15   subscriptions?
16        A.   There are reports generated on a monthly
17   basis that show the active users, but not total
18   enrollees, that I receive.
19        Q.   And what qualifies as an active user, as
20   opposed to someone who is not active?
21        A.   Someone who makes a payment.
22        Q.   How frequently?
23        A.   Within that month.
24        Q.   So there's a listing every month of all
```

20

```
1      Q.   And where was Kim Coleman?
2      A.   Norcross, Georgia, I believe.
3      Q.   Outside of Atlanta.  The same with the
4    operations contact?
5      A.   Yes, I believe so.
6      Q.   Is that where CheckFree is headquartered?
7      A.   Yes, I believe so.
8      Q.   Did you -- do you know if Fidelity, do you
9    know -- does CheckFree have a local operation here
10   in Boston?
11     A.   Not that I'm aware of.  I don't interact
12   with anyone locally.
13          MR. RUBEL:  Are you leaving and coming
14   back or are you just leaving?
15          MR. SHOPE:  We don't know.
16          MS. HANKINS:  It's unclear, we don't
17   know yet.
18          (Miss Hankins left.)
19     Q.   You said that there are, approximately,
20   44,000 accounts that participate in the BillPay
21   service?
22          MR. SHOPE:  Objection.
23          MR. RUBEL:  What's your objection?
24          MR. SHOPE:  I think it misstates the
```

1  previous testimony.
2      Q.  Well, that's what I'm asking; was that
3  your previous testimony, that was my question?
4      A.  My previous testimony was that there are,
5  approximately, 44,000 accounts that have enrolled in
6  our BillPay service.
7      Q.  Okay.  And that's total nationally,
8  internationally?
9      A.  That would represent total.
10     Q.  Does the Fidelity BillPay service operate
11 the same with respect to each of those accounts?
12     A.  Yes.
13     Q.  There are no differences from one account
14 to another in how they operate within the BillPay
15 service?
16     A.  There are no differences in how the
17 service operates.
18     Q.  Do you have any idea -- you said there
19 are, approximately, 44,000 accounts; do you have any
20 idea how many individuals that might be?
21     A.  I don't.  I don't know.
22     Q.  Would there be records that would show,
23 does Fidelity generate records that evidence or show
24 who participates in the BillPay service?

```
 1      Q.   So none of the reports that are generated
 2   to you would show that information?
 3      A.   No.
 4      Q.   Who would have, who at Fidelity would have
 5   documents that would show that?
 6      A.   I don't know.
 7      Q.   Your estimate as to 44,000 accounts,
 8   that's 44,000 as of what point in time?
 9      A.   As of the end of December, 2004.
10      Q.   And do you know if, were there more
11   accounts at the end of December, 2004 than there
12   were at the end of December in 2003?
13      A.   I don't know.
14      Q.   Can you describe for me generally how the
15   operation, the bill payment service has changed over
16   time, to your understanding?
17      A.   From what time period?
18      Q.   From whenever your understanding is, if
19   you had an understanding of how it operated at the
20   beginning of its implementation, then from then, you
21   tell me?
22      A.   It is my understanding that BillPay used
23   to be a phone based service, then it moved to a
24   computer based system, and is now primarily an
```