IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOAN BERENSON and DAVID
BERENSON, individually and on behalf of
all others similarly situated,

        Plaintiffs,

        v.

NATIONAL FINANCIAL SERVICES LLC,
FIDELITY BROKERAGE SERVICES LLC,
and DOES 1-50, inclusive,

        Defendants.

Civil Action No. 04 CV 11311 (WGY)

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION



Nicholas C. Theodorou (BBO No. 495730)
John A. Shope (BBO No. 562056)
William W. Fick (BBO No. 650562)
David E. Cole (BBO No. 658705)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

# TABLE OF CONTENTS

Introduction .................................................................................................................. 1

I.    Factual and Procedural Background ...................................................................... 3

      A.    Fidelity's Bill Payment Service .................................................................3

      B.    The Plaintiffs.............................................................................................6

      C.    Plaintiffs' Counsel .....................................................................................9

      D.    The Plaintiffs' Conduct in Discovery .....................................................11

II.   Argument ............................................................................................................ 12

      A.    The Requirements of Rule 23 ..................................................................12

      B.    The Plaintiffs and Their Counsel are Inadequate to Represent the Class. ............13

            1.    The Plaintiffs are Inadequate Representatives Because of Their
                  Family Relationship with Counsel...............................................13

            2.    The Berensons' Individual Claims are Subject to Unique Infirmities. ......16

            3.    The Plaintiffs Failed to Demand c. 93A Relief for the Class. ...................16

            4.    Both the Plaintiffs and Their Counsel's Discovery Conduct Evidence
                  Inadequacy.. ...............................................................................17

            5.    Lead Counsel Has No Experience in the Substantive Area of Law. .........17

      C.    Common Issues Will Not Predominate....................................................18

            1.    Individual Issues of Fact Will Overwhelm Any Common Issues.............18

            2.    The Application of Many States' Laws Precludes Predominance of
                  Common Legal Issues..................................................................19

CERTIFICATE OF SERVICE ......................................................................................21

## Table Of Authorities

### *Cases*

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................... 12, 13

*Ballan v. Upjohn Co.*, 159 F.R.D. 473 (W.D. Mich. 1994) ........................................................... 16

*In re Bridgestone/Firestone Tire Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002) ................. 19

*Broussard v. Parish of Orleans*, No. Civ.A. 00-2318, 2001 WL 881290 (E.D. La. Aug. 3, 2001) ................................................................................................................................................... 16

*Burstein v. Applied Extrusion Techs., Inc.*, 150 F.R.D. 433 (D. Mass. 1993) ............................... 15

*Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) .......................................................... 18

*Conran v. Great Atl. & Pac. Tea Co.*, 499 F. Supp. 727 (E.D. Pa. 1980) ..................................... 16

*Contrast Baldassari v. Pub. Fin. Trust*, 337 N.E.2d 701 (Mass. 1975) ......................................... 15

*Fischer v. International Telephone & Telegraph Corp.*, 72 F.R.D. 170 (S.D.N.Y. 1976) ........... 13

*Gen. Tel. Co. v Falcon*, 457 U.S. 147 (1982) .............................................................................. 11

*Gorsey v. I.M. Simon & Co.*, 121 F.R.D. 135 (D. Mass. 1988) ..................................................... 19

*Hale v. Citibank, N.A.*, 198 F.R.D. 606 (S.D.N.Y. 2001) ............................................................. 13

*Holmberg v. Armbrecht*, 327 U.S. 392 (1946) .............................................................................. 15

*Ideal Elec. Sec. Co. v. Int'l. Fed. Ins. Co.*, 129 F.3d 143 (D.C. Cir. 1997) .............................. 18

*Key v. Gillette Co.*, 782 F.2d 5 (1st Cir. 1986) ............................................................................. 12

*Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303 (D. Mass. 1987) ............................................... 13

*London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246 (11th Cir. 2003) ............................................... 13

*Malchman v. David*, 761 F.2d 893 (2d Cir. 1985) .................................................................. 13, 14

*Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 142 F.3d 512 (1st Cir. 1998) 15

*Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000) ............................................................................................................................... 18

*Olson v. Energy N., Inc.*, No. 9800228, 1999 WL 1332362 (Mass. Super. Ct. 1999) ................. 16

*Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21 (D. Mass. 2003) ..................................... 19

*In re Relafen Antitrust Litig.*, 225 F.R.D. 14 (D. Mass. 2004) ....................................... 12

*cf. Savino v. Computer Credit, Inc.*, 164 F.3d 81 (2d Cir. 1998)................................... 16

*Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371 (11th Cir. 1984)........................... 14

*Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768 (Mass. 1975)...................................... 15

*State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003)...................... 18

*Susman v. Lincoln Am. Corp.*, 561 F.2d 86 (7th Cir. 1977) ........................................... 13

*Van Dusen v. Barrack*, 376 U.S. 612 (1964) .................................................................. 18

*Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000)....................... 12

*Zlotnick v. TIE Communications, Inc.*, 123 F.R.D. 189 (E.D. Pa. 1988)....................... 13

### Statutes

15 U.S.C. § 1693f(a) ....................................................................................................... 17

15 U.S.C. § 1693f(a), (c)................................................................................................. 17

15 U.S.C. § 1693m(g) ................................................................................................. 1, 15

28 U.S.C. § 1404(a) ........................................................................................................ 18

Conn. Gen. Stat. § 6-13.1-5.2(a) .................................................................................... 18

Fed. R. Civ. P. 23(b)(3)................................................................................................... 12

Fed. R. Civ. P. 23(a) ....................................................................................................... 12

Mass. Gen. Laws c. 93A ........................................................................................... passim

### Other Authorities

*Restatement (Second) of the Conflicts of Laws*, § 187................................................. 18

## INTRODUCTION

Defendants National Financial Services LLC and Fidelity Brokerage Services LLC (together, "Fidelity") respectfully submit this memorandum in opposition to the plaintiffs' Motion for Class Certification (filed January 25, 2005).

Plaintiffs Joan and David Berenson allege that Fidelity failed to disclose that its bill payment service, now called BillPay, would deprive them of "interest" during the period of "float" between the time that amounts were debited from their Fidelity accounts and the time that payees were ultimately credited with payments. They also allege that Fidelity fails to make the payments as promptly as is commercially practicable in order to maximize such interest for itself and allege that Fidelity used a third party vendor to pay bills without their authorization. The Berensons assert that these practices amount to "kiting" of interest that violates federal and state law. As argued in Fidelity's Motion to Dismiss and for Summary Judgment (filed November 7, 2003), which remains pending before this Court, Fidelity in fact made full disclosure and conforms to accepted industry practices.

With respect to disclosure, although the Berensons contend that they either never received or did not review the materials, there is no dispute that Fidelity regularly mailed to BillPay users, and provided on its website, copies of BillPay service agreements, customer agreements, and prospectuses, T13:¶¶4-6.[1] These documents clearly disclosed that:

- Fidelity debits the brokerage customer's "Core Account" (here, a money market mutual fund) on the "Transaction Date" scheduled by the customer, which is recommended to be at least five (5) business days before payment is actually due (T13:Ex.B,¶9);

---

[1] Citations refer to tab numbers in the Fidelity Appendix, filed concurrently herewith, followed by additional location information. For example, the referenced citation denotes Tab 13 of the Appendix (which happens to be an affidavit), at paragraphs 4-6.

- Fidelity ceases paying "interest" (here technically dividends on the mutual fund) as of the next business day after the debit (T13:Ex.C,16);
- Fidelity transfers the funds to an account it maintains for its use in paying bills (T13:Ex.B,¶11);

- Some bills may be paid by check sent by mail and thus the payee may not actually receive the funds until several days after the Transaction Date (*Id.*);

- Fidelity offers the service "as is" without any warranty of fitness, but will pay late payment fees actually incurred by customers who met specified scheduling rules (T13:Ex.B,¶¶12-13) (it also may reimburse such charges as goodwill (T3:119-21)); and

- Fidelity may involve third-party contractors in its "sole discretion." (T13:Ex.B,1).

In addition, as Fidelity argues in a second motion for summary judgment filed concurrently herewith, the Berensons' claim under the Electronic Funds Transfer Act ("EFTA") is barred by the statute's one-year limitations period, 15 U.S.C. § 1693m(g).

In the unlikely event that the plaintiffs' case should survive those pending dispositive motions, class certification should be denied. <u>First</u>, the Berensons are not adequate representatives. Retention of their son's law firm as lead counsel gives rise to an inherent conflict of interest with the proposed class. Moreover, the Berensons and their counsel have failed to make a proper demand under Mass. Gen. Laws c. 93A on behalf of the class, have displayed fundamental misunderstanding of basic banking principles, have submitted manifestly false affidavits and otherwise failed to abide the rules of discovery, and suffer from other unique infirmities. <u>Second</u>, the Berensons' claims are not typical because, among other reasons, they contend their bill payment relationship with Fidelity is controlled not by current contracts, but rather documents generated in the 1980s or early 1990s that neither they nor Fidelity can locate. <u>Third</u>, common issues of fact do not predominate because issues such as reliance, causation, and the statute of limitations rest on subjective expectations or understanding that will necessarily vary across class members. In addition, the claim of deliberately delayed payments by check to

certain payees—for which there is no evidence—will necessarily depend on the varied identities of any given customer's designated payees. <u>Fourth</u>, common issues of law will not predominate due to wide variations in common law and consumer protection statutes among the fifty states and foreign jurisdictions involved. Wholly apart from its patent lack of merit, the case should not proceed as a class action.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Fidelity's Bill Payment Service

In the 1980s, Fidelity established a bill payment service, now called BillPay, through which a customer could request Fidelity to make payments to merchants and other payees. T2:¶3. At present, payments generally must be scheduled through Fidelity's internet website, but Fidelity permits customers with greater assets, such as the Berensons, to arrange bill payments with service representatives by phone. *Id.* Fidelity assesses a monthly fee of $6.95 for the service, but the fee is waived for many users, including the Berensons. T3:¶5.

Since June 2000, Fidelity has used CheckFree Corp., the largest provider of third party electronic billing and payment solutions, to process bill payments. T1:¶6; T2:¶4. CheckFree makes these payments either by electronic transfer to those payees with whom it has established an electronic payment relationship or by corporate check sent by mail. T1:¶8; T2:¶4. Even without including the additional costs of customer service, Fidelity operates BillPay at a significant loss, since Fidelity pays CheckFree more than Fidelity collects in service fees, T3:¶6, and Fidelity earns no interest or other benefit on BillPay funds. T4:¶4. Although at present approximately 57,000 Fidelity accounts are subscribed to BillPay, many have never used it and only approximately 29,000 are active users, of which approximately 12% are Fidelity Investments employees. T3:¶3. A small number of users are businesses, such as Thunderbird Realty Ventures (T3:¶4), a real estate partnership owned by the plaintiffs and managed by

plaintiff Joan Berenson. T9:51. Users are located in all 50 states and several foreign jurisdictions. T17:Ex.A.

Due to a high volume of transactions on behalf many other institutions besides Fidelity, CheckFree is able to establish electronic payment relationships with thousands of payees. T1:¶7. CheckFree's economic interest is to maximize the use of electronic Automated Clearing House ("ACH") transfer, at a cost of pennies per transaction, T1:¶19, thus avoiding the cost of envelopes, postage, and research of lost payments. T1:¶8. As the plaintiffs concede, however, there are practical reasons why some payees do not establish an electronic relationship with CheckFree. T9:165; T12:66-67. ACH transfer is processed in large batches for next day settlement, and contrary to the plaintiffs' erroneous nomenclature, is distinct from same-day electronic wire transfer, which at the usual charge of about $25 or more would not be economical for ordinary bill payments. T1:¶19.

Like many other financial institutions, Fidelity has elected to use CheckFree's "good funds" business model. T1:¶9; T2:¶6. Specifically, and as disclosed in the BillPay Service Agreement, Fidelity debits payments from a customer's account on the "Transaction Date" specified by the customer. T1:¶9; T2:¶6. This process ensures that the customer has adequate funds available and allows CheckFree to issue a payment in "good funds" by ACH transfer or corporate check. T1:¶9; T2:¶6. If a customer has insufficient funds on the scheduled Transaction Date, Fidelity will try to debit the funds again on the next two succeeding days, and if funds remain unavailable it will send a notice of that fact to the customer, as has happened to the Berensons. T2:¶7, Exs.A-C; T10:131-32; T12:160-70. Because Fidelity recommends that customers schedule the Transaction Date at least five (5) business days before payment is due, in a case of insufficient funds this program permits the customer to arrange for payment before the

payment becomes significantly past due, a conceded advantage. T10:132. Fidelity's "good funds" approach to bill payment is analogous to use of a cashier's check. T1:¶12.

CheckFree and other providers also offer a "risk" model, under which the provider will issue a payment by an ACH transfer, a corporate check, or a draft (that is, a check) written directly on the customer's account without knowing whether the customer has sufficient funds. T1:¶10: T2:¶7. The plaintiffs assert that Fidelity should use it. However, the "risk" model exposes customers to the possibility of "bounced" checks and concomitant charges, reversed electronic payments, and/or collection actions by CheckFree, among other disadvantages. T1:¶10; T2:¶7. Fidelity's use of the "good funds" model is an accepted banking practice, T1:¶11, permitting Fidelity, among other things, to maintain the highest level of customer service and avoid the reputational disadvantages of dishonored payments. T2:¶8.

The system operates as follows: On the Transaction Date scheduled by the customer ("Day 1"), Fidelity's system (i) informs CheckFree that a particular payment is to be made, (ii) checks the customer's Core Account to ensure that the customer has adequate funds, and (iii) debits the customer's Core Account for the amount of the transaction. T4:¶3. In accordance with the fund prospectus, the customer continues to earn dividends on those funds until the next business day ("Day 2"). *Id.* At the end of Day 1, the funds are credited to a general ledger account that Fidelity maintains for making bill payment settlements with CheckFree. *Id.*

At approximately 1:00 a.m. on Day 2, CheckFree verifies payee information, determines whether the payee will accept payment electronically or by check, and sends a settlement funding request to Fidelity for all of that day's transactions. T3:¶4. At approximately 1:00 p.m. on Day 2, Fidelity wires funds to CheckFree for the settlement. *Id.* Because Fidelity wires funds

intraday on Day 2 to CheckFree and does not maintain those funds over night in the bank, *Fidelity itself does not earn any interest or other value on BillPay funds. Id.*

If payment is to be made electronically, CheckFree initiates the electronic payment on Day 2 and settles with the payee thereafter. T4:¶5. If payment is to be made by check, CheckFree mails a corporate check, also on Day 2. *Id.* Any "float" prior to the time when payees are ultimately credited with funds inures solely to CheckFree. *Id.*

## B.    The Plaintiffs

Now age 70, plaintiff David Berenson has had an extensive business career. He is the chairman of Comfidex Corp., a software company, a former partner of Ernst & Young, and an attorney and certified public accountant licensed to practice in multiple jurisdictions. T11:23-31. In addition to being a partner of Thunderbird, he is the principal of his own consulting firm, Berenson & Company International, T23.; T2.ExI. Both firms have Fidelity accounts. T2:Ex.I; T11:93.

Including the business accounts, the Berensons today maintain nine separate retail brokerage accounts with Fidelity. T16:¶9. The Berensons testified that they have been users of BillPay since the 1980s on two of their accounts: a joint personal account and the account of Thunderbird. T10:8-9; T11:7, 13-15, 56-59. Mr. Berenson testified that the only disclosure about the BillPay service that he had reviewed before asserting the claim was a service agreement in effect when he first began using the service in the 1980s, which he contends still controls his bill payment arrangements with Fidelity. T11:86-87; T12:138-39. Mrs. Berenson testified that she would have reviewed only any service agreement in place when she began using the service in the 1980s and the one in effect when she executed an application for BillPay service in 1993, T9:116, 153, which Mr. Berenson testified was merely a continuation of prior

service. T11:7, 13, 48-52. Neither the Berensons nor Fidelity have been able to locate copies of these agreements. T3:¶7.

Fidelity in fact mailed multiple revised (and in its view, superseding) versions of the BillPay Service agreement to the Berensons and all other users in the later 1990s and early 2000s. T13:¶¶4-16. Asked whether he had received them, Mr. Berenson responded:

> I probably killed half the Amazon Rain Forest. I don't think I ever received anything in the mail. I really don't. If anything came and I already got one going from the eighties, I would not have looked at it and it would have gotten discarded. I don't recall anybody ever sending me anything since we first started with them in the eighties. If they did, I wouldn't have paid any attention because I already had it.

T11:87-88. Mrs. Berenson will "read what comes" but "does not recall" receiving BillPay agreements either, T9:151-2.

The Berensons testified that they "discovered" the "float" issue that underlies their claims around January of 2002. T10:27; T11:92-95. They had been using BillPay to make a recurring transfer of $7,000 from their joint Fidelity account to the Fidelity account of Berenson & Co. International. T10:26-28; T11:61-70, 92-95. They noticed that funds were arriving in the latter account "late" and, when comparing statements, noted that several days would elapse between the time when the joint account was debited and the business account was credited. T10:26-28; T11:61-70, 92-95. Upon inquiry to Fidelity, they learned that this gap was the result of CheckFree's having mailed a check back to Fidelity. T11:61-70. (For a variety of reasons, CheckFree does not have an established electronic transaction relationship with Fidelity as a third party billing entity or payee. T2:¶5.)

Designed to effect payment of bills to third parties, BillPay is not the optimal method to transfer funds between Fidelity accounts. T2:¶15. On April 24, 2002, Fidelity sent a letter to Mr. Berenson informing him that he could set up a recurring transfer between Fidelity accounts

(*i.e.*, not using BillPay), which he understood would avoid the loss of float, by submitting a Letter of Instruction with a signature guarantee, T2:Ex.D; T12:82. Mr. Berenson "believes" he submitted a completed letter, T12:84, but the only copy produced by the Berensons does not contain the required signature guarantee and Fidelity has no record that the recurring transfer was ever authorized. T2:¶16; T27. In addition, Mr. Berenson called Fidelity to complain about the need to obtain a signature guarantee twice that May, T2:¶17, even though the Berensons have obtained signature guarantees without difficulty on other occasions. T10:82; T12:84.

Mr. Berenson realized that, on all of his payments through the BillPay service, his account was debited before the payee was credited with the funds. T11:61-70. Despite Fidelity's efforts to assist him, he inferred that Fidelity was deliberately "mailing itself a check" so as to maximize its float. *Id.* He brought the situation to the attention of his son, attorney Daniel Scott Berenson, known as D.S. Berenson, of Johanson Berenson LLP, lead counsel for the plaintiffs. T11:84-85. D.S. Berenson then helped to prepare a demand letter his father sent to Fidelity on or around September 17, 2002. T11:67; T25. The letter referred only to the Berensons' joint account, and contained a single request: "I would like to be repaid the interest on money which was taken out of my account before the creditor actually obtained the money." T25. Although Mr. Berenson testified that this letter was his "93" [sic] demand (there is no other), T11:66-70, the letter did not invoke Mass. Gen. Laws c. 93A or any other statute, nor did it seek relief for any account other than the sole account listed, much less for BillPay users as a class. T25.

At 12:13 p.m. on October 3, 2002, a Fidelity service representative made the following entry in Fidelity's customer service tracking system:

> called Mr. Berenson to try and explain the bill pay system insofar as collected
> interest between the time the payment is sent and the time the check is presented.

> Was not happy with the fact that he was not collecting interest. *I offered to*
> *reimburse him for the lost interest and he declined.*

T2:¶18 (emphasis added). According to Mr. Berenson, the Fidelity representative did not offer

to repay the interest but had offered to credit a lump sum $25 dollars to his account, which Mr.

Berenson said he rejected even though he did not actually know how much "interest" he might

have "lost." T11:70-73, 81-82. Indeed, Mr. Berenson, a career accountant, was unwilling to

make a simple calculation of the lost interest from each day of possible "float" taking his $75

monthly payment to the YMCA as an example. T11:74-77. In fact, using the annual return of

1.83% accruing in December 2004 on his Core Account, T3:Ex.E, the daily interest "float" on

that payment is approximately $0.00376—just over a third of a cent. Payments by mail are

typically credited to the payees in 3-5 days and payments by Automated Clearinghouse are

typically credited by the third day, T7:86-88, so the "loss" would be about a penny.

     In contrast to the Berensons' purported concern over a few days' worth of lost interest on

bill payments from their Fidelity accounts, they acknowledged that they use some checking

accounts that do not earn interest at all. T10:85, 89. Mrs. Berenson explained that she does not

keep track of whether her checking accounts pay interest because "the amount [of interest] they

pay is so small that it is not even worth considering." T10:85-86. Ironically, she identified that

amount as "one or two percent," T10:86, the range currently paid on their Fidelity Core

Account. T3:Ex.E. In fact, notwithstanding their "loss," the Berensons have continued to use

the BillPay service through the present time. T9:85; T10:82-85.

### C.     Plaintiffs' Counsel

     Despite Fidelity's offer to refund lost interest, Mr. Berenson was not satisfied. His son,

D.S. Berenson, prepared a case analysis upon which Mr. Berenson relied in deciding to pursue a

class action lawsuit. T11:65-66, 77, 84-85; T28. Although Mr. Berenson was aware of

prominent class action law firms such as Milberg Weiss, he did not consider contacting them. T11:103-04. Mr. Berenson testified that he did not "shop" the case because "I have a great deal of respect for Johanson Berenson and the people who I knew in that law firm. . . . I wanted somebody good who [sic] I would be an important client to." Id. D.S. Berenson supplied his father with a form letter engaging Johanson Berenson LLP that irrevocably assigns any right to attorneys' fees awarded by the Court to the firm, including those payable "from any recovery obtained or protected for members of the class." T26; T11:100-02. David Berenson neither negotiated nor investigated other possible engagement terms. T11:100-02. Mrs. Berenson is not a party to nor did she review the agreement, and there is no signature line for a representative of the firm. T10:64-65; T26. Although the firm ordinarily would obtain a signed copy of the agreement, none has been produced despite Fidelity's request. T8:127-32; T24.¶3.

According to its website, Johanson Berenson LLP has four partners and two associates. D.S. Berenson is one of only two equity partners in the firm and acknowledges that he has a substantial financial interest in any fees recovered in this litigation. T8:48-58. The lead counsel of record, Douglas Rubel and Kenneth McWilliams, apparently do not have previous experience in prosecution of class actions, although, according to ¶7 of Mr. Rubel's affidavit in support of class certification, they have consulted with "friends and colleagues" in large class action firms and have attended relevant continuing legal education events. The firm's website does tout, however, D.S. Berenson's experience in settling a large class action. T8:39-40.

The plaintiffs and D.S. Berenson have many relationships apart from that of family. Johanson Berenson LLP represents Mr. Berenson's company, Comfidex, represented Mr. Berenson's former company R2K, and has represented Thunderbird. T8:63-64; T11:34-37. D.S. Berenson is listed as an agent for a co-owner of Berenson & Company International. T11:38-40;

T23. His father has referred clients to the law firm. T8:66-70. Mr. Berenson believes that he has an indirect ownership interest in the property housing one of the firm's offices. T11:43-45.

While Mr. Berenson stated in ¶10 of his affidavit in support of class certification that D.S. Berenson is "not my counsel in this case," D.S. Berenson clearly has played an important role in the representation of his parents:

- He helped his father draft the demand letter of September 17, 2002 (T8:138-40);

- He supplied the engagement letter, which was not negotiated (T11:100-01);

- The plaintiffs' privilege log notes that D.S. Berenson has reviewed drafts of pleadings and conducted legal research. It represents that he wrote eight (8) of ten (10) documents authored by counsel, including the case analysis on which his father relied (T28);

- D.S. Berenson estimated that he has logged at least 40 or 50 hours to the case for which he would expect the firm to recover in the event of an award of fees (T8:133-34).

The Berensons have been very generous to their children, paying mortgages, tuition, student loans, and providing for the education of D.S. Berenson's daughter, their only grandchild. T9:114; T10:24; T11:42-43, 51-52. D.S. Berenson resides rent-free at his parents' farm. T8:15, 17. This generosity extends to the present suit, in which the plaintiffs have paid all of their own travel expenses and do not intend to seek reimbursement from Johanson Berenson LLP even though the firm is to advance litigation expenses under the retention agreement and even though the travel expenses are likely to greatly exceed any "interest" that they may have "lost" on BillPay transactions. T26; T10:67; T11:106.

### D.    The Plaintiffs' Conduct in Discovery

The plaintiffs' failures to provide full and timely discovery has been briefed separately. Indeed, Mrs. Berenson testified that they did not even begin looking for documents responsive to the defendants' requests, issued on November 15, 2004, until January 2005, weeks after responses were due. T10.95. Mr. Berenson later submitted an affidavit to excuse his inaction, in

which he asserted that the plaintiffs had retained only Fidelity account statements. T21:¶6. However, Mrs. Berenson testified that she kept other Fidelity communications and Mr. Berenson later admitted that he had unilaterally narrowed the requests and hadn't actually looked for documents in various files and piles of documents that might have contained responsive matter. T10:11-18, 95-102; T11:113-22. His affidavit was false. For their own part, the plaintiffs have never served interrogatories or a request for production of documents upon Fidelity. T24:¶10.

The plaintiffs, moreover, admitted that they signed interrogatory answers not knowing their foundation, for example, a false assertion that Fidelity does not retroactively credit back lost interest for uncashed checks even though such retroactive credits were reflected on their own statements. T2.¶¶20-21, Exs.F-G; T11:124-27; T12:6, 8-13, 19-61; T22:5. Similarly, the plaintiffs asserted in interrogatory answers that Fidelity had improperly refused to refund a late fee when, in fact, the plaintiffs had not even initiated the payment until it was already late and the payee had agreed, at Fidelity's request, to waive the fee. T2:Ex.H; T7:123; T22:15-18; Finally, the plaintiffs asserted that two competing "risk" based bill payment services—the only ones they could identify, MyCheckFree.Com and Navy Federal Credit Union—are "less expensive" than Fidelity's and would not have deprived them of "float." T22:8. These assertions are baseless because MyCheckFree.com would not be able to pay any of the bills the Berensons pay through Fidelity, T1:¶25; T12:112-13, the Navy Federal Credit Union may in fact deprive users of float in some circumstances, T1:¶28; T12:130-33, and both services assess costs and penalties that Fidelity does not. T1:¶¶26-27; T12:121-22, 124-26.

## II.    ARGUMENT

### A.    The Requirements of Rule 23

Rule 23 requires a "rigorous analysis" before any class may be certified. *Gen. Tel. Co. v Falcon*, 457 U.S. 147, 161 (1982); *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 21 (D. Mass.

2004). While the Court is not to adjudicate the merits, it must "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues will predominate." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000).

The plaintiffs bear the burden under Rule 23(a) to demonstrate that the class is sufficiently numerous, that there are questions of law or fact common to the class, that their claims and defenses thereto are typical, and that they will fairly and adequately protect the interests of the class. Although the plaintiffs' motion does not specify the subsection of Rule 23(b) on which they rely, the only one they have briefed, and that might apply in the present circumstance, is Fed. R. Civ. P. 23(b)(3). They must therefore demonstrate that any common issues will predominate and that a class action is superior to other possible methods of adjudication. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997).

Here, the plaintiffs do not adequately represent the interests of the class and their claims and defenses thereto are far from typical. In addition, while some common issues of fact or law may exist, those common issues will not predominate.

## B.    The Plaintiffs and Their Counsel are Inadequate to Represent the Class.

"One of the most important of [the Rule 23] requirements is that the represented party fairly and adequately represent the interests of the class," as constitutional due process for absent class members requires. *Key v. Gillette Co.*, 782 F.2d 5, 7 (1st Cir. 1986).

### 1.    The Plaintiffs are Inadequate Representatives Because of Their Family Relationship with Counsel.

The "adequacy" inquiry must "uncover conflicts of interest between named parties and the class they seek to represent," *Amchem Prods.*, 521 U.S. at 625-26. A class representative with close family or business ties to counsel may place the interests of counsel above those of the class — or appear to do so — when negotiating attorneys' fees or deciding whether to accept a

- 13 -

settlement that minimizes the attorney's workload (and concomitant risk of rendering service without compensation) but fails to maximize recovery by the class. Courts therefore routinely decline to certify a class in such cases. *See, e.g., London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253-55 (11th Cir. 2003) (reversing certification due to business relationship between named plaintiff and counsel); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 94-95 (7th Cir. 1977) (plaintiff inadequate because "recovery as plaintiff [would be] dwarfed by attorney's fees which could be awarded to his brother as class counsel"); *Hale v. Citibank, N.A.*, 198 F.R.D. 606, 607 (S.D.N.Y. 2001) (class representative whose husband was an attorney who had referred other cases to class counsel with the expectation of a fee inadequate); *Zlotnick v. TIE Communications, Inc.*, 123 F.R.D. 189, 194-95 (E.D. Pa. 1988) (parent of class counsel inadequate); *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 310 (D. Mass. 1987) (plaintiff whose son was partner in the firm representing plaintiff, but not counsel of record, inadequate).

Against this weight of authority, the plaintiffs cite only three cases. All precede the Supreme Court's emphasis in *Amchem* upon preventing conflicts of interest and are of dubious vitality today. They are, moreover, distinguishable on their facts: In *Lewis v. Goldsmith*, 95 F.R.D. 15, 20 (D.N.J. 1982), the nephew of class counsel was adequate where there was no question of financial interactions or dependence between the two, obviously not true here. Likewise, in *Fischer v. International Telephone & Telegraph Corp.*, 72 F.R.D. 170, 174 (S.D.N.Y. 1976), the district judge accepted at face value the father's statement that he had no interest in his son's fees where there was no other evidence of economic relationships between the two — again, not true here. The plaintiffs' only appellate decision, *Malchman v. David*, 761 F.2d 893, 899 (2d Cir. 1985), *abrogated on other grounds by Amchem Products*, 521 U.S. at 618-20, was decided on the abuse of discretion standard, and even there Judge Mansfield

dissented on the ground that the (then) enormous hourly rate accruing to class counsel in settlement could have resulted from their close family and other relationships with the class representatives. *Id.* at 912.

Recognizing the dearth of authority in support of their position, the Berensons erect a series of purported distinctions, none of which withstand scrutiny:

- Zeal. The plaintiffs assert that they are "zealous." While Mr. Berenson has displayed anger at Fidelity over the BillPay Service and other perceived wrongs, neither he nor Mrs. Berenson prepared for deposition, T9:14-15; T11:42, both failed to gather documents, and both admitted signing interrogatory answers without knowing their basis. Mrs. Berenson testified that interest at the rate her Fidelity account pays was "not worth considering."

- Financial Interest. Contrary to the plaintiffs' contention, Mr. David Berenson may have a financial interest in any fee because he may have an ownership interest in Johanson Berenson's Virginia landlord. Moreover, his company's use of his son's firm raises the prospect that favorable treatment in the class action could lead to reduced fees to the company. The larger point is that, as a father, he may put his son's financial interest ahead of his own and that of the class, especially when his own financial recovery in the best of all outcomes is highly unlikely to exceed a few pennies on each bill payment.

- Local Counsel. The plaintiffs assert that Ms. Stenger will have "a primary" role in advising the plaintiffs on settlement, but do not exclude some role for self-described "lead" counsel, Johanson Berenson LLP, which will carry great weight because Mr. Berenson chose that firm—not Ms. Stenger—over more experienced counsel based on trust. Ms. Stenger's participation will regardless not prevent the plaintiffs from acting to benefit their son.

- Court Approval of Settlement. The plaintiffs note that that the Court must approve any settlement but ignore the fact that named plaintiffs and their lawyers exercise great influence over the process by which any settlement is reached. Moreover, court approval of fees does not remove improper incentives for an early settlement with minimal hours (and risk) expended by class counsel but minimal recovery for the class.

- Statutory Fees vs. Common Fund Fees. The plaintiffs assert that only "statutory" fees, such as those payable under c. 93A, rather than fees deducted from a common recovery, are at issue. However, this argument ignores the prospect that the EFTA and c. 93A counts, the only two for which statutory fees might be available, may fail due to the plaintiffs' procedural and legal errors, leaving only a common fund (as the retention agreement expressly contemplates); ignores the fact that no statutory fees will necessarily be awarded by the Court in a settlement; and further ignores the conflict between client and counsel in deciding whether to settle. Other cases deeming similar class representatives inadequate have included consumer claims for which statutory fees were available. *See, e.g., Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1375-76 (11th Cir. 1984).

- Prejudice. The Berensons contend that it would "prejudice" the class to reject certification based on their conflict of interest, but ignore the prejudice to the class from having improper representatives.

### 2.   The Berensons' Individual Claims are Subject to Unique Infirmities.

As noted, the Berensons' claim under the EFTA is barred by a one-year statute of limitations. 15 U.S.C. § 1693m(g). While Fidelity may also litigate whether other class members in diligence "should have" discovered their claims more than a year prior to suit, *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946), there is no question that the Berensons actually did. Because they failed to read the superseding agreements that Fidelity mailed to them, moreover, they cannot prove the reliance required for their claims of intentional and negligent misrepresentation or the causation of injury required under c. 93A. The Berensons are neither typical nor adequate in this regard. T1:¶¶4-28. Finally, due to their failure to abide Fidelity's instructions, much of their interest "loss" is self-inflicted.

### 3.   The Plaintiffs Failed to Demand c. 93A Relief for the Class.

The plaintiffs failed to make the requisite demand on behalf of the class under Mass. Gen. Laws c. 93A, § 9(3). At a minimum, a c. 93A demand must identify "the claimant," the unfair or deceptive act, and the relief requested. *Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 779 (Mass. 1975). While Mr. Berenson's letter of September 17, 2002 might suffice for his own claim to lost interest, a separate analysis is required to determine whether it suffices on behalf of the class. *Burstein v. Applied Extrusion Techs., Inc.*, 150 F.R.D. 433, 448 (D. Mass. 1993). Because the letter does not identify anyone besides Mr. Berenson as a "claimant," it plainly does not. *Contrast Baldassari v. Pub. Fin. Trust*, 337 N.E.2d 701, 707 (Mass. 1975) (one of named plaintiffs sent a 93A demand letter on behalf of himself "and others similarly situated"); *Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 142 F.3d 512, 513 (1st Cir. 1998)

- 16 -

(same); *Olson v. Energy N., Inc.*, No. 9800228, 1999 WL 1332362, at *10 (Mass. Super. Ct. 1999) (93A class demand letter "identifie[d] the plaintiff and the putative class, reasonably describes the fraudulent scheme alleged and the injury suffered by the aggrieved ... customers, and identifies the putative class period").

### 4.    Both the Plaintiffs and Their Counsel's Discovery Conduct Evidence Inadequacy.

The plaintiffs' conduct of discovery is further evidence of inadequacy. They have served neither interrogatories nor requests for production. *See Broussard v. Parish of Orleans*, No. Civ.A. 00-2318, 2001 WL 881290, at *6 (E.D. La. Aug. 3, 2001); *Conran v. Great Atl. & Pac. Tea Co.*, 499 F. Supp. 727, 729 (E.D. Pa. 1980). Their failure to comply with their own obligations to produce discovery likewise supports a finding of inadequacy. *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 489-90 (W.D. Mich. 1994); *Conran*, 499 F. Supp. at 729. Neither plaintiff prepared for deposition, T9:14-15; T11:42, both admitted that they signed interrogatory answers not knowing the basis for the same, *supra* at 11-12, and it is now clear that Mr. Berenson signed an affidavit asserting that neither plaintiff had retained Fidelity communications other than account statements without knowing whether it was true. T10:11-18, 95-102; T11:113-22; *cf. Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (plaintiff who changed testimony and pleadings was inadequate).

### 5.    Lead Counsel Has No Experience in the Substantive Area of Law.

Neither of the designated lead counsel, Attorneys Rubel and McWilliams, claim experience with class actions or consumer protection laws. Although Ms. Stenger is recognized as an accomplished attorney, she reports experience with class actions only as local counsel—the same role she has played here. Stenger Aff., ¶¶ 6-7. While she offers the prospect of a more active role, *id.* ¶ 9, her incentive to play it may be limited by the fee sharing agreement between

- 17 -

her firm and Johanson Berenson, the existence of which was concealed and which has not been produced even though it is responsive to Fidelity's document requests. T24:¶¶2-9.

## C.    Common Issues Will Not Predominate

### 1.    Individual Issues of Fact Will Overwhelm Any Common Issues.

While the plaintiffs assert that common issues would predominate, the opposite is true. There are likely to be numerous differing factual issues among the putative class members regarding, among other things: (1) when class members began using BillPay; (2) what specific disclosures individual class members actually received, read, and relied upon; (3) the reasonableness of any reliance in particular circumstances; (4) whether individual class members actually expected to earn interest on the "float," which would likely depend on the nature of other accounts the person held (many checking accounts do not pay interest at all); (5) whether, when, and how individual class members discovered or should in diligence have discovered that they were not going to earn interest on the "float," which depends in part upon the sophistication of the class member; (6) what financial vehicle the customer used as his "Core Account" from which payments were made; (7) whether individual class members gave Fidelity timely notice of an alleged "error" pursuant to the EFTA, 15 U.S.C. § 1693f(a); (8) whether any customers were provisionally re-credited while investigating allegations of such error, *id.* § 1693f(a), (c); (9) whether individual class members' payees received payments by electronic transfer or by check, since the complaint and interrogatory answers allege that Fidelity fails to pay as promptly as commercially practicable; (10) whether the customer had payees suitable for electronic transfer but whom CheckFree nonetheless paid by check; (11) what other bill payment services the customer could have used, and therefore lost any opportunity; and (12) whether the customer would have used Fidelity's service regardless of loss of float due to the convenience of telephone scheduling with personal service representatives, avoidance of the risk of "bounced" checks, and

other advantages of the "good funds" model.  The federal courts routinely deny certification due to such variations. *See, e.g., Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 197-98 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996).

    2.    **The Application of Many States' Laws Precludes Predominance of Common Legal Issues.**

    While the federal law of the EFTA presents common legal issues (but with many disparate factual issues), the balance of the case brings into play the tort and consumer protection laws of the fifty states and even several foreign jurisdictions.  In reliance upon the choice of law provision in the current BillPay Service Agreement (which agreement, ironically, Mr. Berenson testified was not operative as to him), the plaintiffs assert that Massachusetts law will apply to all of the non-federal claims of all class members. But even assuming that the contract's choice of law clause should be construed to cover tort and consumer protection claims as well as ones for breach of contract, that choice may not be honored as to all states if Massachusetts law is deemed "contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." *Restatement (Second) of the Conflicts of Laws*, § 187; *Ideal Elec. Sec. Co. v. Int'l. Fed. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997) (adopting *Restatement*); *Van Dusen v. Barrack*, 376 U.S. 612, 631-39 (1964) (conflicts rules of transferor district under 28 U.S.C. § 1404(a) control).  For example, some states provide more remedies than Massachusetts (e.g., punitive damages limited only by constitutional due process, as in Utah, *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 429 (2003), or statutory minimum penalties greatly exceeding the $25 in c. 93A, *see, e.g.*, Conn. Gen. Stat. § 6-13.1-5.2(a), which has a $200 statutory minimum) or, conversely, greater protection for companies doing business in those states.  Some place a cap on damages, do not provide for statutory minimum damages,

or do not encompass the type of claim that the plaintiffs are making. *In re Bridgestone/Firestone Tire Prods. Liab. Litig.*, 288 F.3d 1012, 1018 (7th Cir. 2002) (rejecting class certification because "state consumer protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules"). The plaintiffs have failed even to address, much less satisfy, their burden of showing that these incongruities may be overcome. *Gorsey v. I.M. Simon & Co.*, 121 F.R.D. 135 (D. Mass. 1988) (burden on plaintiffs for proposed nationwide class); *cf. Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21 (D. Mass. 2003) (defendant's burden where only six states involved).

### Conclusion

For the reasons stated above, the plaintiffs' Motion for Class Certification should be denied.

Respectfully submitted,

NATIONAL FINANCIAL SERVICES LLC and
FIDELITY BROKERAGE SERVICES LLC
By their attorneys,

Nicholas C. Theodorou (BBO No. 495730)
John A. Shope (BBO No. 562056)
William W. Fick (BBO No. 650562)
David E. Cole (BBO No. 658705)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: February 8, 2005

- 20-

## CERTIFICATE OF SERVICE

I, John A. Shope, one of the attorneys for defendants, hereby certify that I have caused a copy of the foregoing document to be served upon the plaintiffs as follows:

By Hand:

Susan Stenger, Esquire
PERKINS, SMITH & COHEN, LLP
One Beacon Street, 30th Floor
Boston, MA 02108

By Federal Express:

Kenneth L. McWilliams, Esquire
JOHANSON BERENSON LLP
1146 Walker Road, Suite C
Great Falls, Virginia 22066

Douglas A. Rubel, Esquire
JOHANSON BERENSON LLP
201 Shannon Oaks Circle, Suite 200
Cary, North Carolina 27511

John A. Shope

Dated: February 8, 2005

FHBOSTON/1946287.11

- 21-