# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action
No. 04-11311-WGY

* * * * * * * * * * * * * * * * * *

JOAN BERENSON and DAVID BERENSON, individually and on behalf of all others similarly situated, *

Plaintiffs, *

v. * MOTION HEARING

NATIONAL FINANCIAL SERVICES LLC, FIDELITY BROKERAGE SERVICES LLC, and DOES 1-50, inclusive, *

Defendants. *

* * * * * * * * * * * * * * * * * *

BEFORE: The Honorable William G. Young, District Judge

APPEARANCES:

PERKINS, SMITH & COHEN (By Susan E. Stenger, Esq.), One Beacon Street, 30th Floor, Boston, Massachusetts 02108
- and -
JOHANSON BERENSON LLP (By Douglas Andrew Rubel, Esq.), 201 Shannon Oaks Circle, Suite 200, Cary, North Carolina 27511, on behalf of the Plaintiffs

FOLEY HOAG LLP (By Nicholas C. Theodorou, Esq. and John A. Shope, Esq.), 155 Seaport Boulevard, Boston, Massachusetts 02210, on behalf of the Defendants

1 Courthouse Way
Boston, Massachusetts

February 16, 2005

THE CLERK: Calling Civil Action 04-11311, Berenson v. National Financial Services.

MR. THEODOROU: Good afternoon, your Honor.

THE COURT: Good afternoon.

MS. STENGER: Good afternoon, your Honor.

THE COURT: Would counsel identify themselves.

MS. STENGER: Good afternoon, your Honor. Susan Stenger for the plaintiffs.

MR. RUBEL: Douglas Rubel for the plaintiffs.

MR. SHOPE: Your Honor, John Shope for the defendants. With me are Nicholas Theodorou and Colleen Hankins who is in-house counsel for Fidelity.

THE COURT: Good afternoon.

We have a number of things that need be analyzed this afternoon and I think I'm going to have to go back, back and forth on different issues and you'll permit me to do that.

Let's start with the particular requirements of 23(a). There's no problem here with numerosity in this class?

MR. THEODOROU: Your Honor, Mr. Shope's going to address the issues in the class.

THE COURT: That's fine.

MR. SHOPE: Your Honor, 29,000 people is a sufficient number.

THE COURT: Thank you.

MR. SHOPE: If that's a properly defined class. We dispute that but that's --

THE COURT: I understand that.

MR. SHOPE: There are issues that --

THE COURT: Okay. Now, law or fact common to the class, or typicality. Well, let's see. There are some questions that are common. So I'm not terribly troubled by that, but there's some questions that are common.

MR. SHOPE: That's correct, your Honor. The standard under 23(a) is relatively lenient. There have to be some issues and there are some issues, everyone deals with the same defendants.

THE COURT: All right. And so we're up to, now in 23(b)(3) we're talking about issues predominant over ones affecting individual members. And on that I, I have problem.

Let me see here. The Berensons didn't go to this website, right? That's your position? Plaintiffs?

MR. RUBEL: No, the Berensons went to the website, your Honor. I believe --

THE COURT: But not everybody did.

MR. RUBEL: I believe the testimony was that Mr. Berenson -- Mrs. Berenson did not. Mr. Berenson went to the website not for purposes of this but to look up stocks

and things.

THE COURT: No, but isn't their point that some people got disclosures that other people didn't get and your purported class sweeps them all together?

MR. RUBEL: Is it whose point, their point?

THE COURT: Yes.

MR. RUBEL: The defendants' point --

THE COURT: Yes.

MR. RUBEL: -- that some people got disclosures that others did not?

THE COURT: Yes. Am I missing something?

MR. RUBEL: I'm not sure that that's accurate, your Honor. I don't know that that's what they're contending.

THE COURT: All right. How do you, how do you --

MR. RUBEL: I believe the defendants' point was that we supplied notice and adequate notice of everything by, A, our mailings. As you look through their appendix there is, Ms. Fagan, I believe, submitted documentation --

THE COURT: All right.

MR. RUBEL: -- that these were the mailings that were sent to --

THE COURT: I think we will sharpen it up by letting them argue themselves.

What's your problem with typicality?

MR. SHOPE: Let's see, your Honor's asking about

typicality or predominance?

THE COURT: Both.

MR. SHOPE: Well, okay. Well, first of all, let me back up a little bit. Under 23(a), your Honor, since we were proceeding in steps, there's the adequacy issue. I don't know whether your Honor wants to address that or not --

THE COURT: Not now but I --

MR. SHOPE: -- at this point.

THE COURT: -- I do want to address it.

MR. SHOPE: With respect to predominance, and I think this also relates to typicality, typicality obviously being a 23(a) requirement whereas predominance is a (b)(3) requirement.

The record in fact is something of an odd one. From Fidelity's point of view from 1996 on, which relates to the records that we at least have readily available, Fidelity did in fact by mail and notification of availability on website provide disclosure of various agreements that in our view clearly disclosed what, how the BillPay system works and should defeat the class, excuse me, should defeat the claim. We have a pending summary judgment before your Honor that addresses that very point.

THE COURT: Shouldn't I wait then until I resolve that?

MR. SHOPE: Well, we believe that that would be judicially efficient to resolve that.

And then your Honor may also be aware, we filed a motion for summary judgment on the statute of limitations with regard to the Electronic Funds Transfer Act which has a special one year statute after we had taken --

THE COURT: I understand that. Let me face up to that.

Treated as a motion to dismiss, not as a motion for summary judgment, treated as a motion to dismiss, the motion presently before the Court is denied. Now, I -- and I state that with some care because it seems to me that I will want to revisit many of these same arguments in a motion for summary judgment. But you're going to have to replead it and you're going to have to support it with evidentiary material.

Now, we also have the motion for, that's on for March 3rd on the statute of limitations. It's not the time to argue that. But we'll hear that on the 3rd and we'll see where we are.

I rather wonder, if you think that's, I would guess I'm speculating, if you think that's such a good motion why don't you want me to certify the class, then defeat the entire class and it's all over.

MR. SHOPE: A couple of things. With respect to

the summary judgment on the statute of limitations, the facts that we've put forward in our motion, a number of them are quite unique to the Berensons.

THE COURT: All right.

MR. SHOPE: Because it's a one year statute and they have sent what they say is their demand letter more than one year before they filed the lawsuit. So, we think that that's a pretty fair case as to them. As to other people in the proposed class, they may not have had awareness of this supposed problem more than a year before the statute at which point the defendants will have to be arguing that in diligence by reviewing the disclosures that we've made they should have realized that this was how the BillPay system worked.

THE COURT: And that feeds into your typicality argument.

MR. SHOPE: Absolutely. It feeds into typicality, and it also feeds into adequacy because the named plaintiffs should not be subject to special defenses that would prejudice the class.

THE COURT: All right. I think that firms it up, now I'll hear you, Mr. Rubel.

MR. RUBEL: Our position is that the documents, even if they are, if notice has purportedly been given, the documents themselves don't, don't provide the information in

the notice that we believe should have been provided. There is no reference in the documentation, for example, to the notion that CheckFree Corporation is going to be performing the entirety of the service on behalf of Fidelity and that CheckFree is going to be -- well, we believe that it's Fidelity that's earning interest on the money, but the defendants are now contending that it's CheckFree that's actually earning interest on the moneys.

THE COURT: Let me ask you this. And this I think gives rise to my confusion. The Berensons, the named plaintiffs here, are they, are they agreed that the agreements, the notices, the buck slips for the BillPay services, they got all those things? Do they agree to that?

MR. RUBEL: The Berensons -- no, I don't think that's entirely accurate. The Berensons are unable to agree that they received all of those. I think their position is, you know, many of these things may have come in the mail. We don't know.

You know, most people don't read everything that comes to them from a credit card --

THE COURT: But that's my, that's my problem. And I guess this goes back to my inapt question before. You can get on to this by going to a website, right?

MR. RUBEL: So the defendants state, yes.

THE COURT: All right. And the website has various

data on it. Right?

MR. RUBEL: They now say that they post the BillPay service agreement on their website, that's correct.

THE COURT: All right. So some people in this class got into this that way. Right?

MR. RUBEL: Okay. You're saying some people got notice of the BillPay service agreement by accessing the Internet; other people's got it, other people got it by virtue of the mail.

THE COURT: Correct.

MR. RUBEL: And still some people may not have read it or seen it at all.

THE COURT: Well, how did they -- whether they read it or not, maybe they got it in the mail and didn't read it. My point is aren't those individual determinations that have to be made about reliance and about what in fact was conveyed?

MR. RUBEL: I think it's an objective standard, your Honor, under 93A as to whether or not the notice that's provided is sufficient. I think the Court can look at, you know, objectively whether a reasonable person given the notice that was provided, and their position is that it was provided, whether the notice that's provided was sufficient or because of deficiencies would have caused or could have allowed the particular subscriber to act differently.

I submit that the Berensons will testify and have testified, and we're more than happy for the Court to take a look at the testimony, that they upon notice of this have begun doing things differently; that if they had known that they weren't going to be earning interest on these moneys, and they never gave Fidelity their consent to earn interest on these moneys, that if they had known they would have done things differently by, for example, instead of using BillPay to pay the gas company, they would have gone straight to the gas company and said, look, you just take the money out of my account on the due date, that way I continue to earn the interest, whatever it is, on my money until that date. And that's what the Berensons have done. I think that's typical of everybody.

THE COURT: Why isn't it?

MR. RUBEL: Why isn't it?

THE COURT: No, I'm turning to the defense now.

MR. SHOPE: All right. Well, first of all, with respect to the disclosure and who saw what, we're in a somewhat strange situation, which is that on our motion for summary judgment which is pending, our first motion for summary judgment on the adequacy of the disclosure, for purposes of the local rules in which we set forth a statement of undisputed material facts and the other side had to contest it, it was uncontested that the Berensons had

received all of these documents. So for purposes of the briefing on the summary judgment that was conceded.

However, when we took their depositions very recently, last month, what the Berensons stated very affirmatively was, repeating what they had said in the complaint, which was that they had not received any of these disclosures and that the only thing that they had reviewed was a contract that was back in the 1980's which they don't have and frankly we don't have. And Mrs. Berenson testified that the only thing she would have reviewed was something back in the 1980's and something from 1993 which again the Berensons don't have and we don't have.

And Mr. Berenson very vociferously asserted that, for example, he never knew that Fidelity was going to take the money out of his account and put it into an account that it uses to pay bills. And that's a term that's set forth very clearly in all of the agreements that have been sent out since 1996, and it's also in something that he signed in 1993, but that's just one piece of it.

So, there is a very real issue certainly as to what people saw and whether they relied upon it. And let me just give an example of how that's so.

The Berensons themselves prove this. The Berensons according to them discovered this problem in January of 2002. They continued to use the service. They continue to

use the service up to the present day. Now, bear in mind your Honor has dismissed the breach of contract count. So, they have to say, for them to recover damage here they have to say that they relied upon some sort of misrepresentation about how this service worked. The reality is they've kept using it. We think that there are many people in the class who really don't care about losing a third of a cent on a bill payment transaction. They would much prefer to have the convenience of being able to pick up the telephone and call Fidelity and say could you schedule my bill payment on this day.

The other thing that we think is enormous, this relates to the predominance issue, is that we think many people, frankly, most people if told that money is going to be taken out of their account on day one would no longer expect to earn interest after day one when they're specifically told we're taking the money out of your account and they're receiving a prospectus that also says you continue to earn interest up until the beginning of the next day after we've debited your account.

So, certainly there's going to be a lot of variation in the class's understanding of this and whether they've acted to their detriment.

THE COURT: All right. I would like you to respond to that.

MR. RUBEL: Well, first of all, I disagree with the characterization of the testimony. Mrs. Berenson said that, repeatedly that if documents were sent to her she would have read them. Mr. Berenson basically said, look, I get so much stuff, I don't remember what I've read and what I haven't read. So nobody is denying and the Berensons to their credit haven't affirmatively said no, we didn't get these documents. There's no way that they would remember it and they don't remember it.

THE COURT: But does that make a difference if disclosure was adequate?

MR. RUBEL: I don't think it makes a difference.

THE COURT: No? Suppose the --

MR. RUBEL: I don't think the disclosure was adequate, that's why I don't think it makes a difference.

THE COURT: Well, let's be clear what I've done. All I did was deny the motion to dismiss.

MR. RUBEL: I understand.

THE COURT: I know it was framed as a motion to dismiss over summary judgment. But all I've done is denied the motion to dismiss. Now, I'm going to take a fresh look at this on summary judgment. You've got to replead it. I'm not terribly troubled because for purposes of summary judgment they took one position having, which is a position that assumes that they got everything because they, they --

their position is they win anyway, and then when asked individually they took arguably a different position. However, in terms of typicality and whether the common claims predominate, I suppose I have to keep that in mind.

Let's talk about adequacy of representation. What's the matter with the Berensons as the named representatives of this class?

MR. SHOPE: Your Honor, I think one thing that's being overlooked by the plaintiffs here is that the Berensons themselves have fiduciary duties in these circumstances. They have a fiduciary duty to the proposed class and to the class that's certified. They have a fiduciary duty to that class to ensure that the return for the class of litigation is maximized. That's I think bedrock, bedrock law.

It's also recognized that there is an inherent conflict of interest in contingency fee cases between the clients on the one hand and the attorneys on the other hand. And that gets resolved in ordinary cases by virtue of the fact that the clients have to look out for their own, for their own interests. And they have to think long and hard about what the attorney is recommending. Is the attorney wanting to work hard and get maximum recovery or is the attorney looking for the so-called quick kill.

Because of this issue the cases have said, I think

fairly, fairly, and certainly in recent years, I think fairly uniformly, that where there are close connections between the attorneys for the class and the class representatives that are unrelated to the lawsuit there is the danger that the class representatives will disregard their fiduciary duties to the class and instead favor the interests of the attorneys, at the very least that there is an appearance that they might do so.

THE COURT: All right.

MR. SHOPE: And that is why there are numerous cases that have held --

THE COURT: All right.

MR. SHOPE: -- that these family relationships are inappropriate.

THE COURT: I understand what your argument is. What's the response to that?

MR. RUBEL: Your Honor, there is no per se rule.

THE COURT: Yes. But it's fairly clear that Mr. Berenson's son is a partner here and will share in any recovery.

MR. RUBEL: Well, first of all, the contingency, we ought define it. It's pretty much our position that this is really a lodestar case at this point in time and obviously our firm will be entitled to whatever the Court awards. This isn't a situation where counsel has a percentage of a

recovery from common fund.

Mr. Berenson is a partner in the firm. D.S. Berenson, to distinguish him from his father. He has no involvement in this case. He's not counsel of record. He's not --

THE COURT: He has done some work on the case apparently.

MR. RUBEL: He did some work initially. Before the case was filed he prepared a memorandum, an analysis, if you will, of potential claims that he gave to his father. His father is himself a very accomplished man. He's licensed as an attorney in three jurisdictions. He's an accountant in four jurisdictions. His, his credentials and his wife's credentials are, quite frankly, your Honor, impeccable. And I would invite the Court to review the deposition transcripts of the Berensons.

Their interest in this case are as a principle about what's going on and they have nothing to do with our firm.

THE COURT: Well, then that actually intrigues me. Why don't we try the case without it being a class action, win, lose or draw. If you lose, well, you know that. But if you win, then they're collaterally estopped, res judicata, and then we'll see if any class wants to come out of the woodwork and pile on that.

Why not do it that way?

MR. RUBEL: Well, that's well said, your Honor, but I think we're entitled to bring the claim as we've brought it. If that's what ultimately --

THE COURT: No, but that doesn't answer my question. Why not do it that way?

MR. RUBEL: Well, I don't know why.

THE COURT: Oh, well, all right. Maybe that makes some sense. Maybe I'll just defer this. When is this case on for trial?

MR. RUBEL: July.

MR. SHOPE: September.

THE COURT: September of this year?

MR. SHOPE: September of this year.

THE COURT: This will keep until after September, won't it?

MR. RUBEL: I imagine that it would, yes, your Honor.

THE COURT: You're not hurt by that. If I simply, it's a putative class action now, but I try this case as an exemplar case. They lose it, then it's lost and we'll see where we are. Then surely their interests won't be typical. But if they win it, then we'll see where we are, too.

Doesn't that make sense?

MR. SHOPE: Certainly I think that there would be

some benefit to having a hearing on the Berenson particular facts because I think that would, among other things, show why the case is inappropriate for class treatment. I think that there would be some benefit of your Honor's acting on the motion so that it's not sort of hanging as a cloud over the company.

THE COURT: Well, I don't see why it should be a cloud. Suppose I simply defer it. I'll defer it until after I try the case in September, then I'll entertain it. It's not even reportable on my list until the end of September.

What cloud is over the company?

MR. SHOPE: Certainly -- well, let me say the following. I think that there would be a definite advantage to deferring the class certification because we believe that there are these other dispositive motions that can be addressed to the Berensons in particular. So from the point of judicial efficiency we do understand deferral in that respect.

THE COURT: Fine. The matter is deferred. It may be -- it will be readdressed and scheduled for further argument upon the conclusion of the case as to the Berensons individually which case will go to trial in September if not earlier disposed of.

MR. SHOPE: Your Honor, may I raise two matters?

THE COURT: Yes.

MR. SHOPE: One is that with respect to the motion hearing that was scheduled, I believe in the beginning of March, we did have some conflicts with that date. So if there's no objection, we did speak to Mr. Rubel about it, we would like to ask Ms. Smith for the dates when you'll be sitting so we could move that hearing slightly.

THE COURT: No. Look at all these attorneys. March 3rd. If I get into that -- you can submit on papers if you would like. But if you would like to be there, I'll hear it on March 3rd. I'll decide it. But it's March 3rd or not. We can't go picking dates to hear motions. There's too many motions. It's a matter of grace to give a motion an oral hearing. The oral hearing will be on the 3rd of March.

MR. THEODOROU: Your Honor?

THE COURT: If you want to submit on papers that's fine.

MR. THEODOROU: Your Honor, may I just be heard on one point?

THE COURT: Of course.

MR. THEODOROU: Just on scheduling.

THE COURT: Yes.

MR. THEODOROU: March 3rd, we're scheduled for Boston University.

THE COURT: Right.

MR. THEODOROU: Okay. For the hearing on the motion for partial summary judgment. We have a trial scheduled, we're heading for a trial in September. You are deferring the class issues depending on what happens on the merits.

THE COURT: And I expect you'll probably at some stage move for summary judgment on the, on the definitional point that --

MR. THEODOROU: Yes, on the, on the issue of the, on the issue of the debit versus fee.

THE COURT: Correct.

MR. THEODOROU: And that's so. Just so I, so we understand. The motion to dismiss that we argued in October --

THE COURT: Treated as a motion to dismiss only.

MR. THEODOROU: Correct.

THE COURT: Has been denied.

MR. THEODOROU: All right. That leaves us with, we have a motion for partial summary judgment on the EFTA which will be heard on March 3rd at BU.

THE COURT: Correct. Statute of limitations.

MR. THEODOROU: Correct. And I believe that you have already set out an order regarding what we're going to be doing on merits discovery, and at some point we've got

the summary judgment which we will moving for which will deal with the issues of whatever we haven't addressed or -- when you say replead it, we don't want to have to rebrief everything again, or just supplement --

THE COURT: You may supplement it.

MR. THEODOROU: Okay.

THE COURT: And then -- I would just like you to file an identifiable motion for summary judgment.

MR. THEODOROU: Right.

THE COURT: I'm not trying to run up your moneys. That would be reprehensible. You may make reference to earlier briefs.

MR. THEODOROU: Right.

THE COURT: I should have, I wished I had gotten an opinion out. I'm busy, too.

MR. THEODOROU: Oh, I understand that.

THE COURT: I'm satisfied in my own mind really that this is an intriguing enough argument.

MR. THEODOROU: Frankly, I know how busy you are. I would have liked to have seen --

THE COURT: Now that you know that I'm going to deny --

MR. THEODOROU: -- an opinion.

THE COURT: -- the motion to dismiss. Now I've got this in a posture that I can look at the Berensons

specifically.

MR. THEODOROU: Correct.

THE COURT: And on that record I can act relative to your renewed motion for summary judgment. If the case doesn't go away on the 3rd, I fully expect you'll make a renewed motion for summary judgment. I express no opinion on that. You won the motion to dismiss, but candidly it's easy to duck a motion to dismiss. Summary judgment, we'll look at it again, maybe up, maybe down.

MR. THEODOROU: Right. Now --

THE COURT: An appeal will lie from that if the case is lost.

MR. THEODOROU: Right.

THE COURT: If you win on summary judgment it's a trial, it seems to me.

Now, what was your question?

MR. THEODOROU: Well, we have, then that leaves us procedurally, we have the motion for summary judgment down the road on the EFTA. We also moved for summary judgment on the common law counts and the 93A count so that when we renew it we'll supplement our arguments that we made there. Because the issues are pretty much tied together as you know in terms of adequacy of disclosure and --

THE COURT: Right.

MR. THEODOROU: -- reliance. Okay.

THE COURT: I haven't injured either side. I just treated it as a motion to dismiss.

MR. THEODOROU: Right.

THE COURT: Let me speak with the clerk.

(Whereupon the Court and the Clerk conferred.)

THE COURT: Ms. Smith properly reminds me. I mean, the case is going to trial in September.

MR. THEODOROU: Yes.

THE COURT: So you best get those motions in soon because they have to be heard --

MR. THEODOROU: Right.

THE COURT: -- early in the summer.

MR. THEODOROU: Right. So we've got March 3rd, the motion for partial summary judgment, statute of limitations, a discrete issue, and then we've got the merits discovery and we've got to get, as Ms. Smith noted, we've got to set up something on the summary judgment.

THE COURT: Correct. But I don't mean to cause you to just file more briefs. You may, but you're not required to.

MR. THEODOROU: Thank you.

MR. RUBEL: Your Honor, I believe we already have in the scheduling order deadlines for dispositive motions, so he's got plenty of time --

THE COURT: Well --

MR. RUBEL: -- in which to do it.

THE COURT: -- the order is what it is.

(Whereupon the Court and the Clerk conferred.)

THE COURT: Well, again, I don't plan to be here in August. So keep that in mind. All right.

MR. THEODOROU: Okay.

THE COURT: Thank you.

MR. THEODOROU: But we'll be there on March 3rd.

THE COURT: Thank you.

MS. STENGER: Thank you, your Honor.

MR. RUBEL: Thank you, your Honor.

(Whereupon the matter concluded.)

CERTIFICATE

I, Donald E. Womack, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of our shorthand notes taken in the aforementioned matter to the best of our skill and ability.

______________________

DONALD E. WOMACK
Official Court Reporter
1 Courthouse Way, Suite 5510
Boston, Massachusetts 02210
womack@megatran.com