# EXHIBIT R

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOAN BERENSON, individually and on behalf of all others similarly situated; and DAVID BERENSON, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Civil Action 04 CV 11311 WGY |
| NATIONAL FINANCIAL SERVICES LLC; FIDELITY BROKERAGE SERVICES LLC; and DOES 1-50, inclusive, | ) ) ) ) | |
| Defendants | ) ) ) | |

## PLAINTIFFS' SUPPLEMENTAL ANSWERS TO DEFENDANTS' INTERROGATORIES

Plaintiffs, Joan Berenson and David Berenson, each individually and on behalf of all other similarly situated, supplement their answers to Defendants' interrogatories, as follows:

## I.    PRELIMINARY STATEMENT

Plaintiffs have not completed their investigation of all of the facts relating to this case, have not fully completed their discovery in this action, and have not completed their preparation for trial. Thus, the following responses are based only upon such information and documents presently available to and specifically known to Plaintiffs, and said responses disclose only those contentions which presently occur to Plaintiffs. Plaintiffs anticipate that further discovery, independent investigation and legal research and analysis will supply additional facts, add meaning to known facts, and establish entirely new factual conclusions and legal contentions herein set forth. The following responses are given without prejudice to Plaintiffs' rights to

produce evidence at trial. Plaintiffs accordingly reserve their right to amend any and all responses herein as additional facts are ascertained, analysis made, legal research is completed and contentions are formulated. These responses contained herein are made in a good faith effort to supply as much factual information and as much specification as is presently known, but should in no way be to the prejudice of Plaintiffs in relation to further discovery, research, analysis or proof.

Moreover, these responses are made solely for the purpose of this action and are subject to objections as to competence, relevance, materiality, propriety, and admissibility, and any other objection or grounds that would require exclusion of any statement made herein if such statement were made by a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at time of trial.

No incidental or implied admissions are intended by these responses. The fact that Plaintiffs respond or object to any Interrogatory should not be taken as an admission that Plaintiffs accept or admit the existence of any facts assumed by such Interrogatory, or that such response or objection constitutes admissible evidence as to any such assumed facts. The fact that Plaintiffs respond or object to any Interrogatory should not be taken, and is not intended to act, as a waiver by Plaintiffs of any objection to an Interrogatory.

## II.    General Objections

1.    Plaintiffs object to each Interrogatory, and the Definitions and/or Instructions accompanying the Interrogatories, to the extent that they differ from or impose requirements beyond those set forth in the Federal Rules.

2.    Plaintiffs object to each Interrogatory, and the Definitions and/or Instructions accompanying the Interrogatories, to the extent that they seek information or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other rule of privilege, confidentiality, or immunity provided by law.

3.      Plaintiffs object to each Interrogatory, and any Definitions and/or Instructions accompanying the Interrogatories, to the extent that they seek information that is or is embodied in a publicly available pleading, document or other filing.

4.      Plaintiffs do not concede that any information or document they provide in response to any Interrogatory is relevant to this litigation, and specifically reserve the right to object to further discovery in the subject matter of any Interrogatory and to the introduction into evidence of any information or document provided.

5.      The information supplied in these answers is not based solely on the knowledge of the executing party, but includes knowledge of the party, its agent, representatives and attorneys, unless privileged.

6.      Plaintiffs object to each of the Interrogatories to the extent that the Interrogatories seek information that is not in the possession, custody or control of Plaintiffs.

7.      The word usage, sentence structure and syntax may be that of the attorney assisting in the preparation of these answers, and thus, does not necessarily purport to be the precise language of the executing party.

## III.    ANSWERS TO INTERROGATORIES

1.      State the basis for your allegation in ¶ 40 of the Complaint that "the BillPay system cost[s] substantially more to a consumer than a third-party [electronic bill payment system] which competes with Fidelity," identifying all less expensive and competing systems of which you are aware and their costs.

**Answer:** Any electronic bill payment system which, after having been directed to make

a certain payment and having taken monies out of a customer's account, transfers said monies to

the intended recipient in the most commercially expedient manner available is less expensive

than Fidelity's BillPay Service. Any electronic bill payment system which, after having been

directed to make a certain payment, transfers said monies to the intended recipient without first

taking ownership of said monies and denying the consumer benefit of said monies up until the

time of the actual transfer of said monies to the intended recipient, is less expensive than

Fidelity's BillPay Service. Any electronic bill payment system which, after having been directed

to make a certain payment, transfers said monies to the intended recipient without first taking

3

ownership of said monies and denying the consumer benefit of said monies up until the time of the actual transfer of said monies to the intended recipient, is less expensive than Fidelity's BillPay Service. Presently known less expensive and competing electronic bill payment systems include "MyCheckFree" and Navy Federal Credit Union. Plaintiffs are in the process of investigating what other electronic bill payment services are less expensive and compete with Fidelity's BillPay Service.

**Supplemental Answer:** There are several answers to this Interrogatory. First, any electronic bill payment system which, after having been directed to make a certain payment, transfers said monies to the intended recipient in the most commercially expedient manner available is less expensive than Fidelity's BillPay Service because (i) Fidelity does not always transfer monies under its BillPay service in the most commercially expedient manner and (ii) does not pay interest on the customers' monies, or pay any other value to the customer, after having transferred the customers' monies out the customers' account and before actually paying the monies to the intended recipient, as directed by the customer.

Evidence of this includes the Plaintiffs' use of BillPay to transfer monies from their joint account (believed to be their Ultra Service Account X37-068900) to one of their business accounts (believed to be account No. X37-198650). The Plaintiffs instructed Fidelity to pay $7000 each month on or about the 19th of each month. (That amount is currently $5,000.) The funds were not received in the corresponding recipient account until on or about the 25th of each month, even though the funds were withdrawn from the originating account days before. Fidelity obviously used a check to pay itself instead of transferring the subject monies in the most commercially expedient manner, such as wire transfer or inter-account electronic debit. Moreover, even with the use of a paper check the transfer should have been more expedient since

4

it was within the same financial institution. By failing to uphold its fiduciary duty and to transfer the monies in the most commercially expedient manner, Fidelity obtained use of, and profited from, the Plaintiffs' monies for about five days, to the obvious detriment of the Plaintiffs. Defendants' records will reveal that Fidelity does not pay interest on the monies, as will those of any account holder that uses the Fidelity BillPay service.

Similarly, evidence of this also includes Fidelity's failure to properly account for uncashed checks. For example, if Fidelity is instructed to make a certain payment under the BillPay service, and it cuts a check and mails that check to the intended recipient, and the check is not cashed, Fidelity fails to reimburse the customer for the lost value of the monies during the time in which the monies were in limbo, once Fidelity then returns the funds to the originating customer's account. Fidelity benefits from the mail delay and there is a direct cost to the customer.

Evidence of this also includes Fidelity's failure to properly account for late or deferred payments. For example, if Fidelity is instructed to make a certain payment under the BillPay service, and it cuts a check and mails that check to the intended recipient, and the check is delayed in United States mail for any period of time, Fidelity fails to reimburse the customer for the lost value of the monies during the time in which the monies were in limbo, having been lost or delayed in the mail. Fidelity benefits from the mail delay and there is a direct cost to the customer.

This is precisely what happened to the Plaintiffs in December 2004. Fidelity was instructed to make a payment to Scarsdale Manor for the payment of certain cooperative fees on or about December 5 or 6, 2004. Fidelity cut a check and allegedly mailed the check on December 6, 2004. The Berensons recently received a statement from Scarsdale Manor

5

indicating that Scarsdale Manor did not receive the check until December 23, 2004 and setting forth a late charge of $25.00.    Plaintiffs immediately called Fidelity at the Fidelity Premium telephone number and requested to speak with the BillPay service personnel.  The telephone call was "recorded" and/or "monitored for quality control purposes," according to the taped message one always receives when calling Fidelity.

Plaintiffs spoke with Jim Guinn, who advised Plaintiffs that Fidelity mailed the Scarsdale Manor check on December 6, 2004 and informed Plaintiffs that Fidelity would not reimburse Plaintiffs the late charge because, he said, Fidelity is not responsible for delays caused by the United States mail.

Second, any electronic bill payment system which, after having been instructed to make a certain payment, transfers said monies to the intended recipient without first denying the consumer benefit of said monies from the effective date of the instruction until the time of the actual transfer of said monies to the intended recipient, is less expensive than Fidelity's BillPay Service.  Under normal checking clearinghouse channels, the customer would continue to earn whatever interest was being earned on the monies until the time the intended recipient actually obtained the monies.  Thus, there is a direct cost to the customer.

Evidence of this includes the Plaintiffs' use of BillPay to transfer monies from their joint account (believed to be their Ultra Service Account X37-068900) to one of their business accounts (believed to be account No. X37-198650), as previously described.   The Plaintiffs instructed Fidelity to pay $7000 each month on or about the 19th of each month. (That amount is currently $5000.) The funds were not received in the corresponding recipient account until on or about the 25th of each month, even though the funds were withdrawn from the originating account days before.  Fidelity obviously used a check to pay itself instead of transferring the

6

subject monies in the most commercially expedient manner, such as wire transfer or inter-account electronic debit. Moreover, even with the use of a paper check the transfer should have been more expedient since it was within the same financial institution. By failing to uphold its fiduciary duty and to transfer the monies in the most commercially expedient manner, Fidelity obtained use of, and profited from, the Plaintiffs' monies for about five days, to the obvious detriment of the Plaintiffs. Defendants' records will reveal that they do not pay interest on the monies, as will those of any account holder that uses the Fidelity BillPay service. Evidence of ordinary checking account functions can also be found in Defendants' records, among others.

Evidence of this also includes Fidelity's failure to properly account for late or deferred payments. For example, if Fidelity is instructed to make a certain payment under the BillPay service, and it cuts a check and mails that check to the intended recipient, and the check is delayed in United States mail for any period of time, Fidelity fails to reimburse the customer for the lost value of the monies during the time in which the monies were in limbo, having been lost or delayed in the mail. Fidelity benefits from the mail delay and there is a direct cost to the customer.

This is precisely what happened to the Plaintiffs in December 2004. Fidelity was instructed to make a payment to Scarsdale Manor for the payment of certain cooperative fees on or about December 5 or 6, 2004. Fidelity cut a check and allegedly mailed the check on December 6, 2004. The Berensons recently received a statement from Scarsdale Manor indicating that Scarsdale Manor did not receive the check until December 23, 2004 and setting forth a late charge of $25.00. Plaintiffs immediately called Fidelity at the Fidelity Premium telephone number and requested to speak with the BillPay service personnel. The telephone call was "recorded" and/or "monitored for quality control purposes," according to the taped message

7

one always receives when calling Fidelity.

Plaintiffs spoke with Jim Guinn, who advised Plaintiffs that Fidelity mailed the Scarsdale Manor check on December 6, 2004 and informed Plaintiffs that Fidelity would not reimburse Plaintiffs the late charge because, he said, Fidelity is not responsible for delays caused by the United States mail.

Similarly, evidence of this also includes Fidelity's failure to properly account for uncashed checks. For example, if Fidelity is instructed to make a certain payment under the BillPay service, and it cuts a check and mails that check to the intended recipient, and the check is not cashed, Fidelity fails to reimburse the customer for the lost value of the monies during the time in which the monies were in limbo, once Fidelity then returns the funds to the originating customer's account. Fidelity benefits from the mail delay and there is a direct cost to the customer.

Presently known less expensive and competing electronic bill payment systems include "MyCheckFree," Navy Federal Credit Union, and Yahoo! BillPay. Plaintiffs are in the process of investigating what other electronic bill payment services are less expensive and compete with Fidelity's BillPay Service.

> 2.    Identify by date, publication, page and content each and every example of "the advertising and other information provided to BillPay's customers, actual or potential," that you allege, in ¶ 42 of the Complaint, "constitutes deceptive business practices."

**Answer:** Any and all of Defendants' advertising for the BillPay Service that fails to fully and completely set forth that interest will not be paid on monies between the time that any funds are designated for payment and until such time as the intended designee of the monies actually receives the monies. Specific identification cannot be made until the Plaintiffs have completed their discovery, as the advertising in question is in the possession of the Defendants.

8

**Supplemental Answer:**    Any and all of Defendants' documents (including media advertising) or other information provided to BillPay customers for the BillPay Service that fails to fully and completely set forth that interest or other value will not be paid on a customer's monies between the time that any funds are designated for payment and until such time as the intended designee of the monies actually receives the monies constitutes a deceptive business practice.

An example of the documentation is included in Plaintiffs' Response to Defendants' Requests for Production of Documents and is identifiable as "Everyday Finances" addressed to "Berenson & Company Intl." Plaintiffs do not have possession of any other such documents, except as may have been provided as part of Defendants' Motion for Summary Judgment some of which was also reproduced to Defendants.

3.    State the basis for your allegation in ¶ 43 of the Complaint that Fidelity "charge[s] for services at higher rates than the disclosed, published or advertised price."

**Answer:**    Fidelity fails to disclose the true cost of the use of the Fidelity BillPay Service; fails to disclose that Fidelity does not transfer monies under the BillPay Service to the intended recipient without first taking ownership of, and benefit to, said monies; fails to disclose that the BillPay Service customer will not have the benefit of their money during the time Fidelity has taken ownership of such monies; fails to disclose that the BillPay Service customer will not be credited the stolen benefit of their money even in the event that the monies transferred under the BillPay Service are never actually cashed by the intended recipient and are eventually returned by Fidelity's BillPay Service to the consumer.

**Supplemental Answer:**

Fidelity fails to disclose the true cost of the use of the Fidelity BillPay Service; fails to

9

disclose that Fidelity does not transfer monies under the BillPay Service to the intended recipient without first taking full and complete "ownership" of, and benefit to, said monies; fails to disclose that the Fidelity BillPay Service customer will not have the benefit of their money during the time Fidelity has taken "ownership" of such monies; fails to disclose that the Fidelity BillPay Service customer will not be credited the stolen benefit of their money even in the event that the monies transferred under the BillPay Service are (i) never actually cashed by the intended recipient and are eventually returned by Fidelity's BillPay Service to the Fidelity BillPay Service customer, or (ii) there is a delay in making the payment. Defendants' documentation fails to fully and completely inform Plaintiffs and all other Fidelity BillPay Service subscribers of the foregoing information.

As fully and completely set forth in answer to Interrogatory 1, any electronic bill payment system which, after having been directed to make a certain payment, transfers said monies to the intended recipient in the most commercially expedient manner available is less expensive than Fidelity's BillPay Service because (i) Fidelity does not always transfer monies under its BillPay service in the most commercially expedient manner and (ii) does not pay interest on the customers' monies, or pay any other value to the customer, after having transferred the customers' monies out of the customers' account and before actually paying the monies to the intended recipient, as directed by the customer.

Evidence of this includes the Plaintiffs' use of BillPay to transfer monies from their joint account (believed to be their Ultra Service Account X37-068900) to one of their business accounts (believed to be account No. X37-198650), as previously described. The Plaintiffs instructed Fidelity to pay $7000 each month on or about the 19th of each month. (That amount is currently $5,000.) The funds were not received in the corresponding recipient account until on

10

or about the 25th of each month, even though the funds were withdrawn from the originating

account days before. Fidelity obviously used a check to pay itself instead of transferring the

subject monies in the most commercially expedient manner, such as wire transfer or inter-

account electronic debit. Moreover, even with the use of a paper check the transfer should have

been more expedient since it was within the same financial institution. By failing to uphold its

fiduciary duty and to transfer the monies in the most commercially expedient manner, Fidelity

obtained use of, and profited from, the Plaintiffs' monies for about five days, to the obvious

detriment of the Plaintiffs. Defendants' records will reveal that Fidelity does not pay interest on

the monies, as will those of any account holder that uses the Fidelity BillPay service.

Similarly, evidence of this also includes Fidelity's failure to properly account for

uncashed checks. For example, if Fidelity is instructed to make a certain payment under the

BillPay service, and it cuts a check and mails that check to the intended recipient, and the check

is not cashed, Fidelity fails to reimburse the customer for the lost value of the monies during the

time in which the monies were in limbo, once Fidelity then returns the funds to the originating

customer's account. Fidelity benefits from the mail delay and there is a direct cost to the

customer.

Evidence of this also includes Fidelity's failure to properly account for late or deferred

payments. For example, if Fidelity is instructed to make a certain payment under the BillPay

service, and it cuts a check and mails that check to the intended recipient, and the check is

delayed in United States mail for any period of time, Fidelity fails to reimburse the customer for

the lost value of the monies during the time in which the monies were in limbo, having been lost

or delayed in the mail. Fidelity benefits from the mail delay and there is a direct cost to the

customer.

11

This is precisely what happened to the Plaintiffs in December 2004. Fidelity was instructed to make a payment to Scarsdale Manor for the payment of certain cooperative fees on or about December 5 or 6, 2004. Fidelity cut a check and allegedly mailed the check on December 6, 2004. The Berensons recently received a statement from Scarsdale Manor indicating that Scarsdale Manor did not receive the check until December 23, 2004 and setting forth a late charge of $25.00. Plaintiffs immediately called Fidelity at the Fidelity Premium telephone number and requested to speak with the BillPay service personnel. The telephone call was "recorded" and/or "monitored for quality control purposes," according to the taped message Plaintiffs always receive when calling Fidelity.

Plaintiffs spoke with Jim Guinn, who advised Plaintiffs that Fidelity mailed the Scarsdale Manor check on December 6, 2004 and informed Plaintiffs that Fidelity would not reimburse Plaintiffs the late charge because, he said, Fidelity is not responsible for delays caused by the United States mail.

Second, any electronic bill payment system which, after having been instructed to make a certain payment, transfers said monies to the intended recipient without first denying the consumer benefit of said monies from the effective date of the instruction until the time of the actual transfer of said monies to the intended recipient, is less expensive than Fidelity's BillPay Service. Under normal checking clearinghouse channels, the customer would continue to earn whatever interest was being earned on the monies until the time the intended recipient actually obtained the monies. Thus, there is a direct cost to the customer.

Evidence of this includes the Plaintiffs' use of BillPay to transfer monies from their joint account (believed to be their Ultra Service Account X37-068900) to one of their business accounts (believed to be account No. X37-198650). The Plaintiffs instructed Fidelity to pay

12

$7000 each month on or about the 19th of each month. (That amount is currently $5,000.) The funds were not received in the corresponding recipient account until the 25th or 26th of each month. Fidelity obviously used a check to pay itself instead of transferring the subject monies in the most commercially expedient manner, such as wire transfer. By failing to uphold its fiduciary duty and to transfer the monies in the most commercially expedient manner, Fidelity obtained use of, and profited from, the Plaintiffs' monies for about five days, to the obvious detriment of the Plaintiffs. Defendants' records will reveal that they do not pay interest on the monies, as will those of any account holder that uses the Fidelity BillPay service. Evidence of ordinary checking account functions can also be found in Defendants' records, among others.

Evidence of this also includes Fidelity's failure to properly account for late or deferred payments. For example, if Fidelity is instructed to make a certain payment under the BillPay service, and it cuts a check and mails that check to the intended recipient, and the check is delayed in United States mail for any period of time, Fidelity fails to reimburse the customer for the lost value of the monies during the time in which the monies were in limbo, having been lost or delayed in the mail. Fidelity benefits from the mail delay and there is a direct cost to the customer.

This is precisely what happened to the Plaintiffs in December 2004. Fidelity was instructed to make a payment to Scarsdale Manor for the payment of certain condominium fees on or about December 5 or 6, 2004. Fidelity cut a check and allegedly mailed the check on December 6, 2004. The Berensons recently received a statement from Scarsdale Manor indicating that Scarsdale Manor did not receive the check until December 23, 2004 and setting forth a late charge of $25.00. Plaintiffs immediately called Fidelity at the Fidelity Premium telephone number and requested to speak with the BillPay service personnel. The telephone call

13

was "recorded" and/or "monitored for quality control purposes," according to the taped message one always receives when calling Fidelity.

Plaintiffs spoke with Jim Guinn, who advised Plaintiffs that Fidelity mailed the Scarsdale Manor check on December 6, 2004 and informed Plaintiffs that Fidelity would not reimburse Plaintiffs the late charge because, he said, Fidelity is not responsible for delays caused by the United States mail.

4. Identify any bank, savings and loan association, credit union, mutual fund company, or financial institution that pays interest or dividends on debited amounts after they have been debited from a customer's account.

**Answer:** Plaintiffs object to Interrogatory 4 because it cannot be answered in its present form. For Plaintiffs to fully and faithfully answer the Interrogatory, Defendants must provide context, such as the type of account in question, what is meant by "debited" and under what circumstances.

**Supplemental Answer:** Plaintiffs object to Interrogatory 4 because it is vague and misleading and cannot be answered in its present form. Moreover, the interrogatory is incomplete in its present form. The relevant inquiry is not whether "any bank, savings and loan association, credit union, mutual fund company, or financial institution [] pays interest or dividends on debited amounts after they have been debited from a customer's account," but whether any bank, savings and loan association, credit union, mutual fund company, or financial institution pays interest or dividends on debited amounts after they have been debited from a customer's account and the respective bank, savings and loan association, credit union, mutual fund company, or financial institution exercises dominion and control over those fund after they have been debited from the customer's account and before the intended designee of the funds actually receives the funds. To that extent, Plaintiffs are now aware that Fidelity does not do so.

14

Plaintiffs are also aware that most banks, savings and loan associations, credit unions, mutual fund companies, or financial institutions do not pay interest or dividends on debited amounts after they have been debited from a customer's account because the debited monies have actually been transferred to the intended recipient of the monies and thus no longer in the custody and control of such bank, savings and loan association, credit union, mutual fund company or other financial institution.

> 5.    Identify each and every transaction by customer, date, and payee in which Fidelity did not make payments to third parties "as quickly as possible and in a commercially practicable fashion as required."

**Answer:**  Plaintiffs object to interrogatory 5 because it is vague and unduly burdensome. Plaintiff cannot possibly identify "each and every transaction" without Fidelity clarifying what users of the BillPay Service they are referring to.  If the Interrogatory is designed to elicit a list of all transactions in the BillPay System in which Fidelity did not make payments to third parties "as quickly as possible and in a commercially practicable fashion as required", that information is not available to the Plaintiffs, but is in the possession of the Defendants.  If the Interrogatory is designed to elicit a list of all transactions in the BillPay System in which Fidelity did not make payments to third parties "as quickly as possible and in a commercially practicable fashion as required", in regard to the Plaintiff's use of the BillPay System, this information is also only within the possession of the Defendants and not the Plaintiffs, as only Fidelity knows exactly how and when or in what specific manner it effectuated transactions under the BillPay System for the Plaintiffs.  To the extent that such information may be deemed to be in the Plaintiffs' "custody," Defendants' already possess the information.  However, the Plaintiffs believe that all transactions effectuated under the BillPay System are not completed as quickly as possible or in a commercially practicable fashion as required.  Moreover, the Plaintiffs state that in each and

every transaction in which they utilized the BillPay System, which transactions can only be identified from account records in the possession of the Defendants, the transactions were not completed as quickly as possible or in a commercially practicable fashion as required.

**Supplemental Answer:** Plaintiffs object to interrogatory 5 because it is vague and unduly burdensome. Plaintiff cannot possibly identify "each and every transaction" without Fidelity clarifying what users of the BillPay Service they are referring to. If the Interrogatory is designed to elicit a list of all transactions in the BillPay System in which Fidelity did not make payments to third parties "as quickly as possible and in a commercially practicable fashion as required", that information is not available to the Plaintiffs, but is in the possession of the Defendants.

If the Interrogatory is designed to elicit a list of all transactions in the BillPay System in which Fidelity did not make payments to third parties "as quickly as possible and in a commercially practicable fashion as required", in regard to the Plaintiff's use of the BillPay System, in addition to the information provided in answer to Interrogatories 1 and 3 (and set forth again below) regarding the Defendants' late payment of the Scarsdale Manor invoice, this information is also only within the possession of the Defendants and not the Plaintiffs, as only Fidelity knows exactly how and when or in what specific manner it effectuated transactions under the BillPay System for the Plaintiffs. To the extent that such information may be deemed to be in the Plaintiffs' "custody," Defendants' already possess the information. However, the Plaintiffs believe that all transactions effectuated under the BillPay System are not completed as quickly as possible or in a commercially practicable fashion as required. Moreover, the Plaintiffs state that in each and every transaction in which they utilized the BillPay System, which transactions can only be identified from account records in the possession of the Defendants, the transactions were not completed as quickly as possible or in a commercially practicable fashion

as required.

Plaintiffs can provide certain of the following information, as more fully and completely set forth in answer to Interrogatories 1 and 3: Evidence of this includes the Plaintiffs' use of BillPay to transfer monies from their joint account (believed to be their Ultra Service Account X37-068900) to one of their business accounts (believed to be account No. X37-198650). The Plaintiffs instructed Fidelity to pay $7000 each month on or about the 19th of each month. (That amount is currently $5,000.) The funds were not received in the corresponding recipient account until on or about the 25th of each month. Fidelity obviously used a check to pay itself instead of transferring the subject monies in the most commercially expedient manner, such as wire transfer or inter-account electronic debit. By failing to uphold its fiduciary duty and to transfer the monies in the most commercially expedient manner, Fidelity obtained use of, and profited from, the Plaintiffs' monies for about five days, to the obvious detriment of the Plaintiffs. Defendants' records will reveal that Fidelity does not pay interest on the monies, as will those of any account holder that uses the Fidelity BillPay service.

Evidence of this also includes Fidelity's failure to properly account for late or deferred payments. For example, if Fidelity is instructed to make a certain payment under the BillPay service, and it cuts a check and mails that check to the intended recipient, and the check is delayed in United States mail for any period of time, Fidelity fails to reimburse the customer for the lost value of the monies during the time in which the monies were in limbo, having been lost or delayed in the mail. Fidelity benefits from the mail delay and there is a direct cost to the customer.

This is precisely what happened to the Plaintiffs in December 2004. Fidelity was instructed to make a payment to Scarsdale Manor for the payment of certain condominium fees

on or about December 5 or 6, 2004. Fidelity cut a check and allegedly mailed the check on December 6, 2004. The Berensons recently received a statement from Scarsdale Manor indicating that Scarsdale Manor did not receive the check until December 23, 2004 and setting forth a late charge of $25.00. Plaintiffs immediately called Fidelity at the Fidelity Premium telephone number and requested to speak with the BillPay service personnel. The telephone call was "recorded" and/or "monitored for quality control purposes," according to the taped message Plaintiffs always receive when calling Fidelity.

Plaintiffs spoke with Jim Guinn, who advised Plaintiffs that Fidelity mailed the Scarsdale Manor check on December 6, 2004 and informed Plaintiffs that Fidelity would not reimburse Plaintiffs the late charge because, he said, Fidelity is not responsible for delays caused by the United States mail.

Plaintiffs will supplement this answer as required under the federal rules.

6.      Identify each and every act by Fidelity that is, or is part of, "deceptive and fraudulent practice" or "unfair methods of competition and unfair or deceptive acts or practices" as alleged in ¶ 89 of the Complaint.

**Answer:** Please see the Answers to Interrogatory 3 and 5, above.

**Supplemental Answer:**

Fidelity fails to disclose the true cost of the use of the Fidelity BillPay Service; fails to disclose that Fidelity does not transfer monies under the BillPay Service to the intended recipient without first taking full and complete "ownership" of, and benefit to, said monies; fails to disclose that the Fidelity BillPay Service customer will not have the benefit of their money during the time Fidelity has taken "ownership" of such monies; fails to disclose that the Fidelity BillPay Service customer will not be credited the stolen benefit of their money even in the event that the monies transferred under the Fidelity BillPay Service are (i) never actually cashed by the

18

intended recipient and are eventually returned by Fidelity's BillPay Service to the Fidelity BillPay Service customer, or (ii) there is a delay in making the payment. Defendants' documentation fails to fully and completely inform Plaintiffs and all other Fidelity BillPay Service subscribers of the foregoing information.

As fully and completely set forth in answers to Interrogatories 1 and 3, any electronic bill payment system which, after having been directed to make a certain payment, transfers said monies to the intended recipient in the most commercially expedient manner available is less expensive than Fidelity's BillPay Service because (i) Fidelity does not always transfer monies under its BillPay service in the most commercially expedient manner and (ii) does not pay interest on the customers' monies, or pay any other value to the customer, after having transferred the customers' monies out the customers' account and before actually paying the monies to the intended recipient, as directed by the customer.

As fully and completely set forth in answer to Interrogatory 1 and 3, evidence of this includes the Plaintiffs' use of BillPay to transfer monies from their joint account (believed to be their Ultra Service Account X37-068900) to one of their business accounts (believed to be account No. X37-198650). The Plaintiffs instructed Fidelity to pay $7000 each month on or about the 19th of each month. (That amount is currently $5,000.) The funds were not received in the corresponding recipient account until on or about the 25th of each month. Fidelity obviously used a check to pay itself instead of transferring the subject monies in the most commercially expedient manner, such as wire transfer or inter-account electronic debit. By failing to uphold its fiduciary duty and to transfer the monies in the most commercially expedient manner, Fidelity obtained use of, and profited from, the Plaintiffs' monies for about five days, to the obvious detriment of the Plaintiffs. Defendants' records will reveal that Fidelity does not pay interest on

the monies, as will those of any account holder that uses the Fidelity BillPay service.

Evidence of this also includes Fidelity's failure to properly account for late or deferred payments. For example, if Fidelity is instructed to make a certain payment under the BillPay service, and it cuts a check and mails that check to the intended recipient, and the check is delayed in United States mail for any period of time, Fidelity fails to reimburse the customer for the lost value of the monies during the time in which the monies were in limbo, having been lost or delayed in the mail. Fidelity benefits from the mail delay and there is a direct cost to the customer.

This is precisely what happened to the Plaintiffs in December 2004. Fidelity was instructed to make a payment to Scarsdale Manor for the payment of certain cooperative fees on or about December 5 or 6, 2004. Fidelity cut a check and allegedly mailed the check on December 6, 2004. The Berensons recently received a statement from Scarsdale Manor indicating that Scarsdale Manor did not receive the check until December 23, 2004 and setting forth a late charge of $25.00. Plaintiffs immediately called Fidelity at the Fidelity Premium telephone number and requested to speak with the BillPay service personnel. The telephone call was "recorded" and/or "monitored for quality control purposes," according to the taped message Plaintiffs always receive when calling Fidelity.

Plaintiffs spoke with Jim Guinn, who advised Plaintiffs that Fidelity mailed the Scarsdale Manor check on December 6, 2004 and informed Plaintiffs that Fidelity would not reimburse Plaintiffs the late charge because, he said, Fidelity is not responsible for delays caused by the United States mail.

Second, any electronic bill payment system which, after having been instructed to make a certain payment, transfers said monies to the intended recipient without first denying the

consumer benefit of said monies from the effective date of the instruction until the time of the actual transfer of said monies to the intended recipient, is less expensive than Fidelity's BillPay Service. Under normal checking clearinghouse channels, the customer would continue to make earn whatever interest being earned on the monies until the time the intended recipient actually obtains the monies. Thus, there is a direct cost to the customer.

Evidence of this includes the Plaintiffs' use of BillPay to transfer monies from their joint account (believed to be their Ultra Service Account X37-068900) to one of their business accounts (believed to be account No. X37-198650). The Plaintiffs instructed Fidelity to pay $7000 each month on or about the 19th of each month. (That amount is currently $5,000.) The funds were not received in the corresponding recipient account until on or about the 25th of each month. Fidelity obviously used a check to pay itself instead of transferring the subject monies in the most commercially expedient manner, such as wire transfer or inter-account electronic debit. By failing to uphold its fiduciary duty and to transfer the monies in the most commercially expedient manner, Fidelity obtained use of, and profited from, the Plaintiffs' monies for about five days, to the obvious detriment of the Plaintiffs. Defendants' records will reveal that they do not pay interest on the monies, as will those of any account holder that uses the Fidelity BillPay service. Evidence of ordinary checking account functions can also be found in Defendants' records, among others.

Evidence of this also includes Fidelity's failure to properly account for late or deferred payments. For example, if Fidelity is instructed to make a certain payment under the BillPay service, and it cuts a check and mails that check to the intended recipient, and the check is delayed in United States mail for any period of time, Fidelity fails to reimburse the customer for the lost value of the monies during the time in which the monies were in limbo, having been lost

21

or delayed in the mail.  Fidelity benefits from the mail delay and there is a direct cost to the customer.

This is precisely what happened to the Plaintiffs in December 2004.  Fidelity was instructed to make a payment to Scarsdale Manor for the payment of certain condominium fees on or about December 5 or 6, 2004.  Fidelity cut a check and allegedly mailed the check on December 6, 2004.  The Berensons recently received a statement from Scarsdale Manor indicating that Scarsdale Manor did not receive the check until December 23, 2004 and setting forth a late charge of $25.00.   Plaintiffs immediately called Fidelity at the Fidelity Premium telephone number and requested to speak with the BillPay service personnel.  The telephone call was "recorded" and/or "monitored for quality control purposes," according to the taped message one always receives when calling Fidelity.

Plaintiffs spoke with Jim Guinn, who advised Plaintiffs that Fidelity mailed the Scarsdale Manor check on December 6, 2004 and informed Plaintiffs that Fidelity would not reimburse Plaintiffs the late charge because, he said, Fidelity is not responsible for delays caused by the United States mail.

Each and every act would also include each and every transaction under the Fidelity BillPay service and each and every instance in which Fidelity communicated to its customers that incomplete and misleading terms of the BillPay service.  Defendants are in possession of the specific dates and times of each transaction, as well of the dates of each advertisement and other communication with Fidelity customers, as evidenced by the Exhibits attached to the Affidavit of Anne Warren Fagan tendered in support of Defendants' motion to dismiss and for summary judgment.

      7.     Identify all other electronic bill payment services of which you are aware and the business models that they follow, such as the "good funds"

22

business model as alleged in Plaintiff's Opposition to Defendants' Motion to Dismiss and for Summary Judgment (p. 7).

**Answer:** It is the Defendants that alleged the BillPay System is based on a "good funds" business model, not the Plaintiffs. Plaintiffs are in the process of investigating what other electronic bill payment services are in existence and what "business models" they follow, but state that "MyCheckFree", and the Navy Federal Credit Union electronic bill payment services all are believed to utilize the "good funds" business model, as does any other banking service.

**Supplemental Answer:** It is the Defendants' contention that alleged the Fidelity BillPay System is based on a so-called "good funds" business model, not the Plaintiffs. Plaintiffs can find no reference to any so-called "good funds" model in the literature. Plaintiffs are in the process of investigating what other electronic bill payment services are in existence and what "business models" they follow, but state that "MyCheckFree" and the Navy Federal Credit Union electronic bill payment services all are believed to utilize a "good funds" business model, as does any other banking service.

8.    With respect to each expert witness whom you expect to call for testimony on your behalf at the trial of this action, state, specifying as to each expert, (a) the substance of facts and opinions to which each such expert is expected to testify; and (b) the grounds for each opinion of each expert.

**Answer:** Plaintiffs have not yet identified any expert witnesses whom they expect to call for testimony at the trial of this case. Plaintiffs will supplement this Answer to Interrogatory when a decision has been made and in accordance with the Scheduling Order in this case.

9.    Identify each common issue of fact and each question of law supporting a class certification.

**Answer:** Plaintiffs have not completed their discovery in this case and are presently investigating the facts concerning all of the Class Members in this case. Nonetheless, Plaintiffs are presently aware that Fidelity's BillPay Service appears to have the identical documentation

23

and practices for all of its members, such that Defendants' application of the BillPay Service is the same for all subscribers; its failure to provide adequate notice of Defendants' usurpation of ownership over a subscriber's funds is the same for all subscribers; Defendants' usurpation of ownership over a subscriber's funds is the same for all subscribers; Defendants' failure to provide payment in the most commercially practicable and efficient means applies equally to all subscribers; and Massachusetts law applies to all subscribers.

**Supplemental Answer:**

Plaintiffs have not completed their discovery in this case and are presently investigating the facts concerning all of the Class Members in this case. Nonetheless, Plaintiffs are presently aware that Fidelity's BillPay Service has identical documentation and practices for all of its members, such that: Defendants' application of the Fidelity BillPay Service is the same for all Fidelity BillPay Service subscribers, including the apparent use of CheckFree Corporation as a third-party vendor and Fidelity's failure to inform the Fidelity BillPay Service subscribers that CheckFree Corporation is being used as a third-party vendor; Defendants' failure to provide adequate notice of Defendants' failure to pay interest or any other value for a subscriber's funds while still on deposit at Fidelity is the same for all subscribers; Defendants' actual failure to pay interest or any other value for a subscriber's funds while still on deposit at Fidelity is the same for all subscribers; Defendants' failure to provide payment in the most commercially practicable and efficient means applies equally to all subscribers; the facts and circumstances of any delays and/or complete failures in remitting payment as instructed, applies equally to all Fidelity BillPay Service subscribers; and Massachusetts law applies to all subscribers.

Evidence of this are the documents Fidelity purports to provide to its subscribers, including those attached to the Affidavit of Anne Warren Fagan tendered in support of

24

Defendants' motion to dismiss and for summary judgment and those provided in response to

Defendants' Requests for Production of Documents. Plaintiffs will supplement this answer when

they obtain additional information from Defendants and others

    10.    State the dollar amount of damages claimed by Joan Berenson and David
Berenson for themselves or for any entity as to which both or either hold
an account as a representative, setting forth the basis and calculation of
such amount.

**Answer:** Damages cannot be calculated at this time. The information relating to the cost

and damage of the use of the BillPay System by the Plaintiffs is within the possession of the

Defendants and not the Plaintiffs, as only Fidelity knows exactly how and when or in what

specific manner it effectuated transactions under the BillPay System for the Plaintiffs.

As to Objections:

Dated:  January 16, 2005               Respectfully submitted,

                      Douglas A. Rubel, Esquire
                      Johanson Berenson LLP
                      201 Shannon Oaks Circle, Suite 200
                      Cary, North Carolina 27511
                      (919) 654-4544

AS TO THE ANSWERS:

Under the pains and penalties of perjury, I hereby swear and affirm that the foregoing

facts are true and correct to the best of my knowledge, information and belief.

Dated:  January 16, 2005            _____
                      JOAN BERENSON

Dated:  January 16, 2005            _____
                      DAVID BERENSON

Defendants' motion to dismiss and for summary judgment and those provided in response to

Defendants' Requests for Production of Documents. Plaintiffs will supplement this answer when

they obtain additional information from Defendants and others

10.    State the dollar amount of damages claimed by Joan Berenson and David
       Berenson for themselves or for any entity as to which both or either hold
       an account as a representative, setting forth the basis and calculation of
       such amount.

Answer: Damages cannot be calculated at this time. The information relating to the cost

and damage of the use of the BillPay System by the Plaintiffs is within the possession of the

Defendants and not the Plaintiffs, as only Fidelity knows exactly how and when or in what

specific manner it effectuated transactions under the BillPay System for the Plaintiffs.

As to Objections:

Dated:  January 16, 2005                    Respectfully submitted,


                                            _____
                                            Douglas A. Rubel, Esquire
                                            Johanson Berenson LLP
                                            201 Shannon Oaks Circle, Suite 200
                                            Cary, North Carolina 27511
                                            (919) 654-4544

AS TO THE ANSWERS:

Under the pains and penalties of perjury, I hereby swear and affirm that the foregoing

facts are true and correct to the best of my knowledge, information and belief.

Dated:  January 16, 2005          _____
                                  JOAN BERENSON

Dated:  January 16, 2005          _____
                                  DAVID BERENSON

25