# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOAN BERENSON and DAVID
BERENSON, individually and on behalf of
all others similarly situated,

              Plaintiffs,

v.

NATIONAL FINANCIAL SERVICES LLC,
FIDELITY BROKERAGE SERVICES LLC,
and DOES 1-50, inclusive,

              Defendants.

Civil Action No. 04 CV 11311 (WGY)

## EXPERT REPORT: PROF. DAVID B. HUMPHREY

I, David B. Humphrey, state as follows:

1.      I am a Professor and the Fannie Wilson Smith Eminent Scholar in Banking at the
Florida State University Department of Finance. I have held this position since 1991.

2.      I have not been deposed or testified in another case in the last four years.

3.      A copy of my current curriculum vitae and list of publications covering the last
ten years (and more), which describes my qualifications, is attached hereto as Exhibit A.

4.      My compensation for researching and writing this Expert Report as well as any
deposition or trial testimony is $350 an hour.

5.      I have devoted the larger part of my academic and earlier Federal Reserve career
to the study of payment systems and practices. Unless otherwise indicated, I make the
statements herein on the basis of personal knowledge.

6.      I have reviewed the following materials in connection with this matter:

- Plaintiffs' Complaint, dated September 26, 2003

- Defendants' Memorandum in Support of their Motion to Dismiss and for Summary Judgment, dated November 7, 2003;
- Affidavit of Camille Zaslau dated November 6, 2003;
- Affidavit of Camille Zaslau dated February 7, 2005;
- Deposition of Camille Zaslau dated January 19, 2005;
- Affidavit of Anne Warren Fagan dated November 6, 2003;
- Affidavit of Daniel Stickney dated November 6, 2003;
- Plaintiffs' Opposition to the Defendants' Motion to Dismiss and for Summary Judgment, dated November 28, 2003;
- Affidavit of Kenneth L. McWilliams dated November 28, 2003;
- Undated Affidavit of Joan Berenson;
- Undated Affidavit of David Berenson;
- Defendants' Reply Memorandum in support of their motion to dismiss and for summary judgment, dated December 12, 2003;
- Plaintiffs' Supplemental Answers to Defendants' Interrogatories, dated January 17, 2005;
- Plaintiffs' Memorandum of Law in Support of Class Certification, dated January 25, 2005;
- Confidential Berenson Fidelity Account Statement for December, 2004;
- Plaintiffs' Reply to Defendants' Opposition to Motion for Class Certification, dated February 15, 2005;
- Internet web sites of Fidelity, CheckFree, MyCheckFree, Navy Federal Credit Union, and Bank of America.
- Federal Reserve and Census Bureau articles/reports and web sites cited in the text.

7.    I have identified multiple errors and/or misleading statements made by the plaintiffs in their court papers. The plaintiffs appear to suffer from fundamental misunderstandings about the banking system in general and bill payment services in particular. I identify several examples below.

**Established Banking Practices and Commercial Practicability**

8.    In ¶ 23 of the Complaint, the plaintiffs allege that Fidelity does not "transfer the subject funds to Plaintiffs' designated transferee(s) as quickly as is commercially practicable, including the transfer by electronic transfer where possible" and that Fidelity's practices are "inconsistent with established banking practices regarding checking accounts and automated clearinghouse transactions." These statements appear to lack any basis in fact, and the plaintiffs have certainly not provided any basis in the documents listed above.

9.      Fidelity employs the services of CheckFree Corp. ("CheckFree"), the largest provider of third-party electronic billing and payment solutions for financial institutions, to operate its BillPay service.

10.     By leveraging a high volume of transactions on behalf of many other institutions besides Fidelity, CheckFree is able to establish electronic payment relationships with thousands of individual payees to reduce the use of paper checks and thereby minimize the cost and maximize the speed and reliability of individual bill payments.

11.     The plaintiffs are unlikely to know which of the payees they have designated to receive a bill payment can accept an Automated Clearing House ("ACH") payment and which payees require a check to be cut and mailed. CheckFree has to determine this itself. Not all payees receive a sufficient number of payments to warrant the up-front expense of receiving an electronic payment rather than payment by paper check. As a matter of cost and reliability, it is in CheckFree's interest to make as many payments as possible by ACH transfer rather than check, avoiding the costs of postage, envelopes, and research of payments lost in the mail. These ACH payments are credit transfers and this requires that good funds be in CheckFree's account to be so transferred.

12.     Like Bank of America, Fidelity has elected to use a "good funds" business model for its bill payment service. In a good-funds approach, Fidelity debits payments from the customer's account on the transaction date selected by the customer in order to ensure that adequate funds are available. Fidelity then transmits those funds to CheckFree to execute the payments. Having already received the funds from Fidelity, CheckFree is able to make the payments by corporate check (equivalent to a bank cashier's check) or ACH transfer without assuming any risk that the customer might later have insufficient funds to cover the payment.

13.    Alternatively, Fidelity and CheckFree could have utilized a business model whereby they would assume the customer's credit risk. In other words, Fidelity and CheckFree could execute payments by ACH transfer, corporate check, or draft on the customer's account without knowing in advance whether the customer has sufficient funds. However, this approach would expose customers to the risk of "bounced" checks, reversed payments, and collection actions by CheckFree in the event that the customer had an insufficient balance. The same problem and charges would apply if an account owner had insufficient funds in his account to cover an ACH bill payment debit.

14.    Fidelity's use of a "good funds" model is an accepted banking practice. One benefit is that check or ACH payments drawn on an account with good funds in it will not be subsequently returned or reversed due to insufficient funds. This eliminates bank NSF (non sufficient funds) fees, bank overdraft fees, and bank charges to payees — fees which the bill payment user may otherwise incur. These fees are substantial and, as illustrated in an example at the end of this report, can exceed interest or float benefits that a consumer may receive on normal values of ACH or check payments for a given number of transactions. Another benefit concerns lower operating cost both for Fidelity and CheckFree. Handling returned checks and failed ACH transactions is operationally cumbersome, requiring corrections to accounts and notifying users. Finally, payments that fail to be completed will have to be reinitiated by the user, perhaps using a different payment arrangement.

15.    Bank fees for returned checks and failed ACH payments are significant. According to an article published in the Federal Reserve Bulletin (T. Hannan, "Retail Fees of Depository Institutions, 1997-2001," September, 2002: 405-413), the writer of a check drawn on an account with insufficient funds was charged an average fee of $20.73 in 2001 and the check

would be returned to the payee who deposited it. The payee, in turn, may also have to pay a fee that averaged $7.11 in 2001. Depending on the account agreement between the account owner and his bank, the paying bank could pay a check drawn on an account with insufficient funds (so the payee receives the check amount he deposits and is not charged a fee) but the account owner would be charged an overdraft fee, which averaged $20.42 in 2001. The "good funds" model followed by Fidelity assures payees that the check they deposit will be drawn on an account (owned by CheckFree) that has sufficient funds to pay the check received and so eliminates any such bank NSF, overdraft, or payee charges. As NSF or overdraft fees also apply to ACH debits to accounts with insufficient funds to pay them, the good-funds model used by Fidelity also eliminates these costs for users of its BillPay service.

16.    Fidelity's "good funds" approach to bill payment is analogous to that commonly used by banks in issuing a cashier's check. The customer requesting a cashier's check has his or her deposit account debited for the full amount of the cashier's check at the time the request is made. These funds are immediately credited to an internal account at the bank that is owned by the bank, not the requesting customer. The customer can then present the cashier's check in person or by mail to the payee. Thus, the customer earns no interest on the funds debited from his or her account, the check is drawn on an account that has good funds to cover the check, and no NSF or overdraft or payee fees are ever charged since the account the check is drawn upon is fully funded before the check is presented for payment.

**"Debit"**

17.    In ¶ 31 of the Complaint, the plaintiffs acknowledge that Fidelity's BillPay Service Agreement discloses that the customer's account is debited on the transaction date and that the payee generally will not receive payment until a later time. Common usage of the word "debit" means that when an account is debited, the owner of that account no longer owns the

- 5 -

funds that were debited. Consequently, the owner would also know that interest could not be earned on the funds so debited, regardless of who or what other account the funds were credited to. At the very least, many consumers would have this understanding.

**Check "Kiting"**

18.    In ¶ 37 of the Complaint, the plaintiffs allege that Fidelity has operated its BillPay "for the sole purpose of enabling Defendants to kite or otherwise improperly earn interest on the use of the customer's funds." The plaintiffs have not supplied any facts to support this statement in the papers listed above, and it also reflects a fundamental misunderstanding of check "kiting." In fact check kiting is the process of floating worthless checks between accounts established in two or more banks, and implies fraudulent intent. Neither the debiting of the plaintiffs' accounts by Fidelity nor the process of making ACH or check payments by CheckFree to payees as directed by the plaintiffs involves writing a check against an account with insufficient funds and so, by definition, is not associated with "check kiting."

**Customary Practices Associated With Checking Accounts**

19.    In ¶ 25 of the Complaint, the plaintiffs allege that they "were further misled into believing that they would earn interest on their monies in accordance with customary banking practices associated with the establishment and use of checking accounts." This statement reflects fundamental misunderstanding of "customary banking practices."

20.    A check can be written against balances held in a demand deposit account (DDA), a NOW account (Negotiable Order of Withdrawal), an MMDA (Money Market Deposit Account), or credit union share draft account. Since the 1930s, the payment of interest on a demand deposit account held by any party — consumer or business — has been prohibited by Regulation Q of the Federal Reserve Act. Balances in a NOW account or a MMDA, newly established in the 1970s and 1980s, respectively, can receive interest but these accounts need not

be payable on demand as they are actually special savings accounts. The same holds for credit union share draft accounts that pay interest.

21.     Prior to the 1970s, checks could only be written on demand deposits and no interest was paid on balances in these accounts. Currently, bank demand deposits make up about half ($312 billion) of checkable deposits ($622 billion) so, clearly, it not customary to pay interest on all balances in bank transaction/checking accounts (U.S. Census Bureau, <u>Statistical Abstract of the United States: 2004-2005</u>, Table No. 1187, page 748). When customers open a checking account at their bank they typically can choose either a demand deposit account that pays no interest but has lower fees and/or minimum balance requirements (an arrangement favored by tax law, since interest is taxable but reductions in fees are not) or they can choose a NOW or (sometimes) a MMDA which does pay interest but typically has higher fees and minimum balance requirements. Credit union share draft accounts may have lower fees and/or pay higher interest rates since — unlike Fidelity or commercial banks — their profits are not taxed and these savings are generally passed on to their customers. Other than what might be learned by disclosures from the financial institution, consumers would therefore likely have varying expectations regarding the earning of interest depending upon what types of bank accounts they have held.

22.     On page 5 of the plaintiffs' Opposition to Defendants' Motion to Dismiss and for Summary Judgment, the plaintiffs assert that they assumed "BillPay was supposed to operate like a normal checking account, through normal automated clearinghouse channels, in which interest is earned until the designated payee receives credit for the designated funds." However, interest is earned only for checks written directly by the account owner using a bank MMDA or NOW account, or on a credit union share draft account. Interest is not earned on checks written

directly by the owner of a demand deposit account nor is interest necessarily earned if the account owner does not himself or herself write the check but instead uses a cashier's check or delegates this task to some third party (*i.e.*, a bill payment service).

23.    On page 6, n.11 of the plaintiffs' Opposition to Defendants' Motion to Dismiss and for Summary Judgment, the plaintiffs state "...there are essentially two ways to transfer monies: by wire transfer or check." The plaintiffs also suggest that "Wire transfers account for approximately seventy-five (75%) of the transactions processed by CheckFree according to the CheckFree internet website." These statements reflect misunderstanding of how funds are transferred under Fidelity's BillPay service. In fact, the CheckFree website states that "...more than 75% of CheckFree's payments are made electronically, securely, from your account to the merchant. The remainder of payments are mailed by check, generally to smaller merchants." Paying bills electronically is almost always done through an ACH (Automated Clearing House), which is not the same as a wire transfer. If a wire transfer were used, the bank fee would be on the order of $25 or more per payment, which would not be economical. A wire transfer is typically only used for very large value, same day, business-to-business or government-to-business transactions that average more than $3.5 million per transfer. The processing of ACH transactions by the Federal Reserve — which processes around 80% of ACH transactions — only costs between $.0025 per item originated in a large file containing more than 2,500 transactions or $.0030 per item in a small file containing less than 2,500 items. There are also similar per item fees for receiving an ACH payment along with monthly account ($25.00) and settlement ($20.00) fees (http://www.frbservices.org/FeeSchedules/FedACH2004.html) that are spread over the number of transactions. Overall, the cost per ACH item processed by the Federal Reserve is about $.012 per item (Federal Reserve System, <u>Annual Report 2003</u>). This, of course,

is considerably less than the cost of sending a check through the mail (with $.37 just for the stamp) and is a strong incentive for bill payment providers to deliver payments electronically. Indeed, some bill payment services (such as MyCheckFree, noted below) only accept payment requests for payees that can accept electronic payments. Fidelity's BillPay service accepts payment requests that can be paid either electronically or by check but has a strong incentive to deliver these payments electronically and can do so when the designated payee has taken the effort to be able to receive ACH payments.

24.    Also on page 6, n.11 of the plaintiffs' Opposition to Defendants' Motion to Dismiss and for Summary Judgment, the plaintiffs assert that "the name 'good funds' business model is completely misleading." In fact, as described above "good funds" is a standard, accepted banking practice and common terminology in the industry. It means that funds in an account are "good" and can be transferred. They are not "provisional" and uncollected and thus possibly subject to reversal. Good funds are available to be transferred immediately.

25.    On page 15 of the plaintiffs' Opposition to Defendants' Motion to Dismiss and for Summary Judgment, the plaintiffs state: "Under ordinary check clearinghouse channels, a customer continues to receive interest on the subject funds until the designated payee is paid." This is certainly true for the party that wrote the check since the check will be drawn on the account of the check writer. This would apply to the plaintiffs if they were the party that wrote the check and owned the account the check is drawn upon. However, Fidelity, through its agent CheckFree, wrote the check and CheckFree is the owner of the bank account the check is drawn upon. Therefore, the plantiffs' assertion that "...ordinary check clearinghouse channels..." somehow refers to them is incorrect.

26.    Fidelity is not a bank and so is unable to hold a reserve or clearing account with the Federal Reserve in order to directly originate or settle an ACH transaction. While commercial banks, savings and loan associations, or credit unions could provide their bill payment service entirely "in-house," since they can hold Federal Reserve reserve or clearing balances, they often choose not to and use CheckFree or some other bill payment provider instead.

27.    Essentially the same misconceptions and errors described above also pervade the Plaintiffs' Supplemental Answers to Defendants' Interrogatories and the Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification.

**MyCheckFree and Navy Federal Credit Union**

28.    On pages 3-4 of the plaintiffs' Supplemental Answers to Defendants' Interrogatories, the plaintiffs state:

> Any electronic bill payment system which, after having been directed to make a certain payment, transfers said monies to the intended recipient without first taking ownership of said monies and denying the consumer benefits of said monies up until the time of the actual transfer of said monies to the intended recipient, is less expensive than Fidelity's BillPay Service. Presently known less expensive and competing electronic bill payment systems include "MyCheckFree" and Navy Federal Credit Union.

29.    The plaintiffs do not offer any support or basis for this statement. In fact, the services provided by MyCheckFree and Navy Federal Credit Union are materially different from Fidelity's BillPay service and each carries its own set of risks and "costs." It is therefore not possible to state categorically that any one of the services is precisely equivalent to, or necessarily cheaper than, another. As noted earlier, this will be demonstrated in an illustrative calculation at the end of this report.

30.    MyCheckFree allows payments to be issued only to a select number of payees that have an established e-billing and e-payment relationship with CheckFree. Consequently, no

checks are disbursed and thus this service limits the number of payees that can be paid. A list of

entities payable by MyCheckFree is attached as Exhibit B.

31.     Unlike Fidelity BillPay, MyCheckFree exposes the customer to potential costs

and penalties in the event the customer has insufficient funds in his or her payment account to be

debited. Specifically, the MyCheckFree Terms and Conditions provide:

> In using the Service, you are requesting the Service to make payments for you
> from your Payment Account. If we are unable to complete the transaction for any
> reason associated with your Payment Account (for example, there are insufficient
> funds in your Payment Account to cover the transaction), the transaction may not
> be completed. In some instances, you will receive a return notice from the
> Service. In each such case, you agree that:
>
> 1) You will reimburse the Service immediately upon demand the transaction
> amount that has been returned to the Service;
>
> 2) For any amount not reimbursed to the Service within fifteen (15) days of the
> initial notification, a late charge equal to 1.5% monthly interest or the legal
> maximum, whichever rate is lower, for any unpaid amounts may be imposed;
>
> 3) You may be assessed a fee by your financial institution as a result of the return
> and/or you may be assessed a fee by the Service as a result of the return;
>
> 4) You will reimburse the Service for any fees it incurs in attempting to collect
> the amount of the return from you; and,
>
> 5) The Service is authorized to report the facts concerning the return to any credit
> reporting agency.

A copy of the MyCheckFree terms and conditions is attached hereto as Exhibit C.

32.     Also unlike Fidelity BillPay, the Navy Federal Credit Union bill payment service

exposes the customer to potential costs and penalties in the event the customer has insufficient

funds in his or her payment account to be debited. Specifically, the Navy Federal Credit Union

Terms and Conditions Agreement provides:

> In using the Service, you are requesting the Service to make payments for you
> from your Payment Account. If we are unable to complete the transaction for any
> reason associated with your Payment Account (for example, there are insufficient
> funds in your Payment Account to cover the transaction), the transaction will not

- 11 -

be completed. In some instances, you will receive a return notice from the Service. In such case, you agree that:

1) You will reimburse the Service immediately upon demand the transaction amount that has been returned to the Service;

2) For any amount not reimbursed to the Service within fifteen (15) days of the initial notification, a late charge equal to 1.5% monthly interest or the legal maximum, whichever rate is lower, for any unpaid amounts may be imposed;

3) You will reimburse the Service for any fees imposed by your financial institution as a result of the return;

4) You will reimburse the Service for any fees it incurs in attempting to collect the amount of the return from you; and,

5) The Service is authorized to report the facts concerning the return to any consumer credit reporting agency.

In these cases, you agree that a non-sufficient funds (NSF) fee will be charged in accordance with Navy Federal's Schedule of Fees & Charges, which can be found on the Navy Federal Web site (www.navyfcu.org). Further, you also agree that a NSF fee may be charged to your account even if the payment is not returned but is paid and overdraws your Payment Account.

By enrolling for and using the Service, you agree that Navy Federal has the right to collect funds from all of your share accounts as well as the available balance on your line of credit accounts (e.g., NAVchek or credit card accounts) to recover funds for all payments that have been requested to be paid by you and your authorized user; this includes accounts on which you are the primary member-owner, as well as accounts on which you are the joint owner.

A copy of the Navy Federal Credit Union Terms and Conditions Agreement is attached hereto as Exhibit D.

33.    In addition, a user of the Navy Federal Credit Union Bill Payment service may also experience a loss of interest "float" on his or her account in certain circumstances. Specifically, the Navy Federal Credit Union Terms and Conditions Agreement provides that payments may be made by methods including, but not limited to: "an electronic payment, an electronic to check payment, or a laser draft payment." A laser draft payment is a paper check drawn on the customer's own account, and would be mailed. The Terms and Conditions

- 12 -

Agreement further provides that " 'Scheduled Payment Date' is the day you want your Payee to receive your bill payment and is also the day your Payment Account will be debited." In the event that a laser draft is not cashed on or before the scheduled payment date (*e.g.*, due to postal delays or because the payee has forgotten about the check in a desk drawer), the customer's account nevertheless would be debited and there would be a period of "float" until such time as the laser draft is actually presented for payment.

34.    It is possible to approximate the value of the opportunity cost of check float to a user of a good-funds bill payment service similar to that offered by Fidelity. Here the user losses the opportunity cost on the value of check float but is not charged any fees for checks returned unpaid since good funds are always available to pay the checks. This is compared to the cost from returned check fees and overdraft or NSF fees on payments made electronically a user of a risk-funds bill payment service, such as that offered by Navy Federal Credit Union, may pay. Here the user earns the opportunity cost of check float but will, probabilistically speaking, face returned check fees as well as NSF or overdraft fees on electronic payments that can not be completed due to insufficient funds in a deposit owner's account.

**Estimating the Opportunity Cost of Lost Check Float to Account Holders**

35.    According to a Federal Reserve study, the number of checks presented in 2003 was 36.7 billion. Of these, some 183 million checks (or 0.5%) were returned unpaid. Thus, one check is returned for about every 200 written. The average value of all returned checks in 2003 was $756.[1] Since checks returned for insufficient funds are typically due to simple errors on the part of the account holder (e.g., not keeping accurate track of the account balance or expecting a deposit to be credited to an account sooner than it is), the same problems can and do arise with

---

[1] Federal Reserve System, The 2004 Federal Reserve Payments Study: Analysis of Noncash Payment Trends in the United States: 2000 - 2003, December 15, 2004, pages 5-7.

electronic payments in a risk-funds model. Thus it is likely that 1 out of every 200 consumer electronic ACH bill payments creates a return or account overdraft as well.

36.    As consumers are the basic users of either the Fidelity or Navy Federal bill payment services, the average value of all returned checks ($756) overstates the average value of a returned consumer check. The average value of a consumer check is estimated to be $357 while the average value of a business check is $1,802.[2] As I could find no public information on the average value of a returned consumer check (and an inquiry to Federal Reserve payment staff indicated that they did not know of any source either), in the illustration below both the $357 and the (overstated) $756 values will be used in computing the opportunity cost of lost float, which will then be compared to the cost of fees associated with a returned consumer check or a failed consumer ACH transaction.

37.    Since the probability of having a check returned unpaid is 0.5%, some 200 checks would have to be written before 1 is returned and bank return item fees are paid by the check writer/account holder. If the average value of a consumer check is $357, then the total value of 200 consumer checks would be $71,400. If the average deposit interest rate being paid was 2% (it is lower today) and the average number of days of mail-associated check float was 3 days, the value of lost check float on a good-funds bill payment system similar to that offered by Fidelity for 200 checks would be $11.74. Following the same procedure, if the average value of a

---

[2] These average values were derived from Tables 1, 2, and 3 in Federal Reserve System, Retail Payments Research Project, A Snapshot of the U.S. Payments Landscape, 2002, which is found at: (http://www.frbservices.org/Retail/pdf/RetailPaymentsResearchProject.pdf). Tables 2 and 3 show that consumer payors account for 50.9% of the 42.5 billion checks written in 2001 and 19.2% of the $39.3 trillion check value. They also show that business payors account for 32.3% of the 42.5 billion checks written in 2001 and 61.6% of the $39.3 trillion check value. More recent data does not exist. When the 12% of unclassified check volume and 13.9% of unclassified check value is allocated to the consumer and business check categories in the proportions of consumer and business checks shown above, the average value of a consumer check is (.223 x $39.3 trillion)/(.578 x 42.5 billion) = $8,764 billion/24.6 billion = $357 while the average value of a business check is (.715 x $39.3 trillion)/(.367 x 42.5 billion) = $28,100 billion/15.6 billion = $1,802.

consumer check is $756 then the total value of 200 checks would be $151,200 and, at an interest rate of 2%, the opportunity cost of 3 days lost float would be $24.85.[3] With 5 days mail float, the value of lost check float from disbursing 200 consumer checks with an average value of $357 to $756 would be from $19.56 to $41.42.[4]

38.    Overall, the value of lost float on a good-funds bill payment arrangement may vary at the low end from $12 to $25 and at the high end from $20 to $41 for every 200 consumer checks disbursed. The exact cost of lost float for the average user, or any individual, will depend on (a) the average value of a check that would likely be returned unpaid; (b) the total value of 200 checks disbursed (assumed here to be 200 times the value of a returned consumer check); (c) the number of days of lost float; and (d) the deposit interest rate paid on the account. According to their website, the current rate being paid on a Navy Federal Credit Union share draft account is 1.25% while the plaintiffs received a return of 1.83% (December 2004) on their Fidelity account. Both of these rates are lower than the 2% return used in the illustration.[5]

39.    One day's float can also be lost on a good-funds ACH bill payment. Since I could find no information on the incidence or value of a failed consumer ACH transaction, I will apply the same incidence and value used for checks. This is reasonable since the incidence of a failed ACH or returned check is a function of mistakes made by the account owner, not on whether the payment is a check or an ACH transaction. Consequently, 1 consumer ACH transaction is expected to fail for every 200 made (the same as that observed for checks). If the average value

---

[3] These values are from ($357 or $756) x 200 x .02 x 3/365.

[4] Computed from ($357 or $756) x 200 x .02 x 5/365.

[5] Recall that interest is paid on only about half of all checkable deposits in the U.S. This is because, due to the Federal Reserve's Regulation Q, interest can not be paid on demand deposits but can be paid on checkable savings accounts. If other fees exist (e.g., monthly account fees, per check fees, etc.), the actual realized interest return to a deposit account owner can be lower.

of a consumer ACH payment is $357, which is our estimate of the average consumer check

payment, then it is expected that the total value of 200 consumer ACH payments is $71,400. If

an account owner was receiving an interest return of 2%, the opportunity cost of the loss of 1

days float on these 200 ACH payments is $3.91. If the average value of a consumer ACH

payment is $756 then, under the same assumptions, the opportunity cost of 1 day's float would be

$8.28.[6] The range of estimated check and ACH float losses associated with a good-funds model

presented here is summarized below and compared to the cost of paying bank NSF, overdraft,

and payee charges under a risk-funds model.

**Estimating the Cost of Returned Checks to Account Holders**

40.    As noted above, checks drawn on an account with insufficient funds were charged

an average fee of $20.73 in 2001 and the check would be returned to the payee who deposited it.

The payee, in turn, may also have to pay a fee that averaged $7.11 in 2001.[7] Depending on the

account agreement between the account owner and his bank, the paying bank could pay a check

drawn on an account with insufficient funds (so the payee receives the check amount he deposits

and is not charged a fee) but the account owner would be charged an overdraft fee which

averaged $20.42 in 2001.

41.    The good funds model followed by Fidelity assures payees that the checks they

deposit will be drawn on an account (owned by CheckFree) that has sufficient funds to pay the

checks received and so eliminates any such bank NSF, overdraft, or payee charges. The risk-

---

[6] Neither the national average value of a failed consumer ACH payment nor its actual incidence are known since the
payment surveys that have been instituted have focused on checks. The calculations in the text are from ($357 or
$756) x 200 x .02 x 1/365.

[7] Hannan, T.H., "Retail Fees of Depository Institutions, 1997-2001," Federal Reserve Bulletin, September, 2002,
pages 405-413. The survey upon which this article is based was not structured to include ACH return or overdraft
fees since ACH transactions only accounted for 8.6% of all non-cash payments in 2000. As well, many ACH
payments are made by corporations for cash management purposes and have a high average value whereas
consumer bill payments would have a lower average value.

funds model followed by Navy Federal Credit Union would charge a fee to the account holder using their bill paying service for checks returned for insufficient funds. This would also occur if an electronic payment was presented to be paid but the account had insufficient funds to cover the debit.

42.    Using the average values reported by the Federal Reserve, the owner of the account on which a returned check is drawn or an account which has insufficient funds to pay an electronic payment can be charged $20.71 while the payee who received the check may be charged $7.11 by its bank. Payees would likely try to recoup this fee from the payor and, as well, often impose other side charges (which are not reflected in the Federal Reserve survey of bank charges). Overall, a user of a risk-model bill payment service may face a charge of around $28 for each returned check or failed electronic payment while enjoying the benefits of receiving deposit interest on checks issued by this service until the check is collected and the user's deposit account is debited. The user would likely also obtain a one-day float benefit for electronic payments made, compared to electronic payments made using a good-funds bill payment system.

**Costs and Benefits of Risk-Funds and Good-Funds Bill Payment Services**

43.    Probabilistically speaking, the average user of a bill payment service applying a risk-funds model basically faces the following cost: a $28 cost for the 1 out of every 200 checks disbursed that is returned unpaid plus a $21 cost (excluding the payee fee) for 1 failed ACH transaction out of 200 electronic payments disbursed. On the benefit side the user of a risk-funds service would receive $12 to $41 from check float for 200 disbursed checks (whose average value was $357 to $756) plus $4 to $8 from float associated with 200 electronic payments (using the same average values used for checks).

44.     The benefits to the user of a risk-funds service are the costs to a user of a good-funds service. A user of a good-funds service can face an opportunity cost of from $12 to $41 in float revenues for 200 disbursed checks plus an opportunity cost of from $4 to $8 due to lost float for 200 disbursed electronic payments. Offsetting these costs would be the fact that a user of a good-funds service will not have to pay $28 for the 1 out 200 disbursed checks that probabilistically will be returned nor pay $21 for the 1 out of 200 disbursed electronic payments that can fail due to insufficient funds in an account.

45.     This comparison is summarized below:

|  | Risk-Funds Service | | Good-Funds Service | |
|---|---|---|---|---|
|  | Cost | Benefit | Cost | Benefit |
| Per 200 Disbursed Checks | $28 | $12 to $41 | $12 to $41 | $28 |
| Per 200 Electronic Payments | $21 | $4 to $8 | $4 to $8 | $21 |

46.     Taking the midpoint of the cost/benefit figures shown and assuming for illustration that half of bill payments are by check, the risk-funds approach has a net $1.50 cost for 200 checks ($26.50 benefit - $28 cost) while the net cost is $15 for 200 electronic payments ($6 benefit - $21 cost). Adding the two costs together suggests that the risk-funds approach could cost a user $16.50 for 400 payments. If fewer than half of the 400 payments are by check, then this total net cost would be higher since the net cost of $15 for electronic payments would be given a greater weight than the net cost of $1.50 for checks. Under the same assumptions that generated a $16.50 total net cost for 400 payments for the risk-fund model, the good-funds approach would have a net benefit of $16.50.

47.    Taking the largest cost/benefit values shown, the risk-funds approach for 200 checks has a net benefit of $13 ($41 benefit - $28 cost) with a net cost of $13 ($8 benefit - $21 cost) for 200 electronic payments. In this situation, there is no net cost or net benefit to a user of either a risk-funds or a good-funds bill payment service.

48.    Taking the smallest cost/benefit values shown, the risk-funds approach for 200 checks has a net cost of $16 while the net cost for 200 electronic payments is $17, for an overall net cost of $33. Doing the same for the good-funds approach gives a net benefit of $33. As the return item check and ACH return/overdraft fees are stable across transactions, the net costs of a risk-funds approach (or net benefits of a good-funds approach) are lower when the average value of check or ACH payments are very high. Just the opposite occurs when these average values are lower.

49.    In sum, plaintiffs' assertion on pages 3-4 of Supplemental Answers to Defendants' Interrogatories that:

> Presently known less expensive and competing electronic bill payment systems include "MyCheckFree" and Navy Federal Credit Union.

is not borne out when more deeply investigated using values likely associated with the average user of a bill payment service similar to that operated by Fidelity or Navy Federal Credit Union. In particular, the MyCheckFree bill payment service which uses the risk-funds approach and in addition only disburses electronic payments, would in the illustrative computation above consistently incur a net cost of from $13 to $17 for 200 electronic payments. This equals the consistent net benefit of $13 to $17 seen for a good-funds service associated with 200 electronic payments. In practice, there will be individual users of each model, when compared to the other, that can experience a positive net cost while others obtain a positive net benefit. Neither model

will always provide a positive net benefit or a positive net cost to all of its users (with the likely exception of the MyCheckFree risk-funds model which only disburses electronic payments).

     50.     In conclusion, many bill payment users with full information would choose a good-funds model since their opportunity cost of lost float could be less than the bank and other fees they may have to pay when their check and/or ACH payments are returned or fail due to not having sufficient funds. While users of a risk-funds model will have to re-initiate failed payments and can face late fees in addition to bank charges, the Fidelity good-funds arrangement (as noted in the Affidavit of Camille Zaslau, February 7, 2005, ¶ 6) notifies users if their account has insufficient funds prior to initiating a payment so they may either bring the account up to balance or make the desired payment using other means (and avoid late fees).

Respectfully submitted by:

_David B. Humphrey_    _April 15, 2005_

David B. Humphrey