IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOAN BERENSON AND DAVID BERENSON, Individually and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>NATIONAL FINANCIAL SERVICES, LLC, et al.,<br><br>Defendants | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:   04-11311-WGY<br>:<br>:<br>:<br>:<br>:<br>: |

**PLAINTIFFS' REPLY TO OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL AND FOR SANCTIONS, ETC.**

Plaintiffs, Joan Berenson and David Berenson, each individually and on behalf of all others similarly situated, reply to Defendants' opposition to Plaintiffs' motion to compel and for sanctions, to extend discovery for purpose of taking Defendants' deposition, and to extend the expert witness deadline, as follows:

**I.   Introduction**

Fidelity's opposition papers exhibit a level of arrogance that is offensive. Defendants have decided to impose their own twisted sense of ethics and interpretation of the discovery rules on this case, and their opposition papers are replete with outright falsehoods and misstatements. This must not be permitted.

**II.   Background**

The beginning of Fidelity's opposition is apparently a preview of the motion for summary judgment they intend to file on or before May 26, 2005. While it ordinarily would

require a detailed response, this is not a motion for summary judgment and the material facts not in genuine dispute have not been re-filed or amended.

Plaintiffs will simply note here that the opposition papers are as disingenuous as the purported "notice" that Fidelity allegedly gave to its BillPay customers regarding the true charges, fees and costs of the Fidelity BillPay service. In order to mislead this Court into believing that (i) Fidelity's BillPay customers somehow knew, or at least were apprised, that Fidelity—and not the individual customers—would obtain ownership rights to the customer's monies once a transaction was designated under the BillPay Service; and (ii) that Fidelity—and not the individual customers—would earn interest on those monies, Fidelity cobbles together a series of purported buckslips, form notices and agreements. In so doing, however, Fidelity ignores the plain language of those agreements and would have this Court draw all of the reasonable inferences from those agreements against the Berensons,

Indeed, only now does Fidelity inform the Court—and thereby, indirectly, its BillPay subscribers—that it transfers the BillPay Service monies to CheckFree Services Corporation ("CheckFree") and that CheckFree earns "limbo float" on the BillPay monies.[1]

Moreover, while Fidelity justifies this transfer under the veil of a so-called "good funds" model, Fidelity's present discovery responses do not demonstrate where Fidelity has ever invoked the so-called "good funds" model with its customers or explained to them just what "good funds" means to Fidelity and why a check drawn on a BillPay subscriber's account would not be "good funds"? This is the heart of Plaintiffs' discovery of Fidelity, and a critical matter in

---

[1]     Query the financial stability of CheckFree.

this case![2]  Fidelity completely failed and refused to inform its BillPay customers of this before.[3]  Nowhere in the BillPay Agreements is this set forth.  One can hack his way through the thicket of buckslips or other purported notices allegedly provided to Fidelity's customers and never see a reference to the "good funds" model or to CheckFree.  Nowhere on Fidelity's internet website was this set forth.[4]

To the contrary, all of the print advertising that Fidelity sends to its customers about BillPay specifically references payments "directly" from a subscribers' account.  Where is there any mention of an "arms-length, commercial, purchaser-vendor contractual relationship with CheckFree under which a subscriber's monies are transferred to CheckFree so that CheckFree can issue a standard check directly from its corporate checking account or even make an electronic payment?

Indeed, contrary to Fidelity's contentions, the only terms and conditions that can be reasonably inferred from the parties' relationship is that BillPay was supposed to operate like a standard, non-demand deposit, checking account—such as NOW account or a check issued on a

---

[2]  Contrary to Fidelity's contentions Fidelity's failure to apprise its BillPay subscribers of CheckFree is of moment to this case.  There is a huge difference between giving oneself (through documents of its own drafting) the discretion to choose a vendor to provide service for the BillPay Service and not identifying a corporate entity to whom the monies are being transferred as part of the BillPay Service and whose financial stability seemingly rises and falls with the tides of interest rates and the amount of float it earns on another's monies.

[3]  The Berensons do not mean to imply that by informing the Court of this, Fidelity has somehow informed its BillPay customers of this.

[4]  Now, having had the benefit of some discovery, one is left with the distinct understanding that that Fidelity made a deliberate business decision not to fully and faithfully inform its customers of exactly how the BillPay Service works or what the true costs to the customer were because Fidelity didn't want its customers to know that the alleged "convenience" being provided to them actually benefited Fidelity and its vendor, CheckFree, did so to the detriment of the customer and ran contrary to banking practices regarding the issuance and payment of standard checks, namely, that the customer retains ownership of his funds and continues to earn interest until the payee receives and takes possession of the customer's funds.

money market account, such as the Berensons, in which interest is earned until the designated payee receives credit for the designated funds, except that the BillPay customers paid Fidelity to transfer the monies or, in certain circumstances, to write the check and mail it. Why would anyone believe otherwise? Again, those were the actual expectations and understandings of the Berensons.

If the Berensons, as the "sophisticated" investors Fidelity alleges them to be, understood this to be the case, then, they submit, Fidelity failed to give proper notice to the contrary. Why would an unsophisticated investor understand otherwise? Indeed, just as it took a "highly sophisticated" Attorney General to discover the long-standing practice in numerous mutual funds to engage in after hours trading at an undisclosed cost to consumers, so it appears to have taken the Plaintiffs in this case to bring Fidelity's long-standing practice to light.

### III. Fidelity's Discovery

#### A. The Parties Conferred by Correspondence; To Further "Confer" Would Have Been Futile

Fidelity disingenuously contends that the parties did not confer and that its obvious delay tactics in unilaterally proffering that the exchange of correspondence of April 3, 2005 and April 8, 2005 was somehow insufficient. This is absurd. Fidelity took an absolute position that it was not going to produce certain documents, such as those relating to the class. There was nothing to narrow. And, whatever narrowing was going to be done, was done.[5]

Moreover, at the time Plaintiffs' counsel had written the April 3, 2005 letter no documents had been produced. Fidelity intentionally waited until after the March 30, 2005 due

---

[5] Fidelity need not be reminded that Messrs. Shope and Rubel agreed to conduct discovery matters via correspondence because of their inability to communicate in the last discovery dispute.

date for their production to begin the "rolling production," which did not commence until April 4, 2005, as a result of Plaintiff's counsel's April 3, 2005 letter.

Fidelity represents to the Court that further efforts to confer would have been fruitful because Fidelity waived one of its objections as a result of Plaintiff's April 3, 2005 facsimile, namely, its production of its agreement with Integrion, the company that provided the BillPay service for Fidelity before CheckFree. There simply is no foundation for this assertion.

Fidelity chose what to produce and when to produce it. It asserts that the purpose of further conferring was to have "narrowed [the] requests to the case at hand." The scope of the case at hand is precisely the issue that cannot be resolved. Even so, after Plaintiffs' motion had been filed, but long before Defendants' Opposition was due, while counsel were together attending a deposition in Florida, Plaintiffs offered to meet with Defendants to discuss their responses in connection with Defendants request for a discovery conference, but Defendants refused.

In short, this was not a premature motion. An impasse had been reached and Defendants acknowledged as much.

    **B.**    **Privilege Log**

Fidelity proffers that it will provide a privilege log on May 17, 2005, a full month and one-half after its discovery responses were due (March 30, 2005). This is impermissible. Plaintiffs were entitled to the log long ago, and were entitled to know what documents were not being produced in order to timely file a motion to compel, if necessary.

    **C.**    **Fidelity's Failure To Attribute Documents to Categories of Request**

Fidelity contends that it produced documents in the ordinary course of business so that it is not obligated under Rule 34(b) to identify which documents were attributed to specific

document requests. This is absurd. Fidelity's counsel obtained approximately 6000 pages of documents from Fidelity. One can envision Fidelity's counsel requesting certain documents to be printed out and then photocopied or their office obtaining certain documents from Fidelity and having to scan them into their litigation software (Summation or some such program). How is this the ordinary course of business? It is not. As such, Fidelity must attribute the documents to each request. Rule 34(b).

      D.      **Other Complaints, etc.**

Fidelity contends that what it did with other requests to re-credit monies, other BillPay errors, and other complaints have no bearing on the Plaintiffs' claims. This is untrue. What other complaints Fidelity received about the BillPay Service and how it handled them has a direct bearing on the veracity of Fidelity's contentions as to how it handled the Berenson complaints, re-credits and errors as well as direct relevance to the particular "good funds" model Fidelity chose to implement and its failure to advise its BillPay customers that they would not receive interest or float on the BillPay monies.

For example, Fidelity contends that it offered Mr. Berenson to pay the value of interest he lost, which Mr. Berenson directly denies. Whether Fidelity received complaints similar to Mr. Berenson's complaint, when Fidelity received the complaint, and what other offers Fidelity allegedly made has a direct bearing on the veracity of Fidelity's contention that it made an offer to Mr. Berenson. Fidelity should be compelled to produce this information.

Similarly, Fidelity contends that it fully re-credited all of the funds with lost float to the Berensons when a certain payment was lost in the mail. Plaintiffs contend that this was only done because they continued to complain to Fidelity. Fidelity would have this Court believe that

if they behaved in this fashion for the Berensons, then they behaved in this fashion for all BillPay customers. They should be required to corroborate this contention with other information.

Fidelity also contends that because they have "tens of thousands" of BillPay subscribers—they only have 28,000 or so, should be required to identify them by name and geographic location to prove that their representations in the transfer motion were not false also—that it is burdensome for Fidelity to produce the requested information. This, too, is misleading. Fidelity does not identify the number of error, complaints and the like—only the number of subscribers. How do we know that the request is burdensome? Indeed, Fidelity can simply printout from its computers the listing of errors, etc. (which document likely exist anyway).

### E. CheckFree

Fidelity contends that its contractual relationship with CheckFree is that of an "arms-length, commercial, purchaser-vendor," and that it is not entitled under its contract to demand information or documents "other than in circumstances not applicable here."

This is also misleading. While the Fidelity-CheckFree Agreement is designated as "Confidential," it can be said that it does not provide that Fidelity may not request documents or information or that CheckFree will not provide requested information. Indeed, such a concept runs contrary to the entire relationship of the two parties.

Rather, the Agreement permits Fidelity to obtain certain payee information at the termination of the Agreement and that Fidelity is required to keep at its expense copies of the source documents of the information delivered to CheckFree. Thus, Fidelity has certain of the requested documents, and can obtain the remaining documents. Once again, however, Fidelity has been disingenuous.

F.     **Misrepresentations, Payment Methods and Advertising**

Fidelity contends that the Berensons cannot identify any misrepresentations Fidelity made or relied upon. This is also misleading. Counsel have conferred about Plaintiffs' objections to the interrogatories requesting this information. Fidelity's counsel is well aware that Plaintiffs are supplementing their interrogatory answers. Fidelity simply fails to inform the Court of this.

IV.    **Expert Witness and Discovery Deadline**

Had Fidelity provided all of the documents by March 30, 2005, when they were due, Plaintiffs' expert witness could have timely prepared a report which was due on or before April 15, 2005. Plaintiffs' expert will be available for deposition, should Fidelity seek to depose him.

Similarly, had Fidelity timely produced all of their documents, the deposition of their corporate designees would have been timely noticed.

V.    **Conclusion**

WHEREFORE, Plaintiffs, Joan Berenson and David Berenson, individually and on behalf of all others similarly situated, respectfully request this Court to grant their motion to compel and for sanctions, and to enlarge the discovery deadline and expert witness deadline for purpose of providing an expert witness report.

Dated: May 16, 2005                                              Respectfully submitted,


  //ss// Douglas A. Rubel
Douglas A. Rubel
Johanson Berenson LLP
201 Shannon Oaks Circle, Suite 200
Cary, North Carolina 27511
(919) 654-4544

Attorneys for Plaintiffs