IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOAN BERENSON and DAVID BERENSON, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>NATIONAL FINANCIAL SERVICES LLC, FIDELITY BROKERAGE SERVICES LLC, and DOES 1-50, inclusive,<br><br>        Defendants. | Civil Action No. 04 CV 11311 (WGY) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON ALL REMAINING CLAIMS**

Nicholas C. Theodorou (BBO No. 495730)
John A. Shope (BBO No. 562056)
William W. Fick (BBO No. 650562)
David E. Cole (BBO No. 658705)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

## Table of Contents

Table of Authorities ...................................................................................................... ii

Introduction ...................................................................................................................... 1

Procedural History .......................................................................................................... 2

Summary Factual Background ........................................................................................ 3

Argument ......................................................................................................................... 9

I.      THE PLAINTIFFS' STATE LAW CLAIMS ARE UNTIMELY. ................................... 9

II.     THE PLAINTIFFS' MISREPRESENTATION CLAIMS FAIL AS A MATTER OF
        LAW (COUNTS II AND III). .......................................................................... 11

        A.      The Plaintiffs Cannot Prove Any Misrepresentation. ........................... 11

                1.      Fidelity Provides Full Disclosure. ............................................ 11

                2.      The Berensons Knew There Is No "Trust" Account. ................ 12

        B.      The Plaintiffs Cannot Prove Reliance ................................................. 13

III.    THE PLAINTIFFS' REMAINING CLAIM UNDER THE ELECTRONIC FUNDS
        TRANSFER ACT FAILS AS A MATTER OF LAW (COUNT I). ............................. 14

        A.      The Error Resolution Provisions of the EFTA Are Inapplicable. ........ 14

        B.      The Plaintiffs Failed to Put Fidelity on Notice of a Purported "Error." .............. 15

        C.      The Plaintiffs' EFTA "Error Resolution" Claim is Untimely .............. 16

IV.     THE PLAINTIFFS' CLAIM FOR BREACH OF FIDUCIARY DUTY FAILS AS A
        MATTER OF LAW (COUNT IV) .................................................................... 16

V.      FIDELITY DID NOT VIOLATE M.G.L. C. 93A AS A MATTER OF LAW
        (COUNT VI). ............................................................................................. 18

Conclusion ...................................................................................................................... 20

## Table of Authorities

**Cases**

*AT&T v. IMR Capital Corp.*, 888 F. Supp. 221 (D. Mass. 1995) .................................... 20

*Action Ambulance Service, Inc. v. Atlanticare Health Services, Inc.*, 815 F. Supp. 33 (D. Mass. 1993) ................................................. 19

*Bamberg v. S.G. Cowen*, 236 F. Supp. 2d 79 (D. Mass. 2002) ........................................ 13

*Barden v. Harpercollins Publishers, Inc.*, 863 F. Supp. 41 (D. Mass. 1994) .................. 20

*Boston Pilots v. Motor Vessel Midnight Gambler and East Coast Excursions, Inc.*, 357 F.3d 129 (1st Cir. 2004) ............................................. 19

*Carroll v. Xerox Corp.*, 294 F.3d 231 (1st Cir. 2002) .................................................... 12

*FTC v. Patriot Alcohol Testers, Inc.*, 798 F. Supp. 851 (D. Mass. 1992) ........................ 19

*Gianocostas v. Riu Hotels, S.A.*, 59 Mass. App. Ct. 753 (2003) ...................................... 11

*Houck v. Local Federal Savings and Loan, Inc.*, 996 F.2d 311, 1993 WL. 191818 (10th Cir. 1993) ................................................. 16

*J. Geils Band Employee Benefit Plan v. Shearson, Inc.*, 76 F.3d 1245 (1st Cir. 1996) ................................................. 11

*Kent v. Dupree*, 429 N.E.2d 1041 (Mass. App. Ct. 1982) .............................................. 11

*Kravetz v. United States Trust Co.*, 941 F. Supp. 1295 (D. Mass. 1996) .................... 9, 11

*Lefkowitz v. Smith Barney, Harris, Upham & Co.*, 804 F.2d 154 (1st Cir. 1986) ........... 17

*Loguidice v. Metropolitan Life Ins. Co.*, 336 F.3d 1 (1st Cir. 2003) ............................... 10

*Macoviak v. Chase Home Mortgage Corp.*, 40 Mass. App. Ct. 755 (1996) ................... 11

*Merola v. Exergen Corp.*, 423 Mass. 461 (1996) ........................................................... 17

*Mesnick v. General Elec. Co.*, 950 F.2d 816 (1st Cir. 1991) ..................................... 13, 15

*Schmid v. National Bank of Greece*, 622 F. Supp. 704 (D. Mass. 1985) ........................ 17

*United States v. Knott*, 256 F.3d 20 (1st Cir. 2001) ....................................................... 14

**Statutes**

15 U.S.C. § 45(a)(1) ................................................................................................ 19

15 U.S.C. § 1693c ...................................................................................................... 3

15 U.S.C. § 1693f..................................................................................................... passim

15 U.S.C. § 1693m(g) .............................................................................................. 16

12 C.F.R. § 205.11(a) .............................................................................................. 15

D.C. Code Ann. § 28-3901 ....................................................................................... 2

Mass. Gen. Laws ch. 93A ........................................................................... 2, 9, 18, 19

Mass. Gen. Laws ch. 140E ......................................................................................... 2

Mass. Gen. Laws ch. 260 ........................................................................................... 9

**Other Authorities**

29 Fed. Reg. 8355 (1964) ........................................................................................ 19

S. Rep. No. 95-915 (1978) ....................................................................................... 15

Defendants National Financial Services LLC and Fidelity Brokerage Services LLC (together, "Fidelity") respectfully submit this memorandum in support of their Motion for Summary Judgment on All Remaining Claims.

## Introduction

Plaintiffs David and Joan Berenson allege in this proposed consumer class action that Fidelity failed to disclose that its bill payment service, now called BillPay, would not credit them with "interest" on their Fidelity money market mutual fund during the period of "float" between the time that amounts were debited from their account and the time that payees ultimately were credited with payments. They further allege that, in order to maximize its float, Fidelity deliberately pays their bills less promptly than is commercially practicable. The Berensons claim that these alleged practices and Fidelity's related disclosures violate federal and state law.

As a matter of law and undisputed fact, however, Fidelity fully disclosed precisely when and how the Berensons' account would be debited and when interest would be paid. Although the Berensons contend that they did not review the materials, there is no dispute that Fidelity regularly mailed to BillPay users, and provided on its website, copies of BillPay service agreements, customer agreements, and fund prospectuses. These documents clearly disclosed that:

- On the defined Transaction Date selected by the customer, Fidelity debits the customer's brokerage account in the amount of the bill payment;
- Fidelity ceases paying "interest" (dividends) on those funds as of the beginning of the next business day after the debit;
- After having debited the customer's account, Fidelity transfers the funds to an account it maintains for its own use in paying its customers' bills; and
- Payees will not be credited on the date of debit from the customer's account, and because some bills may be paid by check sent by mail, the payee may not receive the funds for several days.

Indeed, the Berensons' case is premised on their failure to read even documents that they signed. Mr. Berenson testified that, "I never authorized Fidelity, first, to take my money . . . . I

believed that Fidelity was writing the checks for me out of my account," T4.59.[1]  But in 1993 both plaintiffs signed a BillPay application that expressly authorized Fidelity to debit their account for amounts to be paid to Fidelity for Fidelity's use in executing bill payments.  T7.ExB.

As to the dispatch with which Fidelity effects payment, there is no dispute that payment by Automated Clearinghouse ("ACH") electronic transfer used by Fidelity's third-party administrator, CheckFree Services Corporation, is prompt, and no dispute that some payees must receive payment by mail rather than ACH transfer.  There is no evidence of unnecessary delay.

Beyond these fundamental flaws, the undisputed facts demonstrate that the Berensons will be unable to prove critical elements of their claims, and that all the claims are further barred by applicable statutes of limitation.

**Procedural History**

The complaint, filed on September 26, 2003, alleged that Fidelity violated the federal Electronic Funds Transfer Act, 15 U.S.C. §§ 1693 *et seq.* ("EFTA") (Count I); the Massachusetts Truth in Savings Law, M.G.L. c. 140E ("Mass. TiSL") (Count V); the Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A ("c. 93A") (Count VI); and the District of Columbia Consumer Protection Procedures Act, D.C. Code Ann. § 28-3901 *et seq.* ("D.C. Consumer Protection Act") (Count VII).  In addition, the complaint asserted common law claims of intentional (Count II) and negligent (Count III) misrepresentation, breach of fiduciary duty (Count IV), and breach of contract (Count IV).[2]

On November 8, 2003, Fidelity filed a Motion to Dismiss and for Summary Judgment, arguing that several counts were legally insufficient on their face and that all must fail because

---

[1] Citations refer to tab numbers in the supporting Appendix filed herewith, followed by additional location information.  For example, the referenced citation denotes Tab 4 of the Appendix (deposition of David Berenson, Day 1) at page 59.

[2] The plaintiffs erroneously numbered two separate counts as "Count IV."

Fidelity provided full disclosure in customer agreements, BillPay Service Agreements, fund prospectuses, and other documents both provided to investors in hard copy and available on Fidelity's website. At a hearing on October 13, 2004, the Court granted the motion to dismiss in part from the bench, dismissing Count V (Mass. TiSL, for which there is no private right of action), Count VII (D.C. Consumer Protection Act, which was withdrawn by the plaintiffs), and Count IV (breach of contract, which was dismissed due to the absence of any relevant promise). The Court then took under advisement possible dismissal of Count I (EFTA), but denied facial dismissal of the other remaining counts. The Court at that time also took under advisement the defendants' motion for summary judgment with respect to all of the remaining counts.

On January 25, 2005, the plaintiffs filed a motion for class certification. At a hearing on February 16, 2005, the Court stated that it would defer decision on the plaintiffs' motion until the conclusion of a trial on the Berensons' individual claims (scheduled for September).

On March 3, 2005, the Court granted summary judgment for Fidelity as to the plaintiffs' claim under 15 U.S.C. § 1693c, the "disclosure" provision of the EFTA, due to the expiration of the statute of limitations, but denied summary judgment as to the claim under 15 U.S.C. § 1693f, the "error resolution" provision of the EFTA. The Court further clarified that the balance of the motion to dismiss and for summary judgment filed on November 8, 2003 had been denied, but without prejudice to renewal following discovery.

<u>**Summary Factual Background**</u>

**Fidelity's BillPay Service**

In the 1980s, Fidelity established a bill payment service, now called BillPay, through which a brokerage customer could request Fidelity to make payments to merchants and other payees by debiting the customer's Core Account. Statement of Undisputed Facts ("SOF") ¶ 8.

A Core Account is a money market mutual fund or cash account used, among other things, to purchase securities and satisfy debits, such as bill payments. *Id.* ¶ 7.

Since June 2000, Fidelity has used CheckFree Services Corp., the largest provider of third party electronic billing and payment solutions, to process bill payments. *Id.* ¶ 10. CheckFree makes these payments either by ACH transfer to those payees with whom it has established an electronic payment relationship or by corporate check sent by mail. *Id.* ¶ 11. CheckFree's financial incentive is to maximize the use of ACH transfer, but it is not available or appropriate for some payees. *Id.* ¶ 13.

Like other financial institutions, Fidelity has elected to use CheckFree's "good funds" business model. *Id.* ¶ 14. Fidelity debits payments from a customer's account on the date selected by the customer, the funds are transferred briefly to an internal Fidelity account on which Fidelity earns no interest, Fidelity then transfers the funds to CheckFree, and CheckFree in turn remits the payment either electronically or by check from its own account. *Id.* This process ensures that the customer has adequate funds available and allows CheckFree to issue a payment in "good funds." *Id.* There is no risk that the payment will "bounce" due to insufficient funds in the customer's account. *Id.* The process is analogous to payment by a cashier's check. *Id.*

CheckFree also offers a "risk" model, pursuant to which it will typically issue a payment by electronic transfer or a laser draft (that is, a check) written directly on the customer's account without knowing whether the customer has sufficient funds. *Id.* ¶ 15. However, the "risk" model exposes customers to the possibility of "bounced" checks and related charges, reversed electronic payments, and collection actions, among other disadvantages. *Id.*

Although it is possible to use the BillPay Service for one-time payments, the Berensons and others use it primarily for recurring transactions such as mortgage and utility payments. *Id.* ¶ 16. In the example of a mortgage, the due date at the bank would be the first of the month. *Id.*

In order for payment to be received in time, the bill payment process must begin several days earlier. *Id.* Thus the Transaction Date on which the customer's brokerage account is debited would typically be the 25th of the preceding month, that is, about five days before the payment due date at the bank. *Id.*

The Fidelity system operates as follows: On the Transaction Date scheduled by the customer ("Day 1"), Fidelity's system (i) informs CheckFree that a particular payment is to be made, (ii) verifies that there are adequate funds in the customer's Core Account, and (iii) debits the customer's Core Account for the amount of the transaction. *Id.* ¶ 17. Mutual fund shares are redeemed to satisfy the debit amount. *Id.* In accordance with the Core Account's mutual fund prospectus, the customer continues to earn dividends on the redeemed shares until the beginning of the next business day ("Day 2"). *Id.* ¶ 18. In other words, since balances are accumulated once daily (there is no "intraday" interest), the Core Account is still deemed to contain the debited funds for interest purposes at the end of Day 1. *Id.*

At approximately 1:00 a.m. on Day 2, CheckFree verifies the payee information, determines whether the payee will accept payment electronically or by check, and sends a settlement funding request to Fidelity for all of that day's transactions. *Id.* ¶ 19. At approximately 1:00 p.m. on Day 2, Fidelity wires funds to CheckFree for the settlement. *Id.* ¶ 20. Because Fidelity wires the funds to CheckFree before the end of Day 2 and Fidelity's bank account also does not earn intraday interest, Fidelity itself does not earn any interest or other value on BillPay funds debited from customers' accounts. *Id.* If payment is to be made electronically, CheckFree initiates the electronic payment on Day 2. *Id.* ¶ 21. If payment is to be made by check, CheckFree mails a corporate check, also on Day 2. *Id.* Any ensuing "float" prior to the time when payees ultimately are credited with funds would inure solely to CheckFree. *Id.*

**Fidelity's Disclosures**

Fidelity's relationship with BillPay customers is governed by the brokerage Customer Agreement, the BillPay Service Agreement, and the Fidelity prospectus for the customer's "Core Account." *Id.* ¶ 22. Fidelity provides customers with copies of the Customer Agreement and any pertinent prospectuses when they open their account. *Id.* ¶ 23. Although the practices in the 1980s as to BillPay (when the Berensons say they opened their account) have not been established, in recent years Fidelity has provided customers with a copy of the BillPay Service Agreement when they enroll in the BillPay Service. *Id.* The Customer Agreement, the BillPay Service Agreement and relevant Fidelity prospectuses for the customer's Core Account may be viewed on Fidelity's website, *id.*, which the Berensons have visited from time to time. *Id.* ¶ 44. The BillPay Service Agreement in particular has been on the website since at least 1998. *Id.* ¶ 23. When material changes are made to these documents, Fidelity has notified existing BillPay subscribers, such as the Berensons, by mail or electronically. *Id.* For example, the Berensons were sent superseding BillPay agreements in November 1998 and May 2000, and agreed to their terms by continuing to use the service. *Id.* ¶¶ 24, 28, 30, and 32.

Fidelity's BillPay Service Agreements and prospectuses clearly disclose what the Berensons allege was misrepresented or omitted. To begin, although it is nowhere in the complaint, the Berensons now assert that Fidelity has committed fraud by concealing its use of an independent contractor, CheckFree, to pay their bills. T16.5. Yet the BillPay Service Agreement has provided clearly that Fidelity may do so in its sole discretion. SOF ¶¶ 25, 32, 33. The 2003 agreement's preamble states:

> "we," "us" or "our" refers to Fidelity Brokerage Services LLC, and any affiliate, subsidiary, agent, <u>independent contractor</u>, designee or assignee we may, <u>in our sole discretion</u>, involve in the provision of the Service.

*Id.* ¶ 33 (emphasis added).  Earlier versions dating back to at least 1998 contain nearly identical language.  SOF ¶¶ 25, 32.

The Berensons further allege that they believed that Fidelity was mailing checks to payees drawn on the Berensons' own account (as in the "risk" model), such that they would continue to earn interest until payees were credited.  T4.59.  But the BillPay Service Agreement since at least 1998 has made clear that the sequence of events and relevant accounts are quite different.  Fidelity debits the customer's account first, and then uses those funds to transmit payment from a different account.  The BillPay Service Agreement states:

> <u>After</u> we debit your Fidelity Account for the amount of a payment, we will remit your payment to the Payee by mailing the Payee a check drawn on <u>an account we maintain</u> for this purpose, by electronic funds transfer, or by other means. (emphasis added)

SOF ¶¶ 27 (1998); ¶ 32 (2000), ¶ 33 (2003).

Another fundamental premise of the Berensons' case is their belief that their account would not be debited until the payee was credited with the funds.  T16.5.  The Service Agreement again has disclosed that this is not so.  It tells the customer that the customer's account will be debited on the scheduled Transaction Date:

> The date on which a Non-Recurring Payment or a Recurring Payment is actually initiated (<u>debited from your Fidelity Account</u>) is the "<u>Transaction Date</u>."

SOF ¶ 33 (emphasis added); ¶ 27 (1998); ¶ 32 (2000).  The agreement then states clearly that the payee will <u>not</u> receive the funds on the same date that they are debited from the customer's account (the Transaction Date):

> Because of the time it takes to transmit a payment, <u>a Payee generally will not receive payment on the Transaction Date</u> regardless of whether the payment is a Same Day payment, a Future Payment, or a Recurring Payment.

*Id.* (emphasis added).  Lest there still be any remaining doubt, the agreement further explains that in order to be eligible for Fidelity's on-time Payment Guarantee, in which Fidelity pledges to

reimburse any penalty if a payment is delivered late, the Transaction Date must have been scheduled "at least five (5) business days prior to the due date, excluding any applicable grace period." *Id.*

Fidelity explains not only the timing of debits, but also the payment of interest. To provide the debited funds to pay a bill, shares in the Berensons' Core Account money market mutual fund must be redeemed. The prospectus for Fidelity Cash Reserves, the Berensons' brokerage Core Account, provides: "Shares earn dividends until, but not including, the next business day following the day of redemption," *id.* ¶ 35, and the 1998 prospectus for the Core Account at that time stated "Shares will earn dividends through the date of redemption." *Id.* ¶ 29. The interest is determined only once per day. The Cash Reserves prospectus states, "Each fund normally declares dividends daily…." *Id.* ¶ 35; *see also id.* ¶ 29 (1998 Core Account "dividends are declared daily"). The Customer Agreement likewise has provided that "all debit items, including … bill payments … will be accumulated daily." *Id.* ¶ 34.

**The Berensons' Use of BillPay and Knowledge of Disclosures**

The Berensons first began using the Fidelity bill payment service provided in the 1980s. *Id.* ¶ 36. In 1993, they completed a BillPay application in order to continue pre-existing service. *Id.* ¶ 37. But the only disclosure about the BillPay service that Mr. Berenson recalled reviewing before asserting his claims was the service agreement in effect in the 1980s (the content of which he could not recall and which neither side has located). *Id.* ¶ 40. Mrs. Berenson said she would have reviewed the service agreement in place at the time she began using the service in the 1980s and the one in effect when she executed the BillPay application in 1993 (both unavailable with content unknown). *Id.* ¶ 41. Asked whether he had received further disclosures, Mr. Berenson testified:

> Everything you say that was sent to us, I will say we would have received except that last one that's dated December 31st, New Year's Eve.  If you're talking about the ones from earlier years, I would say, okay, whether I find them or not, I'm going to say, yes, what you showed me we would have received, but not the last one that somebody is talking about on December 31st [a letter regarding a single payment not relevant here].

*Id*. ¶ 42.

**The Berensons' "Discovery" of the Basis for their Claims**

The Berensons contend that they "discovered" the interest "float" issue that underlies their claims around January of 2002.  *Id*. ¶ 45.  Mr. Berenson complained by telephone to Fidelity on multiple occasions thereafter and sent a letter of complaint on or around September 17, 2002.  *Id*. ¶ 52.  The Berensons filed suit on September 26, 2003.  They have nonetheless continued to use the service through the present time.  *Id*. ¶ 62.

<u>**Argument**</u>

**I.    THE PLAINTIFFS' STATE LAW CLAIMS ARE UNTIMELY.**

The Berensons' remaining common law claims have a three-year statute of limitations while the limitations period under M.G.L. c. 93A is four years.  *See* M.G.L. c. 260, §§ 2A *&* 5A; *see also Kravetz v. U.S. Trust Co.*, 941 F. Supp. 1295, 1302 (D. Mass. 1996).  Under the discovery rule, the statute of limitations begins to run "when the injured party reasonably should have known the factual basis for the cause of action."  *Kravetz*, 941 F. Supp. at 1303.  In order for the statute of limitations not to run, "the factual basis for the cause of action must have been 'inherently unknowable' at the time of the injury."  *Id*.

The Berensons understood they were not earning interest on the float as soon as they noticed a gap in time between the date their Fidelity account was debited and the date their payee was credited.  SOF ¶ 50.  In particular, they had been using BillPay to make a recurring transfer of $7,000 from their joint Fidelity account to the account of Berenson & Co. International.  *Id*. ¶ 45.  They noticed that several days would elapse between the time when the joint account was

debited and the business account was credited. *Id.* ¶ 46. This observation led Mr. Berenson to

conclude that he was being shortchanged on interest. *Id.* ¶ 50. He testified:

> I started saying, you know, I know what's going on. There's a period of time
> when the money is not in account A and it's not in account B, somebody else is
> owning the money in that period. It's blatant and it shows up. And then I
> realized its being done on every single BillPayer transaction . . . .

*Id.*

While the Berensons aver that they did not make that "discovery" until around January

2002, *id.* ¶ 52, nothing made it "inherently unknowable" prior to that time. Fidelity's updated

agreements and other disclosures sent to the Berensons from at least 1998 (and available since at

least 1998 on Fidelity's website, *id.* ¶ 23), made clear that there is a gap in time between the date

bill payments are debited from their Fidelity account and the date when payees will receive the

money, and that the customer ceases to earn interest as of the next business day after his account

is debited. *Id.* ¶¶ 25-33. Had the Berensons read those materials, they would have understood

by 1998 exactly how Fidelity has allegedly wronged them. This is especially so given Mr.

Berenson's legal training and career in accounting and law. *Id.* ¶ 3. Mr. Berenson also admitted

that if only he had not been "too busy," the same discovery would have been "readily apparent"

at any time simply by comparing his Fidelity account statements with any payee statements (the

Berensons conveniently have retained none). *Id.* ¶ 51.

At their depositions, the Berensons did not deny receiving Fidelity's disclosures. *Id.*

¶¶ 40-43. Rather, they either ignored and discarded Fidelity materials mailed to them or do not

recall their contents. *Id.* This is insufficient for the Berensons to bear their burden of proving

that in diligence they could not have discovered their claims before September 26, 1999. As a

matter of law, the diligence required by the statute of limitations presumes review of what

Fidelity sent to the Berensons. *See Loguidice v. Metro. Life Ins. Co.,* 336 F.3d 1, 7 (1st Cir.

2003) ("Massachusetts courts require plaintiffs seeking to invoke the discovery rule to read the

monthly statements sent by their securities broker"); *J. Geils Band Employee Benefit Plan v. Shearson, Inc.,* 76 F.3d 1245, 1259 (1st Cir. 1996) (plaintiffs were "put on notice by the plain text of the prospectuses and simple arithmetic of the numbers on the monthly statements"); *Kravetz*, 941 F. Supp. at 1308 (plaintiff had a "common sense obligation to review investment materials which are created pursuant to federal mandate and which are provided to him"); *Kent v. Dupree*, 429 N.E.2d 1041, 1043 (Mass. App. Ct. 1982). Counts II, III, IV, and VI should be dismissed as untimely.

## II. THE PLAINTIFFS' MISREPRESENTATION CLAIMS FAIL AS A MATTER OF LAW (COUNTS II AND III).

In order to prevail on their claim of intentional misrepresentation, the Berensons would have to show that Fidelity "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing [them] to act thereon, and that [they] relied upon the representation as true and acted upon it to [their] damage." *Macoviak v. Chase Home Mortgage Corp.*, 40 Mass. App. Ct. 755, 760 (1996). The elements of negligent misrepresentation are similar except that the defendant need only act negligently, rather than knowingly. *See, e.g., Gianocostas v. Riu Hotels, S.A.*, 59 Mass. App. Ct. 753, 758 n.9 (2003). But the Berensons cannot show that Fidelity made any false representation, nor can they show reliance.

### A. The Plaintiffs Cannot Prove Any Misrepresentation.

#### 1. Fidelity Provides Full Disclosure.

In their supplemental interrogatory responses filed May 24, 2005, the Berensons offered a laundry list of supposed omissions from each and every Fidelity disclosure, such as the fact that interest would not be paid after debit from the customer's account but before the receipt of funds by the payee, and the fact that Fidelity would use an independent contractor (CheckFree). T16.5 But in fact, as argued above, the available agreements provided to Fidelity customers, including the Berensons, clearly disclose the material facts that the Berensons allege were omitted. The

Berensons' additional grievances that Fidelity failed to disclose the "financial stability" of CheckFree and its "commingling" of bill payment funds (*id.*) are not only not in the complaint, but are also frivolous in light of Fidelity's "sole discretion" to select an independent contractor and the absence of any requirement that the contractor pay bills individually.  Indeed, such an approach would defeat the economy of ACH electronic batch transfer.  SOF ¶¶ 12-13.  The Berensons' further complaint that Fidelity did not disclose the rate of interest (if any) earned by CheckFree (T16.5) is simply immaterial, since what matters is when the customer ceases to earn interest, a fact that Fidelity discloses.  Summary judgment is proper.  *See generally Carroll v. Xerox Corp.,* 294 F.3d 231, 243 (1st Cir. 2002).

### 2.    The Berensons Knew There Is No "Trust" Account.

Contrary to the allegations of the complaint, the Berensons cannot credibly contend that they believed Fidelity held funds for their benefit in some kind of interest bearing "trust" account during the period after the money was taken out of their account and before their payees were credited.  Compl. ¶ 75.  In the first place, Mr. Berenson claims never to have known that Fidelity was putting money into its own account.  T4.59  Indeed, he asserts he was misled by language in unspecified documents that Fidelity was paying bills "directly" from his account.  T16.5.

Second, when Fidelity disclosed that it would make transfers to its own account, it stated that the funds would be for its own use, not the customer's use.  The Berensons' signed application in 1993 stated:

> I (we) hereby authorize and request Fidelity Brokerage Services, Inc. to debit my (our) account for amounts to be paid to it for its use in making payments or initiating credit entries to accounts I (we) have authorized you to pay on my (our) behalf.

SOF ¶ 39 (emphasis added).

Finally, at his deposition Mr. Berenson testified that as soon as he realized that there was a gap between the date of debit to his account and credit to the payee's account, he knew that he

was being deprived of interest. *Id.* ¶ 50. In other words, he had no actual expectation or belief that he would earn interest on some intermediate "trust" account after his own account was debited. Fidelity is entitled to summary judgment. *See, e.g., Bamberg v. S.G. Cowen*, 236 F. Supp. 2d 79, 92 (D. Mass. 2002).

### B.    The Plaintiffs Cannot Prove Reliance

Likewise, the Berensons cannot prove reliance at two levels. First, in their interrogatory responses, the Berensons failed to identify any particular documents upon which they relied and cannot prove that they took or refrained from taking particular actions. The Berensons wrote that they "relied upon each and every document they saw in taking the actions they took in their use of the BillPay service." T16.7. This conclusory assertion is inadequate to survive a motion for summary judgment. *See, e.g., Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991).

The only specific document that the Berensons did identify was a Fidelity promotional mailing called "Everyday Finances." T16.4 Although "Everyday Finances" was addressed to Mr. Berenson's company, at deposition he could not recall having even read it, much less relied upon it. SOF ¶ 57. In fact, the Berensons could not have relied upon Everyday Finances because it was mailed no earlier than 2002 (*id*. ¶ 56) and Mr. Berenson was already aware of the "float" issue by January of that year. *Id*. ¶ 52. Finally, there is nothing at all deceptive about "Everyday Finances," which does not discuss interest float but repeatedly advises prospective customers to "[s]ee the BillPay Service Agreement for complete details." *Id*. ¶ 58. The only other "misrepresentation" that the Berensons identified was a reference to payment "directly" from their account (T16.5), but the only document they had seen with that language is the application in 1993 in which they specifically authorized payment to Fidelity for Fidelity's use in making payment to others. T9.ExB.

At another level, the Berensons cannot prove that they took or refrained from taking any particular actions in reliance on Fidelity's representations about BillPay resulting in ascertainable damage. In their supplemental interrogatory answers, the Berensons assert that they would have arranged for direct debits with their payees or would have used some other bill payment service in order to avoid losing interest on the float. T16.6. Yet now, after discovery has closed, they concede that they are unable to calculate any loss. *Id.* In fact, the Berensons have continued to use the BillPay service through the present time. SOF ¶ 62.

## III. THE PLAINTIFFS' REMAINING CLAIM UNDER THE ELECTRONIC FUNDS TRANSFER ACT FAILS AS A MATTER OF LAW (COUNT I).

The remaining claim under the EFTA alleges that Fidelity violated the "error resolution" provisions of the statute, which require financial institutions to follow certain procedures when they receive proper oral or written notice of an "error" from a customer. *See* 15 U.S.C. § 1693f. Specifically, the Berensons allege that, within ten days of receiving notice from them, Fidelity did not provisionally re-credit their account, did not conduct a good faith investigation, and did not respond in writing. (It is undisputed that a Fidelity representative called the Berensons to discuss the issue. SOF ¶ 55.) The Berensons' claim fails for three reasons: (i) Fidelity's intentional actions in accordance with the parties' contract cannot be deemed an "error" within the meaning of the EFTA; (ii) the Berensons never properly notified Fidelity of a purported "error"; and (iii) any "error resolution" claim is untimely.

### A. The Error Resolution Provisions of the EFTA Are Inapplicable.

When construing a statute, a court must "read statutory terms to convey their ordinary meaning, including as reflected in dictionary definitions." *United States v. Knott*, 256 F.3d 20, 28 (1st Cir. 2001). In ordinary usage, an "error" is "an act, assertion, or belief that unintentionally deviates from what is correct, right, or true." AMERICAN HERITAGE DICTIONARY 475 (4th ed. 2000) (emphasis added). Here, in contrast, the Berensons allege that it is not an

unintentional error but rather the intentional "regular practice" of Fidelity not to pay interest on any BillPay "float" period.  SOF ¶ 52; Compl. ¶ 61.  Indeed, the parties' contract so provides.

The Federal Reserve Board's implementing regulations likewise demonstrate that the Berensons' dissatisfaction with the terms of Fidelity's BillPay Service Agreement does not implicate the EFTA's "error resolution" provisions.  None of the species of "error" on the Board's exhaustive list come close.  *See* 12 C.F.R. § 205.11(a).  The legislative history explains the purpose and scope of these provisions:

> [B]ecause most EFT systems rely totally on computers and electronics, errors are bound to occur, particularly at this relatively early stage of development.  But more important, a consumer is likely to discover an EFT error only after it has occurred, meaning that outstanding checks on a checking account might be dishonored or, even worse, the consumer left without money to meet his essential expenses like rent, utility bills, and groceries.

S. Rep. No. 95-915, at 6-7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9403, 9408-09; *see also id*. at 14, *reprinted in* 1978 U.S.C.C.A.N. at 9416.  The Berensons' complaint does not implicate any of these concerns.  While the Berensons may not like Fidelity's contract terms, and may believe that they were not properly disclosed, Fidelity's actions pursuant to the contract are not an "error" triggering the EFTA's notice and response provisions.

**B.    The Plaintiffs Failed to Put Fidelity on Notice of a Purported "Error."**

Receipt of an "error" notice from a consumer triggers investigation, provisional credit, and written response requirements only if the notice "[i]ndicates why the consumer believes an error exists and includes to the extent possible the type, date, and amount of the error."  12 C.F.R. § 205.11(b); *see also* 15 U.S.C. § 1693f(a).  In response to Fidelity's interrogatory no. 11, the Berensons stated that they "cannot recall the specifics of each communication" with Fidelity and failed to identify a single occasion on which they had notified Fidelity of an "error" within the meaning of the EFTA.  T15.3.  Such evidence is inadequate as a matter of law.  *See Mesnick,* 950 F.2d at 822.  Furthermore, the Berensons' single written complaint to Fidelity, a

- 15 -

letter dated September 17, 2002, expressly described the non-payment of interest on the "float" period as a "regular practice," not an error. SOF ¶ 52. Fidelity cannot be liable when the Berensons never informed Fidelity that their complaints about BillPay interest amounted to a belief that an "error" in the statutory sense had occurred.

### C.    The Plaintiffs' EFTA "Error Resolution" Claim is Untimely[3]

The EFTA statute of limitations is one year. *See* 15 U.S.C. § 1693m(g). The "error resolution" provisions further require that the customer provide notice of any alleged error — *which may be written or oral* — within sixty (60) days of the account statement in which it was recorded. *See* 15 U.S.C. § 1693f.

Here, it is undisputed that the Berensons began complaining orally to Fidelity about the loss of interest on the BillPay float no later than January 2002, well over a year before filing the complaint on September 26, 2003. SOF ¶ 52. The Berensons knew that Fidelity had neither responded in writing (it called) nor recredited their account in response to these oral complaints (the alleged violation on which they sue), but waited more than a year to file suit.

As noted, the only written complaint is a letter dated September 17, 2002, which would have required a written response from Fidelity by September 27, 2002 (within the limitations period by one day). *Id.* But the letter's regurgitation of old complaints did not extend the EFTA statute of limitations. *See Houck v. Local Fed. Sav. & Loan, Inc.*, 996 F.2d 311, 1993 WL 191818 (10th Cir. 1993) (unpublished table decision).

## IV.    THE PLAINTIFFS' CLAIM FOR BREACH OF FIDUCIARY DUTY FAILS AS A MATTER OF LAW (COUNT IV).

The Berensons allege that Fidelity has breached a fiduciary duty to them by taking money from their accounts without paying interest, failing to disclose this alleged loss, and failing to

---

[3] To the extent that this issue was implicitly addressed in the Court's oral ruling on March 3, 2005, Fidelity respectfully requests reconsideration based on the more extensive briefing herein.

pay the Berensons' designated payees as promptly as is commercially practicable.  Compl. ¶¶ 75-76.  These claims fail because:  (i) Fidelity is not acting as the Berensons' fiduciary; (ii) Fidelity is acting in accordance with the terms of its contract with the Berensons; and (iii) the Berensons have never explained how it is that Fidelity has failed to pay their payees as promptly as is commercially practicable.

In the first place, there is no fiduciary relationship.  In response to Fidelity's interrogatory No. 17, the Berensons failed to state <u>any</u> basis for their contention that Fidelity acts as a fiduciary in its provision of the BillPay service and instead merely repeated their allegations about how the system operates and Fidelity's purportedly inadequate disclosures.  T15.8-9.  In fact, the Berensons contracted for BillPay service with Fidelity Brokerage Services LLC, a registered broker-dealer, not the manager of the money market mutual fund they hold in their brokerage accounts.  SOF ¶ 2.  A "simple stockbroker-customer relationship does not constitute a fiduciary relationship." *Lefkowitz v. Smith Barney, Harris, Upham & Co.,* 804 F.2d 154, 155 (1st Cir. 1986).

There can be no breach of fiduciary duty, moreover, where, as here, Fidelity has acted in accordance with the terms of its contract with the Berensons.  *See Schmid v. Nat'l Bank of Greece*, 622 F. Supp. 704, 710-11 (D. Mass. 1985) (holding that the customer agreement "controlled the obligations of the Bank" and that claim for breach of fiduciary duty could not be sustained where bank acted consistently with agreement), *aff'd*, 802 F.2d 439 (1st Cir. 1986); *Merola v. Exergen Corp.*, 423 Mass. 461, 466 (1996) (holding that the majority shareholder terminating employment of minority shareholder did not breach a fiduciary duty where termination permitted by employment contract).  The Berensons have identified no breach of contract, as this Court recognized when it dismissed Count IV.  They specifically authorized Fidelity to pay itself funds from their account for Fidelity's use in bill payment, SOF ¶ 39, and

- 17 -

the agreements Fidelity sent specifically stated that the bills would be paid from an account

Fidelity maintains for this purpose, not the Berensons' own account. *Id.* ¶ 33.

Finally, the fiduciary duty claim fails because the Berensons have never identified any

method of paying the bills faster that Fidelity should have used instead of the one that it did.

T16.15-17. The Berensons concede that some payees should be paid by mail and they have

never challenged the timeliness of ACH transfer. SOF ¶ 63. As to mail, their first complaint is

that one mailed check was received late for reasons unknown, but in that instance they had failed

to schedule that payment until after its due date and even then the payee waived its late fee upon

Fidelity's request. *Id.* ¶ 64. The Berensons' only other criticism is that Fidelity itself should

have had an electronic payment relationship with CheckFree such that funds would be

transferred through the BillPay Service from one Fidelity account to another by ACH rather than

by a check mailed from CheckFree. But they supply no facts to explain why such an electronic

relationship was mandatory. Furthermore, the Berensons ignored Fidelity's specific written

explanation to them, that to avoid loss of float, transfers between Fidelity accounts should be

effected by written instruction on a form that Fidelity supplied but that they failed to complete.

SOF ¶ 49.

## V. FIDELITY DID NOT VIOLATE M.G.L. C. 93A AS A MATTER OF LAW (COUNT VI).

The Berensons allege that Fidelity's supposed failures of disclosure together violate the

Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 1 *et seq*. This claim fails as a matter

of law because, as argued above, the underlying common law and statutory causes of action upon

which it is based also fail. Although "the determination of whether a particular set of acts is

unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as

a ch. 93A violation is a question of law." *Boston Pilots v. Motor Vessel Midnight Gambler & E. Coast Excursions, Inc.,* 357 F.3d 129 (1st Cir. 2004) (internal quotation omitted).

In determining whether an act or practice is deceptive, courts must be guided by interpretations of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). *See* M.G.L. c. 93A, § 2(b). Federal courts and the Commission have established a three-prong test to determine whether a practice is deceptive: (1) there was a representation, omission, or practice; (2) the representation, omission, or practice is likely to mislead consumers; and (3) any omission was material. *See FTC v. Patriot Alcohol Testers, Inc.,* 798 F. Supp. 851, 855 (D. Mass. 1992). Here, the Berensons have failed to identify any misrepresentation and Fidelity has disclosed all of the operative terms of the BillPay system and the accrual of dividends on their mutual fund.

Courts have likewise invoked the FTC's definition of "unfair" practices as "(1) within the penumbra of some common-law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive or unscrupulous; or (3) causing substantial injury to consumers." *Action Ambulance Serv., Inc. v. Atlanticare Health Servs., Inc.*, 815 F. Supp. 33 (D. Mass. 1993) (quoting 29 Fed. Reg. 8355 (1964)). In this case, the Berensons cannot prove any acts or omissions that even come close to implicating a common law, statutory[4], or any other established sense of "unfairness," nor has it acted "immorally" or "to the detriment of consumers." Different service providers offer different bill payment models with different advantages and disadvantages. SOF ¶¶ 14-15. Fidelity's fully-disclosed choice to pay its customers' bills in

---

[4] The Berensons cannot rely upon their theory that Fidelity violated the EFTA or the TiSL by failing to disclose a "fee" or "charge." First, there <u>was</u> full disclosure. Second, as Fidelity argued at length in its motion to dismiss and for summary judgment the EFTA is inapplicable because (i) the lost opportunity to earn interest is not a "fee" or "charge" subject to disclosure under the EFTA; (ii) even if a lost opportunity were deemed a "fee," Fidelity lies within a statutory safe harbor provided by Federal Reserve form disclosures. Third, Fidelity is not a bank subject to the TiSL. T17.13-21, 27-29.

good funds, thus debiting their accounts in advance of payment but avoiding the embarrassment and expense of reversed payment or bounced checks, was neither deceptive nor unfair. *Id.* Summary judgment is proper. *See, e.g., AT&T v. IMR Capital Corp.*, 888 F.Supp. 221, 256 (D. Mass. 1995); *Barden v. Harpercollins Publishers, Inc.*, 863 F. Supp. 41, 46 (D. Mass. 1994).

## Conclusion

For the reasons described above, defendants National Financial Services LLC and Fidelity Brokerage Services LLC respectfully request that the Court enter a summary judgment in their favor on all remaining counts in the complaint.

Respectfully submitted,

NATIONAL FINANCIAL SERVICES LLC and
FIDELITY BROKERAGE SERVICES LLC

By their attorneys,

        /s/ John A. Shope
Nicholas C. Theodorou (BBO No. 495730)
John A. Shope (BBO No. 562056)
William W. Fick (BBO No. 650562)
David E. Cole (BBO No. 658705)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated:  May 26, 2005