IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOAN BERENSON and DAVID BERENSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FINANCIAL SERVICES LLC, FIDELITY BROKERAGE SERVICES LLC, and DOES 1-50, inclusive,<br><br>Defendants. | Civil Action No. 04 CV 11311 (WGY) |

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, defendants National Financial Services LLC and Fidelity Brokerage Services LLC (together, "Fidelity") hereby submit the following Statement of Undisputed Facts in support of their Motion for Summary Judgment On All Remaining Claims.

**The Defendants**

1.      Defendants National Financial Services LLC ("NFS") and Fidelity Brokerage Services LLC ("FBS") are subsidiaries of FMR Corp. and part of the Fidelity Investments family of companies.  T9.¶4.[1]

2.      NFS and FBS are each a registered broker and dealer under the Securities Exchange Act and a member of the New York Stock Exchange, Inc. and various other national and regional stock exchanges.  T9.¶ 5.

---

[1] Citations refer to tab numbers in the Appendix, filed concurrently herewith, followed by additional location information.  For example, the referenced citation denotes Tab 9 of the Appendix (the affidavit of Daniel Stickney) at paragraph 4.

**The Plaintiffs**

3.      Now age 70, plaintiff David Berenson has had an extensive business career. He is the chairman of Comfidex Corp., a software company, a former partner of Ernst & Young, and an attorney and certified public accounted licensed to practice in multiple jurisdictions. T4.23-31. He is the principal of his own consulting firm, called Berenson & Co. International. T4.93.

4.      Plaintiff Joan Berenson is the wife of David Berenson. T2:43. She is a principal of Thunderbird Realty Ventures, in which David Berenson is also a partner. T2.51; T10.ExI.

5.      The Berensons have been Fidelity customers since the 1980s and presently maintain multiple personal and business accounts with Fidelity. T4.86-87; T5.138-39.

6.      The Berensons have been users of Fidelity's bill payment service since the 1980s. T4.56-59.

7.      Until 2001, the Berensons' Fidelity Brokerage Core Account, from which bill payment transactions were debited in respect to their joint account, was the Fidelity Daily Income Trust, a mutual fund. T9.¶ 11. In May 2001, the Berensons began using the Fidelity Cash Reserves Money Market Fund, another mutual fund, as their Core Account. *Id.* A Core Account is a money market mutual fund or cash account used by the customer, among other things, to purchase securities and to satisfy debits, such as bill payments. *Id.* When the Berensons' money market mutual funds were debited to pay bills as they requested, mutual funds shares in their Core Account were redeemed to the extent necessary to satisfy the debit. *Id.*

**Fidelity's BillPay Service**

8.      In the 1980s, Fidelity established a bill payment service, now called BillPay, through which a brokerage customer could request Fidelity to make payments to merchants and other payees by debiting the customer's Core Account. T10:¶3.

9. At present, payments generally must be scheduled through Fidelity's internet website, but Fidelity permits customers with greater assets, such as the Berensons, to arrange bill payments with service representatives by phone. *Id.*

10. Since June 2000, Fidelity has used CheckFree Corp., the largest provider of third party electronic billing and payment solutions, to process bill payments. T18.Ex1.¶9; T10:¶4.

11. CheckFree makes these payments either by Automated Clearinghouse ("ACH") transfer to those payees with whom it has established an electronic payment relationship or by corporate check sent by mail. T10:¶4.

12. By leveraging a high volume of transactions on behalf of many other institutions besides Fidelity, CheckFree is able to establish electronic payment relationships with thousands of individual payees to reduce the use of paper checks and thereby minimize the cost and maximize the speed and reliability of individual bill payments. T18.Ex1.¶10.

13. As a matter of cost and reliability, it is in CheckFree's interest to make as many payments as possible by ACH batch transfer rather than check, avoiding the costs of postage, envelopes and research of payments lost in the mail. T18.Ex1.¶11. However, not all payees receive a sufficient number of payments to warrant the up-front expense of receiving an electronic payment rather than payment by paper check. *Id.*

14. Like other financial institutions, Fidelity has elected to use CheckFree's "good funds" business model. T18.Ex1.¶12; T10.¶6. Using this model, Fidelity debits payments from a customer's account on the date selected by the customer, the funds are transferred briefly to an internal Fidelity account on which Fidelity earns no interest, Fidelity then transfers the funds to CheckFree, and CheckFree in turn remits the payment either electronically or by check from its own account. *Id.*; T7.ExB; T11.¶¶3-5. This process ensures that the customer has adequate funds

available and allows CheckFree to issue a payment in "good funds" by electronic transfer or corporate check. T18.Ex1.¶12; T10.¶6. There is no risk that the payment will "bounce" due to insufficient funds in the customer's account. *Id.* The process is analogous to a payment by a cashier's check. T6.95.

15.     CheckFree also offers a "risk" model, pursuant to which it will typically issue a payment by electronic transfer or a draft (that is, a check) written directly on the customer's account without knowing whether the customer has sufficient funds. T18.ExA.¶13; T10.¶7. However, the "risk" model exposes customers to the possibility of "bounced" checks and related charges, reversed electronic payments, and collection actions by CheckFree, among other disadvantages. *Id.*

16.     Although it is possible to use the BillPay service for one-time payments, the Berensons and others use it primarily for recurring transactions such as mortgage and utility payments. T10.ExE. In the example of a mortgage, the due date at the bank would be the first of the month. In order for payment to be received in time, the bill payment process must begin several days earlier. T7.ExB. Thus the transaction date on which the customer's brokerage account is debited would typically be the 25th of the preceding month, that is, about five days before the payment due date. *Id.*

17.     The BillPay system operates as follows: On the Transaction Date scheduled by the customer ("Day 1"), Fidelity's system (i) informs CheckFree that a particular payment is to be made, (ii) verifies that there are adequate funds in the customer's Core Account, and (iii) debits the customer's Core Account for the amount of the transaction. T11.¶3. Mutual fund shares are redeemed to satisfy the debit amount. T7.ExA.

18. In accordance with the fund prospectus, the customer continues to earn dividends on those funds until the beginning of the next business day ("Day 2"). *Id.* In other words, since balances are accumulated daily, the Core Account is still deemed to contain the debited funds for interest purposes at the end of Day 1. *Id.*

19. At approximately 1:00 a.m. on Day 2, CheckFree verifies payee information, determines whether the payee will accept payment electronically or by check, and sends a settlement funding request to Fidelity for all of that day's transactions. T11.¶4.

20. At approximately 1:00 p.m. on Day 2, Fidelity wires funds to CheckFree for the settlement. *Id.* Because Fidelity wires funds intraday on Day 2 to CheckFree and does not maintain those funds over night in the bank, Fidelity itself does not earn any interest or other value on BillPay funds. *Id.*

21. If payment is to be made electronically, CheckFree initiates the electronic payment on Day 2 and settles with the payee. T11.¶5. If payment is to be made by check, CheckFree mails a corporate check, also on Day 2. *Id.* Any "float" prior to the time when payees ultimately are credited with funds would inure solely to CheckFree. *Id.*

**Fidelity's Disclosures**

22. Fidelity's relationship with BillPay customers is governed by the brokerage Customer Agreement, the BillPay Service Agreement, and the Fidelity prospectus for the customer's Core Account. T7.¶4.

23. Fidelity provides customers with copies of the Customer Agreement and any pertinent prospectuses when they open their account. T7.¶5; T1.74-77, 82-83. In addition, Fidelity provides customers with a copy of the BillPay Service Agreement when they enroll in the BillPay Service. *Id.* All of these documents may be viewed on Fidelity's website. T7.¶6; T1.85. The BillPay Service Agreement in particular has been on Fidelity's website since at least

1998. *Id.* When material changes have been made to these documents, Fidelity has notified existing BillPay subscribers by mail or electronically. T7.¶5; T1.86-87.

24.     In November 1998, Fidelity prepared and sent mailings to its BillPay subscribers that directed the customer to "review the enclosed Fidelity BillPay Service Agreement for new terms and conditions." T7.¶9, ExsD-G.

25.     The preamble of the Fidelity BillPay Service Agreement in the November 1998 mailings provides that Fidelity may, in its "sole discretion, involve in the provision of the service . . . . any affiliate subsidiary, agent, independent contractor, designee, or assignee." T7.ExG.

26.     Section 8 of the Fidelity BillPay Service Agreement in the November 1998 mailings disclosed the timing of debits from the customer's Core Account:

> The date on which a Non-Recurring Payment or a Recurring
> Payment is actually initiated (debited from your Fidelity Account)
> is the "Transaction Date."

*Id*.

27.     Section 10 of the Fidelity Bill Pay Service Agreement in the November 1998 mailings stated:

> After we debit your Fidelity Account for the amount of a payment,
> we will remit your payment to the Payee by mailing the Payee a
> check drawn on an account we maintain for this purpose by
> electronic funds transfer, or by other means. Because of the time it
> takes to transmit a payment, a Payee generally will not receive
> payment on the Transaction Date regardless of whether the
> payment is a Same Day Payment, a Future Payment, or a
> Recurring Payment.

*Id*.

28.     Section 12 of the Fidelity BillPay Service Agreement in the November 1998 mailings explained that in order to be eligible for Fidelity's on-time Payment Guarantee, in which Fidelity pledged to reimburse any penalty if a payment is delivered late, the Transaction

Date must have been scheduled "at least five (5) business days prior to the actual due date, excluding any applicable grace period." *Id*. Section 23 of the Agreement provides: "We may modify or amend this agreement at any time by giving you at least thirty (30) days' prior written notice." *Id*.

29. The 1998 version of the Fidelity Daily Income Trust (the Berensons' Core Account until 2001) stated: "Shares will earn dividends through the date of redemption . . ." T7.ExH. The same prospectus also states: "Income dividends are declared daily." *Id*.

30. In May 2000, Fidelity sent a letter to all BillPay customers that effective June 16, 2000, touch-tone phone service would be deactivated and that Fidelity web-based services would be enhanced in late June of that year. The letter included a buckslip that stated: "the Fidelity BillPay Service Agreement has been amended to reflect important changes outlined in this letter. Please visit fidelity.com/goto/billpayagree/ to read the new Service Agreement. Use of the Fidelity BillPay service on or after June 16, 2000 -- the effective date of these changes -- indicates your agreement with the modifications and amendments." T7.ExI (May 2000 letter); T7.ExJ (May 2000 buckslip).

31. Before June 18, 2000, Fidelity implemented a notification of changes to the BillPay Service Agreement on Fidelity's Internet web site. Customers who used the BillPay web site had to click-through a pop-up window that stated: "Effective June 18, 2000 we have updated the Fidelity BillPay Service Agreement to reflect important changes. Use of the Service after June 18 indicates your agreement with the modifications and amendments." T7.ExK.

32. The BillPay Service Agreement in effect as of June 2000 contained material language similar to its predecessor. The preamble stated:

> "we," "us" or "our" refers to Fidelity Brokerage Services, Inc., and any affiliate, subsidiary, agent, independent contractor, designee or

>assignee we may, in our sole discretion, involve in the provision of the Service.

T7.ExL. Section 9 stated:

>The date on which a Non-Recurring or a Recurring Payment is actually initiated (debited from your Fidelity Account) is the "Transaction Date."

*Id*. Section 11 stated:

>After we debit your Fidelity Account for the amount of a payment, we will remit your payment to the Payee by mailing the Payee a check drawn on an account we maintain for this purpose, by electronic funds transfer, or by other means. Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of whether the payment is a Same Day payment, a Future Payment, or a Recurring Payment.

*Id.* Section 13 explains that in order to be eligible for Fidelity's on-time Payment Guarantee, where Fidelity pledges to reimburse the customer's penalty if a payment is delivered late, the Transaction Date must be scheduled at least five business days prior to the actual due date. *Id.* Section 27 provides:

>[I]n the future we may provide amendments to the Agreement and notices and disclosures related to the Agreement and the Service to you electronically.

*Id*.

  33. The Fidelity BillPay Service Agreement in effect at the time the complaint contained material language identical to its predecessors. The preamble provides:

>"we," "us" or "our" refers to Fidelity Brokerage Services LLC, and any affiliate, subsidiary, agent, independent contractor, designee or assignee we may, in our sole discretion, involve in the provision of the Service.

T7.ExB. The preamble further provides:

>In the event that a revise service agreement is provided by Fidelity, that agreement will supersede the terms of this agreement.

- 8 -

*Id*. Section 9 provides:

> The date on which a Non-Recurring Payment or a Recurring Payment is actually initiated (debited from your Fidelity Account) is the "Transaction Date."

*Id*. Section 11 provides:

> After we debit your Fidelity Account for the amount of a payment, we will remit your payment to the Payee by mailing the Payee a check drawn on an account we maintain for this purpose, by electronic funds transfer, or by other means. Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of whether the payment is a Same Day payment, a Future Payment, or a Recurring Payment.

*Id*. Section 13 explains that in order to be eligible for Fidelity's on-time Payment Guarantee, where Fidelity pledges to reimburse the customer's penalty if a payment is delivered late, the Transaction Date must be scheduled at least five business days prior to the actual due date. *Id*.

34. Section 4 of the Fidelity brokerage Customer Agreement in effect at the time the complaint was filed provides:

> I have received and read a copy of the prospectus of the transaction fund selected by me, containing a more complete description of the fund and its fees, charges and operations.

T7.ExA. Section 7 of the Customer Agreement also provides:

> [T]he Fidelity BillPay service is subject to the Fidelity BillPay Service Agreement . . . [A]ny use of the Fidelity BillPay service confirms my agreement to the Fidelity BillPay Service Agreement

*Id*. *Section* 9 of the Customer Agreement also provides:

> I understand that all debit items, including . . . bill payments . . . will be accumulated daily . . . .

*Id*. Section 14 of the Customer Agreement also provides:

> Communications by mail, electronic means, messenger, telegraph, or otherwise, sent to me at the U.S. postal or electronic mail address listed on the application, or any other address I may give

- 9 -

> FBS, are presumed to be delivered to and received by me whether actually received or not.

*Id.*

35. The prospectus for Fidelity Cash Reserves (the Berensons' Core Account from 2001 to the present) in effect at the time the complaint was filed provides: "Shares earn dividends until, but not including, the next business day following the day of redemption." T7.ExC. The same prospectus states: "Each fund normally declares dividends daily . . . ." *Id.*

**Berensons' Use of BillPay**

36. The Berensons first began using the Fidelity bill payment service in the 1980s. T4:56-59.

37. In 1991, the Berensons filled out an application for a joint Fidelity Ultra Service Account. In completing and signing their application in 1991, the Berensons acknowledged that they had "read, understood, and agree to the terms set forth in the Customer Agreement." T9.ExA.

38. In accepting the Customer Agreement, the Berensons also acknowledged that they had "received and read a copy of the Prospectus of the Transaction Fund selected by me, containing a more complete description of it and its operations" and that they "understand that all debit items, such as checks, card charges, Securities Account purchases and electronic fund transfers, will be accumulated daily. . ." *Id.*

39. The Berensons filled out an application for bill payment service in 1993 in order to continue pre-existing service. T4.7, 13, 48-52. In completing and signing this application, the Berensons acknowledged:

> I (we) hereby authorize and request Fidelity Brokerage Services, Inc. to debit my (our) account for amounts to be paid *to it for its use* in making payments or initiating credit entries to accounts I (we) have authorized you to pay on my (our) behalf.

- 10 -

T9.ExB (emphasis added).

**Berensons' Knowledge of Disclosures**

40. The only disclosures about the BillPay service that Mr. Berenson recalled reviewing before asserting his claims was the service agreement in effect when he first began using the service in the 1980s (the content of which he cannot recall and neither side has located). T4.86-87; T5.138-39.

41. Mrs. Berenson reviewed the service agreement in place at the time she began using the service in the 1980s and the one in effect when she executed the application for BillPay service in 1993 (the content of both of which she cannot recall and which neither side has located). T2.116, 153.

42. Asked whether he had received further disclosures in succeeding years, Mr. Berenson responded:

> I probably killed half the Amazon Rain Forest. I don't think I ever received anything in the mail. I really don't . If anything came and I already got one going from the eighties, I would not have looked at it and it would have gotten discarded. I don't recall anybody ever sending me anything since we first started with them in the eighties. If they did, I wouldn't have paid any attention because I already had it.

T4. 87-88. Mr. Berenson subsequently added:

> Everything you say that was sent to us, I will say we would have received except that last one that's Dated December 31st, New Year's Eve. If you're talking about the ones from earlier years, I would say, okay, whether I find them or not, I'm going to say, yes, what you showed me we would have received, but not the last one that somebody is talking about on December 31st.

T4.123.

43. Mrs. Berenson typically will "read what comes" from Fidelity but "do[es] not recall" receiving BillPay agreements or other disclosures. T2.151-52.

44.     The Berensons have a high speed internet connection and periodically use the Fidelity website.  T5.150-57.

**Berensons' "Discovery" of Basis for Claims**

45.     The Berensons contend that they "discovered" the interest "float" issue that underlies their claims around January of 2002.  T3.27; T4.92-95.  They had been using BillPay to make a recurring transfer of $7,000 from their joint Fidelity account to the Fidelity account of Berenson & Co. International.  T3.26-28; T4.61-70, 92-95.

46.     They noticed when comparing statements that several days would elapse between the time when the joint account was debited and the business account was credited. *Id*.

47.     Upon inquiry to Fidelity, they learned that this gap was the result of CheckFree's having mailed a check back to Fidelity.  T4.61-70.

48.     For a variety of reasons, CheckFree does not have an established electronic transaction relationship with Fidelity as a third party billing entity or payee."  T10.¶5.

49.     Designed to effect payment of bills to third parties, BillPay is not the optimal method to transfer funds between Fidelity accounts.  T10.¶15.  On April 24, 2002, Fidelity sent a letter to Mr. Berenson informing him that he could set up a recurring transfer between Fidelity accounts (i.e., not using BillPay), which he understood would avoid the loss of float, by submitting a Letter of Instruction with a signature guarantee.  T10.ExD; T5.82-83.  Mr. Berenson "believes" he submitted a completed letter, T5.84, but the only copy produced by the Berensons does not contain the required signature guarantee and Fidelity has no record that the recurring transfer was ever authorized.  T10.¶16; T13.  In addition, Mr. Berenson called Fidelity to complain about the need to obtain a signature guarantee twice that May, T10.¶17, even though the Berensons have obtained signature guarantees without difficulty on other occasions.  T3.82; T5.84.

50. Mr. Berenson realized that, on all of his payments through the BillPay service, his account was debited before the payee was credited with the funds:

> I started saying, you know, I know what's going on. There's a period of time when the money is not in account A and it's not in account B, somebody else is owning the money in that period. It's blatant and it shows up. And then I realized its being done on every single BillPayer transaction . . . .

T4.62-63.

51. Nothing prevented Mr. Berenson from making this discovery earlier:

> Q. In other words, when you actually took the time to compare the two [statements] it was readily apparent?
>
> A. Yes.
>
> Q. You just have been too busy before then to make the comparison?
>
> A. Yes.

T4.95. The Berensons represent that they have retained none of their payee statements, even after commencement of this litigation. *See* Plaintiffs' Responses to Defendants' Second Set of Requests for Production of Documents at 5 (attached as Exhibit 4 to the Affidavit of Nicholas C. Theodorou, filed on May 18, 2005 [dkt # 54]).

52. On or around September 17, 2002, David Berenson sent a letter to Fidelity that stated:

> In January of 2002 I noticed that in BillPay transactions I made, monies were being subtracted from my account before the payee actually cashed the BillPay Check or received any BillPay funds which I had transferred. A review of my account statements indicated this was a regular practice, and occurs literally every month I make a BillPay transaction.
>
> I contacted Fidelity representatives by telephone on numerous occasions since then attempting to determine why this was the case, and where the interest on my money was during this period of time. However, I received no response to my questions. I

> believe the interest on my money during this period of time
> belongs to me and is actually being used by Fidelity.  I was
> unaware of this practice and feel I am being charged a fee for using
> the BillPay service.
>
> As such, on all BillPay transactions I have ever made I would like
> to be repaid the interest on money which was taken out of my
> account before the creditor actually obtained the money.

T12.

53. At his deposition, David Berenson authenticated this letter and testified that the statements therein are true.  T4.92-93.

54. Joan Berenson also participated in the drafting and review of this letter.  T3.47; T4.68.

55. On October 3, 2002, a Fidelity service representative made the following entry in Fidelity's customer service tracking system:

> called Mr. Berenson to try and explain the bill pay system insofar
> as collected interest between the time the payment is sent and the
> time the check is presented.  Was not happy with the fact that he
> was not collecting interest.  I offered to reimburse him for the lost
> interest and he declined.

T10.¶ 18.

**"Everyday Finances"**

56. No earlier than 2002, Fidelity sent a promotional package entitled "Everyday Finances" to Mr. Berenson's company, Berenson & Co. International.  T14.2 (referring to January 2002 data in past tense).

57. Mr. Berenson testified that he could not recall having read "Everyday Finances."  T5.143.

58. The section of Everyday Finances concerning BillPay advises prospective customers to "[s]ee the BillPay Service Agreement for complete details."  T14.5 n.1.

**Other Accounts**

59.     The Berensons maintain some checking accounts that do not earn interest at all. T3:85, 89.

60.     Mrs. Berenson does not keep track of whether her checking accounts pay interest because "the amount they pay," one to two percent, "is so small that it is not even worth considering." T3:85-86.

61.     As of December 31, 2004, the rate of return on the Core Account for the Berensons' joint Fidelity account was 1.83%. T10.ExE.

62.     The Berensons have continued to use the Fidelity BillPay service through the present time. T2.85-86; T3.82-85.

**Method of Payment**

63.     The Berensons concede that some payees should be paid by mail and they have never challenged the timeliness of ACH transfer. T2.165; T5.66-67.

64.     The Berensons allege that Fidelity delivered a payment late to their payee Barhite & Holzinger in December 2004. In fact, however, the Berensons had not even initiated the payment until it was already late and the payee ultimately agreed, at Fidelity's request, to waive the late fee. T10.ExH.

                         Respectfully submitted,

                         NATIONAL FINANCIAL SERVICES LLC
                         FIDELITY BROKERAGE SERVICES LLC
                         By their attorneys,

                         /s/ John A. Shope
                         Nicholas C. Theodorou (BBO No. 495730)
                         John A. Shope (BBO No. 562056)
                         William W. Fick (BBO No. 650562)
                         David E. Cole (BBO No. 658705)
                         FOLEY HOAG LLP
                         155 Seaport Boulevard
                         Boston, MA 02210
Dated: May 26, 2005          (617) 832-1000

B3037040.1