IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTTS

| | |
|---|---|
| JOAN BERENSON AND DAVID BERENSON, Individually and on behalf of all others similarly situated, <br><br>     Plaintiff <br><br> v. <br><br> NATIONAL FINANCIAL SERVICES, LLC, et al., <br><br>     Defendants | : <br> : <br> : <br> : <br> : <br> : <br> : 04-11311 WGY <br> : <br> : <br> : <br> : <br> : |

**PLAINTIFFS' MEMORANDUM IN RESPONSE
TO DEFENDANTS' PREVIOUSLY-FILED
"STATEMENT OF UNDISPUTED FACTS
PURSUANT TO LOCAL RULE 56"**

Plaintiffs, Joan Berenson and David Berenson, individually and on behalf of all others similarly situated, by counsel, and as agreed at the April 3, 2005 hearing on Defendants'[1] Motion for Partial Summary Judgment, hereby amend their previous response to Defendants' Motion for Summary Judgment and the "Statement of Undisputed Facts Pursuant to Local Rule 56"[2], as follows:

**I.   Introduction**

This Court noted on April 3, 2005 that Defendants' previously filed Motion for Summary Judgment was no longer pending, and that Defendants could renew their motion by May 12,

---

[1]   Defendants, National Financial Services, LLC ("NFS") and Fidelity Brokerage Services, LLC ("FBS") are hereinafter collectively referred to as "Fidelity".

[2]   Hereinafter referred to as "Fidelity's Statement." Fidelity filed its Motion for Summary Judgment while this case was pending in the United States District Court for the District of Columbia. Thus, the reference to "Local Rule 56"—actually, Local Rule 56.1—was to the local rules of that court, which is essentially the same as Local Rule 56.1 of this Court.

2005, then the scheduled deadline for dispositive motions that the Court has since extended to May 26, 2005. The Court also granted leave to Plaintiffs to amend their previous submission with regard to the Defendants' initial statement of facts not in genuine dispute and to otherwise respond to Defendants' renewed Motion for Summary Judgment as permitted under the Federal Rules and the Local Rules of this Court.

As Defendants have indicated that they intend to renew their Motion for Summary Judgment, Plaintiffs will respond to that renewed motion in due course.

## II.    Response to Statement

Plaintiffs respond to the statement of facts as they were numbered by Defendants:

**6**.    Defendants purport to summarize the content of the Comfidex Corp. internet website as it pertains to Mr. Berenson. While Plaintiffs believe that these "facts" are not material to this dispute, and will, if necessary, address this in response to Defendants' renewed Motion, the entire content of the website is as follows:

> David Berenson is a co-founder of Comfidex. He was the former CEO of TRV Imaging, co-founded with his partner, the former CEO of Prime Computer and Legent (acquired by Computer Associates). TRV was a technology reseller of document imaging and workflow solutions for Eastman Software. Mr. Berenson was one of the original founders of R2K, LLC a service integrator and technology consulting firm, and was previously an advisor and equity holder in Sigma Imaging Systems until its successful sale to Wang Laboratories. He is a former National Partner of Ernst & Young and has held Partner-in-Charge and Director positions in New York City, the New York Region, and the Washington National Services office, where he also worked closely with numerous technology companies including the Unisys merger of Sperry and Burroughs, Intel, Sun Micro Systems, Hewlett Packard, Texas Instruments, EDS, AOL, Advanced Micro Devices, Vishay Intertech, Novell and IBM Global.
>
> Mr. Berenson's academic background includes an Economics degree from Wharton and a Master of Laws from NYU and he is a member of The Economic Club of New York and a member of the

> Bar and CPA in various jurisdictions including New York, DC, Virginia, North Carolina, Louisiana and Florida. He has written extensively on the technical and legal implications of the Electronic Signatures in National and Global Communications Act. He has been a Congressional Advisor, Adjunct Professor Lecturer at the NYU Graduate School of Business and a United States National Reporter for the Cahiers du Droit Fiscal International where he is currently focused on E-Commerce for international business. He has presented testimony before the House, Senate, Treasury and Joint Congressional Committees with regard to legislation and has frequently been interviewed by all major business publications including The Wall Street Journal, The New York Times, Fortune, Barrons, The Washington Post and other media such as CNN, Tom Brokaw's [N]BC Evening News, Good Morning America, the Charlie Rose Show, Jim Barry Financial and has been profiled by Forbes and the Dreyfus Round Table. He was Chairman of the Board of Wolf Trap, a U.S. National Park and performing arts center. His fellow Board members included the major technology executives of the Northern Virginia area.

A copy of the Website is attached as **Exhibit 1**.

7. Plaintiffs Joan Berenson and David Berenson did not jointly open a brokerage account with Fidelity <u>in 1991</u> (as Defendants' contend in the Affidavit of Daniel Stickney, ¶ 8 & Exhibit A (August 26, 1991 Application and Customer Agreement) that accompanied the Fidelity Statement). Rather, the Berensons jointly opened a brokerage account at Fidelity <u>sometime in the early 1980s</u>. Docket No. 40, Tab 9 (Deposition of Joan Berenson (January 21, 2005) at pp. 64:20-65:10 and 82:15-83:6); Docket No. 40, Tab 11 (Deposition of David Berenson (January 26, 2005) at pp. 52:8-18 and 56:4-58:13). Fidelity does not have the records that evidence the opening of the accounts and the only records they have produced in discovery are certain of the year-end tax statements for the accounts going back to 1983.

11. The Berensons have **not** been joint subscribers to Fidelity's bill payment service since 1993 (as Defendants contend in the Affidavit of Daniel Stickney, ¶ 10 & Exhibit B (June 14, 1993 Bill Payment Application)). Rather, the Berensons jointly subscribed to Fidelity's bill

payment service in the 1980s. That bill payment service was essentially a check-writing service, where the Berensons paid Fidelity a certain fee and Fidelity wrote checks for the Berensons to the payees they designated. The checks that Fidelity wrote were paid directly from the Berensons' "core" accounts and no monies were transferred to Fidelity or its agents/vendors for purposes of the check-writing, before the checks were forwarded to the designated payees and the designated payees presented the checks for payment against the Berensons' accounts. Docket No. 40, Tab 9 (Deposition of Joan Berenson (January 21, 2005) at pp. 64:20-65:10 and 82:15-83:6); Docket No. 40, Tab 11 (Deposition of David Berenson (January 26, 2005) at pp. 52:8-18 and 56:4-58:13).

14.   a.   **Fidelity's bill payment service has not always worked on a "good funds" business model**. Prior to the establishment of Fidelity's relationship with CheckFree Services Corporation ("CheckFree") in 1999, Fidelity did not operate its bill payment service on a "good funds" business model, but operated it on another business model—a standard check-writing business model—consistent with the Berensons' understanding that they would continue to accrue interest on their core account monies until their designated payees presented payment of any checks against the core account or actually received an electronic transfer. Attached as **Exhibit 2** is a copy of Fidelity's admission that it used a business model other than the so-called "good funds" business model.[3] Attached as **Exhibit 3** is a copy of Fidelity's admission that by changing from the other business model to the so-called "good funds' business model, that Fidelity's customers would lose the "float" on the monies in the bill payment service, but that Fidelity was going to make the change anyway because it believed that not enough of the bill

---

[3]   Exhibit 2 was produced by Fidelity but was marked "Confidential." Accordingly, it will be filed under seal.

payments customers had complained about the lost float to warrant not changing the alleged business models—or even, providing any notice thereof.[4]

    b.  The Service Agreement referenced in paragraph 14 relates only to the current Service Agreement, namely, the Service Agreement that applies to Fidelity's bill payment service as operated by CheckFree, after changing to the so-called "good funds" business model from the standard check-writing model.

    c.  Fidelity's assertion that it if it did not utilize the so-called "good funds" business model, that "[o]therwise, Fidelity would assume the risk that a customer might withdraw funds in between requesting a payment and the payment reaching the payee" is misleading. It is undisputed that Fidelity permits its customers, including the Plaintiffs, to write checks on their core accounts. Thus, the alleged "risk' that a customer might withdraw funds in between requesting a payment and the payment reaching the payee is no different that the "risk" that Fidelity otherwise assumes by permitting checks to be written on the money market mutual funds or cash accounts that are the core accounts. Fidelity's customers are, of course, obligated by the same or substantially similar contractual terms and are subject to the same criminal charges and civil penalties in the event they write "bad" checks.

    d.  The risk that a Fidelity customer might withdraw funds in between requesting a payment and the payment reaching the designated payee is considerably lower than the risk that a customer at a commercial bank or credit union might withdraw funds in between requesting a payment and the payment reaching the designated payee because Fidelity's desired bill payment customer, as indicated by the customers being targeted or solicited by Fidelity for

---

[4] Exhibit 3 was produced by Fidelity but was marked "Confidential." Accordingly, it will be filed under seal.

its bill payment service, are either young professionals with a net worth of $600,000 or more, or retirees with a net worth of about $2,000,000. Attached, collectively, as **Exhibit 4** is a copy of Fidelity's internal memoranda regarding the desired bill payment customers.[5]

    e.    That even under the so-called "good funds" model, there is **no** guarantee that CheckFree has sufficient funds in its corporate account. Attached as **Exhibit 5** is a copy of the relevant portions of the deposition transcript of David B. Humphrey, Fidelity's expert witness.[6] Exhibit 5 at 92-93. In other words, "good funds" does not mean the "good funds" of CheckFree.

    f.    The putative Service Agreement (attached as Exhibit B to the Affidavit of Anne Warren Fagan) does not provide the following:

    (i)    That Fidelity was not, and would not be, paying interest on the monies designated for payment until the designated payee actually presented the check for payment or actually received the monies via electronic transfer;

    (ii)    That Fidelity would transfer a BillPay subscriber's monies to CheckFree;

    (iii)    About CheckFree, including the financial stability of the company, in order to allow the subscriber an opportunity to make a reasoned determination about the company, the BillPay Service and whether to use the BillPay Service;

    (iv)    That CheckFree earns interest on Plaintiffs' BillPay monies and/or those of any of the other BillPay subscribers or potential subscribers, the rate at which CheckFree earns interest on the monies, and/or the amount earned;

---

[5]   Exhibit 4 was produced by Fidelity but was marked "Confidential." Accordingly, it will be filed under seal.

(v)    That CheckFree does not segregate or hold in trust the monies it receives from Fidelity as part of the BillPay Service and that CheckFree commingles the monies it received from Fidelity as part of the BillPay Service with other monies. Attached as **Exhibit 6** is a copy of the representation from CheckFree's counsel that CheckFree does not segregate Fidelity's monies from other monies it receives from its clients. Exhibit 6 at pp. 5-6;

(vi)   That Fidelity could have used laser drafts to make the payments from the BillPay subscriber's accounts, rather than permit corporate checks to be drawn on CheckFree's corporate account (thought to be at BankOne). Attached as **Exhibit 7** is a copy of the relevant portions of the deposition transcript of Camille Zaslau. Exhibit 7 at pp. 57:8-58:9;

(vii)  That even under the so-called "good funds" model, there is no guarantee that CheckFree has sufficient funds in its corporate account to cover the check to be forwarded to the designated payee. Exhibit 5 at pp. 92-93;

(viii) That Plaintiffs and/or the BillPay subscribers would lose the ownership and/or lose use of their monies between the transaction date and the time of actual payment to the designated payee; and,

(ix)   That Fidelity and/or its agent, CheckFree would likely earn a higher rate of interest on the Plaintiffs' and/or BillPay subscriber's monies than it paid to the Plaintiffs and/or BillPay subscribers.

---

[6]  A copy of Dr. Humphrey's deposition transcript will be filed under seal, because Plaintiffs have not received any indication as to whether Defendants are designating any portions of the transcript as "Confidential" and the time for the designation has not run.

18.    A bill payment service customer may telephone Fidelity to provide the necessary information, as is set forth in paragraph 16 of the Fidelity's Statement and the accompanying Affidavit of Camille Zaslau at ¶ 6. Internet access is not necessary.

21.    a.    CheckFree determines the manner in which a designated payee may be paid. There are three ways: (i) by an electronic transfer via the automated clearinghouse system; (ii) a check drawn on CheckFree's own corporate checking account; or (iii) by a laser draft, that is a check written by CheckFree on the bill payment service subscriber's account. Exhibit 7 at pp. 57:8-65.

b.    It usually takes CheckFree three days to electronically transfer monies to the subscriber's designated payee via automated clearinghouse transfer. *Id*. at pp. 86:10-87:1.

c.    It usually takes four to five days for a check drawn on CheckFree's corporate account to reach the designated payee. *Id*. at 87:2-88:5. It is undisputed that CheckFree earns interest on the monies in its corporate account.

d.    Laser drafts operate like standard checks are the bill payment service subscriber earns the interest thereon until the laser draft is presented for payment against the subscriber's account. Exhibit 5 at pp. 148-150.

26.    Fidelity's relationship with BillPay customers is **not** governed by the "global" customer Agreement, the BillPay Service Agreement, and the Fidelity prospectus for the customer's "core account." Fidelity's contention is not a matter of "fact," and should be stricken from Fidelity's Statement.

27.    Plaintiffs did not receive a copy of the Service Agreement when they enrolled in Fidelity's bill payment service. Docket 56 (Plaintiffs' Opposition to Defendants' Second Motion to Compel) at Exhibit 1, Supplemental Response to Request 2.

**28**.   Fidelity's agreements and prospectuses specifically do not provide as set forth in paragraph 28.  For example, the agreements and prospectuses do not provide that (i) that the bill payment service customers agree that they would not earn any interest or other benefit on their monies after Fidelity takes the monies, puts them into their own account, and transfers them to CheckFree; (ii) that anyone other than the customer may earn interest on the monies or otherwise benefit from them, including Fidelity and CheckFree; (iii) that the monies are being transferred to CheckFree; (iv) that Fidelity was changing from the standard check-writing model to the "good funds" model; (v) that Fidelity was not, and would not be, paying interest on the monies designated for payment until the designated payee actually presented the check for payment or actually received the monies via electronic transfer, as it had been under the previous standard check-writing model; (vi) Fidelity was even using CheckFree, or any information about the financial stability of the company, in order to allow the subscriber an opportunity to make a reasoned determination about the company, the BillPay Service and whether to use the BillPay Service; (vii) that CheckFree earned interest on Plaintiffs' BillPay monies and/or those of any of the other BillPay subscribers or potential subscribers, the rate at which CheckFree earned interest on the monies, and/or the amount earned; (viii) that CheckFree does not segregate or hold in trust the monies it receives from Fidelity as part of the BillPay Service and that CheckFree commingles the monies it received from Fidelity as part of the BillPay Service with other monies; (ix) that Fidelity could have used laser drafts to make the payments from the BillPay subscriber's accounts, rather than permit corporate checks to be drawn on CheckFree Services Corporation's corporate account; (x) that Plaintiffs and/or the BillPay subscribers would lose the ownership and/or lose use of their monies between the transaction date and the time of actual payment to the designated payee; and, (xi) that Fidelity and/or its agent, CheckFree Services

Corporation, would likely earn a higher rate of interest on the Plaintiffs' and/or BillPay subscriber's monies than it paid to the Plaintiffs and/or BillPay subscribers. Docket 34 (Redacted Appendix to Defendants' Opposition to Motion for Certification, Volume II, at Tab 13 (Affidavit of Anne Warren Fagan), Exhibits A-C.

**29-41 & 44-62**. Plaintiffs simply receive too many mailings from Fidelity and otherwise, on a monthly basis and over the last twenty or so years of their relationship with Fidelity, to recall having received each and every of the supposed mailings from Fidelity. Fidelity must prove that it mailed the referenced agreements, notices and buckslips, etc. Moreover, the referenced documents "speak for themselves." Docket No. 56 (Plaintiffs' Opposition to Defendants' Second Motion to Compel) at Exhibit 1, Supplemental Responses to Requests for Admission 12-25.

### III.   Advertising

For a considerable period of time (at least since 1999), Fidelity has been advertising that its bill payment service would allow its customers to pay bill "directly from your account." Attached, collectively, as **Exhibit 8** is a copy of the advertising that Fidelity has produced in discovery so for.[7]

However, Fidelity's own expert witness, Dr. Humphrey, testified in deposition that the applicable Service Agreement, which does not identify CheckFree, does not give Fidelity's customers the impression that monies are coming directly out of their account and to the payee:

> Q   Assuming that it does not identify CheckFree in the terms and
> conditions –

---

[7]   Exhibit 8 was produced by Fidelity but was marked "Confidential." Accordingly, it will be filed under seal.

A  As in the terms of the name CheckFree or service provider?  If it says service provider, I already know that the service provider is CheckFree.

Q  How do you know that?

A  How do I know that?  That's the whole point here, isn't it?

Q  How would anyone else know that?

A  **I have no idea how anyone else would know that.**  I don't even think it's any of their concern.  It's just a bill payment provider.

Q  Well, if CheckFree is not identified in the terms and conditions, how would anyone know that CheckFree is paying it and it's coming out of their account and not the BillPay user's account?

A  Well, in fact, it says that it will be debited from the customer's account at the time of payment.  So that means it's not going to be in their account, doesn't it?

**Q  Doesn't that give the assumption [impression] that the monies are coming straight from your account and going to the payee?**

**A  No.**

MR.THEODOROU:  Objection.

Q  It doesn't?

A  Why would it?  It just says the monies will be coming out of your account at this date.

Exhibit 7 at pp. 142:3-143:8 (emphasis supplied).


Dated:  May 26, 2005                          Respectfully submitted,


                                              //ss//  Douglas A. Rubel
                                              Douglas A. Rubel  [*Pro Hac Vice*]
                                              Johanson Berenson LLP

201 Shannon Oaks Circle, Suite 200
Cary, North Carolina 27511
(919) 654-4544

Attorneys for Plaintiffs