Camille Zaslau

|   |   |
|---|---|
| | VOLUME I |
| | PAGES 1 - 134 |

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

JOAN BERENSON AND DAVID

BERENSON, INDIVIDUALLY AND ON

BEHALF OF ALL OTHERS SIMILARLY

SITUATED,

    Plaintiffs          Civil Action

  v.                           No. 04 CV 11311

NATIONAL FINANCIAL SERVICES,      (WGY)

LLC, FIDELITY BROKERAGE

SERVICES, LLC, AND DOES 1-50,

INCLUSIVE,

    Defendants

-------------------------------x

      DEPOSITION OF CAMILLE ZASLAU

      Wednesday, January 19, 2005

           10:05 a.m.

        Perkins, Smith & Cohen

         One Beacon Street

       Boston, Massachusetts

REPORTER: Virginia L. Barry, RPR/CSR

Camille Zaslau

| | | 2 |
|---|---|---|
| 1 | APPEARANCES: | |
| 2 | JOHANSON BERENSON, LLP | |
| 3 | By Douglas A. Rubel, Esquire | |
| 4 | 201 Shannon Oaks Circle, Suite 200 | |
| 5 | Cary, North Carolina 27511 | |
| 6 | (919) 654-4544 | |
| 7 | dar@JohansonBerenson.com | |
| 8 | and | |
| 9 | JOHANSON BERENSON, LLP | |
| 10 | By Kenneth L. McWilliams, Esquire | |
| 11 | 1146 Walker Road, Suite C | |
| 12 | Great Falls, Virginia 22066 | |
| 13 | (708) 759-1055 | |
| 14 | On behalf of the Plaintiffs. | |
| 15 | | |
| 16 | FOLEY HOAG, LLP | |
| 17 | By John A. Shope, Esquire | |
| 18 | 155 Seaport Boulevard | |
| 19 | Boston, Massachusetts 02210 | |
| 20 | (617) 832-1000 | |
| 21 | jshope@foleyhoag.com | |
| 22 | On behalf of the Defendants. | |
| 23 | ALSO PRESENT: Colleen Hankins | |
| 24 | | |

JONES REPORTING COMPANY
617-451-8900

Camille Zaslau

3

1                    I N D E X
2  WITNESS:        DIRECT   CROSS   REDIRECT   RECROSS
3  Camille Zaslau
4  (By Mr. Rubel)     4              120,130
5  (By Mr. Shope)            116                126,132
6  (By Mr. McWilliams)                128
7
8
9
10
11              E X H I B I T S
12 NO.                              FOR IDENTIFICATION
13 4   Affidavit of Camille Zaslau          107
14
15
16
17
18
19
20
21
22
23
24 **Original exhibits retained by Attorney Rubel

JONES REPORTING COMPANY
617-451-8900

# Camille Zaslau

<pre>                                                    4
1            PROCEEDINGS
2        CAMILLE ZASLAU, having been
3  satisfactorily identified and duly sworn by the
4  Notary Public was examined and testified in answer
5  to direct interrogatories by MR. RUBEL:
6        Q.   State your name for the record.
7        A.   Camille Zaslau.
8        Q.   And by whom are you employed?
9        A.   National Financial Services, LLC.
10       Q.   Is that what it says on your check?
11       A.   Yes.
12       Q.   The reason I ask is we had some questions
13  yesterday about I don't think two people knew who
14  they were paid by.  It's easy to say Fidelity;
15  right?  Have you ever been deposed before?
16       A.   No.
17       Q.   What I'll do is ask you a question, you'll
18  answer the question to the best of your abilities.
19  If you don't understand what I'm asking you, please
20  let me know, otherwise, I'm going to assume that you
21  understood the question.  Your lawyer may want to
22  interpose an objection, I'm sure he's told you that,
23  so, you know, wait a second, give him a chance to
24  breathe and speak, if he needs to, speak, that is.
</pre>

JONES REPORTING COMPANY
617-451-8900

Camille Zaslau

57

1   for further information from CheckFree?
2       A.   I have to wait for further information
3   from CheckFree.
4       Q.   So Fidelity runs its batch process, and
5   you said it's at that time that it determines how
6   it's going to pay the payee?
7       A.   CheckFree?
8       Q.   I'm sorry, CheckFree. Did I say Fidelity?
9   I'm sorry. CheckFree runs its batch process at
10  1 a.m., and it's at that time that CheckFree
11  determines how it's going to pay the payee?
12      A.   Correct.
13      Q.   What set of criteria do they use to --
14  first of all, what are the -- strike that.
15           What possible ways does CheckFree
16  tender payment to the payee?
17      A.   I am aware of two methods of payment.
18  There's an electronic method, and there's a paper
19  check method -- actually, three payment methods,
20  there's electronic payment, there's a paper check,
21  and there's a draft.
22      Q.   What's the difference between a paper
23  check and a draft?
24      A.   In the CheckFree work flow a paper check

Camille Zaslau

58

1 is a check issued from a CheckFree corporate
2 account; a draft would be a draft initiated off a
3 customer account.
4      Q.    A draft would be initiated off a customer
5 account, the customer being Joe Sample?
6      A.    Correct.
7      Q.    Does CheckFree utilize all three of those
8 methods with regard to Fidelity?
9      A.    No.
10     Q.    Why not?
11     A.    Fidelity is on a Good Funds Model.
12     Q.    What does that mean?  I don't want to
13 interrupt you, go ahead.
14     A.    Fidelity reviews customer accounts,
15 ensures that the money is available, takes the money
16 from the customer's account, and then releases that
17 file to CheckFree.
18     Q.    Right.  What makes it a Good Fund -- what
19 makes the Good Funds Model a Good Funds Model; what
20 does that mean?
21     A.    From an industry standard, the Good Funds
22 Model is the corporate client, being Fidelity,
23 withdrawing those funds from the customer's account
24 to ensure that that payment will not bounce, and

JONES REPORTING COMPANY
617-451-8900

Camille Zaslau

59

1   that the money is in the customer's account when the
2   payment is initiated, or that the funds were
3   available in the customer's account when we release
4   the payment; so it's good funds, meaning the funds
5   are good.
6       Q.  Well, but the draft wouldn't go through
7   from CheckFree on the customer's account if there
8   weren't sufficient, sufficient funds in the account
9   anyway; right?
10              MR. SHOPE:  Can I have that question
11  reread?
12              (Record read as requested.)
13              MR. SHOPE:  Objection to the form of
14  the question.
15              MR. RUBEL:  What's wrong with the form
16  of the question?
17              MR. SHOPE:  I think that you're --
18  there's an implicit assumption that the draft
19  relates to the Good Funds Model.
20              MR. RUBEL:  No, there's no assumption
21  that the draft relates to the Good Funds Model. I'm
22  asking a question about whether a draft would be
23  paid if there wasn't sufficient funds in the
24  account.

Camille Zaslau

60

1   A.   No, a draft would not be paid.

2   Q.   Okay. And what -- okay. So there's no
3   risk to Fidelity in utilizing the draft procedure,
4   because the funds wouldn't come out of the account;
5   right? Fidelity wouldn't be paying any money if
6   there wasn't sufficient funds in the account; right?

7   A.   There is not a financial risk to Fidelity,
8   but there could be a customer risk to Fidelity.

9   Q.   What does that mean?

10  A.   On the Good Funds Model we've ensured that
11  that payment is not going to bounce, so the
12  customer -- when the payee receives that payment,
13  that check is good. On a draft version there is no
14  guarantee that when that payment is presented that
15  there is available funds in the account, so that
16  check could bounce, could go back to the payee for
17  nonpayment, and thereby the customer --

18  Q.   That's on a check?

19  A.   That's a draft from a customer's account.

20  Q.   You're saying that CheckFree would -- who
21  issues the draft?

22  A.   CheckFree issues a draft from the
23  customer's DD -- with the customer's Fidelity ABA
24  and DDA account number.

Camille Zaslau

61

```
 1     Q.   And you're saying that there's a risk to
 2   Fidelity that they would issue the draft if there
 3   weren't sufficient funds in the account?
 4     A.   I am indicating that there could be a
 5   customer risk to Fidelity, because the customer
 6   expected a payment to be made to their payee, and
 7   that payment was not made because the funds were not
 8   available in the account.
 9     Q.   Under what circumstances wouldn't the
10   funds be available in the account?
11     A.   If the check is presented for payment and
12   there is insufficient funds in the account.
13     Q.   But then a draft wouldn't be issued; would
14   it?
15     A.   CheckFree doesn't know when they issue the
16   draft whether the funds are available in the
17   account.
18     Q.   Yes, they have, because you've run a
19   sweep.  You've checked the account to make sure that
20   there's sufficient funds in the account when you
21   sent over the file; didn't you?
22         MR. SHOPE:  Objection.
23     Q.   Isn't that what you said?
24     A.   The draft method is not used in a Good
```

Camille Zaslau

62

```
 1  Funds Model.
 2      Q.   I understand that, but when you send the
 3  file over to CheckFree, you've already checked to
 4  ensure that there's sufficient funds in the account;
 5  right?
 6      A.   Correct.
 7      Q.   Okay.  So what's the customer risk?
 8      A.   The, the process when you're utilizing a
 9  draft, which is not part, and I guess that's why I'm
10  a little confused, the draft is not part of a Good
11  Funds Model.
12      Q.   I understand.
13      A.   So at the point where Fidelity has
14  confirmed that there are funds in the account,
15  Fidelity secures those funds, so we take those funds
16  out of the customer's account.  If you would present
17  a draft, then, when that draft came in for payment
18  with the customer's information, there are no -- if
19  the customer doesn't have the funds in their
20  account, that draft would bounce.
21      Q.   Well, why wouldn't there be the funds in
22  the customer's account?
23      A.   Because the funds were withdrawn.
24      Q.   Right.  But if you hadn't withdrawn the
```

JONES REPORTING COMPANY
617-451-8900

Camille Zaslau

63

1   funds, I'm saying if you hadn't withdrawn the funds,
2   and CheckFree utilized this draft, what's the risk
3   to the customer?  Oh, I see, you're saying that
4   there's a risk to the customer because Fidelity has
5   withdrawn the funds, so that if they utilized a
6   draft, the funds wouldn't be in the account from
7   which the draft is drawn?
8           MR. SHOPE:  Note my objection.
9       A.  I was referring --
10          MR. RUBEL:  Let her answer.
11          MR. SHOPE:  I'm entitled to interpose
12  objections.
13          MR. RUBEL:  You're not entitled to
14  interpose objections every time I ask a question
15  that you want your client to be careful answering,
16  though, okay, so stop tipping off your client, it's
17  a really cheap thing, and it's way beneath a guy, a
18  lawyer of your credibility and esteem to be doing,
19  so cut it out.
20          MR. SHOPE:  I didn't give a speech.  I
21  said, "note my objection," and that's all.
22          MR. RUBEL:  You do it all the time.
23  Enough is enough, just cut it out, John.
24      A.  When I was referring to customer risk, I

JONES REPORTING COMPANY
617-451-8900

Camille Zaslau

64

1   was referring to a reputational risk with the
2   customer that a customer, if the check is presented,
3   and it's, it bounces from a customer's account, that
4   there is an embarrassment to that customer with
5   their payee that their check wasn't honored, their
6   draft wasn't honored.  So when I was referencing a
7   customer risk, that's what I was referring to, that
8   if a check is presented for payment and bounces
9   because there's insufficient funds, and it goes back
10  to the payee, that there is, from a customer service
11  perspective, there is a little bit of a customer
12  risk there that they would have embarrassment with
13  their payee that their check wasn't honored.
14       Q.   So you're protecting the customer from
15  themselves?
16       A.   We are providing --
17       Q.   Is that what you mean?
18       A.   It's a customer service that we provide.
19       Q.   You're protecting the customer from
20  themselves in the event that they initiate a
21  transaction, and then somehow withdraw monies from
22  that account before the transaction goes through; is
23  that what you're saying?
24            MR. SHOPE:  Note my objection.

JONES REPORTING COMPANY
617-451-8900

FILE No.542 05/26 '05 16:48  ID:DouglasHRubel    FAX:9196544545    PAGE  13/ 15
Case 1:04-cv-11311-WGY    Document 65-4    Filed 05/26/2005    Page 13 of 15

Camille Zaslau

65

1    A.    Can you repeat that?
2    Q.    Why wouldn't there be sufficient funds in
3  the account, other than the fact that Fidelity --
4  accepting this process by which Fidelity takes the
5  money out of the account and puts it into one of
6  their own accounts, right, if they didn't do that,
7  and you've already ascertained that there is
8  sufficient funds in the account before you sent the
9  file over to CheckFree, why wouldn't there be
10 sufficient funds in the account from which this
11 draft then would be proffered?
12   A.    If the customer has a transaction within
13 their account from the time that we've confirmed
14 there's payment, there's sufficient funds in the
15 account to the time that that check is presented for
16 payment, if there is any movement of activity in
17 that account, there is a potential risk that the
18 funds will not be available.
19   Q.    What do you mean by "movement"; you mean
20 the value of the account, or are you talking about
21 the customer initiating other transactions?
22   A.    The customer initiating another
23 transaction.
24   Q.    Okay. Okay. So for purposes of Fidelity,

Camille Zaslau

86

1  are transferred?
2      A.   I know when that is presented to the
3  clearinghouse.
4      Q.   And then you don't --
5      A.   From that part, ACH is typically a next
6  day settlement, so it's passed to that vendor's bank
7  account typically next day.
8      Q.   Next day would be the 22nd?
9      A.   Correct.
10     Q.   So in the best of all worlds, it should
11 take two business days if everything can be done
12 electronically?
13     A.   We average three business days for an
14 electronic transfer.
15     Q.   Why three?
16     A.   The 20th we initiate the file to
17 CheckFree, the 21st CheckFree initiates the file to
18 the clearinghouse, and that file then on the, the
19 20th, 21st, the 20th, the 21st; the 22nd it's
20 initiated to the clearinghouse, and the payee
21 typically will have access to those funds on the
22 23rd.
23     Q.   Okay.  Assuming that all of those days are
24 business days?

Camille Zaslau

87

1    A.    Correct.
2    Q.    What if CheckFree has to issue a check to
3  HSBC?
4    A.    If a check is issued on the second day,
5  which would be the 21st, CheckFree will issue that
6  check and put it in the mail.
7    Q.    Do they actually generate a paper check on
8  the 21st?
9    A.    Yes.
10   Q.    And somebody sticks it in an envelope,
11 puts a stamp on it, puts it in the United States
12 mail?
13   A.    Whatever CheckFree's mail process is once
14 their checks are issued.
15   Q.    What's your understanding as to their mail
16 process?
17   A.    They have a bulk mail process where they
18 will issue checks and put it in the mail.
19   Q.    First Class mail or bulk mailings; you
20 don't know?
21   A.    I don't know.
22   Q.    Now, if they issue a check to HSBC, do you
23 have any information similar to what you just said
24 with regard to the electronic transfers as taking on