IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOAN BERENSON and DAVID BERENSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FINANCIAL SERVICES LLC, FIDELITY BROKERAGE SERVICES LLC, and DOES 1-50, inclusive,<br><br>Defendants. | Civil Action No. 04 CV 11311 (WGY) |

**DEFENDANTS' [PROPOSED] REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION TO COMPEL AND FOR SANCTIONS**

## I.      INTRODUCTION

On May 18, 2005, defendants National Financial Services LLC and Fidelity Brokerage

Services LLC (together, "Fidelity") filed a motion to compel and for sanctions for failure to

provide discovery.  In response plaintiffs Joan and David Berenson ("the Berensons") do not

even attempt to justify their failure to provide appropriate discovery responses, including signed

answers to interrogatories, by their original deadlines or by the deadline to which they agreed at

the parties' pre-motion discovery conference.  The supplemental responses attached to the

Berensons' brief, moreover, themselves do not comply with the Berensons' discovery

obligations.  Most striking, the Berensons continue to refuse to produce documents on grounds

that are contradicted by their new supplemental interrogatory answers on such key issues as what

(if any) contracts control the parties' relationship and the nature of the Berensons' supposed

damages.

II.      ARGUMENT

A.      *Fidelity's Motion to Compel Complied with Local Rule 37.1.*

The Berensons first assert that Fidelity's motion is "procedurally deficient" because it

purportedly did not comply with Local Rule 37.1(B)(4) and (5).  That rule requires that the

movant set forth the each disputed discovery request and response and the movant's position as

to each disputed item.  *See* LR 37.1(B)(4), (5).  Accordingly, Fidelity specified the requests in

dispute, attached all of the requests and responses as exhibits, and referenced them within the

supporting memorandum in which Fidelity stated the reasons why the Berensons' responses to

discovery were inadequate.  Instead, the Berensons would have had Fidelity include the entire

text of the twenty-six disputed discovery requests and responses within its supporting

memorandum, leaving no room for argument in a brief that may not exceed twenty pages under

Local Rule 7.1(B)(4).  The Rules simply do not require such an exercise.

B.      *The Berensons' Purported Supplemental Responses to Fidelity's Discovery
         Requests are Deficient.*

The Berensons' supplemental responses to Fidelity's discovery requests suffer from the

same deficiencies as the Berensons' original responses or contradict their own sworn deposition

testimony.

1.      The Berensons' supplemental responses to Fidelity's requests for
         admission have not been signed.

Fed. R. Civ. P. 36(a) expressly requires a party's responses to requests for admission to

be signed by the party or the party's counsel.  *See id.*  No such signature appears on the

Berensons' Supplemental Responses to Defendants' Requests for Admission.  *See* Pls.' Suppl.

Resps. to Defs.' Reqs. for Admis., at 11 (Court's Docket No. 56, Ex. 1).  The Court should

require the Berensons to provide signed responses forthwith.

2.      The Berensons have repeated, not supplemented, their responses to
        Fidelity's requests for admission nos. 12 to 15, inclusive.

Fidelity's requests for admission nos. 12 to 25, inclusive, seek an admission or denial by

the Berensons as to whether they received certain buckslips, letters, guides, agreements, and

prospectuses from Fidelity in the years 1996, 1998, 2000, and 2003.  These all contained critical

disclosures defeating liability or, at a minimum, commencing the running of the statute of

limitations.  The Berensons did not deny receiving most of these items in their recently filed

response to Fidelity's Statement of Undisputed Facts.  *See* Pls.' Resp., at 10 (Court's Docket No.

65); LR 56.1 (D. Mass).  Indeed, David Berenson admitted receiving these items during his

deposition.  *See* David Berenson Dep. Tr., at 122-23 (Court's Docket No. 40, Tab 11)

("Everything you say that was sent to us, I will say we would have received except that last one

that's dated December 31, [2004] New Year's Eve.").

Despite this, in their original responses to requests 12 to 25, inclusive, the Berensons

stated, in bad faith, that they lack sufficient information to admit or deny receipt.  In their recent

"supplement" of these responses they merely repeat the exact language: "Plaintiff's [sic] lack

information sufficient to admit or deny [the request] and therefore, deny it."  They should be

ordered to admit or deny receipt without qualification.

3.      The interest rates for the Berensons' checking accounts are relevant to the
        Berensons' claim of damages.

A central question in this case is whether the Berensons suffered any damage as a result

of their asserted belief that Fidelity would pay their bills with checks drawn on their own

account, rather than on a separate account Fidelity maintains for this purpose (as disclosed in the

Fidelity BillPay service agreements).  In their supplemental answers to interrogatories, which

were served for the first time as attachments to the plaintiffs' brief opposing the present motion,

the Berensons state:

As a result of the advertising and the failure of the Fidelity representatives to be truthful about the BillPay service, Plaintiffs kept their monies in the Fidelity BillPay Service and did not either (i) contact their designated payee and made [*sic*] arrangements for them to directly debit Plaintiffs' accounts to pay the subject bills or (ii) *move their monies to another electronic bill payment service.*

Plaintiffs suffered actual damages in the amount of lost interest they would have earned, the amount of which cannot presently be calculated, and loss of ownership of the monies.

Pls.' Suppl. Answer No. 13, at 11–12 (Court's Docket No. 56, Ex. 3) (emphasis added); *see id.*, Suppl. Answer No. 12, at 6; *id.*, Suppl. Answer No. 20, at 15.[1]  This is consistent with Joan Berenson's deposition testimony (which Fidelity did not misrepresent) that now that the Berensons understand how Fidelity's BillPay service works, the Berensons will switch to using direct debits initiated by their payees and, for those who cannot be paid by direct debit, they "would go back to writing checks." *See* Joan Berenson Dep. Tr., at 81–86 (Court's Docket No. 40, Tab 9).  Notwithstanding this testimony, it is undisputed that, to this day, the Berensons continue to use Fidelity's BillPay service. *See id.*, at 86.

Due to the Berensons' assertion of the theory of damages for the lost opportunity to earn "float" through the use of other accounts, Fidelity sought discovery of the rates of interest the Berensons were earning on other accounts they might have used to pay bills (some of the Berensons' other accounts undisputedly earn no interest at all, see Joan Berenson Dep. Tr., at 85 (Court's Docket No. 40, Tab 10)).  The Berensons, however, now resist such discovery arguing in their brief that their only damages are the losses from the lost opportunity to request direct debits and that, therefore, the "Plaintiffs' actual damages are the loss of ownership of its [*sic*] monies and the interest they would have made on those monies <u>at Fidelity</u> had Fidelity [made

---

[1] The Berensons' supplemental answer to interrogatory no. 14 did not address the questions of reliance or actual damages at all.  *See* Pls.' Suppl. Answer No. 14, at 13–14 (Court's Docket No. 56, Ex. 3)

proper disclosures]." *See* Pls.' Response, at 7 (Court's Docket No. 56).  The Berensons cannot

pursue damages on a theory that they espouse in their interrogatory answers, but reject in their

brief to avoid providing discovery.

More fundamentally, the Berensons state in their interrogatory answers that the amount

of lost interest "cannot presently be calculated."  Pls.' Suppl. Answer No. 13, at 11–12 (Court's

Docket No. 56, Ex. 3); *see id.*, Suppl. Answer No. 12, at 6; *id.*, Suppl. Answer No. 20, at 15.  If

the Berensons' damages cannot be calculated now, after discovery has closed, why will they be

calculable at trial in September?  Their supplemental interrogatory answers are admissions that

the Berensons suffered no actual damages in an ascertainable amount.  The Court should issue an

order barring the Berensons from asserting any actual damages due to their failure without

excuse to provide any calculation.  It should further bar the Berensons from asserting any injury

based on a theory that they could have earned greater interest on other account.

4.    The Berensons' forms 1099-INT and income tax returns are relevant to the
Berensons' claim of damages.

Again based on the Berensons' assertion of a lost opportunity to earn interest on other

accounts, Fidelity sought information regarding the extent to which the Berensons actually

earned interest in the relevant period from their other accounts as indicated as an entry item on

the Berensons' forms 1099-INT (in which the interest paying institution reports the amounts

paid) for their various accounts (bank accounts, brokerage accounts, and so forth) and their tax

returns.  The Berensons, however, produced merely a handful of forms 1099-INT from Fidelity

(2001 and 2004), Wachovia Securities (2003), Prudential Financial (2002), and TD Waterhouse

(2001).  Indeed, their production is limited to forms 1099-INT from brokerage companies, is

otherwise incomplete even as to just those companies, and raises spoliation concerns regarding

forms 1099-INT sent to the Berensons by Fidelity since the Berensons filed the complaint in

2003. In the event that the Berensons have not maintained certain forms 1099-INT, then the

existence of the Berensons' various interest-bearing accounts and the interest earned on these

accounts can be verified by referencing the Berensons' tax forms.

It is true that forms 1099-INT show only the gross amounts of interest earned on an

account and do not specifically state the rate at which interest was earned. However, the forms

would at least disclose whether the account paid interest at all—something Mrs. Berenson could

not specifically recall because the interest rates on these accounts, if any, were only 1 to 2% and

were "so small" that, in her opinion, they were "not even worth considering." *See* Joan Berenson

Dep. Tr., at 85–90 (Court's Docket No. 40, Tab 10).

The Berensons produced a hodgepodge of account statements for a variety of accounts.

Indeed, they produced an incomplete assortment of nineteen accounts that they have at ten

different banks and other financial institutions in various states. This includes records for

accounts that do not even appear in the Affidavit of David Berenson purporting to list all of the

Berensons' accounts. *See* Ex. A to David Berenson Aff. (Court's Docket No. 20, Attach. 1). A

complete collection of forms 1099-INT and corresponding income tax returns would at a

minimum help determine whether the production is complete.

Finally, as to the income tax returns themselves, it is ironic that the Berensons should

oppose production of the returns (which would provide evidence of where the Berensons have

actually lived during the period in question—they have addresses in at least three jurisdictions[2])

on the basis that "Massachusetts law does apply to the Fidelity agreements." The Berensons

---

[2] The Berensons deposition testimony was inconsistent regarding where they reside and when they started residing there. Mr. Berenson stated that he has been, or is, a resident of New York, the District of Columbia, Virginia, and Florida, but only started living in Florida in December of 2003. *See* David Berenson Dep. Tr., at 17–19 (Court's Docket No. 40, Tab 11). Mrs. Berenson, however, stated that they started spending a majority of their time in Florida several years ago. *See* Joan Berenson Dep. Tr., at 33–34 (Court's Docket No. 40, Tab 9).

currently maintain that they *never received* Fidelity's agreements, Compl. ¶ 30; Suppl. Pls.'

Suppl. Resp. No. 2, at 4 (Court's Docket No. 56, Ex. 1), and they are *not* bound by them. Mr.

Berenson testified that the only agreement binding on him was from the 1980s, see David

Berenson Dep. Tr., at 138–39 (Court's Docket No. 40, Tab 12), which neither he nor Fidelity has

found and the content of which is unknown.

More recently, in their supplemental responses to Fidelity's request for admission, and in

contradiction of their admissions in their response to Fidelity's motion for summary judgment in

2003, the Berensons deny receipt of any of the agreements. *Compare* Pls.' Suppl. Resp. No. 2, at

4 (Court's Docket No. 56, Ex. 1) (denying receipt), *with* Pls.' Opp'n to Defs.' Mot. Dismiss and

Summ. J., at 14 (Court's Docket No. 1, pt. 20) (acknowledging receipt of Fidelity's agreements,

notices, and buckslips). Moreover, the Berensons contend that Fidelity procured their agreement

to use the BillPay service through fraud, questioning the validity of the BillPay service contract

as a whole and, necessarily with that, any concomitant contractual choice of law.

Fidelity will withdraw its request for income tax returns if the Berensons concede (1)

contrary to the denials in the supplemental responses submitted with their brief, they received all

customer agreements, prospectuses, and BillPay service agreements that Fidelity alleges that it

sent to them; and (2) all such agreements were valid and binding upon the Berensons and were

not procured by fraud or misrepresentation.

Absent such a concession, the laws of New York, Florida, the District of Columbia, or

Virginia may apply, and that law may be more favorable to the defense of the Berensons' suit

than the law of Massachusetts (which has remedies under c. 93A not available in other states).

Further, absent a binding contractual choice of law, the Berensons may not assert application of

Massachusetts law simply because Fidelity is located here.

Moreover, contrary to the Berensons' latest contention, the Court has not decided the

choice of law in this action so to be considered the "law of the case."  At the October 13, 2004

hearing, the Berensons withdrew their claims under the District of Columbia statutory consumer

protection law after stating that it was plead in the alternative to Mass. Gen. Laws ch. 93A.  *See*

Hearing Tr., at 14 (Oct. 13, 2004).  The Court commented that the agreements chose

Massachusetts law, but, as noted, that was at a time when the Berensons were admitting receipt

of the contractual documents.  *See id.*  Their position has now apparently changed.  The choice of

law issues, moreover, were not decided on their merits and were barely presented at all.  *See* 18B

Charles Alan Wright et al., *Federal Practice and Procedure* § 4478, at 649, 664–67, 656–57 &

n.27 (2d ed. 2002).  Indeed, there was no real argument on the subject and the Court did not

conduct any choice of law analysis.  *See* Hearing Tr., at 14 (Oct. 13, 2004).

### III.    CONCLUSION

For the foregoing reasons, Fidelity's motion to compel and for sanctions should be

granted and the Court should order the requested relief.

Respectfully submitted,

NATIONAL FINANCIAL SERVICES LLC and
FIDELITY BROKERAGE SERVICES LLC

By their attorneys,

/s/ John A. Shope
Nicholas C. Theodorou (BBO No. 495730)
John A. Shope (BBO No. 562056)
William W. Fick (BBO No. 650562)
David E. Cole (BBO No. 658705)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated:  May 31, 2005