IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOAN BERENSON AND DAVID BERENSON, Individually and on behalf of all others similarly situated, | : : : | |
| Plaintiff | : : | |
| v. | : : | 04-11311 WGY |
| NATIONAL FINANCIAL SERVICES, LLC, et al., | : : | |
| Defendants | : : | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**

Plaintiffs, Joan Berenson and David Berenson, individually and on behalf of all others

similarly situated, by counsel, submit the following as their Response to the Statement of

Undisputed Facts Pursuant to Local Rule 56.1 of Defendants National Financial Services LLC

("NFS") and Fidelity Brokerage Services LLC ("FBS")[1]:

**The Defendants**

1&2.   NFS and FBS are not chartered by the Commonwealth of Massachusetts as a

savings bank, cooperative bank, credit union or trust company; they are not supervised by the

Massachusetts Commissioner of Banks; and they are not chartered under federal law as a

national savings bank, savings association or credit union.  However, they do provide banking

services in the form of an electronic bill payment service they now call the Fidelity BillPay

---

[1]   The Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 is
hereinafter referred to as "Defendants' Statement."  The paragraph numbers herein correspond
directly to those of Defendants' Statement.

Service.  The relevant portions of the intra-industry journal discussing various bill payment

services is attached as Exhibit 1.  Exhibit  1 at p. 3.

**The Plaintiffs**

3.      Plaintiff David Berenson has had an extensive business career.  In addition to the

basic information set forth in the paragraph 3 of the Defendants' Statement, Mr. Berenson's

business career can be summarized as set forth on the Comfidex Corp. internet website, a copy of

which was previously filed as Exhibit 1 to "Plaintiffs' Memorandum in Responsive to

Defendants' Previously-Filed Statement of Undisputed Facts Pursuant to Local Rule 56":

> David Berenson is a co-founder of Comfidex. He was the former CEO of TRV
> Imaging, co-founded with his partner, the former CEO of Prime Computer and
> Legent (acquired by Computer Associates). TRV was a technology reseller of
> document imaging and workflow solutions for Eastman Software. Mr. Berenson
> was one of the original founders of R2K, LLC a service integrator and technology
> consulting firm, and was previously an advisor and equity holder in Sigma
> Imaging Systems until its successful sale to Wang Laboratories. He is a former
> National Partner of Ernst & Young and has held Partner-in-Charge and Director
> positions in New York City, the New York Region, and the Washington National
> Services office, where he also worked closely with numerous technology
> companies including the Unisys merger of Sperry and Burroughs, Intel, Sun
> Micro Systems, Hewlett Packard, Texas Instruments, EDS, AOL, Advanced
> Micro Devices, Vishay Intertech, Novell and IBM Global.
>
> Mr. Berenson's academic background includes an Economics degree from
> Wharton and a Master of Laws from NYU and he is a member of The Economic
> Club of New York and a member of the Bar and CPA in various jurisdictions
> including New York, DC, Virginia, North Carolina, Louisiana and Florida. He has
> written extensively on the technical and legal implications of the Electronic
> Signatures in National and Global Communications Act. He has been a
> Congressional Advisor, Adjunct Professor Lecturer at the NYU Graduate School
> of Business and a United States National Reporter for the Cahiers du Droit Fiscal
> International where he is currently focused on E-Commerce for international
> business. He has presented testimony before the House, Senate, Treasury and
> Joint Congressional Committees with regard to legislation and has frequently
> been interviewed by all major business publications including The Wall Street
> Journal, The New York Times, Fortune, Barrons, The Washington Post and other
> media such as CNN, Tom Brokaw's [N]BC Evening News, Good Morning
> America, the Charlie Rose Show, Jim Barry Financial and has been profiled by
> Forbes and the Dreyfus Round Table. He was Chairman of the Board of Wolf

Trap, a U.S. National Park and performing arts center. His fellow Board members included the major technology executives of the Northern Virginia area.

4.       Mrs. Berenson is a sophisticated businessperson is her own right, having owned and operated several businesses.  T2.[2]

5-6.       Plaintiffs Joan Berenson and David Berenson opened a brokerage account at Fidelity in the early 1980s.  T3 at 64:20-65:10 and 82:15-83:6; T4 at 52:8-18 and 56:4-58:13. Fidelity does not have the documents that evidence the opening of these accounts and the only documents they produced in discovery are certain year-end tax statements for accounts dating to 1983.

7.       a.       It is undisputed that from the early 1980s to the present, the applicable Fidelity Brokerage Account, from which the Berensons directed Fidelity's electronic bill payment service to write checks, has been a certain joint account that the Berensons used for personal, family or household purposes (the Berensons' "Joint Account").  As indicated on the Berensons' account statements—styled, "Investment Reports" by Fidelity—the Berensons typically paid their utilities or certain mortgages.  As more fully set forth below, the Berensons began using the BillPay service in mid-August 2000 to perform certain intra-Fidelity transfers, namely from their Joint Account to Mr. Berenson's corporate account, styled, Berenson & Company International.

b.       Defendants contend that "[w]hen the Berensons' money market mutual funds were debited to pay bills as they directed, mutual fund shares in their Core Account were redeemed to the extent necessary to satisfy the debt."  While in and of itself this general description is perhaps true, it is nonetheless, in a vacuum, misleading.  When, over the course of

---

[2]       "T" indicates the Tab numbers accompanying Defendants' Statement.  Any Exhibits that accompanying this Statement are simply referred to as "Exhibits" as noted above.

twenty years, the mutual fund shares were debited and/or redeemed, under what circumstances, and what notice of that debiting/redemption is of critical moment to this case. For example, set forth below, the Berensons' Joint Account, from which the Berensons have paid their bills since the 1980s, has been part of at least three forms of electronic bill payment services and two processing models utilized by Fidelity. As is more fully set forth below, it now appears, based upon Fidelity's own documentation, that the bill payment service did operate as a standard check-writing service until June 2000, when Fidelity began utilizing CheckFree Services Corporation ("CheckFree") as a bill payment processing vendor and began using a "good funds" model.

**Fidelity's Bill Payment Service**

8.     a.     The Fidelity bill payment service established in the 1980s is <u>not</u> one through which the brokerage customer could request Fidelity to make payments to merchants and other payees by "debiting the customer's core account." The supporting Affidavit of Camille Zaslau only provides that the customer could "request payment to third party creditors and other entities." T10¶3. No one at Fidelity has testified as to how the bill payment service of the 1980s or 1990s operated. Rather, as noted below, that bill payment service was a check-writing service for certain mutual funds which had check-writing privileges and the prospectuses for those funds expressly proved that they continued to earn interest/dividends until the presentment of the checks written against the funds. Indeed, at that time, there was not even a "core account," by name, attached to the funds or the check-writing privileges.

     b.     The Berensons have jointly subscribed to an electronic bill payment service operated by Fidelity since the mid-1980s. That bill payment service was essentially a check-writing service, wherein the Berensons paid Fidelity a certain fee and Fidelity wrote

checks for the Berensons to the payees they designated.  The checks that Fidelity wrote were paid "directly" from the Berensons' mutual fund accounts, including the Joint Account, and no monies were transferred to Fidelity or its agents/vendors for purposes of the check-writing before the checks were tendered to the Berensons' designated payees and those designated payees presented the checks for payment against the Berensons' accounts.  T3 at 64:20-65:10 and 82:15-83:6); T4 at 52:8-18 and 56:4-58:13.

9.    Because the Berensons are designated as "Premium" customers, i.e., they maintain over $500,000 in assets, they are able to arrange bill payment services by telephone.

10.    a.    Commencing June 16, 2000, Fidelity began using CheckFree as its electronic bill payment service provider.  Fidelity has <u>never</u> disclosed the use of CheckFree to its BillPay customers.  Indeed, as Fidelity testified at deposition, Fidelity's agreements do <u>not</u> disclose that a BillPay customer's monies are transferred to CheckFree and placed in a CheckFree corporate account:

> Q  Where does it disclose in your agreements that the money is going to be paid to CheckFree and that CheckFree is going to be holding the money?
>
> Mr. Shope:  Note my Objection.

A  I don't believe that it does.

T1 at 123:15-19.

b.    However, initially, commencing in the 1980s, Fidelity operated its own bill payment service, as is set forth in paragraph 8 above.

c.    Immediately before utilizing CheckFree as its bill payment service provider, Fidelity contracted with Integrion Corporation ("Integrion") to provide electronic bill payment services.  Under its arrangement with Integrion, Fidelity simply placed an "authorization hold" on the monies that were the subject matter of an electronic bill payment and

those monies continued to accrue interest (or dividends) in whatever fund they were in until the

designated payee actually presented the checks for payment against the fund.  Attached as

Exhibit 2 is a copy of the Deposition Testimony of Camille Zaslau.   Exhibit 2 at 97:12-103:18.

       d.     Fidelity switched from Integrion to CheckFree because Integrion stopped

operating as an electronic bill payment provider, *Id.* at 105:10-17.  Integrion went out of business

apparently because it was not profitable.

       e.     CheckFree offered various payment processing models to Fidelity for the

operation of its BillPay Service.  These models included (i) the Risk model; (ii) the Risk with

Guaranteed Funds model; and (iii) the so-called "Good Funds" model.

       f.     The Risk model is the standard check-writing scenario, wherein the

BillPay subscriber earns interest on his monies until the time his designated payee receives the

funds being paid to it.  Under the CheckFree version of the Risk model, CheckFree will either

pay the designated payee electronically through the Automated Clearinghouse ("ACH") and then

simultaneously reimburse itself by transferring monies from the BillPay subscriber to CheckFree

or will issue a "laser draft," i.e., a check written by CheckFree directly upon the BillPay

subscriber's Core Account.

       g.     The Risk with Guaranteed Funds model is similar to the Risk model,

however, the BillPay sponsor (Fidelity) guarantees payment up to a specified amount.   The Risk

with Guaranteed Funds model is also in keeping with the standard check-writing scenario,

wherein the BillPay subscriber continues to earn interest on the designated BillPay monies until

the time those monies are actually received by the subscriber's designated payee.   In the Risk

with Guaranteed Funds model CheckFree will either pay the designated payee via an ACH

transfer and then transfer monies from the BillPay subscriber to itself or will issue a "laser draft."

*Id.* This is apparently the model Fidelity used when it operated the bill payment service. Attached as Exhibit 3 is a copy of the CheckFree "White Paper" describing its "Payment Processing Models."[3] Attached as Exhibit 4 is a copy of Fidelity's internal memoranda describing its bill payment service.

       h.     Only under the Good Funds model are the BillPay subscriber's monies taken away from him and placed into a special account owned and benefiting Fidelity, and then transferred to CheckFree's own operating account. Thus, the monies having been removed from the BillPay subscriber's account before any intended payee has received its payment, Fidelity and CheckFree receive the benefit of those monies, a benefit which the BillPay subscriber does not receive. Only after receipt of the monies into its own possession, does CheckFree either issue an ACH transfer or write a check on a CheckFree corporate checking account and mail the check to the designated payee. In the event it is a check that it written, CheckFree then continues to earn the benefit of the BillPay subscriber's monies until the intended payee actually receives the funds. The good funds model is thus anything but a standard check-writing model, but instead allows the BillPay Service sponsor (Fidelity) and/or, its (undisclosed) agent CheckFree to take possession of the BillPay subscriber's monies, earn float on those monies, and deny the BillPay subscriber the benefit of those monies he or she is otherwise expecting and entitled to.

       i.     Thus, at all times prior to the establishment of Fidelity's relationship with CheckFree in June 2000, the Fidelity bill payment service subscriber—in this case, the Berensons—continued to earn the benefit or "float" on their monies until the time of payment—consistent with a standard check-writing processing model—and consistent with the

---

[3]    Exhibit 3 was designated as "Confidential" and therefore is being filed under seal. Exhibit 4 was also designated as "Confidential," however, Defendants' prior motion to file this document under seal was denied.

Berensons' understanding that they would continue to accrue interest on their core account monies until their designated payees presented payment of any checks against the core account or actually received an electronic transfer.

        j.     In January 2000, Fidelity conducted a "Bill Payment Service Provider Analysis." Attached as Exhibit 5 is a copy of the January 13, 2000, "Bill Payment Service Provider Analysis." In the analysis, Fidelity describes its own relationship with Integrion as follows:

> This description is provided as a benchmark for evaluating options. The current system offers functionality which customers are satisfied with, including Single and Recurring payment, Bill Payment section of the statement, expense codes, and the "Date to Send" model of scheduling payments **(a simpler model where customers do not lose float).** Also, the system is a "good funds" model, where available balance is verified and **held** as the payment is sent to the Merchant. Some operational inefficiency causes the current system to be somewhat expensive.

Exhibit 5 (emphasis supplied). This is consistent with Ms. Zaslau's deposition testimony that an authorization hold was placed upon the subject monies.

        k.     Moreover, as Fidelity's analysis further concedes, a change from Integrion to CheckFree would have "negative float ramifications" to the BillPay customer, that is, the BillPay customer would lose float because Fidelity and its undisclosed agent, CheckFree, would thereafter earn that float. *Id*. at p. 10.

     14.     a.     Thus, contrary to Fidelity's contentions, Fidelity does earn float on monies the BillPay monies. First, any float earned by CheckFree is necessarily float earned by Fidelity for purposes of BillPay. Simply put, Fidelity does not disclose its use of CheckFree as part of the BillPay Service. Instead, in the BillPay Service Agreement, Fidelity defines "we," or "us" or "our"—terms it then uses throughout the Agreement—to mean "Fidelity Brokerage Services, Inc. and any affiliate, subsidiary, agent, independent contractor, designee or assignee." T7 at

Exhibit B.  This apparently includes CheckFree.  Thus, when Fidelity contends that the BillPay

Service Agreement discloses that designated BillPay monies will be placed into an account "we"

maintain for purposes of BillPay–and, therefore, Fidelity contends, "we" will earn the float, not

you—"we" means CheckFree.  This is absurd.  What consumer, BillPay or otherwise, believes

for a moment that when he or she deposits or invests monies with a financial institution that

those monies are being transferred to the checking account of an unidentified corporation and

that that corporation will earn the interest on the monies?

      b.     Second, Fidelity acknowledged before this lawsuit began that Fidelity

earns float on the BillPay monies.  In the summer of 2001, Fidelity conducted a risk model

versus good funds model analysis.  By an e-mail message, dated August 15, 2001, authored by

Tami Rash, Fidelity acknowledged the following:

> Based upon our analysis and from a Treasury point-of-view being sensitive to
> various risk issues, the customer's overall experience and payment finality, it is
> Treasury's recommendation that we continue to support a "Good Funds" business
> model on a go forward basis.  **While we understand the customer's sensitivity
> to the "lost float" issue inherent in the "Good funds" model, we have not
> experienced many Value Network comments or complaints relative to this
> issue that would warrant changing Fidelity's current "Good Funds" business
> model or compromising our ability to offer a complete customer service
> model.**
>
>        * * * * * * *
>
> With regards to the "Risk Based model, we can discuss in further detail
> tomorrow, but it is not our preference given the "Challenges" (as mentioned on
> the attached).  If this model were to be offered with allowing the customer to enter
> his debit account(s) information (thus offering the ability to debit non-Fidelity
> accounts), Fidelity assume(s) possible reputational risk such [sic] any fraudulent
> activity occur since CheckFree does not verify this information.  If this model
> were to be offered with the Customer's Brokerage/(Amicus) Bank account(s) pre-
> populated as his only debit accounts, **then the only improvement with this
> model to the customer is that he retains more "float" than without current
> "Good Funds" model** but receives a reduced customer service model from
> Fidelity which we are concerned could prove to be a larger dis-satisfier to our
> customers. (emphasis supplied).

Attached as Exhibit 6 is a copy of the Rash August 15, 2001 e-mail.[4]

      c.    The attachment to Rash's August 15, 2001 e-mail was a chart that outlined the plusses and minuses ("challenges," per the Rash e-mail) of utilizing each of the three payment process models offered by CheckFree together with a Fidelity "front-end" computer interface or the CheckFree 3.2 interface.  As Fidelity conceded in the "Challenges" section of the "Fidelity Front-End" section for the "Good Funds" model:

- **Fidelity**, Amicus and CheckFree **earn payment float** until payments are cleared.  (**Fidelity**/Amicus **earn 1 day float** while CheckFree earns 1+ days depending on payment method used.)

Exhibit 6 (emphasis supplied).  As Fidelity conceded in the "Challenges" section of the "CheckFree 3.2" section for the "Good Funds" model:

- **Fidelity**, Amicus and CheckFree **earn payment float** until payments are cleared.  (**Fidelity**/Amicus **earn 1 day float** while CheckFree earns 1+ days depending on payment method used.)

- CheckFree processing cycle adds one additional day to payment process. (How does this effect CheckFree's Payment guarantee to Fidelity Customers?)

*Id*. (emphasis supplied).

      d.    Fidelity asserts that there is no risk that payments under the "Good Funds" model will "bounce" due to insufficient funds on the customer's account and that the process is "analogous to a payment by a cashier's check."  This absurd notion is allegedly supported by the expert testimony of David Humphrey, who testified that the good funds model is analogous to the cashier's check because it is short-hand for "good and final funds":  "meaning that the money in the account is good.  It's the same thing that you get with, in fact, like a cashier's check if you

---

[4]    Exhibit 6 was also designated as "Confidential," but was also the subject matter of an unsuccessful motion to file under seal.

went to the bank.  You have to have funds in your account so they can debit it before they give

you the cashier's check."  T6 at 95.

        e.        However, a cashier's check is backed by the funds of the financial

institution that issues the check, and the Federal Reserve Bank.  Here, as Professor Humphrey

readily conceded, that there is no guarantee, not even a promise, that CheckFree has sufficient

monies to cover the corporate check it issues on its corporate account.  (Indeed, as noted below

in paragraph 65, CheckFree is a corporate entity with no history of profitability.)  To that end,

Professor Humphrey testified:

        Q  How do we know that the **CheckFree** account has good funds?

        A  **We don't.**

        Q  We don't?

        A  No.

T 6.93:18-22 (emphasis supplied).  In other words, "good funds" does not mean the "good

funds" of CheckFree.  It certainly does not equate to a "cashier's check" and if BillPay

customers were going to be paying Fidelity to issue "cashier's checks," then why did not Fidelity

fully and faithfully disclose this fact?  If there was a benefit to the customer of the so-called good

funds model, why did not Fidelity fully and faithfully disclose this fact?

        f.        Moreover, CheckFree concedes that it does not segregate the monies that

it receives from its customers, such as Fidelity, in its corporate account, and that, in fact,

CheckFree commingles those monies with other monies (its own?).  Attached as Exhibit 7 is a

copy of the representations of CheckFree's counsel.  This does not equate to a "cashier's check"

and certainly is not what the Berensons or any other reasonable BillPay customer had in mind

when they used the BillPay service.  It bears noting that Fidelity apparently does not provide

1099s to CheckFree for the interest CheckFree earns on the BillPay customer's funds because CheckFree has represented in this litigation that it does not segregate Fidelity's monies for CheckFree's other customer's monies and, therefore, as unbelievable as it may seem, asserts it is unable to provide any information as to the amount of float CheckFree earned on Fidelity BillPay customer's monies.

15.    a.    Fidelity asserts that, under the "Risk" model, BillPay customers are "exposed" to the possibility of "bounced" checks and related charges, reversed electronic payments and collection actions by CheckFree, among other disadvantages.  (Previously, in paragraph 14 of the Fidelity's first Statement of Undisputed Facts, Fidelity contended that if Fidelity did not utilize the so-called "good funds" business model, that "[o]therwise, <u>Fidelity</u> would assume the risk that a customer might withdraw funds in between requesting a payment and the payment reaching the payee.")  It is undisputed that Fidelity permits its customers, including the Plaintiffs, to write checks ("free and unlimited") on their Core Accounts and that BillPay is advertised as a replacement for the inconvenience of having to write checks (see below).  Thus, the alleged "risk' that a customer might withdraw funds in between requesting a payment and the payment reaching the payee is no different that the "risk" otherwise assumed in the first place by permitting checks to be written on the subject funds.  Fidelity's customers are, of course, obligated by the same criminal charges and civil penalties in the event they write "bad" checks.

b.    If the "Good Funds " model were truly designed to benefit the customer by essentially protecting the customer from himself or herself, then why did not Fidelity inform the customer of this?  There are no advertising circulars, notices, or other documents, setting forth this alleged benefit to the customer.

17.     Fidelity's description of the debiting of a BillPay customer's account is incomplete and incorrect.  The BillPay customer's Core Account is debited at 10:00 p.m. on the first day (Day 1), based upon the closing prices at 4:00 p.m. on that same day (*i.e.*, the net asset value per share ("NAV")), and placed into a Fidelity General Ledger account, via a nightly bookkeeping file.  T8 at Exhibit A.  Thus, any dividends that continue to accrue after that point in time do so to the benefit of Fidelity.  Fidelity and their counsel cannot simply pick and choose what language from numerous documents, purported notices and buckslips they want to apply and ignore their actual practices.  Simply put, Fidelity transfers monies from the Plaintiffs' Core Account at 10:00 p.m. and Fidelity (not the customer) thereafter continues to earn whatever interest/dividends are being earned in the fund of the subject shares.  That, among other things, is the float Fidelity earns on monies they have taken from BillPay subscribers.

18.     Again, the BillPay customer's Core Account is debited at 10:00 p.m. on the first day (Day 1) based upon the net asset value calculated at 4:00 p.m. on that same day.  The monies are taken from the BillPay customer's Core Account and placed into a Fidelity general ledger account.  T8 at Exhibit A.

20.     a.     Again, contrary to Fidelity's contentions, Fidelity does earn "float" on monies that are part of the BillPay Service.  As set forth above in paragraph 14a, any float earned by CheckFree is, as is defined under the BillPay Service Agreement, float earned by Fidelity.

b.     Moreover, as set forth above in paragraph 14b (in the Rash August 15, 2001 e-mail), Fidelity acknowledged before this lawsuit began that it earns float on the BillPay monies:

> Based upon our analysis and from a Treasury point-of-view being sensitive to various risk issues, the customer's overall experience and payment finality, it is Treasury's recommendation that we continue to support a "Good Funds" business model on a go forward basis.  **While we understand the customer's sensitivity**

**to the "lost float" issue inherent in the "Good funds" model, we have not experienced many Value Network comments or complaints relative to this issue that would warrant changing Fidelity's current "Good Funds" business model** or compromising our ability to offer a complete customer service model.

* * * * * * *

With regards to the "Risk Based model, we can discuss in further detail tomorrow, but it is not our preference given the "Challenges" (as mentioned on the attached). If this model were to be offered with allowing the customer to enter his debit account(s) information (thus offering the ability to debit non-Fidelity accounts), Fidelity assume(s) possible reputational risk such any fraudulent activity occur since CheckFree does not verify this information. If this model were to be offered with the Customer's Brokerage/(Amicus) Bank account(s) pre-populated as his only debit accounts, **then the only improvement with this model to the customer is that he retains more "float" than without current "Good Funds" model** but receives a reduced customer service model from Fidelity which we are concerned could prove to be a larger dis-satisfier to our customers.

* * * * * * *

- **Fidelity**, Amicus and CheckFree **earn payment float** until payments are cleared. (**Fidelity**/Amicus **earn 1 day float** while CheckFree earns 1+ days depending on payment method used.)

* * * * * * *

- **Fidelity**, Amicus and CheckFree **earn payment float** until payments are cleared. (**Fidelity**/Amicus **earn 1 day float** while CheckFree earns 1+ days depending on payment method used.)

- CheckFree processing cycle adds one additional day to payment process. (How does this effect CheckFree's Payment guarantee to Fidelity Customers?)

Exhibit 6 (emphasis supplied).

21.   a.   CheckFree was <u>not</u> disclosed to the Plaintiffs or any other BillPay customer. That Fidelity now claims they "delegated" this function to CheckFree is of no moment to Plaintiffs. As far as they or any other BillPay customer know, Fidelity determines the manner in which a designated payee may be paid. As it turns out, there are three ways: (i) by an electronic transfer via the automated clearinghouse system; (ii) a check drawn on CheckFree's

own corporate checking account; or (iii) by a laser draft, that is a check written by CheckFree on the bill payment service subscriber's account.  Exhibit 2 at 57-65.

      b.    It usually takes three (3) days for an electronic transfer of monies to the subscriber's designated payee via automated clearinghouse transfer.  *Id*. at 86:10-87:1.

      c.    It usually takes four (4) to five (5) days for a check drawn on CheckFree's corporate account (SunTrust) to reach the designated payee.  *Id*. at 87:2-88:5.  It is undisputed that CheckFree earns interest on the monies in its corporate account.

**Fidelity's Disclosures**

22.    Fidelity's relationship with BillPay customers is **not** governed by the Customer Agreement, the BillPay Service Agreement, and the Fidelity prospectus for the customer's "core account."  Fidelity's contention is not a matter of "fact," and should be stricken from Fidelity's Statement.

23.    Plaintiffs did not receive a copy of Fidelity's bill payment agreement when they first enrolled in Fidelity's bill payment service, and Fidelity cannot produce a copy of such an agreement.  Docket Entry 56 (Plaintiffs' Opposition to Defendants' Second Motion to Compel) at Exhibit 1, Supplemental Response to Request 2.

24.    Simply put, Plaintiffs received far too much mail, from Fidelity and otherwise, to recall what documents they received and what documents they did not receive in the mail. Plaintiffs do know that they never received the initial bill payment agreement when they opened their account in the 1980s.  T16.

25.    a.    The 1998 BillPay Service Agreement is a form agreement apparently used for all BillPay subscribers and was drafted by Fidelity.

      b.    Despite the overly broad definition of "we," or "us," or "our" in the

preamble to 1998 BillPay Service Agreement, the terms "we" or "us" or "our" cannot mean what Fidelity contends they mean because there is an obvious conflict in terminology.  For example, the preamble to the 1998 BillPay Service Agreement also provides that "Fidelity Trust Company, its successor or agent provides the Service [defined in the first paragraph of the preamble to mean the "Fidelity BillPay Service"].  **Brokerage services, including the Fidelity Ultra Service Account, are provided by Fidelity Brokerage Services, Inc.**"  Thus, the definition of "we" or "us" or "our" is necessarily very specific and depends upon how the terms are used, in what context, and what service is being performed.

        c.      The debiting of the BillPay customer's Fidelity Ultra Service (Core) Account is a brokerage service that can, under the terms of the BillPay Service Agreement and applicable securities laws, only be performed by a licensed broker/dealer, here, Fidelity Brokerage Services, Inc.  Thus, in paragraph 10 of the 1998 BillPay Service Agreement, "we" must, of necessity, refer to Fidelity Brokerage Services, Inc.  To that end, paragraph 10 provides:

> Delivery of Payments.  After **we** debit your **Fidelity Account** for the amount of a payment, **we** will remit your payment to the Payee by mailing the Payee a check drawn on an **account we maintain** for this purpose, by electronic funds transfer, or by other means.  Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of whether the payment is a Same Day payment [sic], a Future Payment, or a Recurring Payment.

T7.ExG (emphasis supplied).

        d.      In other words, as defined in the 1998 BillPay Service Agreement, paragraph 10 actually provides as follows:

> After **Fidelity Brokerage Services, Inc.** debit[s] your Fidelity Account for the amount of a payment, **Fidelity Brokerage Services, Inc.** will remit your payment to the Payee by mailing the Payee a check drawn on an **account Fidelity Brokerage Services, Inc. maintain[s]** for this purpose, by electronic funds transfer, or by other means.  Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of

whether the payment is a Same Day payment [sic], a Future Payment, or a
Recurring Payment.  (emphasis supplied).

29.    a.    The 1998 version of the Fidelity Daily Income Trust prospectus was <u>not</u>
provided in response to discovery requests.  It should be stricken.

b.    The 1998 version of the Fidelity Daily Income Trust prospectus provides
that "Fidelity is committed to providing investors with <u>practical information</u> to make investment
decisions."  T7.ExH at p. 14.

c.    The 1998 version of the Fidelity Income Trust prospectus provides that
"[t]he price to sell one share of each fund is the fund's NAV.  Your shares will be sold at the
next NAV calculated after your order is received in proper form.  The fund's NAV is normally
calculated each business day at 4:00 p.m. Eastern time."  *Id*. at p. 18.

e.    The 1998 version of the Fidelity Income Trust prospectus provides that
"[t]he fund distributes substantially all of its net investment income and capital gains, if any, to
shareholders each year.  Income dividends are declared daily and paid monthly.  *Id*.

f.    Again, the BillPay customer's Core Account is debited at 10:00 p.m. on
the first day (Day 1) based upon the net asset value as calculated at 4:00 p.m. on that same day.
The monies are taken from the BillPay customer's Core Account and placed into a Fidelity
general ledger account.  T8 at Exhibit A.  Fidelity thus earned any interest on those monies until
the time it remitted the monies to the designated payee.

32.    a.    The putative June 2000 Fidelity BillPay Service Agreement is
substantially similar to the November 1998 BillPay Service Agreement.  It is a form agreement
apparently used for all BillPay subscribers and was drafted by Fidelity.  T7 at Exhibit L.

b.    While the "preamble" to the June 2000 BillPay Service Agreement does
purport to define "we," "us" or "our" as "Fidelity Brokerage Services, Inc. and any affiliate,

subsidiary, agent, independent contractor, designee or assignee" that Fidelity involves in the

service, it is entirely misleading and disingenuous to include CheckFree and a CheckFree

corporate account under that definition. *Id*. Again, to repeat, even Fidelity does not believe that

it does. T1 at 123:15-19.

           c.      Despite the overly broad definition of "we," or "us," or "our" in the June

2000 BillPay Service Agreement, the terms "we" or "us" or "our" cannot mean what Fidelity

would have them mean. For example, the preamble to the June 2000 BillPay Service Agreement

also provides that "Fidelity Brokerage Services, Inc., its successor or agent provides the Service

[defined in the first paragraph of the preamble to mean the "Fidelity BillPay Service"].

**Brokerage services, including the Fidelity Ultra Service Account, are provided by Fidelity**

**Brokerage Services, Inc.**" T7 at Exhibit L (emphasis supplied). Thus, the definition of "we" or

"us" or "our" is very specific and depends upon how the terms are used, in what context, and

what service is being performed.

           d.      The debiting of the BillPay customer's Fidelity Ultra Service (Core)

Account is a brokerage service that can, under the terms of the BillPay Service Agreement and

applicable securities laws, only be performed by a licensed broker/dealer, here, Fidelity

Brokerage Services, Inc. Thus, in paragraph 11 of the June 2000 BillPay Service Agreement,

"we" must, of necessity, refer to Fidelity Brokerage Services, Inc. To that end, paragraph 11

provides:

> Delivery of Payments. After **we** debit your **Fidelity Account** for the amount of a
> payment, **we** will remit your payment to the Payee by mailing the Payee a check
> drawn on an **account we maintain** for this purpose, by electronic funds transfer,
> or by other means. Because of the time it takes to transmit a payment, a Payee
> generally will not receive payment on the Transaction Date regardless of whether
> the payment is a Same Day payment [sic], a Future Payment, or a Recurring
> Payment.

*Id.* (emphasis supplied).

       e.     In other words, as defined in the June 2000 BillPay Service Agreement,

paragraph 11 actually provides as follows:

> After **Fidelity Brokerage Services, Inc.** debit[s] your Fidelity Account for the
> amount of a payment, **Fidelity Brokerage Services, Inc.** will remit your payment
> to the Payee by mailing the Payee a check drawn on an **account Fidelity
> Brokerage Services, Inc. maintain[s]** for this purpose, by electronic funds
> transfer, or by other means.  Because of the time it takes to transmit a payment, a
> Payee generally will not receive payment on the Transaction Date regardless of
> whether the payment is a Same Day payment [sic], a Future Payment, or a
> Recurring Payment.  (emphasis supplied).

       f.     The June 2000 BillPay Service Agreement does <u>not provide</u> any of the

following:

> (i)     That Fidelity was not, and would not be, paying interest on the
> monies designated for payment until the designated payee actually
> presented the check for payment or actually received the monies
> via electronic transfer;

> (ii)     That Fidelity would transfer a BillPay subscriber's monies to
> CheckFree;

> (iii)     About CheckFree, including the financial stability of the company,
> in order to allow the subscriber an opportunity to make a reasoned
> determination about the company, the BillPay Service and whether
> to use the BillPay Service;

> (iv)     That CheckFree earns interest on Plaintiffs' BillPay monies and/or
> those of any of the other BillPay subscribers or potential
> subscribers, the rate at which CheckFree earns interest on the
> monies, and/or the amount earned;

> (v)     That CheckFree does not segregate or hold in trust the monies it
> receives from Fidelity as part of the BillPay Service and that
> CheckFree commingles the monies it received from Fidelity as part
> of the BillPay Service with other monies.   Exhibit 7;

> (vi)     That Fidelity could have used laser drafts to make the payments
> from the BillPay subscriber's accounts, rather than permit
> corporate checks to be drawn on CheckFree's corporate account.
> Exhibit 2 at 57:8-58:9;

(vii)   That even under the so-called "good funds" model, there is no guarantee that CheckFree has sufficient funds in its corporate account to cover the check to be forwarded to the designated payee. T6 at pp. 93:18-22;

(viii)  That Plaintiffs and/or the BillPay subscribers would lose the ownership and/or lose use of their monies between the transaction date and the time of actual payment to the designated payee; and,

(ix)    That Fidelity and/or its agent, CheckFree would likely earn a higher rate of interest on the Plaintiffs' and/or BillPay subscriber's monies than it paid to the Plaintiffs and/or BillPay subscribers.

This is true for all of Fidelity's purported Agreements, notices, buckslips, advertising, etc., as is more fully set forth in paragraph 67 below.

33.    a.    The Fidelity BillPay Service Agreement allegedly in effect at the time of the filing of the complaint (ostensibly the "2003 BillPay Service Agreement") is slightly different from its two predecessors. It, too, is a form agreement apparently used for all BillPay subscribers and was drafted by Fidelity. T7 at Exhibit B.

b.    While the "preamble" to the 2003 BillPay Service Agreement does define "we," "us" or "our" as "Fidelity Brokerage Services, LLC and any affiliate, subsidiary, agent, independent contractor, designee or assignee" that Fidelity involves in the service, it is entirely misleading and disingenuous to include CheckFree and a CheckFree corporate account under that definition. *Id*. Again, to repeat, even Fidelity does not believe that it does. T1 at 123:15-19.

c.    Despite the overly broad definition of "we," or "us," or "our" in the 2003 BillPay Service Agreement, the terms "we" or "us" or "our" cannot mean exactly what Fidelity would have them mean. For example, the preamble to the 2003 BillPay Service Agreement also provides that "Fidelity Brokerage Services, LLC, its successor, assignee or agent provides the Service [defined in the first paragraph of the preamble to mean the "Fidelity BillPay Service"].

**Brokerage services, including the Fidelity Account, are provided by Fidelity Brokerage Services, LLC.**" ¶7 at Exhibit B (emphasis supplied).  Thus, the definition of "we" or "us" or "our" is very specific and depends upon how the terms are used, in what context, and what service is being performed.

          d.      The debiting of the BillPay customer's Fidelity Brokerage (Core) Account is a brokerage service that can, under the terms of the BillPay Service Agreement and applicable securities laws, only be performed by a licensed broker/dealer, here, Fidelity Brokerage Services, LLC.  Thus, in paragraph 11 of the 2003 BillPay Service Agreement, "we" must, of necessity, refer to Fidelity Brokerage Services, LLC.  To that end, paragraph 11 provides:

> Delivery of Payments.  After **we** debit your **Fidelity Account** for the amount of a payment, **we** will remit your payment to the Payee by mailing the Payee a check drawn on an **account we maintain** for this purpose, by electronic funds transfer, or by other means.  Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of whether the payment is a Same Day payment [sic], a Future Payment, or a Recurring Payment.

*Id*. (emphasis supplied).

          e.      In other words, as defined in the 2003 BillPay Service Agreement, paragraph 11 actually provides as follows:

> After **Fidelity Brokerage Services, LLC** debit[s] your Fidelity Account for the amount of a payment, **Fidelity Brokerage Services, LLC** will remit your payment to the Payee by mailing the Payee a check drawn on an **account Fidelity Brokerage Services, LLC maintain[s]** for this purpose, by electronic funds transfer, or by other means.  Because of the time it takes to transmit a payment, a Payee generally will not receive payment on the Transaction Date regardless of whether the payment is a Same Day payment [sic], a Future Payment, or a Recurring Payment.  (emphasis supplied).

          f.      The 2003 BillPay Service Agreement does not provide the following:

> (i)      That Fidelity was not, and would not be, paying interest on the monies designated for payment until the designated payee actually presented the check for payment or actually received the monies

via electronic transfer;

(ii)    That Fidelity would transfer a BillPay subscriber's monies to CheckFree;

(iii)   About CheckFree, including the financial stability of the company, in order to allow the subscriber an opportunity to make a reasoned determination about the company, the BillPay Service and whether to use the BillPay Service;

(iv)   That CheckFree earns interest on Plaintiffs' BillPay monies and/or those of any of the other BillPay subscribers or potential subscribers, the rate at which CheckFree earns interest on the monies, and/or the amount earned;

(v)    That CheckFree does not segregate or hold in trust the monies it receives from Fidelity as part of the BillPay Service and that CheckFree commingles the monies it received from Fidelity as part of the BillPay Service with other monies.   Exhibit 7;

(vi)   That Fidelity could have used laser drafts to make the payments from the BillPay subscriber's accounts, rather than permit corporate checks to be drawn on CheckFree's corporate account. Exhibit 2 at 57:8-58:9;

(vii)  That even under the so-called "good funds" model, there is no guarantee that CheckFree has sufficient funds in its corporate account to cover the check to be forwarded to the designated payee.  T6 at 93:18-22;

(viii) That Plaintiffs and/or the BillPay subscribers would lose the ownership and/or lose use of their monies between the transaction date and the time of actual payment to the designated payee; and,

(ix)   That Fidelity and/or its agent, CheckFree would likely earn a higher rate of interest on the Plaintiffs' and/or BillPay subscriber's monies than it paid to the Plaintiffs and/or BillPay subscribers.

34.    a.    Fidelity does not contend that the Fidelity Brokerage Customer Agreement allegedly in effect at the time the Complaint was filed (the "Customer Agreement") was provided to the Berensons.  It is a form agreement that was drafted by Fidelity.  T7 at Exhibit A.  The Customer Agreement is inconsistent with the alleged BillPay Service Agreements, buckslips,

notices and other agreements that Fidelity contends were in effect at the time the Complaint was filed.  To that end:

b.     The preamble to the Customer Agreement provides that the agreement is "between me and Fidelity Brokerage Services LLC ("FBS") and National Financial Services LLC ("NFS") (collectively, "Fidelity" or "you").  The Customer Agreement does not further define Fidelity to include any agents or independent contractors, such as CheckFree.  *Id*. at p. 1.

c.     The Customer Agreement provides that the subject Fidelity Account is "carried by NFS, an affiliate of FBS;" references "third-party data services;" and provides that "FBS routes most orders to its affiliated broker/dealer, NFS."  *Id*.

d.     Section 4 of the Customer Agreement provides:

that "[a]mounts contributed and received in my Fidelity Account will be invested in an income earning account in one of the following money market funds of my choice …. or any other fund Fidelity Account makes available and is selected by me (the "**transaction fund, core account**"), **subject to prior payment by me and on my behalf of any outstanding** margin loans balances, card overdrafts or **other debit items arising from**, including and without limitation, card usage, checkwriting or **Fidelity BillPay**, or authorized payments of securities account settlements….

**Interest and dividends accrued daily are paid monthly on those free credit balances**….

**Shares of the transaction fund will be redeemed at their net asset value, and I agree that such shares shall be automatically redeemed to satisfy debit balances** in the securities account, card or check usage, electronic funds transfers, overdrafts, and other authorized debit items.

*Id.* at pp. 2-3 (emphasis supplied).

e.     Section 7 of the Customer Agreement provides that FBS, and no one else, is the provider of the BillPay Service.  To that end, Section 8 ("Bill Payment") provides, in pertinent part:

> I hereby understand that FBS is the provider of the Fidelity BillPay service. I understand that and/or agree to: (1) authorize FBS to post bill payment transactions originating from the Fidelity BillPay service to my Fidelity Account;
> …

*Id*. at p. 5.

   f. The Customer Agreement provides that electronic funds transfers, including authorization of bill payments to pre-established merchants or other accounts to be settled through the Fidelity Account will be processed through the Automated Clearing House and are normally completed within three (3) business days. *Id*. at Section 8 ("Electronic Funds Transfer"), p. 5.

   g. No provision of the Customer Agreement can be amended or waived except in writing by an authorized representative of FBS. *Id*. at p. 7. This, of course, is inconsistent with any provision in the BillPay Service Agreement that defines FBS ("we" or "us" or "our") as including an unidentified agent or independent contractor, such as CheckFree.

   h. The Customer Agreement purports to constitute the entire agreement between Fidelity and the customer with respect to its subject matter. *Id*.

**The Berensons' Use of BillPay**

   36. a. The Berensons have jointly subscribed to an electronic bill payment service operated by Fidelity since the mid-1980s. That bill payment service was essentially a check-writing service, wherein the Berensons paid Fidelity a certain fee and Fidelity wrote checks for the Berensons to the payees they designated. The checks that Fidelity wrote were paid directly from the Berensons' accounts and no monies were transferred to Fidelity or its agents/vendors for purposes of the check-writing before the checks were forwarded to the designated payees and the designated payees presented the checks for payment against the Berensons' accounts. T2 at 64:20-65:10 and 82:15-83:6; T4 at 52:8-18 and 56:4-58:13.

b.      The Berensons use of Fidelity's bill payment services was essentially to pay five or so payees that were generally utilities or mortgages.  Those payees were First National Bank of Maryland; Potomac Electric Power Company; District Cablevision; Washington Gas; Barhite & Holzinger; YMCA.

c.      Commencing in August 2000, the Berensons started using BillPay to transfer monies from their Joint Account to Mr. Berenson's Berenson & Company International account at Fidelity.  The first statement which the Berensons received that indicates a transfer from the Joint Account to the Corporate Account is their Joint Account "Investment Report" for August 1, 2000 through August 31, 2000, setting for a transfer in the amount of $6,000.  It is unknown when that statement was prepared, although obviously it was prepared sometime after August 31, 2000, when it was mailed and if and/or when it was received by the Berensons. Attached, collectively, as Exhibit 8 is a copy of the Berenson's July 2000 and August 2000 Investment Reports.  The mailing address for the Joint Account was 1617 35th Street NW, Washington, D.C. 20007-2316.  Exhibit 8.

d.      The Berenson & Company International "Investment Report" for August 1, 2000 through August 31, 2000 indicates only that a deposit was made in the corresponding $6,000 amount.  The mailing address for the corporate statement was Middle River Road, RR5, Box 279, Staunton, Virginia 24401-8930.  Attached as Exhibit 9 is a copy of the Berenson & Company International August 2000 Investment Report.  It is unknown when the statement was prepared, although obviously it was prepared sometime after August 31, 2000, when it was mailed and if and/or when it was received by Mr. Berenson.

e.      Given the time necessary for preparation of the Investment Reports, the time for mailing and receipt of those Reports, and the fact that the Reports were mailed to two

separate addresses, Mr. Berenson could not possibly have compared the two August 2000

Investment Reports until sometime in or after October 2000.  Nor would he have had any reason

to do so.  To argue to the contrary is simply nonsensical.  Fidelity takes the position that the

Berensons were under some bizarre obligation to compare account statements from two different

accounts, with two different addresses and for two different purposes, side-by-side to ensure

Fidelity was handling transactions as they were supposed to be – not as to each account, but as to

the relationship and transactions <u>between</u> the accounts.  Such an argument challenges one to take

it seriously.

37.     The August 26, 1991 application for an Ultra Service Account and accompanying

Customer Agreement are somewhat dissimilar from the aforementioned Customer Agreement.

The preamble to the 1991 Ultra Service Account Customer Agreement provides that the Account

offers, *inter alia*, "(4) electronic funds transfer services, including bill payment services."  It does

not reference BillPay, or otherwise incorporate a BillPay Service Agreement.  **Checkwriting**

**and bill payment services privileges on the Account are provided as standard checkwriting**

**privileges, subject to the Uniform Commercial Code, etc., wherein the Account is not**

**debited until the time of presentment of payment of the subject check from the designated**

**payee.**  T9 at Exhibit A; T2 at 64:20-65:10 and 82:15-83:6; T4 at 52:8-18 and 56:4-58:13.  Once

presented for payment, the checks or electronic bill payment services are accumulated daily and

promptly debited; they are not debited before presentment or paid to Fidelity or some

unidentified vendor of Fidelity's choosing.  *Id*.

38.     a.     The preamble to the Customer Agreement provides that the agreement is

"between me and Fidelity Brokerage Services Inc. ("FBSI") and National Financial Services

Corporation ("NFSC") (collectively, "you").  The Customer Agreement does not further define

Fidelity to include any agents or independent contractors, such as CheckFree.  T9 at Exhibit A, Section 1.

        b.     The Customer Agreement provides that the subject Fidelity Account is "carried by National Financial Services Corporation (NFSC), an affiliate of FBSI."  *Id*. at Section 8.

      39.    a.     The 1993 Bill Payment Application was required by Fidelity to continue the existing bill payment service (not for their "BillPay" service which did not come into existence for another 6 years).  That Application expressly provided that "Fidelity's Bill Payment service enables you to arrange for payment of your bills directly from your Ultra Service Account."

        b.     The 1993 Bill Payment Application does not define Fidelity Brokerage Services, Inc. to include any agents or independent contractors, such as CheckFree, or provide that any of the Plaintiffs' monies were going to be paid to CheckFree for its use making bill payments.  T9 at Exhibit B, Section 1.

      40-43.  Plaintiffs simply receive too many mailings from Fidelity and otherwise, on a monthly basis and over the last twenty or so years of their relationship with Fidelity, to recall having received each and every of the supposed mailings from Fidelity.  Fidelity must prove that it mailed the referenced agreements, notices and buckslips, etc.  Moreover, the referenced documents "speak for themselves."  Docket No. 56 (Plaintiffs' Opposition to Defendants' Second Motion to Compel) at Exhibit 1, Supplemental Responses to Requests for Admission 12-25.

      44.    Mrs. Berenson testified that she has not used the internet to visit the Fidelity website (www.fidelity.com) or to conduct bill Payment Services.  T3 at 102:9-20.  Mr. Berenson

testified that he has visited the Fidelity website, but not for purposes of BillPay—he (and Mrs. Berenson) telephone Fidelity to make BillPay transactions. T5 at 150:2-154:7. The Berensons only obtained high speed internet access within the year of their depositions. T5 at 155:7-15.

**The Berensons' "Discovery" of Basis for Claims**

45-47.  a.    Fidelity contends that the Berensons learned that the gap between the debiting of their Joint Account and the crediting of their business account was a "result of CheckFree's having mailed a check back to Fidelity." This misstates Mr. Berenson's deposition testimony. Mr. Berenson did not testify that he was told about CheckFree—indeed, until this litigation commenced, the Berensons knew nothing of CheckFree. Rather, Mr. Berenson testified as follows:

> **Why do you [Fidelity] mail yourself a check? Why are you mailing a Fidelity check to Fidelity in United Missouri Bank of Warsaw?** It's the way we do it. I started saying, you know, I know what's going on. **There's a period of time when the money is not in account A and it's not in account B, somebody else is owning the money in that period.** It's blatant and it shows up. And then I realized that it's being done on every single BillPayer transaction and every single BillPayer account for thousands and thousands of people and millions and millions of dollars, and there's something wrong. I told them this.
>
> Q  Was this something that you detected by comparing the statement from the transferor account to the statement on the transferee account?
>
> A  Yes.
>
> Q  You could see that the debit date and the transferor account was a date that was earlier than the credit date in the transferee?
>
> A  Yes.
>
> Q  When you saw those two things together, you said, wait a second, there's a gap here and I'm not getting interest during that gap?
>
> A No, I didn't know that. I didn't realize that. I said, there's a gap here. I called Fidelity. Why is there a gap? **They first started telling me that it was because of the mails. Then my response, why are you mailing a check to yourself in the same bank, right next door? They're still talking about the mail**.

Then I started to say, wait a minute, I'm no dummy.  People don't mail checks to themselves.  Then it dawned on me, **why are they mailing a check to themselves?  They are mailing a check so they can have use of funds that don't belong to them for a period of time.**

That's when this thing started to unravel.  That wasn't my few days of interest because I'm unimportant when it comes to that.  I know enough about the financial world.  But if you start multiplying the thing out, that's OPM.  **That's other people's money**.  **There's a big amount of money daily that somebody is getting to use that doesn't belong to them.  They are taking money that doesn't belong to them and using it.**

I couldn't get satisfaction.  Believe me, I would have liked to have gotten some satisfaction from Fidelity and got this resolved.  This is not my first.  **I couldn't get anywhere with Fidelity.  I couldn't even get the same person on the phone.**

T4 at pp. 62:19-65:7 (emphasis supplied).

b.    Mrs. Berenson learned of the gap only from Mr. Berenson sometime after he discovered it.  She was not privy to the Berenson & Company International Investment Reports or other details of that business.  T2 at 53:14-55:11.

48-49.  Fidelity contends (i) that BillPay is not the optimal method to transfer funds between Fidelity accounts; (ii) that Mr. Berenson was informed of this and was sent a standard letter of instructions for him and Mrs. Berenson to sign and have a signature guarantee (T10.ExD.); (iii) that Mr. Berenson "believes" that he submitted a complete letter but could only produce a signed copy without a signature guarantee; (iv) that Fidelity has no record of having received it; and (v) that Mr. Berenson called twice (on May 17 and May 20, 2002) to complain about having to obtain a signature guaranty despite having previously obtained such signature guarantees.  This is false.

First, Fidelity's Symphony database notes provide as follows:

May 17, 2002 04 59 PM  "ESCALATION  The client did not want to get sig guar for his req to move 7k from his joint to his business acct on the 18th of every month.  We faxed him an LOI and he will fax it back to process this month as an exception.  **Quincy at the DC branch will call him Monday to set up a time to**

**go to his house to get the guarantee info (driver's license etc..)**  The client was fine with the idea and understands the LOI is only good for one year."

May 20, 2002 01 00 PM "**I moved the 7k based on the client's fax** and left a message for Quincy Jones to call the client about a good time to meet and get sig guarantee."

May 20, 2002 04 13 PM  "called david berenson, he was upset about the sig guarantee that is needed for the transfer from jt. acct to his business acct, he said he could right a check and do bill pay, but that he wanted to fido to initiate the transfers, he was aware of the sig guarantee, not happy about it, **I told him that we can get it done for him in the office**, also touch base with him on his 401k, not rolling now, considering"

May 30, 2002 04 18 PM  **"entered XTRAC to move $7,000 from X37-198650 to X37-0689000**  We duplicated the transaction May 20th and need to reverse one…"

May 30, 2002 0434 PM  **"The transfer is now in intra day"**

Attached as Exhibit 9 is a copy of the relevant portions of the Symphony Notes.  Thus, Fidelity had a record of the recurring transfer being authorized.  Exhibit 9.

50-51.  The full testimony is set forth in paragraph 47 above.

55.    a.    Mr. Berenson <u>denied</u> that a Fidelity representative offered to reimburse him for the lost interest.  More particularly, Mr. Berenson's testimony at deposition was as follows:

… the only response I got after this was somebody, you have all the records, not you, somebody calling me and telling me that the postage alone made it worthwhile.  I think, maybe they said **they would credit me $25.**

* * * * * * *

Q  Now you said you spoke with a Fidelity representative following your transmission of Exhibit 13 to fidelity, correct?

A  Yes, possibly more than one, but definitely yes.

Q  Do you recall the representative offering to you the interest that you had lost?

A  **No, he did not**.

Q  He did not?

A  **No**.  I think the fellow made some, and to the best of recollection, because I know it got me irritated.  It was nobody I had ever dealt with before; despite that I am assigned to a premium team.  **I thought it was rude and a little condescending because it referred to something about the amount of postage I saved should make for any of the, you know, but they would credit me $25**.

T4 at 69:5-71:12 (emphasis supplied).

        b.      The October 3, 2002 communication was a telephone conversation. Fidelity produced in discovery recordings of the telephone calls involving Mr. and Mrs. Berenson; however, Fidelity did not produce a recording of the October 3, 2002 telephone call.

**"Everyday Finances" and Other "Advertising"**

        56.     a.      Among the many things Fidelity has mailed to the Berensons since they opened their accounts at Fidelity are statements, prospectuses, notices, promotional packages and the like.

        b.      The typical prospectus included language regarding check-writing ability for the various funds.  For example, as early as 1983, the prospectuses for the Cash Reserves Fund, typical of the language in other prospectuses, indicated that "the check redemption privilege for withdrawal enables you to receive the dividends declared on the shares to be redeemed **until such time as the check is processed**."  Attached as Exhibit 10 is a copy of the 1983 Cash Reserves Prospectus.  Exhibit 10 at p. 6 (emphasis supplied).

        c.      The January 29, 1986 prospectus for the Cash Reserves Fund, again typical of the language Fidelity used in their prospectuses, provided:  "Additional Investment Liquidity.  A money market fund offers free checkwriting so you always have immediate access to your money.  **And your money earns high current yields right up until the time your**

**checks clear**." Attached as Exhibit 11 is a copy of the 1986 Cash Reserves prospectus (emphasis supplied).

        d.     The November 4, 1992 prospectus for the Cash Reserves Fund, typical of the language for Fidelity's prospectuses, provided: "Based in Boston, Fidelity provides customers with complete information and account service 24 hours a day, 365 days a year through a network of serviced centers around the country," and provided free, unlimited checkwriting. Attached as Exhibit 12 is a copy of the 1992 Cash Reserve prospectus.

        e.     The January 24, 1993 prospectus for the Cash Reserves Fund, typical of the language for Fidelity's prospectuses, provided: "Fidelity is committed to providing investors with practical information to make investment decisions. Based in Boston, Fidelity provides customers with complete service 24 hours a day, 365 days a year through a network of telephone service centers around the country," and provided free, unlimited checkwriting. Attached as Exhibit 13 is a copy of the 1993 Cash Reserves prospectus.

        f.     The January 13, 1995 Cash Reserves Fund prospectus, typical of the language for Fidelity's prospectuses, provided: "Fidelity is committed to providing investors with practical information to make investment decisions. Based in Boston, Fidelity provides customers with complete service 24 hours a day, 365 days a year through a network of telephone service centers around the country," and provided free, unlimited checkwriting. It further provided that the fundholder would "earn dividends through the date of redemption. However, shares redeemed on a Friday or prior to a holiday will continue to earn dividends until the next business day." Attached as Exhibit 14 is a copy of the 1995 Cash Reserves prospectus.

        g.     Fidelity's May 2000 "notice" to BillPay customers regarding the changes to BillPay effective June 16, 2000, provided: "You'll still be able to pay your bills as you always

have; however, you'll now do it exclusively online."  Attached as Exhibit 15 is a copy of the May 2000 notice.

h.    By notice dated November 13, 1998, Fidelity introduced "BillPay" as the new name for its bill payment service.  Attached as Exhibit 16 is a copy of the November 13, 1998 announcement.  Fidelity gave no notice then of any changes to the method by which the bill payment service worked.

i.    At or about the same time, Fidelity provided additional notice, by mail, that the bill payment service had a new name, BillPay, and that "**It's the same service, but better**" and "**you'll be able to pay your bills as you always have**."  Attached as Exhibit 17 is a copy of the announcement.

j.    In 1998-1999, Fidelity's internet website provided:  "Now, Fidelity Ultra Service Account Customers can enjoy the convenience of paying their bills electronically, using touch-tone telephone or any computer that has access to the Internet.  **With Fidelity BillPay, you can send payments directly from your Ultra Service Account to nearly any business or merchant**."  Attached as Exhibit 18 is a copy of the internet website.

k.    The November 1998 BillPay Application provides that "BillPay enables you to pay your bills directly from your Fidelity Ultra Service Account on the internet through www.fidelity.com or through your touch-tone telephone."  Attached as Exhibit 19 is a copy of the BillPay Application.

l.    Fidelity's letters to customers in the fall of 1998 provided "As a bill payment customer, you'll be able to pay your bills as you always have – however, now you'll be able to access your account through Fidelity's Web site at www.fidelity.com," and "It's the same service, but better."  Attached as Exhibit 20 is a copy of the 1998 letter.

m.      The November 1998 bill payment enrollment letter Fidelity sent to its customers provided:  "Fidelity BillPay gives you greater control over your expenses by letting you schedule bill payment as whenever you want, wherever you are.  Bills are paid directly from your Fidelity Ultra Service Account core account, so you'll save on checks, stamps, and trips to the mailbox."  Attached as Exhibit 21 is a copy of the November 1998 bill payment enrollment letter.

n.      The enrollment brochure provided "send payments directly from your ultra Service Account to nearly any business, merchant, or individual you choose."  Attached as Exhibit 22 is a copy of the bill payment enrollment brochure.

o.      By brochure dated April 10, 2001, Fidelity provided its customers with a promotional package entitled "Everyday Finances."  The section of the Everyday Finances concerning BillPay provides that customers can "pay bills directly and automatically from your Fidelity Account."  Attached as Exhibit 23 is a copy of the Everyday Finances brochure.

p.      In the Fidelity Focus magazine for Fidelity's Investors, dated May 2001, at page 8, Fidelity represented that "Fidelity BillPay lets you receive and view bills from certain vendors electronically and schedule single or recurring bill payments directly from your Fidelity Account."  Attached as Exhibit 24 is a copy of the Fidelity Focus magazine.

q.      Fidelity's Interactive Bill Payment Service brochure provided that customers could "send payments directly from your Ultra Service Account to nearly any business, merchant or individual you choose."  Attached as Exhibit 25 is a copy of the Fidelity Interactive Bill Payment Service brochure.

r.      Fidelity's BillPay enrollment brochure of on or about November 1998 provided that customers could "send payments directly from your Ultra Service Account to

nearly any business, merchant or individual you choose."  Attached as Exhibit 26 is a copy of the BillPay enrollment brochure.

       s.     Fidelity's Ultra Service Account brochures provided that customers would receive unlimited checkwriting and bill-paying, either automatically or pay-by-phone, that "another way to rid yourself of the nuisance of writing out checks for bills, and buying stamps, and mailing them.  Just call us at the toll-free 800 number, day or night, and we'll pay them for you."  Attached as Exhibit 27 is a copy of the Ultra Service Account brochure.

**Other Accounts**

59-60.  Fidelity misstates Mrs. Berenson's testimony.  Mrs. Berenson testified that she knew that some of her and her husband's checking accounts other than Fidelity earned interest and that some did not, she just did not know at the depositions every account that paid interest, but that she generally knew that the rate of interest on the Fidelity Accounts generally exceeded those of the other banks.  T3 at 89:1-90:13.  Of course, this is to be expected because the Berensons' Fidelity Accounts are typically cash reserve accounts that bear slight risk and their bank accounts do not.

61.     As recently as August 2000, the rate of return on the core Account for the Berensons' Joint Account was 6.21%  Exhibit 8.

62.    a.     The Berensons' continued use of the Fidelity BillPay Service has been narrowed since they filed this lawsuit.  Both Mrs. Berenson and Mr. Berenson clearly testified at deposition that if they had known the truth about the Fidelity BillPay Service they would have contacted their payees and had them directly debit the Berensons' account so that they Berensons would not lose any interest on their monies.  Indeed, Plaintiffs both testified that they were already doing this for certain of their payees.

      b.      To that end, Mrs. Berenson testified as follows:

…And then as we came forward with the bill payer and so forth, we found some things that were not as they should have been.  Which is the basis now for this suit, because – well, I won't get into that.  But at any rate, that was one of the problems.

**What I shifted to is debit, so I am letting various businesses that used to be on the bill payer be changed over to where they debit an account for the checks –**

T3 at p. 81:8-17 (emphasis supplied).

      c.      Mr. Berenson testified as follows:

BY MR.SHOPE:
    Q  Now, have you ever used any other bill payment services besides Fidelity's?
    **A  The answer on a bill payment service is no.  What I have used, you can see on your Fidelity statement is when I have told Verizon or Sprint, you know, or USAA, which – that they could, you know, on Day X, 5, on Day 10, whatever, I've chosen, Day 16, that they could charge my account, which I guess is done electronically, and then it goes from me to them on that exact same day…**
    Q  Okay.  So you don't use any other bill payment service other than Fidelity?
    A  No.
    **Q  Okay.  The -- now you mentioned that with regard to a few payees, you've authorized them to directly debit your Fidelity account; isn't that fair?**
    **A  Mm-hmm.**
        **Right that's correct.**
    Q  Again, you've got to say yes or no to the court reporter.
    **A  Yes, yes.**

T5 at 92:8-93:13 (emphasis supplied).

**Method of Payment**

      63.     The Berensons concede that some of their designated payees should be paid by

mail; however, those payees should be paid by a laser draft so that the Berensons continue to

earn interest on the subject monies and those monies are being paid directly from their Fidelity

Account, not that the monies should be paid by a check drawn on CheckFree's corporate account.   That is what this lawsuit is all about.

64.     The Berensons payments to Barhite & Holzinger were not initiated until the payment was already late.  Payments to Barhite & Holzinger are not late unless Barhite & Holzinger receives the payment after the fifteenth of each month.  The Berensons scheduled payments with Fidelity so that those payments would be received before late charges attached. T2 at 132-134.

**CheckFree**

65.     a.     CheckFree is a for profit corporation that was incorporated in Delaware. It is headquartered in Norcross, Georgia.  The shares of CheckFree are publicly traded on NASDAQ under the symbol "CKFR".  CheckFree is a corporation that is subject to considerable risk and has not been profitable for a considerable period of time.  To that end, CheckFree's Annual Report for Fiscal Year 2004, provides, in pertinent part, the following:

b.     The market for CheckFree's electronic commerce is evolving and may not continue to develop or grow rapidly enough for CheckFree to sustain profitability.

c.     CheckFree has not consistently operated profitably in the past and may experience net losses in the future.  Since its inception, CheckFree has accumulated losses of approximately $1.7 billion.  In the years 2002 and 2003, CheckFree had net losses of $440.9 million and $52.1 million, respectively.

d.     CheckFree's future profitability depends upon its ability to implement a strategy successfully to increase adoption of electronic billing and payment methods.

e.     CheckFree outlines at least 20 other risks related to its business, including that one customer, Bank of America, accounts for 19.6% of its total revenue and that a loss of

that customer would severely damage its business.  Attached as Exhibit 28 is a copy of the relevant portions of the CheckFree 2004 Annual Report (the entire report is available on-line at CheckFree's internet website www.checkfree.com)

66.    CheckFree's revenues are also dependent upon earning float and the impact of fluctuating interest rates.  CheckFree acknowledged in its 2003 Form 10-K filings that a decrease in interest rates could have a dampening effect upon its revenues.  Attached as Exhibit 29 is a copy of the relevant portions of CheckFree's 2003 10-K, which is also available on-line at the CheckFree website.

67.    None of Fidelity's purported agreements, prospectuses, notices, buckslips and the like, provide:

(i)    that the bill payment service customers agree that they would not earn any interest or other benefit on their monies after Fidelity takes the monies, puts them into their own account, and transfers them to CheckFree;

(ii)    that anyone other than the customer may earn interest on the monies or otherwise benefit from them, including Fidelity and CheckFree;

(iii)    that the monies are being transferred to CheckFree;

(iv)    that Fidelity was changing from the standard check-writing model to the "good funds" model;

(v)    that Fidelity was not, and would not be, paying interest on the monies designated for payment until the designated payee actually presented the check for payment or actually received the monies via electronic transfer, as it had been under the previous standard check-writing model;

(vi)    that Fidelity was even using CheckFree, or any information about the financial stability of the company, in order to allow the subscriber an opportunity to make a reasoned determination about the company, the BillPay Service and whether to use the BillPay Service;

(vii)    that CheckFree earned interest on Plaintiffs' BillPay monies and/or those of any of the other BillPay subscribers or potential subscribers, the rate at which CheckFree earned interest on the monies, and/or the amount earned;

(viii)   that CheckFree does not segregate or hold in trust the monies it receives from Fidelity as part of the BillPay Service and that CheckFree commingles the monies it received from Fidelity as part of the BillPay Service with other monies;

(ix)    that Fidelity could have used laser drafts to make the payments directly from the BillPay subscriber's accounts, rather than permit corporate checks to be drawn on CheckFree's corporate account;

(x)    that Plaintiffs and/or the BillPay subscribers would lose the ownership and/or lose use of their monies between the transaction date and the time of actual payment to the designated payee; and,

(xi)    that Fidelity and/or its agent, CheckFree, would likely earn a higher rate of interest on the Plaintiffs' and/or BillPay subscriber's monies than it paid to the Plaintiffs and/or BillPay subscribers.

T1.

Dated:  June 10, 2005                     Respectfully submitted,


                                          //ss//  Douglas A. Rubel
                                          Douglas A. Rubel  [*Pro Hac Vice*]
                                          Johanson Berenson LLP
                                          201 Shannon Oaks Circle, Suite 200
                                          Cary, North Carolina 27511
                                          (919) 654-4544

                                          Attorneys for Plaintiffs