IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOAN BERENSON and DAVID BERENSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FINANCIAL SERVICES LLC, FIDELITY BROKERAGE SERVICES LLC, and DOES 1-50, inclusive,<br><br>Defendants. | Civil Action No. 04 CV 11311 (WGY) |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT ON ALL REMAINING CLAIMS**

**I.    INTRODUCTION**

Defendants National Financial Services LLC and Fidelity Brokerage Services LLC (together, "Fidelity") respectfully submit this reply memorandum in further support of their motion for summary judgment on all remaining claims (filed May 26, 2005). Notwithstanding the fact that plaintiffs Joan and David Berenson took an unauthorized extra 13 days and two extra pages for their opposition, the opposition does not excuse their failure to bring suit within the statute of limitations and, most strikingly, does not even attempt to identify a single misrepresentation that Fidelity has made to the Berensons. In fact, it remains undisputed that since at least 1998 Fidelity repeatedly advised the Berensons in writing exactly when their account would be debited and how interest would be paid. The only "mendacity" in this case is the Berensons' distortion of the summary judgment record.

## II. THE BERENSONS HAVE DISREGARDED GOVERNING PROCEDURE.

### A. *The Court Should Disregard the Berensons' Untimely, Unsupported, and Overlong Opposition.*

1. <u>The Court should disregard the Berensons' opposition brief because they did not complete its filing until almost two weeks after the due date.</u>

Local Rule 7.1(B)(2) provides:

A party opposing a motion, shall file an opposition to the motion within fourteen (14) days after service of the motion … and in the same (rather than a separate) document a memorandum of reasons, including citation of supporting authorities, why the motion should not be granted. Affidavits and other documents setting forth or evidencing facts on which the opposition is based shall be filed with the opposition. The fourteen day period is intended to include the period specified by the civil rules for mailing time and provide for a uniform period regardless of the use of the mails.

The Berensons' opposition brief, response to Fidelity's statement of facts ("response"), and any supporting affidavits and exhibits to Fidelity's summary judgment motion were due on June 9, 2005. *See* Fed. R. Civ. P. 6(a); LR 7.1(B)(2). Indeed, the Berensons acknowledged the June 9 deadline in their emergency motion to compel discovery (from CheckFree) that they filed in the Northern District of Georgia on May 17, 2005. *See* Excerpt of Mem. Supp. Emergency Mot., at 4, attached hereto at Exhibit 1.

Yet, without notifying Fidelity, moving the Court for an extension, or offering any excuse, the Berensons filed both their opposition brief and response shortly before 5:00 P.M. on June 10, 2005. Further, of the twenty-nine exhibits that the Berensons purport to rely on in both their opposition brief and response, none of them were served on Fidelity or filed with the Court until June 22, 2005—almost two weeks past the due date. The Court is accordingly entitled to consider the motion as unopposed and to disregard the subsequently filed opposition, response, and supporting exhibits. *See Velez v. Awning Windows, Inc.*, 375 F.3d 35, 41–42 (1st Cir. 2004); *see also* LR 7.1(B)(2).

  2. <u>The Court should disregard the Berensons' opposition brief because it exceeds the twenty-page limit.</u>

Local Rule 7.1(B)(4) states: "Memoranda supporting or opposing allowance of motions shall not, without leave of court, exceed twenty (2) pages, double spaced."  But without moving the Court to exceed the page limit, the Berensons filed a 22-page memorandum, which suspiciously omits pagination and includes approximately three full pages of single-spaced footnote text.  The brief should be disregarded.

  3. <u>The Court should disregard the Berensons' opposition brief and response because their factual allegations and denials are generally unsupported.</u>

Federal Rule of Civil Procedure 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Despite the commands of this rule, the Berensons did not provide affidavits or authenticated documents to support much of their opposition.  Indeed, a substantial amount of the factual allegations and denials in the Berensons' opposition brief and response are nothing but lawyer argument.  They should be disregarded.  *See, e.g., Black v. Unum Life Ins. Co. of Am.*, 324 F. Supp. 2d 206, 209 (D. Me. 2004); *see also* Fed. R. Civ. P. 56(e).

**III.   THE BERENSONS' CLAIMS LACK MERIT AS A MATTER OF LAW.**

    **A.**   *The Berensons' Claims are Untimely.*

The Berensons make two arguments in an effort to save their remaining claims from the bar of their respective statutes of limitation.  First, they contend that the loss of "float" was inherently unknowable before October 2000 because they supposedly could not have compared the statements of their multiple Fidelity accounts in order to see the time lag between inter-account transfers.  They ignore the fact that, no later than 1998, Fidelity had undisputedly sent to them and posted on its Web site a BillPay Service Agreement and mutual fund prospectus fully explaining how and when their account would be debited and how interest would be paid.  Second, the Berensons assert that the Fidelity BillPay service operated as they had supposedly expected before June 2000, but the only admissible evidence ― and, indeed, the documents cited by the Berensons themselves ― demonstrate that this is not true.

        1.   <u>The 1998 Fidelity BillPay Service Agreement put the Berensons on notice of their claims.</u>

The Berensons do not deny that Fidelity's BillPay Service agreements from <u>at least</u> 1998 made clear that there was a gap between the time their Fidelity account was debited and when their designated payee was credited.  Indeed, the 1998 Fidelity BillPay Service Agreement clearly states:

> The date on which a Non-Recurring Payment or a Recurring Payment is actually initiated (<u>debited from your Fidelity Account</u>) is the "<u>Transaction Date</u>."
>
> ….
>
> <u>After</u> we debit your Fidelity Account for the amount of a payment, we will remit your payment to the Payee by mailing the Payee a check <u>drawn on an account we maintain for this purpose</u> by electronic funds transfer, or by other means. Because of the time it takes to transmit a payment, a <u>Payee generally will not receive payment on the Transaction Date</u> regardless of whether the payment is a Same Day Payment, a Future Payment, or a Recurring Payment.

T7.ExG, at §§ 8, 10 (emphasis added).  The Berensons concede that they received the 1998 BillPay Service Agreement and that it set forth these terms.  *Compare* SOF ¶¶ 24, 26, 27, *and* T7.¶9 & ExG, *with* Pls.' Resp. ¶ 24.  Although the Berensons assert, without explanation, that the agreement was "ambiguous," their sole basis is their own confusion ― and yet they deny having ever read the agreement before asserting a claim.  *See* T2.116, 153; T4.86-88, 123; T5.138-39, 151-52.

Although hardly necessary, the mutual funds prospectus reinforced that interest would no longer be paid starting the following day after the customer's account was debited T7. ¶10; T7. ExH ― a point that Mr. Berenson himself understood without having read it.  *See* T4.62-63.

Simply reading the BillPay Service Agreement undisputedly supplied to them in June 1998 would have given the Berensons all they needed to know to assert their claims ― over five years before filing of suit in 2003.  Putting aside the question of whether diligence requires comparing multiple agreements on the "kitchen table" (it does, especially when, as here, the agreements expressly incorporate each other, T7.ExA, at 5; *Loguidice v. Metro. Life Ins. Co.,* 336 F.3d 1, 7 (1st Cir. 2003) (insured required to read policy as well as marketing illustrations)), the simple fact is that the BillPay Service Agreement put the Berensons on ample notice that BillPay service did not work like a checking account as they supposedly assumed.  It was not necessary for them to compare statements from Fidelity with statements of any one of their various payees, which Mr. Berenson conceded would have made Fidelity's practice "readily apparent."  T4.95.  Furthermore, the Berensons' conjecture (there is no admissible evidence) that they could not have compared statements from their use of the BillPay service to transfer funds from one Fidelity account to another before October 2000 simply ignores the many other payees who sent statements to the Berensons, such as Potomac Electric Power Co., Washington Gas,

and Comcast (which statements they claim they did not retain). T2. 84-93.  At a minimum, given the undisputed receipt in 1998 of controlling agreements making clear that interest for a brief period would be lost, the Berensons cannot bear their burden of proving that in diligence they could not have discovered their claim.  *See Geo. Knight & Co. v. Watson Wyatt & Co.*, 170 F.3d 210, 213 (1st Cir. 1999).

> 2. <u>The Berensons also lost float under the Fidelity's BillPay service when Fidelity used Integrion as its vendor.</u>

In an effort to avoid the effect of the four-year statute of limitations applicable to claims under Mass. Gen. Laws c. 93A, the Berensons also contend that because Fidelity did not start to use CheckFree Corp. as its vendor until mid-June 2000, their claims were inherently unknowable before that time.[1]

According to the Berensons, they were not losing float until the switch to CheckFree (the largest provider of bill payment services, T18.Ex1.¶9, whose solvency the Berensons disparage without evidence).  This assertion has no support in the record and is simply untrue.  Indeed, the operative terms of the service did not change.  The BillPay Service Agreement sent to the Berensons two years earlier in <u>1998</u> (two years before CheckFree) contains precisely the same terms providing that Fidelity will debit its customers' accounts one or more days in advance of the payee's receipt of payment.  *Compare* SOF ¶¶ 24, 26, 27, *and* T7.¶9 & Ex G, *with* Pls.' Resp. ¶ 24.

---

[1] In any event, as the Berensons concede by silence, this assertion would not save their common law claims from the expiration of the statute of limitations of three years.  It is undisputed that, in connection with the introduction of CheckFree in June 2000, Fidelity sent a notice to all customers in May 2000 indicating that the BillPay Service Agreement had been amended and made the agreement available on Fidelity's Web site. T7.¶¶11, 12.  The Berensons did not file suit until September 26, 2003, more than three years later.

The sworn testimony and the documents the Berensons cite, however, demonstrate that BillPay customers "lost float" before Fidelity began using CheckFree. Before June 2000, Fidelity and its former vendor, Integrion Financial Network LLC, operated an automated process system that managed the BillPay service. As established in the sworn and uncontradicted testimony of Fidelity's Camille Zaslou, the main difference between the pre-2000 BillPay service involving Integrion and the current version of the service involving CheckFree was that, during Integrion's tenure, the BillPay service operated on a debit card platform and Integrion processed the transfer of monies from a customer's Fidelity account through a third-party debit card provider. *See* Pls.' App., Ex. 2, at 97-103 (Court's Docket No. 72). However, the end result was exactly the same — *the customer still lost float*. As an illustration, for each scheduled payment, on the transaction date:

1. Customer A would enter his designated payee's information on Integrion's Web site, which was linked to Fidelity's Web site.

2. On a specific transaction date, Integrion would confirm with Fidelity that there were sufficient funds in Customer A's account to cover the specific scheduled payment;

3. Integrion would place an authorized hold on the subject funds in Customer A's account and Fidelity would hold the funds so that they were not removed;

4. Integrion would send all of the day's debiting and crediting instructions, including those for Customer A's payments, to the debit card provider;

5. The debit card provider would send a debit settlement report to Fidelity for all of the day's scheduled transactions;

6. <u>Fidelity would debit the appropriate customer accounts</u> and send a wire to the debit card provider to settle all of the day's scheduled transactions listed on the debit settlement report; <u>then</u>

7. Integrion would send payments to the payees from Integrion's own account, including to Customer A's payee, either electronically or by check.

- 7 -

*See id.* Accordingly, the customer did not earn float during the period between when his account was debited and the payee was credited with the funds (for example, when the check was in the mail). This procedure was thus similar to the BillPay service as operated since CheckFree became the vendor, under which the customer "loses" float as well.

In the face of these facts, the Berensons offer a quote excerpted out of context from an unauthenticated document for the proposition that, when Integrion was the vendor, customers did <u>not</u> lose float in respect of a "date to send" model. This document, although produced by Fidelity, has not been authenticated, and has not been discussed at any deposition. The document plainly states that in 1998 Fidelity was using a "good funds" model, which the plaintiffs elsewhere (on the thirteenth page of their brief) denounce as depriving them of float. Furthermore, its reference to funds being temporarily "held" does not mean the customers did not lose float. As explained in Camille Zaslau's testimony, the hold was only temporary and preceded a debit of the customer's account that itself preceded the receipt of funds by the designated payee. In fact, the reference to customers' not losing float is apparently only with respect to the "date to send" model in which the customer, not Fidelity, chooses when funds will be sent rather than having Fidelity make that decision, thus permitting the customer to control (but not eliminate) loss of float.

Simply put, as a matter of undisputed fact based upon admissible evidence, Fidelity's change in 2000 from Integrion as its vendor to CheckFree did not substantially change the BillPay service in relevant respects. Customers continued to lose float on the monies transferred by the service — as had been disclosed in the 1998 BillPay Service Agreement.[2] The loss of

---

[2] As with their distortion of Integrion's payment model, the plaintiffs persist in their erroneous assertion that Fidelity itself earns interest "float" from the BillPay service. While it may be legally irrelevant whether any float inures to Fidelity or CheckFree, the fact is that, because

- 8 -

float was not "inherently unknowable." *See Kravetz v. U.S. Trust Co.*, 941 F. Supp. 1295, 1302–03 (D. Mass. 1996). Rather, had the Berensons read the 1998 BillPay Service Agreement, as diligence required, the basis of their entire suit would have been apparent. While the Berensons decry their obligation to read what is sent to them for purposes of the statute of limitations, that is the law and the Berensons cite no contrary authority.

> **B.** ***The Berensons Cannot Show that They Relied on Misrepresentation Allegedly Made by Fidelity.***
>
> > 1. <u>The Berensons have not identified a single misrepresentation made by Fidelity.</u>

Although they have styled their suit as a proposed class action, the Berensons must show what specific misrepresentations Fidelity made to them <u>individually</u> in order for their claims to survive. Yet, in their opposition brief, they do not identify a single misrepresentation—they do not cite to a single record source. *See* Opp'n, pt. IV.C. Instead, they rely on a jumble of statements made in random disclosures to other customers and advertisements in Fidelity's document production, none of which they contend that they themselves received, reviewed, or relied upon.

While the Berensons repeat without citation the assertion that they received Fidelity literature telling them to pay bills "directly" from their account, they ignore the fact that the only document they received with that phrase specifically advised them, above their signatures, that they were authorizing Fidelity "to debit [their] account for amounts to be paid <u>to it</u> [Fidelity] for <u>its use</u>" in paying their bills. T9.ExB. Furthermore, the Berensons choose to ignore the fact that Fidelity's literature repeatedly referred its customers to the Fidelity BillPay Service Agreement,

---

balances are calculated for interest purposes only once a day, Fidelity earns no float itself on funds transferred through the BillPay service, although CheckFree does. The customer's account earns interest through the end of the date of debit, and as of the end of the next day the funds are in the account of CheckFree. Fidelity earns no "intraday" interest on the day of transfer.

which, as discussed, fully disclosed the timing of customer account debits. *See* Pls.' App., Exs. 18, 19, 22, 23, 24, 26 (Court's Docket No. 72). Whatever the basis may have been for the Berensons' (unreasonable) assumption that the service would operate exactly like a checking account, there was no deception.

### 2. The Berensons cannot show reliance.

The Berensons contend, without supporting material, that they relied on unidentified misrepresentations to their detriment because had they known how the Fidelity BillPay service truly operated they would "have, as they have done, changed many of their designated payees to a debit platform." Again, this is simply untrue. At her deposition, Mrs. Berenson admitted that, even after discovering that they do not earn interest float, the Berensons have not substantially altered their use of the Fidelity BillPay service. T2.84-93. Indeed, the Berensons continued to use BillPay to pay at least *five* payees (Barhite & Holzinger, Potomac Electric Power Co., Washington Gas, Comcast, SunTrust Mortgage, and Heritage Oaks H.O.A.). T2.89-93. This is the *same number* of payees as the Berensons had designated in their 1993 BillPay application (Barhite & Holzinger, YMCA, Chevy Chase, Sallie Mae, and Johnson & Higgins). T9.ExB. Mrs. Berenson further testified that the Berensons continue to use BillPay for recurring transfers between their Fidelity accounts, which, at a level of $5,000 per month are by far their largest transfers via the BillPay service. T2.130-31.

The undisputed fact is that it has been almost two years since the Berensons filed their complaint and they still use the Fidelity BillPay service to make scheduled payments to their payees. T2.84-87. They did not significantly alter their payment methods and they continue to make large inter-account transfers, for which they lose the largest amount of float, using the BillPay service, notwithstanding Fidelity's direction to them to execute a standing order that would avoid loss of float completely. T10.ExD; T5.82-83.

The Berensons cannot show reliance or that they would have acted any differently but for the as yet-unidentified misrepresentations. Further, the Berensons have asserted in interrogatory answers that they are unable to calculate any damages, making it perfectly clear that they cannot prove that they suffered any harm actionable at common law. T15.8-9; T16.6, 11-12, 15. Thus, their common law claims for misrepresentation and breach of fiduciary duty should be dismissed.

**C.     *The "Error Resolution" Claim Fails as a Matter of Law and Comes Too Late.***

1. <u>The EFTA's "Error Resolution" Provision is Inapplicable.</u>

Section 1693f requires a financial institution, after receiving notice of an "error" to "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." *See* 15 U.S.C. § 1693f(a). The Berensons' proposal to define "error" to include the parties' intentional actions defies logic. Under the Berensons' definition of "error," financial institutions would be required to "investigate" their own intentional actions as well as any mistakes. What point there would be in having a financial institution determine whether its own *intentional* actions occurred (other than gauging its own internal efficiency)? Furthermore, Fidelity's actions were undisputedly not only <u>intentional</u>, but pursuant to a <u>contract</u> ― the BillPay Service Agreement ― to which the Berensons undisputedly agreed by continuing to use the BillPay Service. T4.7, 13, 48-52; T9.ExB ("I (we) have read, understand and hereby accept the terms and conditions stated in the Bill Payment Agreement and Service Disclosure.") Thus <u>both parties</u> intended it. As a matter of law, intentional acts expressly authorized by the consumer's contract with the service provider cannot be "errors" requiring "investigation" under the EFTA. Otherwise, in this electronic era, every contractual billing dispute would become a federal case, clearly not what Congress intended. The Berensons' claim should be dismissed.

      2.    <u>The Berensons' EFTA claim is barred by the statute of limitations.</u>

With regard to the timeliness of any "error resolution" claim, the Berensons simply rehash old arguments concerning their September 2002 letter to Fidelity. However, with respect to their oral complaints to Fidelity, the Berensons do not deny that they (1) began complaining orally to Fidelity about the loss of interest on the BillPay float as early as January 2002; (2) knew Fidelity had neither responded in writing nor recredited their accounts in response to these oral complaints; and (3) waited more than a year after making these complaints to file suit. *See* T12. The Berensons' EFTA claim is thus barred by the 1-year statute of limitations and cannot be revived by each successive complaint whether made orally or in writing. *See Houck v. Local Fed. Sav. & Loan, Inc.*, 996 F.2d 311, 1993 WL 191818 (10th Cir. 1993) (unpublished table decision). Contrary to the Berensons' unsupported assertion, this Court did not hold that any violation of the statute would "toll" the statute of limitations. Any such holding would contradict the fundamental principle of law that the statute of limitations extinguishes claims irrespective of their merit. The Berensons knew all of the facts of their "error resolution" claim by early 2002 but failed to sue within one year.

    **D.**    *Fidelity is Not a Fiduciary.*

Fidelity does not owe the Berensons any sort of fiduciary duty. Indeed, the only authorities that the Berensons cite in support of their assertion that Fidelity owes such a duty are cases that involve express escrow agreements. *See Shultz v. R.I. Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 724, 729 (1st Cir. 1996) (escrow agreement); *In re Discipline of Two Attorneys*, 660 N.E.2d 1093, 1095, 1097–98 (Mass. 1996) (same); *see also Maganas v. Northroup*, 663 P.2d 565, 566, 568 (Ariz. 1983) (same); *Collins v. Heitman*, 284 S.W.2d 628, 630, 633 (Ark. 1955) (same); *Kitchen Krafters, Inc. v. Eastside Bank of Mont.*, 789 P.2d 567, 569, 571 (Mont. 1990) (same), *overruled by Busta v. Columbus Hosp. Corp.*, 916 P.2d 122 (Mont. 1996); *Am. State*

*Bank v. Adkins*, 458 N.W.2d 807, 808, 810–11 (S.D. 1990). These cases are inapplicable because no escrow agreement exists between Fidelity and the Berensons, and, in the very same section of their brief, the Berensons concede as much. *See* Opp'n, pt IV.D ("*Schmid* relates to a situation involving an escrow agreement, which is the type of agreement and information that is *specifically lacking* between the Berensons and Fidelity.") (emphasis added).

In any event, under Massachusetts law, even if Fidelity did owe the Berensons such a duty, the BillPay Service Agreement plainly supplants any supposed fiduciary duty, and Fidelity has undisputedly complied with that contract. *See Schmid v. Nat'l Bank of Greece*, 622 F. Supp. 704, 710-11 (D. Mass. 1985), *aff'd*, 802 F.2d 439 (1st Cir. 1986); *see also Merola v. Exergen Corp.*, 423 Mass. 461, 466 (1996) (majority-minority shareholder context).

    **E.**    ***The Berensons Cannot Identify a Single Misrepresentation made to Them and have Not been Harmed or Suffered Actual Damages.***

In an effort to save their claim under Mass. Gen. Laws c. 93A, the Berensons, refer the Court to the Unfair and Deceptive Acts and Practices statutes ("UDAP") of other states and mislead the Court as to the requirements under c. 93A, the statute that is actually at issue. Chapter 93A makes actionable acts and practices that are either "unfair" or "deceptive." As discussed above, there has been no deception. Furthermore, what is "unfair" is not left to judicial whim, but to standards established in statutes, regulations, or rules of common law — none of which were violated. Indeed, as Professor Humphrey testifies in his unrebutted affidavit, T18.Ex1.¶¶13-15, the "good funds" model employed by Fidelity is a reasonable model to use and benefits consumers by avoiding substantial charges for insufficient funds, among other costs. (The Berensons concede in footnote 6 of their brief that the "risk" model for which they advocate entails such charges.) Contrary to their lawyer's bold assertion in the brief, there is <u>no</u> evidence that the "good funds" model is either abnormal or illegitimate.

The Berensons' other citations are irrelevant.  The Berensons cite *Besta v. Beneficial Loan Co. of Iowa*, 855 F.2d 532, 534 (8th Cir. 1988), to support the proposition that c. 93A requires the Court to consider the "totality of the transaction."  However, the *Besta* court was applying the unconscionability provision of the Iowa Consumer Credit Code.  *See* 855 F.2d at 534.  There is no argument that Fidelity's BillPay Service Agreement is unconscionable.  Whatever *Besta* may hold, nothing in c. 93A authorizes a court to substitute its business judgment for Fidelity's in selecting a proper payment model.

The Berensons also cite a Arizona and a District of Connecticut case involving statutes other than c. 93A to support the proposition that "[t]he capacity to deceive is measured by the effect upon the least sophisticated."  *See* Opp'n at pt. IV.E (citing *Aurigemma v. Arco Petroleum Prods. Co.*, 734 F. Supp. 1025, 1029 (D. Conn. 1990), and *Madsen v. W. Am. Mortgage Co.*, 694 P.2d 1228, 1232 (Ariz. Ct. App. 1985)).  But that standard has not been adopted in Massachusetts.  To the contrary, the Massachusetts Supreme Judicial Court has stated that as a baseline the standard for c. 93A is that of a "reasonable consumer rather than an ignoramus."  *See Aspinal v. Philip Morris Cos.*, 813 N.E.2d 476, 487–88 (Mass. 2004).  Furthermore, the Berensons' conceded experience and sophistication (SOF ¶¶ 3, 4; Pls.' Resp. to SOF ¶¶ 3, 4) certainly raise the bar.  *See Swanson v. Bankers Life Co.*, 450 N.E.2d 577, 580 (Mass. 1983) ("[A] plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair); *Madan v. Royal Indem. Co.*, 532 N.E.2d 1214, 1218 (Mass. App. Ct. 1989) (court rejected plaintiff's 93A claim regarding an oral lease where plaintiff was "an experienced and successful lawyer" who was "familiar with real estate law").

Regardless of sophistication, reasonable consumers understand that when money is debited from their accounts, they will no longer earn interest on it. Fidelity's disclosures clearly noted that the customer's account would be debited one or more days before the payee would be credited with the funds. That fact alone plainly put customers on notice that they would lose a few days' float. Mr. Berenson himself testified that he discovered his claim once he noted on his statements that the date of debit from his account preceded the date of credit to his payee. *See* T4.62-63. Thus, Mr. Berenson's own testimony supports the sufficiency of Fidelity's disclosures in the BillPay Service Agreement.

Finally, a plaintiff asserting a claim under c. 93A must prove *causation*—a causal connection between the alleged acts and the claimed loss. *See Aspinal*, 813 N.E.2d at 491. "'[T]he [Massachusetts] Legislature, in enacting and amending G.L. c. 93A, § 9, did not intend to confer on plaintiffs who have suffered no harm the right to receive a nominal damage award which will in turn entitle them to a sometimes significant attorney's fee recovery.'" *Aspinal*, 813 N.E.2d at 491, quoting *Lord v. Commercial Union Ins. Co.*, 801 N.E.2d 303, 313-14 (Mass. App. Ct. 2004).

Here, the Berensons have (1) failed to identify a single misrepresentation that Fidelity made to them; (2) continued to use the Fidelity BillPay service since "discovering" the truth of its operation; and (3) have asserted in interrogatory answers that they are unable to calculate any damages. The Berensons' claim under c. 93A should be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Fidelity's motion for summary judgment on all remaining claims should be granted.

        Respectfully submitted,

        NATIONAL FINANCIAL SERVICES LLC and
        FIDELITY BROKERAGE SERVICES LLC

        By their attorneys,

        /s/ John A. Shope
        Nicholas C. Theodorou (BBO No. 495730)
        John A. Shope (BBO No. 562056)
        William W. Fick (BBO No. 650562)
        David E. Cole (BBO No. 658705)
        FOLEY HOAG LLP
        155 Seaport Boulevard
        Boston, MA 02210
        (617) 832-1000

Dated:  June 23, 2005