IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOAN BERENSON AND DAVID BERENSON,    :
Individually and on behalf of all others similarly situated,    :
                                                                :
        Plaintiff                                               :
                                                                :
v.                                                              :        04-11311 WGY
                                                                :
NATIONAL FINANCIAL SERVICES, LLC, et al.,    :
                                                                :
        Defendants                                              :
_____:

**PLAINTIFFS' AMENDED MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Joan Berenson and David Berenson, oppose the Defendants' Motion for

Summary Judgment on All Remaining Counts, as follows:

**I.    Introduction**

With apologies to Tennessee Williams, but there's a "powerful and obnoxious odor of

mendacity" in Defendants' motion papers.[1]  Mendacity and arrogance, actually.  It permeates

Fidelity's motion papers, their litigation strategy in this case, and, indeed, Fidelity's entire

BillPay Service operation (especially, Fidelity's alleged disclosures to its BillPay Service

customers of how that service would work and how it actually worked).

Fidelity repeatedly promised, *inter alia*, that its customers would have complete control

over their monies and that they could pay their bills "directly from their accounts," that Fidelity

operated the BillPay Service and/or made payments from a Fidelity account.  Simple deceit.

Nowhere did Fidelity fully and adequately disclose the changes in its bill payment service.

Nowhere did Fidelity disclose that it changed that service from a check-writing service based

---

[1]        "What's that smell in this room?  Didn't you notice it, Brick?  Didn't you notice the powerful and
obnoxious odor of mendacity in this room?" Tennessee Williams, *Cat on a Hot Tin Roof*, 1955.

upon the standard check-writing model everyone knows and understands (the payment of checks when presented against an account) to the "good funds" model of CheckFree Services Corporation ("CheckFree") and then in June 2000 began precipitately debiting customer's accounts.

Indeed, Fidelity's renewed motion papers are as disingenuous as the purported "notice" that Fidelity allegedly gave to its BillPay customers regarding the true charges, fees and costs of the Fidelity BillPay service. Fidelity cobbles together a series of purported buckslips, form notices and agreements in order to mislead this Court into believing that (i) Fidelity's BillPay customers somehow knew, or at least were apprised, that Fidelity—and not the customer—would obtain ownership rights and benefit to the customer's monies once a transaction was designated under the BillPay service; and (ii) that Fidelity—and not the individual customers—would earn interest on those monies.

In so doing, however, Fidelity ignores the plain language of those very agreements and would have this Court draw all of the reasonable inferences from those agreements against the Berensons, the non-moving parties, which of course, is impermissible on a motion for summary judgment.  Indeed, to repeat from Defendants first motion for summary judgment, any customer who "prefers" to earn interest up until the time a designated payee actually receives payment may do so without using the BillPay service simply by writing checks on his or her Fidelity account, by writing and mailing the checks themselves.  Defendants' Motion to Dismiss and for Summary Judgment at Statement of Undisputed Material Facts Pursuant to Local Rule 56, No. 25.[2]  That is the very crux of this case!  Fidelity completely failed and refused to inform its

---

[2]    Fidelity concedes that its customers (here, the Berensons) may write checks on their core accounts and that the shares in the underlying accounts are not redeemed until the designated transferee has received credit for the designated funds.  From this, it seems apparent that, under the BillPay service, Fidelity and/or its vendor, CheckFree, could easily write the checks for the customers— **continued**

BillPay customers of this!  Nowhere in the BillPay Agreements is this set forth.  Nowhere in the thicket of buckslips or other purported notices allegedly provided to Fidelity's customers is this set forth.  Nowhere on Fidelity's internet website is this set forth.[3]  Pure mendacity!

Instead, to conceal the inadequacy of its notices, Fidelity bootstraps to its BillPay service the underlying agreement(s) for its customer's "core accounts" (what Fidelity calls its "Customer Agreement") and from those multitude of agreements incorrectly argues that the BillPay customers had notice of exactly how the BillPay service worked.[4]  This is absurd.  It didn't work that way before.  Fidelity did not advise its BillPay customers that the Customer Agreements were to be part of the BillPay Service and that the terms of the Customer Agreements and any prospectuses would apply to the Fidelity and CheckFree accounts into which BillPay monies were transferred.  As that scenario would apply to the Berensons, Fidelity contends that because

---

"laser drafts"—and that the mutual fund shares in the underlying accounts would not be redeemed until the designated transferee has received credit for the designated funds.  Indeed, as set forth, *infra*, such is the norm not only in standard consumer financial transactions but apparently also in electronic bill payment services provided by financial institutions such as Fidelity.  Thus, there is no legitimate reason for precipitately debiting a customer's account and forcing a customer to prematurely redeem his or her mutual fund shares before the BillPay checks are issued via the BillPay Service, except that Fidelity and CheckFree sought to benefit and the expense of the BillPay customer.  Had there been a legitimate reason, surely Fidelity would have provided due (or any) notice to the BillPay customers.

[3]    As discovery has now revealed, Fidelity made a deliberate business decision not to fully and faithfully inform its customers of exactly how the BillPay Service works or what the true costs were to the customer when it changed the processing operations under the CheckFree good funds model because Fidelity didn't want its customers to know that the alleged "convenience" being provided to them actually benefited Fidelity (and its vendor, CheckFree), did so to the detriment of the customer and ran contrary to banking practices regarding standard check payment, namely, that the customer retains ownership of his funds and continues to earn interest until the payee receives and takes possession of the customer's funds and makes presentment of the check against the customer's account.  Plaintiffs' Response to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Plaintiffs' Statement") at ¶ 14b and Exhibit 6.

[4]    This, of course, unilaterally imposes upon each Fidelity customer, regardless of sophistication, a never-ending burden (and, as Fidelity would have it, a legal obligation) to review the terms and conditions of each Agreement individually and together with each and every other Agreement pertaining to every Fidelity account or service.  One can imagine Fidelity's millions of customers spreading out their agreements, notices and buckslips like a patch work quilt on their kitchen tables and spending hours comparing the details of each term and condition from one notice or agreement with each term and condition of the numerous other notices or agreements.

the Berensons' Customer Agreement purportedly informed the Berensons that when they redeemed shares from their account, they would not continue to earn interest or dividends on those shares and because the Berensons are purportedly "sophisticated" investors, they "should have known" that they would not earn any interest on monies designated in the BillPay service and placed into the Fidelity trust account. This is the primary "factual" basis on which Fidelity's motion rests. It is misplaced.

Simply put, the Berensons did not know, and they could not have known, that they would not earn any interest ("dividends" according to Fidelity) on the monies that Fidelity held for the Berensons and put into a "special" Fidelity (trust) account for purposes of BillPay.

The Customer Agreements provide that when a customer "redeems" shares in their core account, the customer obtains the monies. However, under the BillPay agreements, on any given "transaction date," Fidelity prematurely redeems shares for the Berensons, and then places those monies in trust in a "special" Fidelity account for the express purpose of paying the Berensons' designated payee. From this "special" Fidelity account the monies are then eventually given over to the CheckFree, and it is from CheckFree that a payee of a BillPay customer is paid. The Berensons' supposed Customer Agreement is completely silent on any of this. The Berensons' prospectuses are all silent on this. The BillPay Agreements and Fidelity's many purported notices and buckslips to its customers (including the Berensons) are all silent on this. And, despite all of Fidelity's deliberations to ensure its website and customer relations are on the cutting-edge, there is nothing on Fidelity's internet website that addresses these particular circumstances.[5]

---

[5]    One should not have to remind Fidelity that Fidelity was not the designated payee under the BillPay service. The purpose of BillPay was not to pay Fidelity so that Fidelity could pay a customer's bills. Indeed, Fidelity's "guarantee" of payment goes only so far as to repay any service fees **continued**

We do not know from Fidelity's motion papers what the proverbial "reasonable" customer is to understand because Fidelity's motion papers stop short of explaining the legal implications of why Fidelity failed to inform its customers that no interest would be paid on customer monies placed into this "special" Fidelity account, interest as would ordinarily be earned otherwise in the case of a standard check drawn on the customer's account, and that the monies would be transferred to CheckFree, an unidentified "agent", to actually make the payments from its account, or why the plain language of the Customer Agreement, when read together with the BillPay Agreements, is not vague and ambiguous (it is clearly susceptible to more than one interpretation, given Fidelity's apparent interpretation vis-à-vis the Berensons' interpretation and understanding).

Indeed, the only terms and conditions that can be reasonably inferred from the parties' relationship is that BillPay was supposed to operate like a standard checking account, through automated clearinghouse channels, in which interest is earned until the designated payee receives credit for the designated funds, except that the BillPay customers paid Fidelity to transfer the monies or, in certain circumstances, to write the check against the customer's account and mail it. Why would anyone believe otherwise? Again, those were the actual expectations and understandings of the Berensons. If the Berensons, as the "sophisticated" investors Fidelity alleges them to be, understood this to be the case, then, they submit, Fidelity failed to give proper notice to the contrary. Why would an unsophisticated investor understand otherwise? The mendacity.

As a last ditch effort to avoid going to trial, Fidelity now contends that all of Plaintiffs' remaining claims are barred by the applicable statute of limitations because the Berensons

---

or late fees incurred by the customer in the event of a late payment. Surely, Fidelity does not contend that it stands in the shoes of its BillPay customers vis-a-vis the gas company or the phone company.

allegedly cannot prove that that in diligence they could not have discovered their claims before

September 26, 1999 through a review of what Fidelity sent to them. As will be demonstrated

below, this is simply false.

## II.    The Material Facts In Genuine Dispute

Fidelity's motion papers purport to set forth all of the material facts that are (allegedly)

not in genuine dispute in this case. Most of what Fidelity sets forth is actually in genuine

dispute; some is blatantly misleading; and other critical facts are simply not set forth.[6]

Plaintiffs Joan Berenson and David Berenson opened a brokerage account at Fidelity in

the early 1980s. Plaintiffs' Statement at ¶5-6. The Berensons have jointly subscribed to the

electronic bill payment service operated by Fidelity since at least the mid-1980s. That original

bill payment service was essentially a check-writing service operated by Fidelity, wherein the

Berensons paid Fidelity a certain fee and Fidelity wrote checks for the Berensons to the payees

---

[6]    Fidelity places great emphasis on the so-called "good funds" model, using it as a theoretical basis for assuming complete ownership of a BillPay customer's funds before they are properly transferred to a designated payee. *See* T10 at ¶ 7. Fidelity contends that otherwise, the customer would assume the risk of bounced checks, reversed electronic payments and collection actions by CheckFree (not that the customer is aware of CheckFree). *Id.* This is disingenuous at best, nonsensical at worst. There are essentially three ways to pay the monies: by ACH transfer, a check drafted on CheckFree's corporate account or laser draft drawn on the customer's account. Approximately seventy-five percent (75%) of the CheckFree's transactions, according to the CheckFree internet website, are by ACH transfer. Sufficient funds are either present or they are not; there is no need to withdraw them from an account before the ACH transfer is to be made. Similarly, if a laser draft is to be drawn under BillPay, then it is no different than a standard check and the risk of insufficient funds at time of check cashing by the merchant falls not on Fidelity or CheckFree but on the customer, as it ordinarily would under standard checking principals. Fidelity concedes that checks may otherwise be drawn (without the use of BillPay) on the core accounts and interest earned until the designated transferee receives credit for the funds.

Moreover, Fidelity would lead us to believe that the "good funds" processing model is analogous to a cashier's check. This absurd notion is betrayed, however, by Defendants' expert testimony that the good funds model provides no assurances or guarantees that CheckFree has sufficient funds in its corporate checking account to process the subject payments and CheckFree's own admissions that it is of dubious profitability, having accumulated $1.7 billion in losses. In short, Fidelity disingenuously contends that by segregating the designated monies under the BillPay service, it ensures that payment will be made. In reality, it simply ensures that Fidelity and CheckFree receive the benefit and use of the customer's monies rather than the customer (without notifying the customer, of course).

they designated.  The checks that Fidelity wrote were paid "directly" from the Berensons' mutual fund accounts, including their Joint Account, and no monies were transferred to Fidelity or its agents/vendors for purposes of the check-writing before the checks were tendered to the Berensons' designated payees and those designated payees presented the checks for payment against the Berensons' accounts.  *Id*. at ¶ 8.[7]  At all times, the applicable Fidelity Brokerage Account from which the Berensons directed Fidelity's electronic bill payment service to write checks, was a certain joint account that the Berensons used for personal, family or household purposes (the Berensons' "Joint Account").  The prospectuses for the mutual funds that comprised the Joint Account expressly provided that the funds continued to earn interest/dividends until the presentment of the checks written against the funds.  *Id* at ¶ 7.

This check-writing service continued into the 1990s.  At some point, Fidelity began using Integrion Corporation ("Integrion") to provide electronic bill payment services and under its arrangement with Integrion, Fidelity began placing an "authorization hold" on the monies that were the subject matter of an electronic bill payment.  However, those monies continued to accrue interest (or dividends) in whatever fund they were in until the designated payee actually presented the checks for payment against the fund.  *Id*. at ¶ 10.[8]

In January 2000, Fidelity conducted a "Bill Payment Service Provider Analysis" in which Fidelity described its own relationship with Integrion as follows:

> This description is provided as a benchmark for evaluating options.  The current system offers functionality which customers are satisfied with, including Single and Recurring payment, Bill Payment section of the statement, expense codes,

---

[7]    Plaintiffs did not receive a copy of Fidelity's bill payment agreement when they first enrolled in Fidelity's bill payment service, and Fidelity does not have a copy of that agreement.  *Id*. at ¶ 23.

[8]    Fidelity switched from Integrion to CheckFree because Integrion stopped operating as an electronic bill payment provider.  Integrion went out of business apparently because it was not profitable. *Id*.

and the "Date to Send" model of scheduling payments **(a simpler model where customers do not lose float).**  Also, the system is a "good funds" model, where available balance is verified and **held** as the payment is sent to the Merchant. Some operational inefficiency causes the current system to be somewhat expensive.

Thus, at all times prior to the establishment of Fidelity's relationship with CheckFree in June 2000, the Fidelity bill payment service subscriber—in this case, the Berensons—continued to earn the limbo float until the time of payment—consistent with a standard check-writing processing model—and consistent with the Berensons' understanding that they would continue to accrue interest on their core account monies until their designated payees presented payment of any checks against the core account or actually received an electronic transfer.[9]

On or about June 16, 2000, Fidelity began using CheckFree as its electronic bill payment service provider, ostensibly because Integrion went out of business. CheckFree offered various payment processing models to Fidelity for the operation of its BillPay Service.  These models

---

[9]     For example, the preamble to the 1991 Ultra Service Account Customer Agreement provides that the Account offers, *inter alia*, "(4) electronic funds transfer services, including bill payment services."  It does not reference BillPay, or otherwise incorporate a bill payment service agreement.  **Checkwriting and bill payment services privileges on the Account are provided as standard check-writing privileges, subject to the Uniform Commercial Code, etc., wherein the Account is not debited until the time of presentment of payment of the subject check from the designated payee.**  Plaintiffs' Statement at ¶ 37.  Once presented for payment, the checks or electronic bill payment services are accumulated daily and promptly debited; they are not debited before presentment or paid to Fidelity or some unidentified vendor of Fidelity's choosing.  *Id*.  None of the other documents between 1991 and the present change this.

The 1993 Bill Payment Application, required by Fidelity to continue the existing bill payment service (not for their "BillPay" service which did not come into existence for another 6 years), expressly provided that "Fidelity's Bill Payment service enables you to arrange for payment of your bills directly from your Ultra Service Account."  The 1993 Bill Payment Application does not define Fidelity Brokerage Services, Inc. to include any agents or independent contractors, such as CheckFree, or provide that any of the Plaintiffs' monies were going to be paid to an outside contractor, such as CheckFree, for its use making bill payments.  T9 at Exhibit B, Section 1.  Indeed, as noted below, Fidelity conceded in its January 2000 analysis and an August 13, 2001 e-mail, Fidelity's actual operation of the bill payment service was consistent with standard check-writing services wherein the Account is not debited until the time of presentment of payment of the subject check from the designated payee.  Thus, the Berensons' keen perception of the workings of the bill payment service for twenty years was a reality.

8

included (i) the Risk model; (ii) the Risk with Guaranteed Funds model; and (iii) the "Good Funds" model.[10]  Fidelity decided to use CheckFree's good funds model and knew that the change would have negative float ramifications for its BillPay customers, that is, they would lose the float that they had been earning because Fidelity and its undisclosed agent, CheckFree, would thereafter be earning the float.  *Id.* at Exhibit 5.

Fidelity nonetheless went forward with the change and failed to notify its BillPay customers.  The mendacity of Fidelity's actions were set forth in an e-mail message, dated August 15, 2001, authored by Tami Rash, in which Fidelity acknowledged the following:

> Based upon our analysis and from a Treasury point-of-view being sensitive to various risk issues, the customer's overall experience and payment finality, it is Treasury's recommendation that we continue to support a "Good Funds" business model on a go forward basis.  **While we understand the customer's sensitivity to the "lost float" issue inherent in the "Good Funds" model, we have not experienced many Value Network comments or complaints relative to this issue that would warrant changing Fidelity's current "Good Funds" business model or compromising our ability to offer a complete customer service model.**

---

[10]    The Risk model is the standard check-writing scenario, wherein the BillPay subscriber continues to earn interest—"float"—on the designated BillPay monies until the time of the designated payee presents payment against the account because CheckFree will either pay the designated payee through the Automated Clearinghouse ("ACH") and then transfer monies from the BillPay subscriber to itself or will issue a "laser draft," i.e., a check written by CheckFree directly upon the BillPay subscriber's Core Account.

The Risk with Guaranteed Funds model is similar to the Risk model, however, the BillPay sponsor (Fidelity) guarantees payment up to a specified amount.   The Risk with Guaranteed Funds model is also the standard check-writing scenario, wherein the BillPay subscriber continues to earn interest—"float"—on the designated BillPay monies until the time of the designated payee presents payment against the account because here, too, CheckFree will either pay the designated payee via an ACH transfer and then transfer monies from the BillPay subscriber to itself or will issue a "laser draft." *Id*.  This is the model Fidelity used when it operated the bill payment service.

Only under the Good Funds model does CheckFree either issue an ACH transfer or write a check on a CheckFree corporate checking account and mail the check to the designated payee, already having the monies in hand.  The good funds model is thus not a standard check-writing model under which the BillPay subscriber earns limbo float, but allows the BillPay Service sponsor (Fidelity) and/or, its (undisclosed) agent CheckFree to earn the limbo float instead of the customer.

\* \* \* \* \* \* \*

> With regards to the "Risk Based model, we can discuss in further detail
> tomorrow, but it is not our preference given the "Challenges" (as mentioned on
> the attached).  If this model were to be offered with allowing the customer to enter
> his debit account(s) information (thus offering the ability to debit non-Fidelity
> accounts), Fidelity assume(s) possible reputational risk such [sic] any fraudulent
> activity occur since CheckFree does not verify this information.  If this model
> were to be offered with the Customer's Brokerage/(Amicus) Bank account(s) pre-
> populated as his only debit accounts, **then the only improvement with this
> model to the customer is that he retains more "float" than without current
> "Good Funds" model** but receives a reduced customer service model from
> Fidelity which we are concerned could prove to be a larger dis-satisfier to our
> customers. (emphasis supplied).

*Id*. at ¶ 14 and Exhibit 6.

The attachment to Rash's August 15, 2001 e-mail was a chart that outlined the plusses

and minuses ("challenges," per the Rash e-mail) of utilizing each of the three payment process

models offered by CheckFree together with a Fidelity "front-end" computer interface or the

CheckFree 3.2 interface.  As Fidelity conceded in the "Challenges" section of the "Fidelity

Front-End" section for the "Good Funds" model:

- **Fidelity**, Amicus and CheckFree **earn payment float** until payments are
  cleared.  (**Fidelity**/Amicus **earn 1 day float** while CheckFree earns 1+ days
  depending on payment method used.)

Exhibit 6 (emphasis supplied).  As Fidelity conceded in the "Challenges" section of the

"CheckFree 3.2" section for the "Good Funds" model:

- **Fidelity**, Amicus and CheckFree **earn payment float** until payments are
  cleared.  (**Fidelity**/Amicus **earn 1 day float** while CheckFree earns 1+ days
  depending on payment method used.)

*Id*. (emphasis supplied).

In reality, Fidelity has never disclosed the use of CheckFree to its BillPay customers.

Indeed, as Fidelity testified at deposition, Fidelity's agreements do <u>not</u> disclose that a BillPay

customer's monies are transferred to CheckFree and placed in a CheckFree corporate account:

Q   Where does it disclose in your agreements that the money is going to be paid to CheckFree and that CheckFree is going to be holding the money?

Mr. Shope:  Note my Objection.

A   I don't believe that it does.

*Id* at ¶ 10.

Fidelity very clearly does earn float on BillPay monies.  The BillPay customer's Core Account is debited at 10:00 p.m. on the first day (Day 1), based upon the closing prices at 4:00 p.m. on that same day (*i.e.*, the net asset value per share ("NAV")), and placed into a Fidelity General Ledger account, via a nightly bookkeeping file.  T8 at Exhibit A.  Thus, any dividends that continue to accrue do so to the benefit of Fidelity.  Simply put, Fidelity transfers monies from the Plaintiffs' Core Account at 10:00 p.m. and Fidelity (not the customer) thereafter continues to earn whatever interest/dividends are being earned in the fund of the subject shares.  That, among other things, is the float Fidelity earns.  *Id*. at ¶ 17.  CheckFree earns float on the monies once Fidelity wires them to CheckFree at 1:00 p.m. on the second day.

The Berensons use of Fidelity's bill payment services was typically to pay six or so payees that were essentially utilities or mortgages.  Those payees were First National Bank of Maryland; Potomac Electric Power Company; District Cablevision; Washington Gas; Barhite & Holzinger; YMCA.  *Id* at ¶ 36.

Commencing in August 2000, the Berensons started using BillPay to transfer monies from their Joint Account to Mr. Berenson's Berenson & Company International account at Fidelity.  The first statement which the Berensons received that indicates a transfer from the Joint Account to the Corporate Account is their Joint Account "Investment Report" for August 1, 2000 through August 31, 2000, setting for a transfer in the amount of $6,000.  It is unknown when that statement was prepared, although obviously it was prepared sometime after August 31, 2000,

when it was mailed and if and/or when it was received by the Berensons.  *Id.* at Exhibit 8.  The

mailing address for the Joint Account was 1617 35th Street NW, Washington, D.C. 20007-2316.

*Id.*

      The Berenson & Company International "Investment Report" for August 1, 2000 through

August 31, 2000 indicates only that a deposit was made in the corresponding $6,000 amount.

The mailing address for the corporate statement was Middle River Road, RR5,  Box 279,

Staunton, Virginia 24401-8930.  *Id.*  It is unknown when the statement was prepared, although

obviously it was prepared sometime after August 31, 2000, when it was mailed and if and/or

when it was received by Mr. Berenson.  *Id.*

      Given the time necessary for preparation of the Investment Reports, the time for mailing

and receipt of those Reports, and the fact that the Reports were mailed to two separate addresses,

and represent two accounts used for different purposes, Mr. Berenson could not possibly have

compared the two August 2000 Investment Reports until sometime in or after October 2000.  *Id.*

Nor would he have had any reason to do so.  To argue to the contrary is simply nonsensical.

Fidelity takes the position that the Berensons were under some bizarre obligation to compare

account statements from two different accounts, with two different addresses and for two

different purposes, side-by-side to ensure Fidelity was handling transactions as they were

supposed to be – not as to each account, but as to the relationship and transactions <u>between</u> the

accounts.  Such an argument challenges one to take it seriously.

## IV.    Legal Discussion

### A.    The Berensons' State Claims Are Not Untimely

      Fidelity contends that the Berensons learned that of a gap between the debiting of their

Joint Account and the crediting of their business account in or about January 2002 and that was

the discovery of their causes of action.  From this, Fidelity makes the quantum leap that the Berensons should have compared their Fidelity statements from these different accounts side-by-side much sooner and that they would have discovered the "gap" long before September 26, 1999.

For many reasons, this is false.  The Berensons' discovery was inherently unknowable until after September 26, 1999; indeed, it was inherently unknowable until October 2000.  First, the Berensons did not start using the BillPay Service to transfer the monies between the two Fidelity accounts until August 2000.  The August 2000 statements were then printed and mailed sometime in September 2000, and were mailed to different addresses.  Mr. Berenson could not possibly have discovered the gap before October 2000.  Plaintiffs' Statement at Exhibits 8-9.

Second, Fidelity did not commence its operations with CheckFree until mid-June 2000. Prior to that, the bill payment service worked as the Berensons thought it had.  *Id*. at Exhibits 5-6.  Given that Fidelity did not inform anyone of the change in operations and the processing of the service, the Berensons could not possibly have known of or reasonably be held to have discovered their claims for some period after that and, in any event, long after September 26, 1999.  As such, common sense dictates that the Berensons' claims were timely brought.  *Kravetz v. U.S. Trust Co.*, 941 F.Supp. 1295 (D.Mass. 1996).

**B.    Plaintiffs' Claims for Intentional Misrepresentation (Count II) and Negligent Misrepresentation (Count III) Are Viable And Should Be Tried**

For reasons similar to those set forth above, Fidelity's motion as to Plaintiffs' claims for intentional and negligent misrepresentation should be denied.  Plaintiffs' claims for intentional misrepresentation and for negligent misrepresentation are similar.  Under Massachusetts law, a defendant can be held responsible not only for outright untrue statements, but also for giving misleading partial information or for telling half-truths.  *Golber v. BayBank Valley Trust Co.*, 46

Mass.App.Ct. 256, 258, 704 N.E.2d 1191, 1193 (1999) (*citing Kannavos v. Annino*, 56 Mass. 42,

48, 247 N.E.2d 708, 711-12 (1969)).  Where a defendant had some special obligation to a

plaintiff based upon a fiduciary relationship between them, an affirmative obligation is imposed

upon the defendant to fully and faithfully inform the plaintiff of all pertinent and material facts.

Similarly, where a defendant actually speaks to an issue, he must do so truthfully.  *Kannavos,*

*supra,* 356 Mass. 42, 47, 247 N.E.2d 708, 711.  *See also Nota Constr. Corp. v. Keyes Assoc.,*

*Inc.*, 45 Mass.App.Ct. 15, 19, 694 N.E.2d 401, 405 (1998) (*citing* Restatement (Second) of Torts

551 (1997)).  This fundamental premise is set forth in the Restatement (Second) of Torts:

> [a] representation stating the truth as far as it goes but which the maker knows or
> believes to be materially misleading because of his failure to state additional or
> qualifying matters is a fraudulent misrepresentation.

Restatement of Law, Second, Torts 2d § 529 (1976).  In this regard, a statement that contains

only favorable matters and omits all references to unfavorable matters is as much a false

representation as if all the facts and circumstances stated were untrue.  *Id*.; *Zimpel v. Trawick*,

679 F.Supp. 1502 (W.D. Ark. 1988).

Under standard check clearinghouse channels, a customer continues to receive interest on

the subject funds until the designated payee is paid.  Fidelity represents that bills are "paid

directly from your account."  This is how the Fidelity bill payment service operated at its

inception and continued to operate through the switch to CheckFree's good funds model.  Now,

as Fidelity readily admits, a customer's bill is not paid directly from his or her account, but

instead it is either paid from a "special" Fidelity account or from a CheckFree account.  This is

misleading.  Under these circumstances, where Fidelity undertakes to inform its customers of the

terms of the BillPay service in the various agreements, and advertises those services, Fidelity

must be faithful and complete in its disclosures.  The clear message, directly and by implication,

of the advertisement that a customer's bills are being paid directly from his or her account is that the customer will continue to earn interest or dividends on the funds in his or her account until the bills are paid.  This was the message for almost twenty years.  This practice was in conformance with accepted clearinghouse practices for standard checks.  Subsequently (mis)informing a customer that the monies are being transferred instead to a Fidelity account and that Fidelity will pay the bills from that account—employing definitions that only a biblical scholar could understand so as to uncover that payment would be made directly from a CheckFree corporate account—does not clear the confusion and does not disclose that the monies being placed in the "special" Fidelity account are <u>not</u> going to continue to accrue interest for the customer, as the customers believed to be the case.  *Kannavos, supra,* 356 Mass. 42, 48, 247 N.E.2d 708, 711 ("Fragmentary information may be as misleading . . . as active misrepresentation, and half truths may be as actionable as whole lies. . . .").

The misrepresentations are clear, and so is the reliance.  Had the Berensons known of Fidelity's change in the actual processing of the bill payment service, they would have, as they have subsequently done, changed many of their designated payees to a debit platform, as was in place before the switch to CheckFree.  Had the Berenson's known that their monies were leaving Fidelity to the checking account of an unprofitable corporation (CheckFree), they would have done the same.

The Berenson's reliance was upon the actual operation of Fidelity's bill payment service until the switch to CheckFree and the documents they either signed or received in the mail.  Over the course of twenty years, it is impossible to remember the documents they received.  Mrs. Berenson testified that she generally reviewed documents she received.  Those documents form the basis of the Berenson's misrepresentation claims.  In the early years, the documents

accurately depicted the workings of the bill payment service.  Later, when Fidelity switched to CheckFree, they did not.

C.    **Plaintiffs' Claim for Breach of Fiduciary Duty (Count IV) Is Viable And Should Be Tried**

For reasons similar to those set forth above, Fidelity's motion as to Plaintiffs' claims for breach of fiduciary duty should be denied.  Here, Fidelity again argues that (allegedly) because the parties' agreements provide that dividend interest will not continue to accrue on shares once they are redeemed, that Fidelity somehow complied with the parties' agreements and, therefore, cannot be held accountable for breach of fiduciary duty.  In support, Fidelity cites as authority *Schmid v. National Bank of Greece*, 622 F.Supp. 704, 710-11 (D.Mass. 1985), *aff'd,* 802 F.2d 439 (1st Cir. 1986)(table).  However, the *Schmid* case is easily distinguishable.  *Schmid* relates to a situation involving an escrow agreement, which is the type of agreement and information that is specifically lacking between the Berensons and Fidelity.  *Schmid, supra* at 710 ("the escrow agreement or instructions constitute the full measure of obligation assumed by the escrow holder and owing to the parties).  Here, Fidelity purports to take control of and hold for the benefit of the Berensons, in trust, the monies that are subject of the BillPay service as designated in a given transaction.  However, Fidelity does not reach an agreement with the Berensons as to the terms of the Fidelity trust account.  Instead, it unilaterally imposes certain terms—which Fidelity still has not disclosed, other than its apparent unilateral right to usurp ownership of the funds. This is improper and impermissible.  Under such circumstances, there exists a duty from Fidelity to the Berensons, which duty Fidelity breached by not informing the Berensons of the true and complete terms of the Fidelity account and the BillPay service.  *See, e.g., Schultz v. Rhode Island Nat. Bank.* 94 F.3d 721, 729 (1st Cir. 1996) (*citing In re Discipline of Two Attorneys*, 421 Mass. 619, 626-27, 660 N.E.2d 1093 (*citing Maganas v. Northrup*, 135 Ariz. 573, 663 P.2d 565 (1983)

(duty to disclose known fraud)); *Collins v. Heitman*, 225 Ark. 666, 286 S.W.2d 628 (1955)(duty

not to engage in self-dealing); *Kitchen Krafters, Inc. v. Eastside Bank of Mont.*, 242 Mont. 155,

789 P.2d 567 (1990) (duty to disclose material facts relevant to escrow), *overruled on other*

*grounds by Busta v. Columbus Hosp. Corp.*, 916 P.2d 122 (Mont. 1996)); *American State Bank*

*v. Adkins*, 458 N.W.2d 807 (S.D. 1990)(duty to avoid self-dealing and conflicts of interest)).

These legal theories equally apply to the Berensons' claim for Fidelity's failure to advise

them of the switch to CheckFree, or even of CheckFree's checking account, let alone the dubious

financial viability of CheckFree.  This switch, and the implementation of the good funds model,

inured to the financial benefit of Fidelity and CheckFree, without the knowledge and consent of

the Berensons.  As such, Fidelity is liable for self-dealing.  *Id*.[11]   As such, Fidelity's Motion for

Summary Judgment on Count IV, should be denied.

### D.    Plaintiffs' Claim for Violation of the Massachusetts Consumer Protection Act (Count VI) is Viable and Should be Tried

The Berensons' claims for violation of the Massachusetts Consumer Protection Act is

proper and permissible under the facts of this case.  Fidelity falls far short of satisfying its burden

of demonstrating the absence of any material factual issue and fails to offer any relevant legal

basis entitling them to judgment as a matter of law.

Among other things, UDAP generally prohibits trade practices which have a tendency to

mislead consumers.  In determining whether a practice violates UDAP, the totality of the

transaction must be examined including the manner and context in which representations or

omissions are made.  *Besta v. Beneficial Loan Co. of Iowa*, 855 F.2d 532, 534 (8th Cir. 1988).

---

[11]    By way of analogy, Fidelity's argument is akin to a lender advising a borrower that it is charging him or her interest at the annual rate of 400% and then arguing that the interest rate was not usurious because the customer was so advised or contracted for same.  This is improper and impermissible. *Johnson v. Tele-Cash, Inc.*, 82 F.Supp.2d 264 (D.Del. 1999).

The capacity to deceive is measured by the effect upon the least sophisticated.  *Aurigemma v. Arco Petroleum Products Co.*, 734 F.Supp. 1025 (D.Conn. 1990); *Madsen v. Western American Mortg. Co.*, 694 P.2d 1228 (Ariz.Ct.App. 1985).

Fidelity simply contends that because it believes all of Plaintiffs' other statutory and common law causes of action should be dismissed, that Count VII for violation of the Massachusetts consumer protection act should also be dismissed.   In support of its contentions, however, Fidelity acknowledges that the Act itself does not precisely define the contours of "unfair or deceptive acts or practices."  Indeed, "it is impossible to frame definitions which enable all unfair practices[ because t]here is no limit to human inventiveness in this field."  H.R. Conf. Rep. No. 1142, 63rd Cong., 2d Session (1914).  Nonetheless, Fidelity contends that while a particular set of facts is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a violation is a question of law.  Motion at p. 18-19.  Fidelity then contends that it has not crossed the boundaries of what may qualify for consideration as a violation of the UDAP statutes.

Yet, for all of the reasons set forth above, this question of law should be decided in favor of the Berensons.  Fidelity failed and refused to fully and faithfully notify the Berensons of the terms of the Fidelity trust account, namely, that contrary to what the Berensons had expected and understood, Fidelity was not paying interest on the Berensons' monies in the Fidelity account and was, instead, unilaterally exercising ownership rights to the Berensons' monies, earning interest on those monies and forwarding them to CheckFree so that CheckFree could earn interest on those monies.  Under what legal theory does this not fall within the UDAP statutes?  Given the banking industry's use of generally accepted clearinghouse channels for standard checks, under which the Berensons earned interest until their monies were actually transferred to

18

the designated payee, Fidelity's almost twenty year following of that common practice, and given no notice from Fidelity to the contrary, the Berensons had every right to believe that they would earn interest on their monies and submit that their claims fall within the "penumbra of common law, statutory and other established concepts of unfairness," and are easily recognizable as "immoral, unethical, oppressive or unscrupulous" conduct which would "even raised the eyebrow of someone inured to the rough and tumble world of commerce." *Levings v. Forbes and Wallace, Inc.*, 8 Mass. App. Ct. 498, 396 N.E.2d 149 (1979). As such, there exists a question of fact, to be determined at trial. For this reason alone, Fidelity's Motion Summary Judgment on Count VI should be rejected.[12]

### E.    Plaintiffs' Claim for Violation of the Electronic Funds Transfer Act (Count I) is Viable and Should be Tried

Fidelity clearly misses the point of the EFTA's error resolution procedures. There is no need to quibble over definitions of "error." First, Fidelity's assertion that its intent is the crux of the "error" resolution procedures is misplaced. Fidelity contends that because they intentionally engaged in a certain practice, that the EFTA does not apply. This is absurd and demonstrates the unmitigated arrogance of these defendants. If a financial institution were intentionally ripping of its customers by charging them $2.00 a transaction at every ATM without notice, and a customer called to complain, would Fidelity argue that the EFTA's error resolution procedures do not apply? The mendacity. Of course, they do. Fidelity asserts the nonsensical position that the mindset of the acting party controls whether or not an "error" occurred. It is the customer's subjective perception of an error as to the understanding and agreement between the parties that

---

[12]    Fidelity cannot counter, as a matter of fact, that its "good funds" business model, as it applies to BillPay, is somehow the industry standard. There is evidence to the contrary, as set forth in Fidelity's own papers. Moreover, it is well established that a misleading and unfair practice violates UDAP even though it may be customary throughout an industry. *Moog Industries, Inc. v. FTC*, 355 U.S. 411 (1958).

matters.  Otherwise, EFTA becomes an impotent tool, subject to the knee-jerk defense of "we meant to do that!"

As to the propriety of the Berensons' notice to Fidelity of an "error," there is no dispute that Mr. Berenson called Fidelity in or about the time he discovered the "gap" and questioned it. Fidelity's counsel admitted this at the April 3, 2005 hearing, and admitted that Fidelity failed to provide a written response.  Thus, Fidelity's arguments are in bad faith.  Moreover, as this Court previously noted, Fidelity's failure to provide a written response to the Berenson's, <u>as required</u>, tolled the applicable Statute of Limitations.  Thus, the EFTA claims are still extant and should not be dismissed.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs, Joan Berenson and David Berenson, individually and on behalf of all others similarly situated, respectfully request this Court to deny Defendants' renewed motion for summary judgment.

Dated:  June 27, 2005                      Respectfully submitted,


                                           //ss//  Douglas A. Rubel
                                           Douglas A. Rubel  [*Pro Hac Vice*]
                                           Johanson Berenson LLP
                                           201 Shannon Oaks Circle, Suite 200
                                           Cary, North Carolina 27511
                                           (919) 654-4544

                                           Attorneys for Plaintiffs