UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOAN BERENSON and DAVID BERENSON, )<br>individually and on behalf of )<br>others similarly situated, )<br> )<br>        Plaintiffs, )<br> )<br>        v. )<br> )<br>NATIONAL FINANCIAL SERVICES, LLC, )<br>FIDELITY BROKERAGE SERVICES, LLC )<br>and DOES 1-50 )<br> )<br>        Defendants )| CIVIL ACTION<br>NO. 04-11311-WGY |

MEMORANDUM

YOUNG, C.J.                                          October 31, 2005

By Order dated July 13, 2005 [Doc. No. 79], this Court ALLOWED in part and DENIED in part a motion for summary judgment [Doc. No. 60].  This Memorandum sets forth the analysis leading to the Court's order.

## I.  INTRODUCTION

This is a putative class action involving an electronic bill payment service provided by National Financial Services LLC and Fidelity Brokerage Services, LLC (collectively, "Fidelity").[1] Compl. ¶¶ 6, 12, 20-22 [Doc. No. 1, Attach. 1].  David Berenson and Joan Berenson (the "Berensons") contend that they, and others

---

[1] In addition, the Berensons include "DOES 1-50" as a fictitious name for defendants "whether individual, partnership, corporate or otherwise" that are "responsible in some manner for the acts and omissions alleged."  Compl. ¶ 8.

similarly situated, lost interest owed them as a result of their participation in Fidelity's electronic bill payment service, and that those losses constituted "fees" or charges that were not disclosed as required under federal and state law. Id. ¶ 22. The Berensons sue Fidelity under several theories of liability.

First, the Berensons contend that Fidelity has violated the Electronic Funds Transfer Act, 15 U.S.C. § 1693 et seq. (the "Act"). They allege in Count I that any interest gained by Fidelity between the transaction date and the date an intended payee actually receives the funds is a "fee" that Fidelity was legally required to disclose. Compl. ¶¶ 57-63. Counts II and III allege that Fidelity's failures to disclosure constituted intentional or negligent misrepresentation. Id. ¶¶ 64-68, 69-73. Count IV alleges both a breach of contract and breach of fiduciary duty by Fidelity.[2] Id. ¶¶ 74-77, 78-82. Count V alleges a violation of the Massachusetts Truth in Savings Law. Id. ¶¶ 83-86. Count VI alleges a violation of the Massachusetts Consumer Protection Act. Id. ¶¶ 87-90. Count VII in the original complaint alleged a violation of the District of Columbia Consumer Procedures Protection Act. Compl. ¶¶ 91-94.

---

[2]The counts in the original complaint are misnumbered. Both the breach of contract and breach of fiduciary duty claims are incorrectly numbered "Count IV."

###### A.    Procedural Posture

The Berensons filed this case on September 26, 2003, in the United States District Court for the District of Columbia. Compl. at 1.  Upon Fidelity's motion, on May 14, 2004 the case was transferred to this Court pursuant to 28 U.S.C. § 1404(a). Berenson v. National Fin. Servs., L.L.C., 319 F. Supp. 2d 1 (D.D.C. 2004).  District Judge Walton noted that the claims arose in Massachusetts, Massachusetts law governed, and Massachusetts had a greater interest in deciding this suit since the majority of the potential class members reside in Massachusetts.  Id. at 5.

Prior to the transfer, on November 7, 2003, Fidelity filed a motion to dismiss and for summary judgment. [Doc. No. 1, Attach. 12].  In its supporting memorandum, Fidelity "reserve[d] the right to compel arbitration" if class certification was denied. Defs.' Mem. in Supp. of Mot. to Dismiss and for Summ. J. [Doc. No. 1 Attach. 13] ("Defs.' Nov. 2003 Mem.") at 2 n.1.

On October 13, 2004, this Court allowed the motion to dismiss the Massachusetts Truth in Savings claim (Count V) and the breach of contract claim (one of the Counts IV).  Tr. of Hr'g of 10/13/04 at 15.  Ultimately the Court denied the motion to

dismiss as to the other counts, and denied the motion for summary judgment.[3]  Tr. of Hr'g of 2/16/05 at 5-6.

The Berensons filed a motion for class certification on January 25, 2005.  [Doc. No. 25].  On February 16, 2005, this Court deferred its ruling as to class certification until after the trial of the Berensons' individual claims, which was scheduled for September of 2005.  Tr. of Hr'g of 2/16/05 at 18.

On February 8, 2005, Fidelity filed a motion for partial summary judgment asserting that the Electronic Funds Transfer Act claim was barred by the statute of limitations.  [Doc. No. 24]. At a hearing on March 3, 2005, the Court granted the motion for summary judgment as to the "fee disclosure" aspect of the claim but denied summary judgment as to the "error resolution" portion of the claim.  Tr. of Hr'g of 3/3/05 at 12.

On May 26, 2005, Fidelity filed the motion for summary judgment that is the subject of this memorandum.  [Doc. No. 60]. On July 13, 2005, this Court issued an order allowing in part and denying in part Fidelity's motion, and dismissing the Berensons' class claims.  [Doc. No. 79].  This memorandum explains the underlying reasoning for this order.

Once this Court dismissed the class claims, Fidelity filed a motion to compel arbitration and to dismiss.  [Doc. No. 82].  On

--------

[3] The motion for summary judgment was denied without prejudice and could be re-filed following discovery.

August 22, 2005, the Court allowed Fidelity's motion to compel arbitration and administratively closed the case.  [Doc. No. 88].

**B.  Facts**

The following facts have been compiled from the Complaint, the Defendants' Statement of Undisputed Facts ("Defs.' Facts") [Doc. No. 62] and the exhibits attached thereto [Doc. Nos. 66-68], Plaintiffs' Memorandum in Response to Defendants' Statement of Undisputed Facts ("Pls.' Facts") [Doc. No. 72] and the exhibits attached thereto [Doc. Nos. 73-75], Defendants Memorandum in Support of Summary Judgment ("Defs.' Mem.") [Doc. No. 61], and Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp'n") [Doc. No. 71].

In deciding Fidelity's motions for summary judgment, where a factual dispute exists this Court takes the Berensons' version of the facts, where supported by record evidence, as true, and draws all reasonable inferences in their favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

1.  **The Parties**

David Berenson is an experienced business person with "an extensive business career."  Defs.' Facts ¶ 3; Pls.' Facts ¶ 3. His wife, Joan Berenson, likewise was a "sophisticated

businessperson" with experience in the business world.  See Pls.'
Facts ¶ 4.

The defendants National Financial Services LLC and Fidelity
Brokerage Services LLC are subsidiaries of FMR Corporation and
are part of the Fidelity Investments family of companies.  Aff.
of Daniel Stickney [Doc. No. 1, Attach. 14] ¶ 4.  Both are
limited liability companies organized in the State of Delaware,
with principal places of business in Boston, Massachusetts.  Id.
¶ 3.

    2.  **Fidelity's BillPay Service**

Fidelity established a bill payment service named BillPay in
the 1980s.  Defs.' Facts ¶ 8;  Aff. of Camille Zaslau, Defs.'
Mem. Ex. 9 ("Zaslau Aff.") [Doc. No. 67] ¶ 3.  Through BillPay,
Fidelity makes payments to third party payees on behalf of
customers.  Zaslau Aff. ¶ 3.  Although most customer requests for
BillPay payments must be made by way of Fidelity's website,
certain "premium" customers -- like the Berensons -- are allowed
to arrange BillPay payments over the phone.  Id.  The Berensons
contend that the BillPay "service established in the 1980s is
not" the same as the service currently provided.[4]  Pls.' Facts ¶
8a.

---

[4]The Berensons also suggest there is a lack of testimony as
to how this earlier service operated.  Pls.' Facts ¶ 8a.

In June of 2000, Fidelity began using CheckFree Corporation as its electronic bill payment service provider. Fidelity describes the operation of this service:

> On the Transaction Date scheduled by the customer ("Day 1"), Fidelity's system (i) informs CheckFree that a particular payment is to be made, (ii) verifies that there are adequate funds in the customer's Core Account, and (iii) debits the customer's Core Account for the amount of the transaction. Mutual fund shares are redeemed to satisfy the debit amount."

Defs.' Facts at 17 (internal citations omitted).

Fidelity decided to use CheckFree's "good funds" model. Under that model, "Fidelity debits payments from a customer's account on the date selected by the customer, the funds are transferred briefly to an internal Fidelity account on which Fidelity earns no interest, Fidelity then transfers the funds to CheckFree, and CheckFree in turn remits the payment electronically or by check from its own account." Id. ¶ 14. In other words, the funds leave the customers' accounts before they are received by the ultimate payee.[5] Rather than transferring individual payments, "CheckFree makes these payments either by [an] Automated Clearinghouse . . . transfer to those payees with whom it has established an electronic payment relationship or by corporate check sent by mail." Id. ¶ 11. The benefit of this model is the elimination of the risk that a check will "bounce."

---

[5]Contrast this with the familiar check-writing "risk model" where a customer earns interest until the intended payee actually receives the funds. Pls.' Facts ¶ 13f.

Id.  The downside is that the customer stops earning interest on the funds before they are actually delivered to the intended payee.

The speed at which funds are delivered to the intended payee depends on whether the payee accepts payment via automatic clearinghouse transfer.  If the payee accepts payment by electronic transfer, funds may be received by the intended payee on the day after the Transaction Date.  See Defs.' Facts ¶ 18; Defs.' Mem. at 5.  If CheckFree issues a check, however, several days may transpire before the intended payee receives funds.  See Defs.' Facts ¶ 21; Defs.' Mem. at 5.  During the intermediate time, CheckFree earns interest on the monies in its account.

    3.  **The Berensons' Relationship with Fidelity**

The Berensons started to use the BillPay electronic bill payment service in the mid-1980s.  Pls.' Facts ¶ 36a; Defs.' Facts ¶ 36.  According to David Berenson, the service at that time was akin to a check writing service and operated as did a checking account.  Defs.' Facts App., Ex. 4 [Doc. No. 66] (deposition of David Berenson) at 58-59.  In 1993, the Berensons

completed and signed a Bill Payment Application.[6]  This application stated that

> I (we) hereby authorize and request Fidelity Brokerage Services, Inc. to debit my (our) account for amounts to be paid to it for its use in making payments or initiating credit entries to accounts I (we) have authorized you to pay on my (our) behalf.

Pls.' Mem. App., Ex. 19.

The Berensons used the BillPay service to pay recurring bills and to make "one-time" electronic transfers.  Compl. ¶ 20. In August of 2000, the Berensons began using BillPay to transfer funds from their joint account into David Berenson's Berenson & Company International Fidelity account.  Pls.' Facts ¶ 36c. According to the investment reports for each of the accounts, $6,000 was paid out of the Berensons' joint account on October 16, 2000, and $6,000.00 was credited to the Berenson & Company account on October 18, 2000.[7]  Pls.' Facts ¶ 36d; Pls.' Mem. App., Exs. 8 & 9.

Though it is unclear when they the Berensons became aware of the BillPay procedures, the Berensons note that they sent Fidelity a letter explaining their complaints and injury and

---

[6] The Berensons note that the application was for an "existing bill payment service (not for their 'BillPay' service which did not come into existence for another 6 years)."  Pls.' Facts ¶ 39a.

[7] It is unclear when these statements were prepared by Fidelity or received by David Berenson.  <u>See</u> Pls.' Facts ¶ 36d.

suggesting a resolution.  The letter David Berenson sent

Fidelity, dated September 17, 2002, read:

> In January of 2002 I noticed that in my BillPay
> transactions I made, monies were being subtracted from
> my account before the payee actually cashed the BillPay
> Check or received any BillPay funds which I had
> transferred.  A review of my account statements
> indicated this was a regular practice, and occurs
> literally every month I make a BillPay transaction.
> I contacted Fidelity representatives by telephone
> on numerous occasions since then attempting to
> determine why this was the case, and where the interest
> on my money was during this period of time.  However, I
> received no response to my questions.  I believe the
> interest on my money during this period belongs to me
> and is actually being used by Fidelity.  I was unaware
> of this practice and feel I am being charged a fee from
> using the BillPay service.
> As such, on all BillPay transactions I have ever
> made I would like to be repaid the interest on money
> which was taken out of my account before the creditor
> actually obtained the money.

Defs.' Mem. App., Ex. 12 [Doc. No. 67] (Letter dated September

17, 2002 from David A. Berenson to Fidelity Investments).  It

appears that the Berensons did not receive a response to the

letter, nor did Fidelity recredit the disputed funds to the

Berensons' account.  See Pls.' Facts ¶ 55a.

Joan and David Berenson submitted individual affidavits

stating that each had expected to receive interest on the funds

until payment was received by the creditor, and that they would

not have utilized the BillPay service had they been aware that

they did not receive the interest accrued during the interim

period.  Aff. of Joan Berenson ("Joan Berenson Aff.") [Doc. No.

34, Ex. 18] ¶¶ 3-4;  Aff. of David Berenson ("David Berenson

Aff.") [Doc. No. 34, Ex. 19] ¶¶ 3-4.  Moreover, both indicate
that neither used Fidelity's website to use the BillPay Services.[8]
Joan Berenson Aff. ¶ 5; David Berenson Aff. ¶ 5.

### 4.  **Fidelity's Disclosures**

Fidelity contends that the customers subscribing to the
BillPay Service are "governed by the brokerage Customer
Agreement, the BillPay Service Agreement, and the Fidelity
prospectus for the customer's "Core Account."  Defs.' Mem. at 6.
The Berensons disagree.  Pls.' Facts ¶ 22 ("Fidelity's
relationship with BillPay customers is <u>not</u> governed by the
Customer Agreement, the BillPay Service Agreement, and the
Fidelity prospectus for the customer's 'core account.'
Fidelity's contention is not a matter of 'fact,' and should be
stricken from Fidelity's [s]tatement.").

### a.  **Customer Agreement**

Fidelity indicates that it provides consumers a Customer
Agreement when they initially open an account.  Defs.' Facts ¶
23.  The Berensons contend, however, that despite Fidelity's
assertion to the contrary, they were not given the "bill payment

---

[8] David Berenson has accessed Fidelity's website for other
purposes.  David Berenson Aff. ¶ 5 ("I have accessed the Fidelity
internet website.  My purpose has been solely to check on the
performance of certain stocks or other investments in which I own
an interest.  The Fidelity BillPay service is not set forth on
the Fidelity internet homepage and I am not required to have
reviewed the BillPay internet materials in order to review the
performance of my investment.").

agreement when they first enrolled in Fidelity's bill payment service, and Fidelity cannot produce a copy of [any] such . . . agreement" between the parties. Id. ¶ 23.

The Fidelity Customer Agreement states, in pertinent part:

Shares of the transaction fund will be redeemed at their net asset value, and I agree that such shares shall be automatically redeemed to satisfy debit balances in the securities account, card or check usage, electronic funds transfers, overdrafts, and other authorized debit items.

Aff. of Anne Warren Fagan ("Fagan Aff.") [Doc. No. 1, Attach. 16], Ex. A § 4.

I have received and read a copy of the prospectus of the transaction fund selected by me, containing a more complete description of the fund and its fees, charges and operations.

Id.

BILL PAYMENT I hereby understand that FBS is the provider of the Fidelity BillPay service. I hereby understand that and/or agree to:
(1) authorize FBS to post bill payment transactions originating from the Fidelity BillPay to my Fidelity Account; (2) my request to add Fidelity BillPay to my Fidelity Account is subject to review and acceptance by the provider of the service; (3) the Fidelity BillPay service is subject to the Fidelity BillPay Service Agreement; (4) any use of the Fidelity BillPay service confirms my agreement to the Fidelity BillPay Service Agreement; (5) I may terminate the Fidelity BillPay service at any time by calling or writing the customer service phone number or address provided in the Fidelity BillPay Service Agreement . . .
I understand the monthly fee is $6.95 and is waived for Billpay customers who trade 36+ times in a rolling 12-month period or maintain $100,000 or more in certain retail assets at Fidelity. All other customers will be charged a $6.95 monthly fee. See the Fidelity BillPay Service Agreement for complete details.

12

Id. § 7.

> I understand that all debit items, including. . . bill
> payments . . . will be accumulated daily . . .

Id. § 9.

> Receipt of Communications.  Communications by mail,
> electronic means, messenger, telegraph, or otherwise,
> sent to me at the U.S. postal or electronic mail
> address of record listed on the application or any
> other address I may give [Fidelity], are presumed to be
> delivered to and received by me whether actually
> received or not.

Id. § 14.

### b.  **BillPay Service Agreement**

According to Fidelity, in November of 1998 a copy of the
BillPay Service Agreement was sent to all BillPay subscribers
together with a letter instructing customers to "review the
enclosed Fidelity BillPay Service Agreement for new terms and
conditions."  Defs.' Facts ¶ 24.  The Berensons response, "simply
put," is that they "received far too much mail, from Fidelity and
otherwise, to recall what documents they received and what
documents they did not receive in the mail.  Plaintiffs do know
that they never received the initial bill payment agreement when
they opened their account in the 1980s."  Pls.' Facts ¶ 24.

The preamble of the 1998 BillPay Service Agreement states
that,

> "we," "us" or "our" refers to Fidelity Trust Company,
> Fidelity Brokerage Services, Inc. and any affiliate,
> subsidiary, agent, independent contractor, designees,
> or assignee we may, in our sole discretion, involve in
> the provision of the Service (collectively "Fidelity").

13

Fagan Aff., Ex. L (1998 BillPay Service Agreement).  The Service

Agreement further provides:

> Scheduling Information . . . The date on which a Non-
> Recurring Payment or a Recurring Payment is actually
> initiated (debited from your Fidelity Account) is the
> "Transaction Date." . . .
>
> To provide sufficient time for a payment to be received
> and processed by a Payee, the Transaction Date for a
> payment must be at least five (5) business days prior
> to the date your payment is due (the "Due Date")
> excluding any applicable grace periods."

Id. § 8.

> Delivery of Payments.  After we debit your Fidelity
> Account for the amount of a payment, we will remit your
> payment to the Payee by mailing the Payee a check drawn
> on an account we maintain for this purpose, by
> electronic funds transfer, or by other means.  Because
> of the time it takes to transmit a payment, a Payee
> generally will not receive payment on the Transaction
> Date regardless of whether the payment is a Same Day
> payment, a Future Payment, or a Recurring Payment.

Id. § 10.

Additionally, the BillPay Service Agreement requires that

discloses certain fees be paid by BillPay customers:

> Fees.  You agree to pay a monthly fee for the Service.
> The monthly fee is tiered and is based on the level of
> assets you hold at Fidelity.  You will be charged $4.95
> per month if you have over $100,000 in assets at
> Fidelity; otherwise you will be charged $9.95 per
> month.  We will determine your asset level at the end
> of each month.  Your monthly fee for the following
> month may increase or decrease depending on your asset
> level at such time.  For new users of the Service, the
> monthly fee will be waived for the first three (3)
> months following enrollment.

Id. at § 17.

14

In May of 2000, Fidelity sent BillPay customers a letter of
notice, Fagan Aff., Ex. I, informing them of changes to the
BillPay Service Agreement.  Defs.' Facts ¶ 30.  The letter
included a "buckslip" directing customers to Fidelity's website
to review these changes, and further noted that "[u]se of the
Fidelity BillPay service on or after June 16, 2000 -- the
effective date of these changes -- indicates your agreement with
the modifications and amendments."  Id.

The BillPay Service Agreement, amended and in effect as of
June 2000, was substantially identical to the 1998 Agreement.
The preamble of the amended agreement included a statement
similar to the original:

> "we," "us" or "our" refers to Fidelity Brokerage
> Services, Inc. and any affiliate, subsidiary, agent,
> independent contractor, designee, or assignee we may,
> in our sole discretion, involve in the provision of the
> Service (collectively "Fidelity").

Fagan Aff., Ex. Q (2000 BillPay Service Agreement).  Compare
Fagan Aff., Ex. L. (1998 BillPay Service Agreement).  Further,
the "Transaction Date" and the "Delivery of Payments" language in
the 1998 agreement recurs in the 2000 agreement.

The fee disclosure in the 2000 agreement, however, differed
slightly from the previous agreement:

> Fees.  You agree to pay a monthly fee for the Service.
> The monthly fee is based on the level of assets you
> hold at Fidelity.  Fidelity Account customers who
> maintain $30,000 or more in assets in certain Fidelity
> accounts will not be charged a monthly BillPay fee.
> All other BillPay customers will get the first three

> months at no charge, thereafter, the monthly fee is
> $6.95.  Should a fee be imposed at a later date,
> Fidelity will notify you in writing of such fee and the
> date it becomes effective.  You agree to allow Fidelity
> to debit your Fidelity Ultra Service Account for such
> fees, if charged.  Your Internet Service Provider or
> other telecommunications provider ("ISP") may impose
> its own fee or charges.

Fagan Aff., Ex. Q.  The BillPay Service Agreement as amended in 2003 was the version in effect at the time the complaint in this matter was filed.  Pls.' Facts ¶ 33a (describing the 2003 Fidelity BillPay Service Agreement as "slightly different from its two predecessors").  Again, there was similar "Transaction Date," "Delivery of Payments," and "we/us/our" language.  See id. ¶ 33.

### C.   Jurisdiction

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## II.  DISCUSSION

### A.   Standard of Review For Summary Judgment

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, no genuine issues of material fact remain.  Anderson, 477 U.S. at 255.  A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party.

16

<u>Id.</u>  In making its determination, the court must view all evidence in the light most favorable to the nonmovant and is to draw all reasonable inferences in favor of the non-moving party. <u>Eastman Kodak Co.</u> v. <u>Image Technical Servs., Inc.</u>, 504 U.S. 451, 456 (1992); <u>Mediacom Corp.</u> v. <u>Rates Tech., Inc.</u>, 4 F. Supp. 2d 17, 33 (D. Mass. 1998).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is therefore entitled to judgment as matter of law.  <u>Anderson</u>, 477 U.S. at 250; <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 322-24 (1986).  If the movant satisfies this burden, the nonmovant must proffer evidence demonstrating the existence of a genuine issue of material fact.  <u>Donovan</u> v. <u>Agnew</u>, 712 F.2d 1509, 1516 (1st Cir. 1983).  The non-moving party may not rest upon mere allegations or denials; rather it must set forth specific facts showing that a genuine issue exists.  <u>Anderson</u>, 477 U.S. at 250; <u>Donovan</u>, 712 F.2d at 1516; Fed. R. Civ. P. 56(e).

**B.    The Electronic Funds Transfer Act**

**1.    Requirements of the Act**

**a.    Disclosure Requirement**

Congress enacted the Electronic Funds Transfer Act, 15 U.S.C. § 1693, to address a concern that automated systems were more vulnerable to "embezzlement and unauthorized use than traditional payment methods."  <u>Wachter</u> v. <u>Denver Nat'l Bank</u>, 751

17

F. Supp. 906, 908 (D. Colo. 1990).  The Act requires financial institutions make disclosures when a customer initially contracts for electronic fund services.  15 U.S.C. § 1693c(a).  The disclosure must include the fees and charges associated with the transfer.  Id.

b.  **Error Resolution Provision**

Section 1693f(a) requires:

> If a financial institution, within sixty days after having transmitted to a consumer documentation pursuant to section 1693d(a), (c), or (d) of this title or notification pursuant to section 1693d(b) of this title, receives oral or written notice in which the consumer
> (1) [provides identifying information];
> (2) indicates the consumer's belief that the documentation . . . or account . . . contains an error; and
> (3) sets forth the reasons for the consumer's belief (where applicable) that an error occurred,
> the financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days.

15 U.S.C. § 1693f(a).

An institution discovering error "promptly" must correct the error.  15 U.S.C. § 1693f(b) (providing the correction must be made within "one business day" after discovery of an error).  If the institution finds there is no error, "it shall deliver or mail to the consumer an explanation of its findings within 3 business days after the conclusion of its investigation."  15 U.S.C. § 1693f(d).  Such explanation must be in writing.  Bisbey v. D.C. Nat'l Bank, 793 F.2d 315, 317 n.5 (D.C. Cir. 1986).

18

Rather than following the mandates of 15 U.S.C. § 1693f(a) and (b), an institution has the option to "provisionally recredit" the amount of the alleged error to the consumer's account, pending the conclusion of its investigation. 15 U.S.C. § 1693f(c).

The Act defines "error" as:

> (1) an unauthorized electronic fund transfer;
> (2) an incorrect electronic fund transfer from or to the consumer's account;
> (3) the omission from a periodic statement of an electronic fund transfer affecting the consumer's account which should have been included;
> (4) a computational error by the financial institution;
> (5) the consumer's receipt of an incorrect amount of money from an electronic terminal;
> (6) a consumer's request for additional information or clarification concerning an electronic fund transfer or any documentation required by this subchapter; or
> (7) any other error described in regulations of the Board.

15 U.S.C. § 1693f(f).[9]

2.    **Statutes of Limitations Determinations**

a.    **Claim for Failure to Disclose**

The Act provides that "any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of

---

[9]Though the Berensons referred to the error resolution in their complaint in the context of treble damages, an institution that violates of the provision is subject to statutory damages, even in the absence of actual damages. See Gale v. Hyde Park Bank, 384 F.3d 451, 452-53 (7th Cir. 2004) (noting that "violations of [§ 1693f], (unlike violations of § 1693h) can lead to statutory damages even in the absence of injury").

the occurrence of the violation." 15 U.S.C. § 1693(g). Upon
Fidelity's motion, this Court ruled that the Berensons' claim
alleging that Fidelity failed properly to disclose information as
required by the Act was untimely. This ruling was based on the
Berenson's own acknowledgment in a letter dated September 17,
2002, which admitted that they were aware of the disputed "fee"
by January 2002, more than a year prior to the filing of this
action.[10]

b. **Error Resolution Claim**

In its February 8, 2005 motion for partial summary judgment,
Fidelity argued that the error resolution portion of the claim
was likewise barred by the statute of limitations -- an argument
this Court rejected. Defs.' Mem. in Supp. of Mot. for Summ. J.
on EFTA Claims as Barred by the Statute of Limitations [Doc. No.
25] at 4; Tr. of Hr'g of 3/3/05 at 12. The Berensons' letter
emphasizing the error resolution provision is dated September 17,
2002. It is unclear on the record whether Fidelity conducted an
investigation or provided any documentation in response to that
letter. According to the Berensons, Fidelity did not respond in
writing. In light of the statutory ten-day period within which a
financial institution must provide a written response, the
statute of limitations did not begin to run until September 27,

---

[10]The Berenson's filed their complaint on September 26,
2003.

20

2002, ten days

after the September 17th letter.  The Berensons filed their

complaint on September 26, 2003.

To the extent that Fidelity requests reconsideration of the

Court's ruling as to the timeliness of the error resolution

claim, this Court has considered the question carefully and again

rules that the error resolution claim was timely filed within the

one year statute of limitations.

### 3.    Surviving Error Resolution Claim

#### a.    General Analysis

Here, in the second motion for summary judgment, Fidelity

argues that the error resolution claim fails as matter of law.

Fidelity asserts:

> (i) Fidelity's intentional actions in accordance with
> the parties' contract cannot be deemed an "error"
> within the meaning of the EFTA; (ii) the Berensons
> never properly notified Fidelity of a purported
> "error"; and (iii) any error resolution claim is
> untimely.

Defs.' Mem. at 14.

The Berensons' "error resolution" claim, however, survives.

Despite Fidelity's "intentional actions," the error resolution

provision applies and Fidelity was required to fulfill the

resolution requirements mandated by the statute.  See Bisbey, 793

F.2d at 317.  In Bisbey, a customer sued a bank for violation of

the Act.  Bisbey had authorized the bank to debit her account for

insurance premiums.  Id. at 316.  One month, Bisbey's account had

21

insufficient funds.   <u>Id.</u>  When the bank resubmitted the request
for funds the following month, Bisbey incorrectly believed she
had been double-charged for the same month.  After she submitted
a written complaint, the bank verbally explained there had been
no error.  <u>Id.</u>

Although the bank was correct and Bisbey did not suffer
damages, the District of Columbia Circuit held that the bank
failed to comply with the statute by not submitting its
explanation in writing.  <u>Id.</u> at 317 ("This section imposed a duty
upon the Bank to 'deliver or mail' the results of its
investigation to Ms. Bisbey and to advise her of her right to
request reproductions of all documents which it relied upon to
conclude that no error occurred.  The oral notice given to
appellant was insufficient with respect to the required
'explanation . . .'").  The circuit court held that the bank's
failure properly to fulfill the error resolution requirements was
a violation of the statute, even though the bank had not
committed the initial error of which Bisbey complained.  The
court explained that:

> [t]he Bank's foregoing failures to comply with the
> statute give rise to civil liability under section 915
> of the Act.  That section provides that 'any person who
> fails to comply with any provision of [the Act] with
> respect to any customer, except for an error resolved
> in accordance with section 908, is liable to such
> consumer' for actual damages or for a symbolic award.
> Thus, under the plain terms of the Act, civil liability
> attaches to <u>all</u> failures of compliance with respect to
> <u>any</u> provision of the Act.

22

<u>Bisbey</u>, 793 F.2d at 317 (referring to the Consumer Credit
Protection Act §§ 908(d), 915, as amended, 15 U.S.C. §§ 1693f,
1693m).

Here, once the Berensons notified Fidelity of their
complaint, Fidelity was required by law to respond in writing
within the prescribed time limit.  As they failed to do so, the
Berensons are entitled to the symbolic statutory award.

b.   **Statutory Notice Requirements**

Fidelity further argues that the September 17, 2002 letter
from David Berenson failed to provide Fidelity the necessary
notice now to invoke the requirements of the Act because the
letter described the nonpayment of interest on the so-called
float as a "regular practice."  Defs.' Mem. at 15.  Mr. Berenson
stated in his letter that,

> I contacted Fidelity representatives by telephone on
> numerous occasions since then attempting to determine
> why this was the case, and where the interest on my
> money was during this period of time.  However, I
> received no response to my questions.  I believe the
> interest on my money during this period belongs to me
> is actually being used by Fidelity.  I was unaware of
> this practice and feel I am being charged a fee for
> using the BillPay service.

Defs.' Ex. 12.

Fidelity's argument is unpersuasive.  Again, although
Fidelity might have prevailed in defending its practices, it was
nevertheless required to investigate and provide a written
response to the Berensons within the statutory ten day period.

23

C.   Misrepresentation Claim

In order to succeed on their intentional misrepresentation claim, the Berensons must show that Fidelity knowingly made a false statement of material fact for the purpose of inducing them to act, and that they reasonably relied on the statement. See John Beaudette, Inc. v. Sentry Ins. A Mut. Co., 94 F. Supp. 2d 77, 128 (D. Mass. 1999) (Bowler, M.J.).  Negligent misrepresentation shares the same elements as intentional misrepresentation except that the defendant need only act negligently, rather than knowingly.  Cole v. New England Mut. Life Ins. Co., 49 Mass. App. Ct. 296, 300 (2000) (citing Restatement (Second) of Torts § 552 (1977)) (explaining that "the plaintiff must show that the defendant, in the course of his business, supplied false information for the guidance of another upon which the plaintiff justifiably relied to his financial detriment" and "that the defendant failed to exercise reasonable care or competence in obtaining or communicating the information.").  It is not necessary to find an actual intent to deceive, Zimmerman v. Kent, 31 Mass. App. Ct. 72, 77 (Mass. App. Ct. 1991 (citations omitted); Powell v. Rasmussen, 355 Mass. 117, 118 (1969) (citation omitted), and "[t]he speaker need not know that the statement is false if the truth is reasonably susceptible of actual knowledge." Rodowicz v. Massachusetts Mut. Life Ins. Co., 279 F.3d 36, 42 (1st Cir. 2002) (quoting

Zimmerman, 31 Mass. App. Ct. at 77) (internal quotation marks
omitted).

Fidelity challenges these two claims by arguing that the
First Circuit requires that there be a false statement in order
for a plaintiff to succeed on a claim of negligent
misrepresentation.   Bamberg v. SG Cowen, 236 F. Supp. 2d 79, 92
(D. Mass. 2002) (Saris, J.) ("In order to recover for negligent
misrepresentation, a plaintiff must prove that the defendant, in
the course of his business, made a false representation of
material fact for the purpose of inducing the plaintiff to rely
upon it, and that the plaintiff did rely upon the representation
as true, to his damage." (quoting Kitner v. CTW Transport, 53
Mass. App. Ct. 741, 749 (2002) (internal quotation marks
omitted))).   Fidelity thus asserts that both claims fail because
there was no false statement.

The Berensons counter that "[u]nder Massachusetts law, a
defendant can be held responsible not only for outright untrue
statements, but also for giving misleading partial information or
for telling half-truths."  Pls.' Opp'n at 15 (citing Golber v.
BayBank Valley Trust Co., 46 Mass. App. Ct. 256, 258 (1999)
("Fragmentary information may be as misleading. . . as active
misrepresentation, and half truths may be as actionable as whole
lies.")).  Though support for the "failure to disclose theory" of
misrepresentation is scarce in this circuit, at least one judge

25

in this district has recognized this interpretation of
Massachusetts law.  Eureka Broadband Corp. v. Wentworth Leasing
Corp., Civ. A. No. 02-11068, 2004 WL 344425, at *5 n.13 (D. Mass.
Feb. 24, 2004) (Stearns, J.) (unreported decision).  In Eureka,
Judge Stearns noted that a failure to disclosure is actionable
when there exists a duty to disclose.  Id. (citation omitted).
This rule applies, for example, when there is a fiduciary
relationship between the parties.  Such a fiduciary relationship,
however, does not exist between Fidelity and the Berensons.  See
section D infra.

     Although the disclosures provided to consumers by Fidelity
may fail to disclose a "fee" as required by the Act, under these
circumstances that failure does not amount to a
misrepresentation.  Thus, this Court allowed Fidelity's motion
for summary judgment as to the Berenson's misrepresentation
claims.

**D.   Claim for Breach of Fiduciary Duty**

     The Berensons allege that Fidelity owed them a fiduciary
duty of care and that they breached that duty by

> (i) not transferring the subject monies to the
> designated transferees of Plaintiffs . . . as quickly
> as possible and in a commercially practicable fashion
> as required; (ii) by kiting or otherwise improperly
> earning interest on the use of the funds of Plaintiffs
> and the Class members; (iii) and/or by not paying
> interest to Plaintiffs . . . on the subject funds
> during the period between which the funds were debited
> from the accounts of Plaintiffs. . . and the time when

such funds were actually credited to the designated
transferee(s) of Plaintiffs.

Compl. ¶ 76.

The Berensons argue that since Fidelity transferred funds
from their account to Fidelity's own account prior to
transferring to the intended payee, a constructive trust was
created. As a result, the argument goes, Fidelity owes the
Berensons a fiduciary duty, a duty that Fidelity breached by not
making the transfers as quickly as possible. Fidelity contests
the creation of such a fiduciary relationship. Defs.' Mem. at 17
("A 'simple stockbroker-customer relationship does not constitute
a fiduciary relationship.'") (quoting <u>Lefkowitz</u> v. <u>Smith Barney,
Harris, Upham & Co. Inc.</u>, 804 F.2d 154, 155 (1st Cir. 1986)
(articulating Massachusetts law)).

Under Massachusetts law, a constructive trust may arise,
even in the absence of any intent to create a trust, in order to
avoid unjust enrichment. <u>Hoult</u> v. <u>Hoult</u>, Civ. A. No. 88-1738,
2002 WL 1009378, at 29 (D. Mass. May 13, 2002) (Woodlock, J.)
(citing <u>Barry</u> v. <u>Covich</u>, 332 Mass. 338, 342-43 (1955)).[11]    <u>Hoult</u>,
however, is dissimilar to this matter and distinguishable on the
facts. There, property was being held by one person so that it

---

[11]<u>But</u> <u>see</u> <u>Kuhn</u> v. <u>Capital One Financial Corp.</u>, Civ. A. No.
015177, 2004 WL 3090707, at *6 (Mass. Super. Nov. 30, 2004)
(MacLeod, J.) ("[O]ne party cannot unilaterally transform a
business relationship into a fiduciary relationship by reposing
trust and confidence in another.") (citing <u>Broomfield</u> v. <u>Kosow</u>,
349 Mass. 749 (1965)).

27

could not be used to satisfy a judgment against another.  <u>Hoult</u>, 2002 WL 1009378 at *28-29.

The Berensons' characterization is that "Fidelity purports to take control of and hold for the benefit of the Berensons, in trust, the monies that are [the] subject of the BillPay service as designated in a given transaction."  Pls.' Opp'n at 17-18. This is, however, inaccurate.  Fidelity, and later CheckFree, merely held the funds until they were transferred to the intended payee.  Although the disclosures as to how BillPay operated ultimately may have been insufficient, a trust was not created and Fidelity did not owe the Berensons a fiduciary duty.  Thus, this Court thus allowed Fidelity's motion for summary judgment on the breach of fiduciary duty claim (the remaining Count IV).

### E.    Chapter 93A Claim

Although the Berensons failed timely to file a failure to disclose claim under the Act, they may be able to seek redress for this statutory violation under Chapter 93A.  <u>See</u> <u>Whitehall Co. Ltd.</u> v. <u>Merrimack Valley Distrib. Co., Inc.</u>, 56 Mass. App. Ct. 853, 858 (2002) ("[V]iolation of a specific statute that does not itself permit private recovery may give rise to a private claim under [chapter] 93A if the violation amounts to an unfair method of competition or an unfair or deceptive practice independently prohibited by G.L. c. 93A, § 2, and if recovery

28

under [chapter] 93A is compatible with the objectives and enforcement mechanisms the underlying statute contains.").

"[O]ne can commit a chapter 93A violation without behaving like a 'rascal,' if one violates consumer protection or public safety laws." Cablevision of Boston, Inc., v. Public Improvement Comm'n of the City of Boston, 184 F.3d 88, 106 (1st Cir. 1999). "The circumstances of each case must be analyzed, and unfairness is to be measured not simply by determining whether particular conduct is lawful (or unlawful, we now add) apart from G.L. c. 93A but also by analyzing the effect of the conduct on the public (or the consumer)." Mechanics Nat'l Bank, 377 Mass. at 109 (quoting Schubach v. Household Fin. Corp., 375 Mass. 133, 137 (1978)).

Not every unlawful act is a violation of Chapter 93A. See, e.g., Flood v. Midland Nat'l Life Ins. Co., 419 Mass. 176, 183-84 (1994) (holding refusal to make payment required pursuant to insurance policy was not an unfair business practice); Mechanics Nat'l Bank of Worcester v. Killeen, 377 Mass. 100, 109 (1979) (ruling a certain sale of stock was not an unfair business practice). To succeed on their claim under section 9 of Chapter 93A, the Berensons must show that the statutory violation also violates Chapter 93A § 2, or that Fidelity's behavior was in itself an unfair method of competition. See Mass. Gen. Laws. ch. 93A, §§ 2,9.

29

Section 2 paragraph (c) of Chapter 93A grants the Attorney General the authority to establish rules and regulations interpreting section 2(a).    Id. §§ 2(a), (c).  The Code of Massachusetts Regulations provides that an act or practice violates section 2 of Chapter 93A if:

> 3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection . . .

Mass. Regs. Code tit. 940, § 3.16(3).

Guided by the Federal Trade Commission's definition, see Action Ambulance Serv. Inc., v. Atlanticare Health Servs., Inc., 815 F. Supp. 33, 39 & n.8 (D. Mass. 1993) (Mazzone, J.), the Massachusetts Supreme Judicial Court has adopted this definition of unfair trade practices:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 777 (1980) (citation omitted).  See American Tel. & Tel. Co. v. IMR Capital Corp., 888 F. Supp. 221, 256 (D. Mass. 1995)(Gertner, J.). Fidelity emphasizes this definition.  Defs.' Mem. at 19 (quoting Action Ambulance, 815 F. Supp. at 39).

Fidelity further challenges the Berensons' argument that Fidelity's alleged violation of the disclosure requirements under the Act likewise constitutes a violation under Chapter 93A. It argues:

> The Berensons cannot rely upon their theory that Fidelity violated the EFTA or the TiSL by failing to disclose a "fee" or "charge." First, there was full disclosure. Second, as Fidelity argued at length in its motion to dismiss and for summary judgment the EFTA is inapplicable because (i) the lost opportunity to earn interest is not a "fee" or "charge" subject to disclosure under the EFTA; (ii) even if a lost opportunity were deemed a "fee," Fidelity lies within a statutory safe harbor provided by Federal Reserve form disclosures. Third, Fidelity is not a bank subject to the TiSL.

Defs.' Mem. at 19 n.4.

### 1. Does the Loss of Interest Constitute a Fee Requiring Disclosure?

There is no case on point as to whether the "lost opportunity to earn interest" -- here the interest lost on the "float" -- constituted a fee under the Act. Black's Law Dictionary defines "charge" as "to demand a fee; to bill." Black's Law Dictionary 248 (8th ed. 2004). A "fee" is defined as "a charge for labor or services, esp[ecially] professional services." <u>Id.</u> at 647. Fidelity, predictably, argues that an "opportunity cost" cannot be considered a "fee". Defs.' Nov. 2003 Mem. at 14.

Fidelity's initial memorandum in support of its motion to dismiss ironically provides one of the most compelling arguments

31

that lost interest may constitute a fee.  Fidelity notes that
"while the retention of interest for a brief period by Fidelity
and CheckFree may be construed as a benefit to them and an
opportunity the plaintiffs lose, it also offsets the expense of
the labor intensive bill payment service, thereby likely reducing
the charge to the consumer."  Defs.' Nov. 2003 Mem. at 15.
Though the reason offered by Fidelity explaining why it should be
allowed to earn interest at the expense of its customers may be
sound, it does not justify circumvention of the disclosure
requirement.  To the contrary, Fidelity's argument that the
interim interest lost by customers reduces other fees supports
the Berensons' argument that the lost interest is a fee subject
to disclosure.

    Fidelity asserts that the Berensons could have avoided
Fidelity's use of their money between the transaction date and
the date of payment if they used traditional paper checks.  This
Court is unpersuaded by that argument.  Rather, this case
illustrates the very purpose of, and reason for, the Act - the
protection of customers from the unauthorized or improper use of
funds.

    Fidelity contends that the Berensons' interpretation of
"fee" would result in an "absurdly burdensome reporting
requirement[] and result in highly confusing periodic account
statements."  Defs.' Mem. at 15.   There indeed exists a

possibility that requiring individual statements might be unduly burdensome. The mere requirement, however, that Fidelity disclose its earning of interest on its customers' funds during the "float" period is not unreasonably onerous.[12]

Fidelity's argument that CheckFree earned the benefit from the float period is likewise unpersuasive. The preamble to Fidelity's BillPay Service Agreement provides that:

> we," "us" or "our" refers to Fidelity Trust Company, Fidelity Brokerage Services, Inc. _and_ any affiliate, subsidiary, agent, independent contractor, designees, or assignee we may, in our sole discretion, involve in the provision of the Service (collectively "Fidelity")

Fagan Aff., Ex. L (emphasis added). Thus, Fidelity cannot avoid its obligations under the Act under the pretense that the fee was actually charged by another party. This is particularly true when Fidelity itself has allied with such other party. See id.

Even if the agreements made it clear that several days would transpire between the withdrawal of funds from a customer's account and receipt of those funds by the intended payee, Fidelity failed to disclose this interim loss of interest as a fee, as required by the Act.

---

[12] Fidelity points to _United States_ v. _Wilson_ in support of its argument that the Court should not accept a broad definition of a "fee," as there is "no evidence that Congress or the Federal Reserve intended to impose such a unwieldy regime." 290 F.3d 347, 367 (D.C. Cir. 2002)). The court in _Wilson_ stated that "absurd results are strongly disfavored." _Id._ at 361. In _Wilson_, however, the statutory interpretation that the Court rejected would have controverted the intention of the statute. That is not the case here.

### 2.    "Safe Harbor" Defense

Fidelity correctly asserts that the Act provides a "safe harbor" defense that shields financial institutions that use an appropriate model disclosure, as delineated in section 1693m(d)(2).  This defense, however, exempts a financial institution from liability for "failure to make disclosure in proper form if a financial institution utilized an appropriate model clause."  15 U.S.C. § 1693m(d)(2) (emphasis added).

If the interest Fidelity earns between the Transaction date and the actual payment date constitutes a fee, none of the model clauses apply.  Fidelity seemingly argues that as the regulations only provide model disclosures for three categories of fees, no other fee exists.  This argument is unavailing.  If this Court accepted Fidelity's argument, it would allow institutions to circumvent the statute and avoid disclosure by devising and implementing creative fee structures.  Fidelity is not exempt because there does not exist an "appropriate model clause."

Additionally, the statutory language suggests that this defense insulates an institution only from a challenge as to the form -- not the adequacy -- of the disclosure.  Finally, the defense relates to "good faith compliance."  If Fidelity intentionally retained interest during the float as a fee, it cannot then shield itself from liability by using a model disclosure for an entirely different "fee."

34

This Court, therefore, holds that any lost interest retained by Fidelity (or CheckFree) is a fee that must be disclosed.

### 3.    The Truth in Savings Law - Is Fidelity a "Bank"?

Fidelity argues that it is not a "financial institution" as contemplated by the Massachusetts Truth-in-Savings Law.[13]  It cites the statutory definition that defines a financial institution as "a state or national bank, a state or federal savings and loan association, a state or federal savings bank, a co-operative bank, a state or federal credit union, or any person doing business similar to any business referred to in section one of chapter [167]."  Mass. Gen. Laws ch. 140E, § 1.

In First Fiduciary Corp. v. Office of the Com'r of Banks, 43 Mass. App. Ct. 457 (Mass. App. Ct., 1997), the court had to determine whether a corporation that limited its business to corporate trusteeships was a "bank" subject to the Office of the Commissioner of Banks.  The Massachusetts Appeals Court ruled that it was not a bank, because the corporation did not perform the traditional base functions of a bank, such as "the acceptance of deposits, the discounting of bills and notes, and the making

---

[13]The Truth in Savings Law count was dismissed because the statute does not create a private right of action.  Nevertheless, the statute explicitly states that "[a] violation of this chapter shall also constitute a violation of chapter [93]A" and, accordingly, this claim can be pursued under the Consumer Protection Act.  See Mass. Gen. Laws ch. 93A; Mass. Gen. Laws ch. 140E, § 3.

of loans." Id. at 461.  This definition, as applied in this case, allows for the potential imposition of liability under chapter 93A.

### 4.    **Statute of Limitations - Chapter 93A Claim**

Fidelity argues that the Berensons are barred from submitting a Chapter 93A claim because there was nothing "inherently unknowable" about the functioning of the BillPay Service.  Defs.' Mem. at 10.  Fidelity fails to appreciate, however, that each undisclosed, individual "fee" charged constitutes a separate violation of the Electronic Funds Transfer Act.  This Court made clear at the March 3, 2005 hearing that once the Berensons became aware of the "fees," the clock then started to run.  Tr. of Hr'g of 3/3/05 at 3-4, 12.  Taking all reasonable inferences in favor of the Berensons, this clock began to run as late as January of 2002.  As this case was filed on September 26, 2003, it was well within the limitations period for a Chapter 93A claim.[14]

---

[14]To reiterate, this does not revive the Berensons' claim under the Electronic Funds Transfer Act, as that claim is barred by the one-year statute of limitations.  The Chapter 93A claim, however, was filed timely and survives.

**III. CONCLUSION**

For these reasons, the Court entered the order of July 13, 2005, ALLOWING in part and DENYING in part the motion for summary judgment [Doc. No. 60].

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
CHIEF JUDGE