IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOAN BERENSON and DAVID
BERENSON, individually and on behalf of
all others similarly situated,

              Plaintiffs,

     v.

NATIONAL FINANCIAL SERVICES LLC,
FIDELITY BROKERAGE SERVICES LLC,
and DOES 1-50, inclusive,

             Defendants.

Civil Action No. 04 CV 11311 (WGY)

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO RECONSIDER OR TO CERTIFY FOR INTERLOCUTORY APPEAL OR ALTERNATIVELY TO VACATE

Nicholas C. Theodorou (BBO No. 495730)
John A. Shope (BBO No. 562056)
William W. Fick (BBO No. 650562)
David E. Cole (BBO No. 658705)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

## Table of Contents

Page

I.   Background ...................................................................................................2

II.  The Court Made Errors on Controlling Questions of Law that Should Be
     Reconsidered. .............................................................................................4

     A.   The "Opportunity Cost" of Interest Foregone Is Not a "Fee" that Fidelity
          Failed to Disclose Under the EFTA. ..................................................4

          1.   Under the EFTA's Plain Meaning, a Foregone Opportunity Cost Is
               Not a "Charge" or "Fee." ..........................................................4

          2.   Federal Reserve Regulations Preclude Foregone Interest From Being
               Considered a "Fee." ..................................................................5

          3.   Even Assuming Foregone Interest to Be a "Fee," Fidelity Disclosed
               It. ...........................................................................................7

     B.   Fidelity Is Not Subject to the MTiSL. ...............................................8

          1.   Fidelity Is Not a Bank Within the Meaning of the MTiSL. ...........8

          2.   The Legislature Did Not Intend for Entities Like Fidelity to be
               Considered "Banks." ................................................................9

          3.   Neither the Substantive Provisions of the MTiSL Nor the Regulations
               Promulgated Under the MTisL Apply to Fidelity. ..................... 10

     C.   The "Error Resolution" Provisions of the EFTA Cannot Apply to a Customer
          Who Does Not Allege an Error of the Type Specified. ..................... 12

III. If the Court Does Not Reconsider its Rulings, the Court Should Certify Them for
     Interlocutory Appeal Under 28 U.S.C. § 1292(b). .......................................14

IV.  Alternatively, The Court Should Vacate its Rulings on the Merits as Inconsistent
     With the Order Compelling Arbitration. .....................................................15

## Introduction

Defendants Fidelity Brokerage Services LLC and National Financial Services LLC (together, "Fidelity") respectfully submit this memorandum in support of their motion for reconsideration or certification for interlocutory appeal or alternatively to vacate. Fidelity respectfully contends that in its order of July 13, 2005 [dkt # 79] and explanatory memorandum opinion of October 31, 2005 [dkt # 89] ("October 31 Memorandum" or "Mem."), the Court made three critical errors of law that, if not corrected, will disturb settled expectations of both regulators and regulated institutions alike, invite inappropriate class action litigation, and require significant business changes for Fidelity, other mutual fund companies, broker-dealers, and other financial institutions.

First, the Court improperly failed to defer to controlling regulations of the Federal Reserve Board in determining that the lost opportunity to earn "interest" was a "fee" subject to disclosure under the federal Electronic Funds Transfer Act, 15 U.S.C. §§ 1693 *et seq.* ("EFTA"), and erroneously suggested that any "fees" must be labeled as such.

Second, the decision allowed claims against Fidelity to go forward notwithstanding that Fidelity is not a "bank" under the text of the Massachusetts Truth in Savings Law ("MTiSL"), Mass. Gen. Laws c. 140E, detailed regulations, judicial precedent, and the understanding of both the Commissioner of Banks and the financial industry.

Third, the Court incorrectly held that customer complaints not alleging an "error" as narrowly defined by the EFTA trigger the EFTA's "error resolution" provisions.

The Court should either correct these errors on reconsideration or certify those issues for an interlocutory appeal. In the alternative, the Court should vacate its order and memorandum as they relate to the Berensons' individual claims. Once the Court decided to deny class certification for unrelated reasons, it rendered the Berensons' individual claims subject to

arbitration. The Court therefore should have refrained from making any further ruling on the merits of their case.

## I.   BACKGROUND

This case relates to Fidelity's electronic bill payment service, called BillPay. The Court's October 31 Memorandum explains that Fidelity notified its customers that it would debit a customer's account to execute bill payments up to five days before the customer's payee would receive the funds. Mem. at 13-14. Fidelity also told the Berensons that they would stop earning dividends (what the Berensons call "interest") on the money market mutual fund from which payments were made as of the next business day after a debit. Defs.' Statement of Facts ¶ 29 [dkt #62]; Pls.' Resp. ¶ 29 [dkt #72]. Mr. Berenson noticed the gap between payment and credit and called Fidelity repeatedly to complain. Mem. at 10. After he wrote a letter to reiterate his complaint, Fidelity called Mr. Berenson to explain the BillPay system and try to resolve his complaint about its "good funds" payment model, Defs.' Statement of Facts ¶ 55 [dkt #62]; Pls.' Resp. ¶ 55 [dkt #72], a model which is also used by other institutions such as the Bank of America, App. Defs.' Mot. Summ. J., vol. 3, tab 18, ex. 1, ¶ 12 (Humphrey Aff.) [dkt #68].

The Berensons brought this suit as a putative class action on behalf of themselves and all others similarly situated, alleging that Fidelity did not adequately disclose that BillPay customers would lose the "float" on bill payments and that Fidelity had failed to respond to their previous complaints as required by the EFTA. Fidelity filed a motion to dismiss the complaint and for summary judgment. It also advised the Court that, if class action status were denied, it reserved the right to seek arbitration pursuant to the parties' arbitration clause, Mem. at 3, which mandates arbitration for individual claims but not class actions. After a hearing on October 13, 2004, the Court granted Fidelity's motion in part and denied it in part without prejudice to renewal as a motion for summary judgment later in the case.

2

The Berensons then moved for class certification. At a hearing on February 16, 2005, the Court stated that it would defer decision of class certification until after a trial of any remaining individual claims of the Berensons to be conducted in September, 2005. Hearing Tr. at 18. At a hearing on March 3, 2005, the Court granted in part and denied in part Fidelity's motion for partial summary judgment, holding that the EFTA statute of limitations of one year barred the claim of inadequate disclosure under that statute but not the claim of failure to follow requisite procedure upon notice of an "error." Following the conclusion of discovery, on May 26, 2005, Fidelity moved for summary judgment on the remaining claims.

On July 13, 2005, the Court issued a brief order granting Fidelity's motion for summary judgment on all claims except for the Berensons' individual EFTA "error resolution" claim and their claims under Mass. Gen. Laws c. 93A. The order also dismissed the class claims, and it stated that an explanatory memorandum would be issued shortly. (The motion for class certification was administratively terminated on the same day.) On August 8, 2005, Fidelity reiterated its desire to have the remaining claims arbitrated by filing an unopposed motion to compel arbitration of the Berensons' individual claims. On August 22, 2005, the Court granted that motion. The Berensons have not yet filed an arbitration claim.

On October 31, 2005, the Court issued its opinion explaining the basis for its July 13, 2005 order. The Court held that Fidelity may be liable under the EFTA's "error resolution" provision for its failure to respond to Mr. Berenson's complaint in writing. Mem. at 23. The Court rejected Fidelity's argument that its actions did not constitute "errors" within the meaning of the EFTA. Mem. at 21-23. The Court further held that Fidelity may be liable under Mass. Gen. Laws c. 93A for violating the EFTA by not disclosing the foregone "interest" as a "fee." *Id*. at 33, 36. Finally, the Court held that Fidelity may be liable under c. 93A for violating the

3

MTiSL.  Although the Court did not elaborate on this point, its opinion appears to suggest that Fidelity's liability could be predicated on a failure to provide Mr. Berenson with adequate information about the lost opportunity to earn interest on bill payments when he opened the account.  Mem. at 35-36.  The Court rejected Fidelity's contention that it is not a "financial institution" subject to the MTiSL because Fidelity could not be deemed a "bank" under state law.  Mem. at 35.  The opinion does not address the grounds for denying class certification.

## II.    THE COURT MADE ERRORS ON CONTROLLING QUESTIONS OF LAW THAT SHOULD BE RECONSIDERED.

### A.    The "Opportunity Cost" of Interest Foregone Is Not a "Fee" that Fidelity Failed to Disclose Under the EFTA.

In its October 31 Memorandum, the Court held that the opportunity cost of foregone "interest" is a "fee" that must be disclosed under the EFTA.  That holding improperly displaces the regulatory authority of the Federal Reserve Board and unfairly disturbs the financial industry's settled expectations arising from the Board's detailed and carefully drawn regulations.  The Court's further suggestion that Fidelity violated the EFTA because it did not label its bill payment model "as a fee" was equally in error.

### 1.    Under the EFTA's Plain Meaning, a Foregone Opportunity Cost Is Not a "Charge" or Fee."

The EFTA requires disclosure of, among other things, "any <u>charges</u> for electronic fund transfers or for the right to make such transfers."  15 U.S.C. § 1693c(a)(4) (emphasis added).  The Federal Reserve Board's implementing regulations have limited that disclosure requirement to "fees."  *See* 12 C.F.R. § 205.7(b)(5) (requiring disclosure of "[a]ny fees imposed by the financial institution for electronic fund transfers or for the right to make transfers").  As when construing a statute, a court must read the terms of a regulation to "convey their ordinary meaning, including as reflected in dictionary definitions."  *United States v. Knott*, 256 F. 3d 20,

28 (1st Cir. 2001). In ordinary usage, the plain meaning of a "fee" is an <u>actual debit</u> for a <u>fixed</u> <u>amount</u>.[1] That definition does not encompass a foregone opportunity to earn an indeterminate amount of future income.

In light of that definition, it is no surprise that the only circuit court and every district court but one that has previously considered the question whether a lost opportunity to earn interest was a "charge" subject to consumer disclosure determined that it was not. *See Turner v. Gen. Motors Acceptance Corp.*, 180 F.3d 451, 456 & n.5 (2d Cir. 1999) (collecting cases). In *Turner*, the Second Circuit rejected the plaintiffs' argument that the defendant had failed to disclose as a "charge" the interest that the defendant might have earned on the plaintiffs' security deposit, because that lost interest did not constitute a "liability" to the plaintiff. *See id.* at 455- 56. The district court decision affirmed in *Turner* put it most succinctly: "Although plaintiff loses the opportunity to earn interest and receive other benefits from his own bank when he transfers the security deposit to defendant, this is an obvious opportunity cost inherent in the concept of a deposit. Inherent costs of this nature are not 'other charges payable by the lessee' that must be disclosed under the CLA [Consumer Lending Act]." *Turner v. Gen. Motors Acceptance Corp.*, 980 F. Supp. 737, 742 (S.D.N.Y. 1997), *aff'd*, 80 F.3d 451 (2d Cir. 1999). The very same analysis applies here.

### 2. Federal Reserve Regulations Preclude Foregone Interest From Being Considered a "Fee."

Even if the words "fee" or "charge" could plausibly be interpreted as in the Court's October 31 Memorandum, such an interpretation is foreclosed by regulations promulgated by the

---

[1] *See* WEBSTER'S NEW COLLEGIATE DICTIONARY 186 & 416 (1981) (defining "charge" as, *inter alia*, "a <u>debit</u> to an account" and defining "fee," *inter alia*, as a "<u>fixed</u> sum charged.") (emphases added); AMERICAN HERITAGE DICTIONARY 236 & 500 (3d ed. 1993) (defining "charge," *inter alia*, as "a <u>debit</u> or an <u>entry</u> in an account recording a debt" and defining "fee," *inter alia*, as "a <u>fixed</u> sum charged.") (emphases added).

Federal Reserve Board. The Board has issued extensive regulations and "safe harbor" model clauses governing disclosures of fees for purposes of the EFTA. Consistent with an ordinary reading of the statutory text, all of those regulations contemplate affirmative debits from the account, and none encompasses a foregone opportunity. *See, e.g.*, 12 C.F.R. § 205, Supp. I, ¶ 7(b)(5)(1); *id*. ¶ 7(b)(5)2; id. ¶ 9(b)(3)1; *see also* 12 C.F.R. § 205, App. A-2 — Model Clauses. The Board's reasonable interpretation of the EFTA, as reflected in its regulations, is binding on this Court. *See Chevron U.S.A., Inc. v. Nat'l Res. Def. Council,* 467 U.S. 837, 843-44 (1984); *Perez-Olivo v. Chavez*, 394 F.3d 45, 52-54 (1st Cir. 2005).

More particularly, the Federal Reserve Board has rejected the notion, which the Court accepted, that all allocations of economic value must be disclosed as a "fee" under the EFTA. Mem. at 32-33. Specifically, the Board has taken the position that, under its regulations, actual interest charges deducted from a customer's account (as in a periodic finance charge) need <u>not</u> be disclosed, although such a charge indisputably has economic value and is more akin to a "fee" than are earnings merely foregone. *See* 12 C.F.R. § 205, Supp. I, ¶ 9(b)(3)3 ("The requirement to disclose any fees assessed against the account does not include a finance charge imposed on the account during the statement period."). If actual interest debited from an account is not a "fee," it follows inexorably that a foregone opportunity to earn "interest" cannot be a "fee."

This Court cannot override that regulatory determination on the assumption that institutions might attempt to impose imaginative fee structures not specifically addressed by the statute or current regulations. *See* Mem. at 32-33. The Federal Reserve Board may issue additional regulations to address any such creative abuses. Congress placed the authority to regulate fees with the Board, and the Board's regulatory judgments are entitled to deference. *See Chevron*, 467 U.S. at 843-44.

Expanding the regulatory definitions beyond those prescribed by the Board, moreover, would be a disruptive and unfair surprise to institutions that have long understood that their conduct was not covered by the EFTA. This is particularly so given that the effect of this Court's decision may be to provoke consumer class action litigation against a broad array of financial institutions that had formulated their disclosures by relying in good faith upon the specific categories of "fees" enumerated in regulations implementing the EFTA and various safe harbor model clauses. Indeed, the promise of a "safe harbor" would be eviscerated.

### 3.    Even Assuming Foregone Interest to Be a "Fee," Fidelity Disclosed It.

In any event, even assuming that the requirements of disclosure in the EFTA and the Federal Reserve Board's implementing regulations reach a foregone opportunity to earn interest, Fidelity respectfully submits that the Court erred in concluding that "Fidelity failed to disclose this loss of interest as a fee." Mem. at 33. It was undisputed that Fidelity disclosed that it would debit the Berenson's money market mutual fund one or more days before the Berensons' payees would be credited with the funds, *id.*, and undisputed that Fidelity also disclosed that the Berensons' acccount would cease to accrue dividends ("interest") on the debited amounts as of the next business day after the debit. Defs.' Statement of Facts ¶ 29 [dkt #62]; Pls.' Resp. ¶ 29 [dkt #72]. Fidelity thus unquestionably disclosed the fact that customers would lose the "float" on bill payments if they used the BillPay service. Although the Court's statement that Fidelity that Fidelity failed to disclose the loss of interest "as a fee" is unexplained, it implies that the EFTA requires not only disclosure of the operative facts but also that they be <u>labeled</u> as a "fee." In fact, neither the statute nor the regulations has any such requirement. *See* 15 U.S.C. §§ 1693 *et seq.*; 12 C.F.R. § 205.7. Fidelity indisputably complied with the disclosure requirements of the EFTA even as interpreted by this Court.

### B.    Fidelity Is Not Subject to the MTiSL.

Fidelity respectfully submits that it is not a "bank" or otherwise subject to the MTiSL. Mem. at 35-36.  That position is supported by the statutory definition of "bank," that term's ordinary meaning, and regulations promulgated under the MTiSL.  The broader incompatibility of banking regulations with Fidelity's business further demonstrates that the Massachusetts legislature did not intend to treat Fidelity and other broker-dealers as "banks."  The Court's suggestion otherwise was error.

### 1.    Fidelity Is Not a Bank Within the Meaning of the MTiSL.

The MTiSL applies only to "financial institutions," Mass. Gen. Laws c. 140E, § 2, which are defined as "a state or national bank, a state or federal savings and loan association, a state or federal savings bank, a co-operative bank, a state or federal credit union, or any person doing business similar to any business referred to" in section one of Mass. Gen. Laws. c. 167 governing regulations of banks, Mass. Gen. Laws c. 140E, § 1.  Fidelity is a registered broker dealer and is not chartered as a bank, savings association, or credit union.  Defs.' Statement of Facts ¶ 2 [dkt #62]; Pls.' Resp. ¶ 2 [dkt #72]; App. Defs.' Mot. Summ. J., vol. 2, tab 9 ¶¶ 5-7 (Stickney Aff.) [dkt #67].  It is undisputed that the Massachusetts Commissioner of Banks has never sought to exercise jurisdiction over Fidelity.  App. Defs.' Mot. Summ. J., vol. 2, tab 9 ¶ 6 (Stickney Aff.) [dkt #67]; Pls.' Resp. ¶ 2 [dkt #72].

The Court's decision relies on *First Fiduciary v. Office of the Com'r of Banks*, 43 Mass. App. Ct. 457, to "allow[] for the potential imposition of liability [against Fidelity] under chapter 93A." Mem. at 35.  That reliance is misplaced.  *First Fiduciary* held that a corporate fiduciary was <u>not</u> a bank because, among other reasons, it did not perform the traditional functions of a bank such as "the acceptance of deposits, the discounting of bills and notes, and the making of loans." 43 Mass. App. Ct. at 461.  The same reasoning applies here.  Fidelity does not discount

bills and notes and is not in the business of making loans. While Fidelity and other broker-

dealers make margin loans to facilitate the purchase of securities, they are not in the business of

lending any more than any other company that extends credit to customers or otherwise makes

incidental loans. And though Fidelity accepts customers' funds for investment, these funds are

materially different from bank deposits because they are not (other than what are again in only

incidental transactions) debts to the customer but are rather monies held on the customer's behalf

and at the customer's investment risk. (Indeed, unlike a bank deposit, funds reposed with

Fidelity are not covered by the federal government's deposit insurance program.)

*First Fiduciary* expressly distinguished similar supposed "deposits" accepted by First

Fiduciary from those accepted by banks:

> First Fiduciary does not receive deposits in the sense that a bank
> receives funds from a customer who may draw on them on
> demand, in exchange for which the bank may create earnings by
> lending out the cash from deposits to third parties. Rather, First
> Fiduciary accepts money for the purpose of investment, and the
> beneficial interest in that money and any accession to wealth that
> money generates remain at all times with the original owner. . .
> First Fiduciary, while it invests the money placed in its care, is not
> engaged in the business of money creation through lending.

*Id*. at 462. Under the *First Fiduciary* decision, Fidelity respectfully contends that it may not

properly be deemed a "bank" under c. 167 or, therefore, the MTiSL.

## 2. The Legislature Did Not Intend for Entities Like Fidelity to be Considered "Banks."

While Fidelity believes that the text of the statutes and regulations make the answer to the

question of interpretation clear, consideration of fact that brokerage firms like Fidelity have

never been treated as a bank makes it even more so. Such firms, for example, do not cash Social

Security checks for persons without accounts, *see* Mass. Gen. Laws c. 167, § 46; do not extend

credit and make investments in local communities as required of banks under the Massachusetts

9

version of the Community Reinvestment Act, *see* Mass. Gen. Laws c. 167, § 14; and are not subject to examination by the Commissioner of Banks every eighteen months, *see* Mass. Gen. Laws c. 167, § 2, with the prospect of being taken under the state's control if deemed unsound, *see* Mass. Gen. Laws c. 167, §§ 22, 24, 36A. It bears repeating that the Commissioner has never sought to exercise jurisdiction over Fidelity. *See* App. Defs.' Mot. Summ. J., vol. 2, tab 9 ¶ 6 (Stickney Aff.) [dkt #67]; Pls.' Resp. ¶ 2 [dkt #72]. That absence of jurisdiction, moreover, does not leave a regulatory gap, since Fidelity and other broker-dealers are already heavily regulated by the Securities and Exchange Commission and state securities regulators as well as the New York Stock Exchange and the National Association of Securities Dealers. *Cf. First Fiduciary*, 43 Mass. App. Ct. at 457 n.2 (rejecting argument that decision would leave a regulatory gap over trustees).

### 3.    Neither the Substantive Provisions of the MTiSL Nor the Regulations Promulgated Under the MTiSL Apply to Fidelity.

The catchall language in the MTiSL sweeping in institutions "similar to" banks likewise does not reach Fidelity. The Commissioner of Banks has authority to promulgate rules to effectuate the MTiSL. *See* Mass. Gen. Laws c. 140E, § 2. The sole implementing regulation (not mentioned in the Court's decision) applies only to actual banks. It provides that a "bank which complies with the consumer deposit account disclosure provisions of 12 C.F.R. Part 230 (Regulation DD) or the provisions of 12 C.F.R. Part 707, the implementing regulations to the federal Truth in Savings Act, shall be deemed to be in compliance with M.G.L. c. 140E." 209 CMR § 4.04. By applying only to "bank[s]," that regulation reflects an affirmative interpretation by the Commissioner of Banks that the MTiSL does not apply to broker-dealers such as Fidelity.

Under principles of administrative law, the statutory interpretation of the Commissioner of Banks, as reflected in his regulations, is entitled to deference. *In re Gateley*, 613 N.E.2d 918,

919 (Mass. 1993) ("The interpretation of a statute by the agency charged with primary responsibility for administering it is entitled to substantial deference."); *Cleary v. Cardullo's, Inc.*, 198 N.E.2d 281, 286 (Mass. 1964) (stating that "[s]ignificance in interpretation may be given to a consistent, long continued administrative application of an ambiguous statute.... The best proof, of course, of a consistent administrative interpretation is the administrative body's regulations, or its published written decisions or interpretations") (internal citations omitted).

Even if the MTiSL could be read to permit the Commissioner to apply it to Fidelity, the Commissioner has decided not to so apply it. The MTiSL itself has no prescriptive content and leaves determination of the rules to the Commissioner. *See* Mass. Gen. Laws c. 140E, § 2. The Commissioner has implemented his authority by incorporating regulations under the <u>federal</u> Truth in Savings Act. See 209 CMR § 4.04.[2] The federal regulations in turn apply only to "credit unions" or "depository institutions," terms that do not cover Fidelity or the customer accounts at issue in this case. <u>See</u> 12 C.F.R. § 707.1 (covering "credit unions"); 12 C.F.R. § 230.1 (covering "depository institutions"); 12 U.S.C. § 461(b)(1)(A) (lengthy definition of "depository institution" cross-referencing various classes of national bank, state bank, savings association, and credit union); App. Defs.' Mot. Summ. J., vol. 2, tab 9 ¶¶ 6-7 (Stickney Aff.) [dkt #67].

Finally, even if the MTiSL and implementing regulations could somehow apply to Fidelity, they do not apply to the mutual fund from which the Berensons' bill payments were made. The regulations expressly <u>exclude</u> mutual funds and other investment products from coverage, even when those products are offered by actual banks. *See* 12 C.F.R. § 230.2(a)(3),

---

[2] As noted above, the regulation states that a "bank which complies with the consumer deposit account disclosure provisions of 12 CFR Part 230 (Regulation DD) or the provisions of 12 CFR Part 707, the implementing regulations to the federal Truth in Savings Acts, shall be deemed to be in compliance with M.G.L. c. 140E and 209 CMR 4.00." *See* pp. 7-8, *supra*.

Supplement 1 to Part 230 — Official Staff Interpretations ("The term 'account' does not apply to all products of a depository institution. Examples of products not covered are . . . [m]utual funds."). The MTiSL simply does not provide a basis on which the Berensons can state a claim for relief.

C. **The "Error Resolution" Provisions of the EFTA Cannot Apply to a Customer Who Does Not Allege an Error of the Type Specified.**

Fidelity respectfully contends that the Court's ruling on the scope of the EFTA's error resolution procedures is incorrect. Under the EFTA's "error resolution" provision, a financial institution must respond in writing to a customer's claim that the institution committed "error." 15 U.S.C. § 1693f. The EFTA and implementing regulations expressly limit the scope of "errors" to enumerated examples of "incorrect" or "unauthorized" fund transfers and other specified mistakes. *See* 15 U.S.C. § 1693f; 12 C.F.R. § 205.11.[3] The statute and regulations thus leave no room for the addition of other or broader types of "error" to be developed by common law adjudication. *Cf. Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985) (noting, in an ERISA case, that the "comprehensive and reticulated" nature of the statute provided "strong

---

[3]      "For the purpose of this section, an error consists of —

(1)      an unauthorized electronic fund transfer;
(2)      an incorrect electronic fund transfer from or to the consumer's account;
(3)      the omission from a periodic statement of an electronic fund transfer affecting the consumer's account which should have been included;
(4)      a computational error by the financial institution;
(5)      the consumer's receipt of an incorrect amount of money from an electronic terminal;
(6)      a consumer's request for additional information or clarification concerning an electronic fund transfer or any documentation required by this subchapter; or
(7)      any other error described in regulations of the Board."
15 U.S.C. § 1693f (f). The regulations add to the definition of "error" a request for documentation required for receipts at ATMs or preauthorized transfers or for information to determine whether an error of the preceding types has occurred. *See* 12 C.F.R. § 205.11. None of these additional categories applies in this case.

evidence" that Congress "did not intend to authorize other remedies that it simply forgot to incorporate expressly").

Here, Mr. Berenson complained to Fidelity, first orally and later in writing, about the loss of "interest" on the amounts of his bill payments. The gravamen of his calls and letter was that he did not like what he had discovered to be Fidelity's regular "practice" of debiting his account before his payees were credited with the funds. Whatever its validity, that complaint did not allege an "error" within any one of the statute's or the regulation's specific enumerated definitions.

By contrast, in *Bisbey v. D.C. Nat'l Bank*, 793 F.2d 315 (D.C. Cir. 1986), upon which the Court relied, Mem. at 21-23, the plaintiff had provided notice of what she believed to be a mistaken duplicative electronic transfer, which would constitute an unauthorized or incorrect electronic transfer covered by 15 U.S.C. § 1693f (f)(1) or (2):

> In September 1981, Ms. Bisbey's account lacked sufficient funds
> to cover the [insurance premium], and no transfer was made. Thus,
> the September request was resubmitted by [the insurer] in October,
> along with the latter month's directive. Appellant's funds were
> insufficient to satisfy either submission, both of which were
> covered by the Bank. As a result, two overdraft notices were sent
> to Ms. Bisbey, each in the amount of her monthly insurance
> premium. The appellant, having forgotten her nonpayment in
> September, believed that the Bank had erroneously made two
> payments in October.
>
> At this point, Ms. Bisbey <u>informed a customer representative of the
> Bank that she believed that an error had occurred</u>.

*Id*. at 316 (emphasis added). While it turned out, in fact, that the bank had not made any error, the court found that the bank had violated the EFTA by failing to advise Ms. Bisbey of the results of its investigation in writing. *See id*. at 318. That situation is thus quite unlike what

13

happened here, where the Berensons never even alleged an error, much less one of the type specified for this purpose, and Fidelity had no reason to suppose that the "error resolution" provisions of the EFTA would apply.

### III.    IF THE COURT DOES NOT RECONSIDER ITS RULINGS, THE COURT SHOULD CERTIFY THEM FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(B).

In the event the Court does not revise its conclusions on all of the issues set forth above, it should certify its order and opinion for interlocutory review pursuant to 28 U.S.C. § 1292(b). That statute provides in pertinent part that:

> When a district judge, in making in a civil action an order not otherwise appealable ... shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b). Those criteria are satisfied in this case.

First, as the Court acknowledged, Mem. at 31, the issues in this case involve open questions of controlling law. *See Miara v. First Allmerica Fin. Life Ins. Co.*, 379 F. Supp. 2d 20, 68 (D. Mass. 2005) (Young, C.J.) (internal quotation marks and citations omitted) (certifying issue for interlocutory appeal). Accordingly, there is clearly "substantial ground for difference of opinion." *Id.*

Second, the matters at issue here are extremely important because of the impact that their resolution will have not only on Fidelity but also on other mutual fund companies, broker-dealers, banks, and providers of electronic fund transfer services.

Third, resolving the issues may materially advance the ultimate termination of the litigation. If the Court of Appeals disagrees with this Court's postulate that Fidelity may be a "bank" under the MTiSL, that foregone interest constitutes a "fee," or that the Berensons'

complaint triggered the error resolution requirements of the EFTA, the claims resting on those conclusions of law will be dismissed. In addition, the Court's opinion potentially alters the scope of financial companies' obligations and raises the specter of further class action litigation by customers. Interlocutory appeal is warranted to ward off these consequences and to preserve judicial resources. *See, e.g., Natale v. Pfizer Inc.*, 379 F. Supp. 2d 161, 183 (D. Mass. 2005) (Young, C.J.) (certifying under § 1292(b) where the Court issued a ruling on new law that was also an important and unsettled question of controlling law and there was marked litigant confusion and disagreement in the area), *aff'd*, 424 F.3d 43 (1st Cir. 2005); *Canty v. Old Rochester Reg'l Sch. Dist.*, 54 F. Supp. 2d 66, 77 (D. Mass. 1999) (Young, C.J.) (certifying under § 1292(b) where the Court's ruling concerned an important and unsettled question of controlling law and where reversal on appeal would affect the scope of the case).

## IV.   ALTERNATIVELY, THE COURT SHOULD VACATE ITS RULINGS ON THE MERITS AS INCONSISTENT WITH THE ORDER COMPELLING ARBITRATION.

If the Court chooses not to reconsider or certify these matters for appeal, the Court should partially vacate and withdraw its order of July 13, 2005 to the extent that it concerns the substantive matters addressed in its October 31 Memorandum, and the memorandum itself, because they address issues that should be decided by a panel of arbitrators. The Customer Agreement between the Berensons and Fidelity provides for arbitration of "all controversies that may arise" between them. Mem. Supp. Mot. Compel Arbitration, at 1, 3, 4 [dkt #83]; App. Defs.' Mot. Summ. J., vol. 2, tab 7, ex. A [dkt #67]; *id.* tab 9, ex. A. Although this provision does not apply to a party who has "initiated . . . a putative class action," that restriction on arbitration is expressly removed if class certification is denied. *See* Mem. Supp. Mot. Compel Arbitration, at 1-2, 5-6, 10 [dkt #83]; App. Defs.' Mot. Summ. J., vol. 2, tab 7, ex. A [dkt #67];

*id.* tab 9, ex. A.  At the outset, Fidelity advised the Court of its intent to pursue arbitration in the event the Court denied class certification. Mem. at 3.

Under Sections 3 and 4 of the Federal Arbitration Act, district courts are required to stay court proceedings and compel arbitration on any claim subject to arbitration.  *See* 9 U.S.C. §§ 3, 4.  As explained by the Supreme Court, these provisions reflect a "liberal federal policy favoring arbitration agreements."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  To ensure that parties benefit from their agreement to arbitrate, a court's role in handling claims subject to arbitration is "very limited."  *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567-68 (1960).  Specifically, while a court may address the arbitrability of a claim, it should not pass "on the potential merits of" an arbitrable claim.  *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986); *see also PaineWebber Inc. v. Elahi*, 87 F.3d 589, 595 (1st Cir. 1996) ("issues other than 'arbitrability' are presumptively for the arbitrator").

In this case, when the Court dismissed the class claims in its order of July 13, 2005, the Berensons' individual claims became subject to arbitration.   It is now apparent from the October 31 Memorandum that the Court's decision to dismiss the class claims (and thereby functionally deny class certification) was not based upon the Court's rulings on the application or meaning of the MTiSL or the EFTA, because those rulings were common to the proposed class of Fidelity BillPay customers and thus did not bear on the adequacy or typicality of the Berensons as class representatives under Fed. R. Civ. P. 23.

As of its determination on July 13, 2005, to deny class certification, the Court should have refrained from taking any position on the merits of the Berensons' claims in light of Fidelity's clear right and stated intent to compel arbitration.  In its October 31 Memorandum,

16

however, the Court expressed its view on the merits in several key particulars — such as whether Fidelity is a "financial institution" under the MTiSL, whether forgone opportunity costs constitute a "fee" under the EFTA, and whether the Berensons' complaint triggered the EFTA's "error resolution" provisions.  These issues should be decided by the arbitrators in the first instance.

Indeed, the Court lacked the power to pass on those issues.  Section 3 of the Federal Arbitration Act obliges a district court, on application of one of the parties, to stay court proceedings on claims subject to arbitration until arbitration is complete.  A stay under this provision is akin to a deprivation of jurisdiction.  *See Merit Ins. Co. v. Leatherby Ins. Co.*, 581 F.2d 137, 143 (7th Cir. 1978) (stating that a motion to stay proceedings and compel arbitration is "akin to a challenge to jurisdiction or venue").   Here, Fidelity moved to compel arbitration on August 8, 2005, and the Court granted the motion on August 22, 2005.  As of that time, the Federal Arbitration Act prohibited the Court from issuing an opinion addressing any arbitrable claims.  *See Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1013 -1014 (6th Cir. 2003) (collecting cases holding that district court lacks authority to amend opinion after filing of notice of appeal); *Key Enterprises of Delaware, Inc. v. Venice Hosp.*, 9 F.3d 893, 900 (11th Cir. 1993) (en banc) (withdrawing panel opinion because the case settled before the mandate issued).

By passing on key issues in the case, the Court has potentially prejudiced Fidelity's ability to arbitrate the Berensons' claims.  Fidelity has made clear from the outset of this lawsuit that it seeks to arbitrate those claims, provided the dispute no longer involves class claims.  The Court's October 31 Memorandum creates a Catch-22 for Fidelity with respect to its arbitral demand.  On the one hand, the arbitrators may treat the Court's opinion as binding, particularly

17

because the Court expressly retained jurisdiction with its order of arbitration. *See Office & Professional Employees Intern. Union, Local No. 471 v. Brownsville General Hosp.*, 186 F.3d 326, 334 (3d Cir. 1999). On the other hand, if the arbitrators do not treat the Court's opinion as binding, they may reach conclusions inconsistent with those of the Court, which could spawn needless litigation of which decisionmaker properly stated and applied the law. Either way, Fidelity has been deprived of its full and fair opportunity to obtain a resolution of the parties' dispute through the arbitration that this Court ordered. To prevent prejudice to Fidelity and the arbitration process, the Court should withdraw its order and memorandum as they relate to the Berensons' individual claims and submit the issues to arbitration.

## <u>Conclusion</u>

For the reasons stated above, the Court should reconsider its order and memorandum, certify the issues decided therein for interlocutory appeal, or partially vacate its Order [dkt# 79, dated July 13, 2005] and explanatory Memorandum [dkt # 89, dated October 31, 2005] as they relate to the individual claims of the plaintiffs.

Respectfully submitted,

NATIONAL FINANCIAL SERVICES LLC and
FIDELITY BROKERAGE SERVICES LLC

By their attorneys,


/s/ John A. Shope
Nicholas C. Theodorou (BBO No. 495730)
John A. Shope (BBO No. 562056)
William W. Fick (BBO No. 650562)
David E. Cole (BBO No. 658705)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

*Of counsel:*

David C. Frederick
F. Andrew Hessick III
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL PLLC
Summer Square
1615 M Street, N.W., Suite 400
Washington, DC 20036
(202) 326-7900


Dated:  November 23, 2005


B3128143.1

19